# 14-2491

## United States Court of Appeals
### FOR THE SECOND CIRCUIT

---

BERTRAM HIRSCH, on behalf of themselves and all others similarly situated,

*Plaintiff-Appellee,*

IGOR ROMANOV, on behalf of themselves and all others similarly situated,

*Plaintiff-Appellee,*

v.

CITIBANK, N.A.,

*Defendant-Appellant.*

---

*On Appeal From The United States District Court
for the Southern District of New York*

## JOINT APPENDIX
## VOLUME I OF III
## (PAGES JA 1 – JA 267)

Julia B. Strickland
STROOCK & STROOCK & LAVAN LLP
2029 Century Park East, Suite 1800
Los Angeles, California 90067-3086
Phone: (310) 556-5800
Joseph E. Strauss
STROOCK & STROOCK & LAVAN LLP
180 Maiden Lane
New York, New York 10038-4982
Phone: (212) 806-5400

*Attorneys for Defendant-Appellant Citibank, N.A.*

James C. Kelly
THE LAW OFFICES OF JAMES C. KELLY
477 Madison Avenue, Sixth Floor
New York, New York 10022
Phone: (212) 930-5042
Samuel P. Sporn
SCHOENGOLD & SPORN, P.C.
World Wide Plaza
393 West 49th Street, Suite 5HH
New York, New York, 10019
Phone: (212) 964-0046

*Attorneys for Plaintiffs-Appellees*

# INDEX TO JOINT APPENDIX

S.D.N.Y. Docket Entries for Case No. 12 CV 01124 (DAB)........................................... JA   1

Declaration of Joseph Strauss, filed March 16, 2012 ................................................. JA   10

      Exhibit A – Class Action Complaint, filed February 14, 2012 ......................... JA   12

Declaration of Joan Haslam, filed March 16, 2012 .................................................... JA   37

      Exhibit 1 – Signature Cards for Hirsch Account.................................................. JA   41

      Exhibit 2 – Signature Cards for Romanov Account ............................................ JA   43

      Exhibit 3 – Exemplar of the Citibank Client Manual
      effective January 1, 2010.................................................................................... JA   45

      Exhibit 4 – Exemplar of the Citibank California & Nevada Marketplace
      Addendum effective January 1, 2010 .................................................................. JA   74

Declaration of Bertram Hirsch in Support of Plaintiffs' Opposition to Defendants
Motion to Compel Arbitration and Stay the Action, dated April 12, 2012 ................... JA   123

Declaration of Igor Romanov in Support of Plaintiffs' Opposition to Defendants
Motion to Compel Arbitration and Stay the Action, dated April 12, 2012 ................... JA   127

Declaration of James C. Kelly in Support of Plaintiffs' Opposition to Defendants
Motion to Compel Arbitration and Stay the Action, dated April 17, 2012 ................... JA   130

      Exhibit A – Notice of Removal of Citibank, N.A., dated February 24,2012
      of Plaintiff Igor Romanov's individual small claims ......................................... JA   132

      Exhibit B – Complaint titled *Amer Safadi v. Citibank, N.A.*, No. 12CV1356
      (N.D. Cal. March 19, 2012) ............................................................................... JA   140

      Exhibit C – Notice of Removal of Citibank, N.A., dated February 24,2012
      of Plaintiff Zakmar Katz's individual small claims............................................ JA   167

      Exhibit D – JAMS Policy on Consumer Arbitrations Pursuant to Pre-
      Dispute Clauses Minimum Standards of Procedural Fairness, Effective July
      19, 2009............................................................................................................... JA   175

      Exhibit E – AAA Review of Consumer Clauses, dated October 11, 2002........ JA   180

      Exhibit F – Consumer Due Process Protocol..................................................... JA   183

Exhibit G – Affidavit of Joseph E. Matranga In Support Of Plaintiffs' Opposition To Defendant's Motion To Compel Arbitration And Stay The Action ................................................................................................ JA  220

Hearing Transcript, dated December 20, 2013 ............................................... JA  223

Verified Responses and Objections to Plaintiffs' First Set of Interrogatories, dated December 23, 2013 ................................................................................... JA  249

Hearing Transcript, dated January 27, 2014 .................................................... JA  268

Hearing Exhibits

Exhibit 1 – Citibank Concierge Daily Transaction/Transmittal Report ............ JA  408

Exhibit 2 – Citibank signature card – Bertram Hirsch ...................................... JA  409

Exhibit 3 – Citibank Concierge Daily Transaction/Transmittal Report ............ JA  410

Exhibit 4 – Citibank signature card – Igor Romanov ....................................... JA  411

Exhibit 5 – Client Manual – Consumer Accounts (effective July 1, 2010) ....... JA  412

Exhibit 6 – Marketplace Addendum – New York (effective July, 1 2010) ....... JA  441

Exhibit 7 – Marketplace Addendum – California and Nevada (effective July, 1 2010) ............................................................................................................ JA  467

Exhibit 8 – Personal Banker Foundations – Participant Guide, North America Consumer ............................................................................................ JA  492

Exhibit 9 – Citibank National Form Center and Citibank "Consumer Account Opening" materials ............................................................................. JA  506

Exhibit 10 – "Citi Products Opened/Applied For Today – Effective Date: October 25, 2010" ............................................................................................. JA  514

Exhibit 11 – C2KB Direct Mail 40,000 AA Miles Checking Offer ................. JA  516

Exhibit 12 – Citibank account statement, dated November 25, 2010............... JA  518

Exhibit 13 – Savings/checking accounts statement – Igor Romanov ............... JA  521

Exhibit A – Citibank Privacy Notice for New Customers ............................... JA  525

Exhibit B – Client Manual Cover Page [Not Admitted into Evidence] ............ JA  528

-ii-

Exhibit C – Declaration of Bertram Hirsch in Support of Plaintiffs'
Opposition to Defendant's Motion to Compel Arbitration and Stay the
Action, dated April 12, 2012................................................................................. JA   529

Defendant's Deposition Designations, dated February 14, 2014 ..................................... JA   530

Hearing Transcript, dated February 19, 2014 .................................................. JA   691

Notice of Appeal, dated July 9, 2014............................................................ JA   725

Exhibit A – Memorandum and Order, dated June 10, 2014 ............................. JA   727

STAYED,APPEAL,CASREF,COMPLEX-CSMGMT,ECF

# U.S. District Court
## Southern District of New York (Foley Square)
## CIVIL DOCKET FOR CASE #: 1:12-cv-01124-DAB-JLC

Hirsch et al v. Citibank, N.A.
Assigned to: Judge Deborah A. Batts
Referred to: Magistrate Judge James L. Cott
Demand: $9,999,000
Cause: 28:1332 Diversity-Breach of Contract

Date Filed: 02/14/2012
Jury Demand: Plaintiff
Nature of Suit: 190 Contract: Other
Jurisdiction: Diversity

Plaintiff

| Beltram Hirsch<br>on behalf of themselves and all others<br>similarly situated | represented by | James Clayton Kelly<br>The Law Offices of James C. Kelly<br>244 Madison Avenue, Suite K-278<br>New York, NY 10001<br>(212)-920-5042<br>Fax: (888)-224-2078<br>Email: jkelly@jckellylaw.com<br>LEAD ATTORNEY<br>ATTORNEY TO BE NOTICED |
|---|---|---|
| | | Samuel P. Sporn<br>Schoengold & Sporn, P.C.<br>19 Fulton Street<br>Suite 408<br>New York, NY 10038<br>(212) 964-0046<br>Email: sporn@spornlaw.com<br>LEAD ATTORNEY<br>ATTORNEY TO BE NOTICED |

Plaintiff

| Igor Romanov<br>on behalf of themselves and all others<br>similarly situated | represented by | James Clayton Kelly<br>(See above for address)<br>LEAD ATTORNEY<br>ATTORNEY TO BE NOTICED |
|---|---|---|
| | | Samuel P. Sporn<br>(See above for address)<br>LEAD ATTORNEY<br>ATTORNEY TO BE NOTICED |

V.

Defendant

Citibank, N.A.

represented by  Joseph Eric Strauss
Stroock & Stroock & Lavan LLP
180 Maiden Lane
New York, NY 10038
212-806-5400
Fax: 212-806-1297
Email: jstrauss@stroock.com
LEAD ATTORNEY
ATTORNEY TO BE NOTICED

Julia Beatrice Strickland
Stroock & Stroock & Lavan LLP
2029 Century Park East
Los Angeles, LA 90067
(310)-556-5806
Fax: (310)-556-5959
Email: jstrickland@stroock.com
PRO HAC VICE
ATTORNEY TO BE NOTICED

Monica Hanna
Stroock & Stroock & Lavan LLP
1800 Maiden Lane
New York, NY 10038
(212)-806-6280
Fax: (212)-806-9280
Email: mhanna@stroock.com
ATTORNEY TO BE NOTICED

| Date Filed | # | Docket Text |
|---|---|---|
| 02/14/2012 | 1 | COMPLAINT against Citibank, N.A. (Filing Fee $ 350.00, Receipt Number 9662)Document filed by Beltram Hirsch, Igor Romanov.(ama) (Entered: 02/16/2012) |
| 02/14/2012 | | SUMMONS ISSUED as to Citibank, N.A. (ama) (Entered: 02/16/2012) |
| 02/14/2012 | | Magistrate Judge James L. Cott is so designated. (ama) (Entered: 02/16/2012) |
| 02/14/2012 | | Case Designated ECF. (ama) (Entered: 02/16/2012) |
| 02/14/2012 | 2 | STANDING ORDER IN RE PILOT PROJECT REGARDING CASE MANAGEMENT TECHNIQUES FOR COMPLEX CIVIL CASES IN THE SOUTHERN DISTRICT OF NEW YORK (See M-10-468 Order filed November 1, 2011). This case is hereby designated for inclusion in the Pilot Project Regarding Case Management Techniques for Complex Civil Cases in the Southern District of New York (the Pilot Project), unless the judge to whom this case is assigned determines otherwise. This case is designated for inclusion in the Pilot Project because it is a class action, an MDL action, or is in one of the following Nature of Suit categories: 160, 245, 315, 355, 365, 385, 410, 830, 840, 850, 893, or 950. The presiding judge in a case that does not otherwise qualify for inclusion in the Pilot |

| | | |
|---|---|---|
| | | Project may nevertheless designate the case for inclusion in the Pilot Project by issuing an order directing that the case be included in the Pilot Project. The description of the Pilot Project, including procedures to be followed, is attached to this Order. (Signed by Judge Loretta A. Preska on 10/31/2012) (ama) (Entered: 02/16/2012) |
| 02/28/2012 | 3 | AFFIDAVIT OF SERVICE of Summons and Complaint. Citibank, N.A. served on 2/24/2012, answer due 3/16/2012. Service was accepted by Bik Yang Ng, Authorized Agent. Document filed by Beltram Hirsch; Igor Romanov. (Kelly, James) (Entered: 02/28/2012) |
| 03/16/2012 | 4 | RULE 7.1 CORPORATE DISCLOSURE STATEMENT. Identifying Corporate Parent Citigroup Inc. for Citibank, N.A.. Document filed by Citibank, N.A.. (Strauss, Joseph) (Entered: 03/16/2012) |
| 03/16/2012 | 5 | MOTION to Compel Arbitration. Document filed by Citibank, N.A..(Strauss, Joseph) (Entered: 03/16/2012) |
| 03/16/2012 | 6 | DECLARATION of Joseph E. Strauss in Support re: 5 MOTION to Compel Arbitration.. Document filed by Citibank, N.A.. (Attachments: # 1 Exhibit A) (Strauss, Joseph) (Entered: 03/16/2012) |
| 03/16/2012 | 7 | DECLARATION of Joan Haslam in Support re: 5 MOTION to Compel Arbitration.. Document filed by Citibank, N.A.. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4)(Strauss, Joseph) (Entered: 03/16/2012) |
| 03/16/2012 | 8 | MEMORANDUM OF LAW in Support re: 5 MOTION to Compel Arbitration.. Document filed by Citibank, N.A.. (Attachments: # 1 Addendum Of Unpublished Decisions / Cases)(Strauss, Joseph) (Entered: 03/16/2012) |
| 03/16/2012 | 9 | AFFIDAVIT OF SERVICE. Document filed by Citibank, N.A.. (Strauss, Joseph) (Entered: 03/16/2012) |
| 03/23/2012 | 10 | STIPULATION TO MODIFY BRIEFING SCHEDULE AND RETURN DATE ON DEFENDANT'S MOTION TO COMPEL ARBITRATION: IT IS HEREBY STIPULATED AND AGREED by and between the parties and/or their respective counsel as follows: Plaintiffs' Opposition to Defendant's Motion to Compel shall be filed on April 10, 2012. Citibank's reply to Plaintiffs' Opposition shall be filed on April 24, 2012. The return date for the Motion to Compel is reset for May 1, 2012, at 9:30 a.m. Set Deadlines/Hearing as to 5 MOTION to Compel Arbitration:( Responses due by 4/10/2012, Replies due by 4/24/2012.) (Signed by Judge Deborah A. Batts on 3/23/2012) (mro) (Entered: 03/23/2012) |
| 04/03/2012 | 11 | STIPULATION TO MODIFY BRIEFING SCHEDULE AND RETURN DATE ON DEFENDANT'S MOTION TO COMPEL ARBITRATION: NOW THEREFORE, IT IS HEREBY STIPULATED, by the parties and/or their respective counsel as follows: 1. Plaintiffs' Opposition to the Motion shall be filed by April 17, 2012; 2. Citibank's reply to Plaintiffs' Opposition shall be filed by May 8, 2012; and 3. The return date of the Motion is reset for May 10, 2012 at 9:30 am. (Signed by Judge Deborah A. Batts on 4/3/2012) (mro) (Entered: 04/03/2012) |
| 04/03/2012 | | Set/Reset Deadlines as to 5 MOTION to Compel Arbitration: ( Responses due by 4/17/2012, Replies due by 5/8/2012.) (mro) (Entered: 04/03/2012) |

| 04/17/2012 | 12 | MEMORANDUM OF LAW in Opposition re: 5 MOTION to Compel Arbitration.. Document filed by Beltram Hirsch, Igor Romanov. (Kelly, James) (Entered: 04/17/2012) |
| 04/17/2012 | 13 | DECLARATION of Bertram Hirsch in Opposition re: 5 MOTION to Compel Arbitration.. Document filed by Beltram Hirsch, Igor Romanov. (Kelly, James) (Entered: 04/17/2012) |
| 04/17/2012 | 14 | DECLARATION of Igor Romanov in Opposition re: 5 MOTION to Compel Arbitration.. Document filed by Igor Romanov. (Kelly, James) (Entered: 04/17/2012) |
| 04/17/2012 | 15 | DECLARATION of James C. Kelly in Opposition re: 5 MOTION to Compel Arbitration.. Document filed by Beltram Hirsch, Igor Romanov. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G)(Kelly, James) (Entered: 04/17/2012) |
| 05/08/2012 | 16 | DECLARATION of Joseph E. Strauss in Support re: 5 MOTION to Compel Arbitration.. Document filed by Citibank, N.A.. (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Strauss, Joseph) (Entered: 05/08/2012) |
| 05/08/2012 | 17 | REPLY MEMORANDUM OF LAW in Support re: 5 MOTION to Compel Arbitration.. Document filed by Citibank, N.A.. (Strauss, Joseph) (Entered: 05/08/2012) |
| 05/09/2012 | 18 | MOTION for Julia B. Strickland to Appear Pro Hac Vice. Document filed by Citibank, N.A.(pgu) (Entered: 05/10/2012) |
| 05/10/2012 | | CASHIERS OFFICE REMARK on 18 Motion to Appear Pro Hac Vice in the amount of $200.00, paid on 05/09/2012, Receipt Number 1037746. (jd) (Entered: 05/10/2012) |
| 08/09/2012 | 19 | ORDER granting 18 Motion for Julia B. Strickland to Appear Pro Hac Vice. (Signed by Judge Deborah A. Batts on 5/25/2012) (ama) (Entered: 08/09/2012) |
| 11/19/2012 | 20 | NOTICE OF CHANGE OF ADDRESS by James Clayton Kelly on behalf of Beltram Hirsch, Igor Romanov. New Address: The Law Office of James C. Kelly, 244 5th Avenue, Suite K-278, New York, New York, US 10001, 212-920-5042. (Kelly, James) (Entered: 11/19/2012) |
| 03/28/2013 | 21 | MEMORANDUM AND ORDER denying 5 Motion to Compel Arbitration. For the foregoing reasons, Defendant's Motion to Compel Arbitration is DENIED. Defendant is instructed to answer the Complaint within twenty-one (21) days of the date of entry of this Order. (Signed by Judge Deborah A. Batts on 3/28/2013) (ago) Modified on 3/29/2013 (ago). (Entered: 03/28/2013) |
| 03/29/2013 | 22 | NOTICE OF INTERLOCUTORY APPEAL from 21 Order on Motion to Compel Arbitration,. Document filed by Citibank, N.A.. Filing fee $ 455.00, receipt number 0208-8370051. Form C and Form D are due within 14 days to the Court of Appeals, Second Circuit. (Strauss, Joseph) (Entered: 03/29/2013) |
| 03/29/2013 | | Transmission of Notice of Appeal and Certified Copy of Docket Sheet to US Court of Appeals re: 22 Notice of Interlocutory Appeal. (tp) (Entered: 03/29/2013) |
| 03/29/2013 | | Appeal Record Sent to USCA (Electronic File). Certified Indexed record on Appeal |

Electronic Files for 20 Notice of Change of Address filed by Beltram Hirsch, Igor Romanov, 13 Declaration in Opposition to Motion filed by Beltram Hirsch, Igor Romanov, 9 Affidavit of Service Other filed by Citibank, N.A., 2 Standing Order re Complex Civil Cases, 22 Notice of Interlocutory Appeal, filed by Citibank, N.A., 15 Declaration in Opposition to Motion, filed by Beltram Hirsch, Igor Romanov, 1 Complaint filed by Beltram Hirsch, Igor Romanov, 18 MOTION for Julia B. Strickland to Appear Pro Hac Vice filed by Citibank, N.A., 7 Declaration in Support of Motion filed by Citibank, N.A., 4 Rule 7.1 Corporate Disclosure Statement filed by Citibank, N.A., 16 Declaration in Support of Motion filed by Citibank, N.A., 3 Affidavit of Service Complaints filed by Beltram Hirsch, Igor Romanov, 10 Stipulation and Order, Set Motion and R&R Deadlines/Hearings, 11 Stipulation and Order, Set Deadlines, 12 Memorandum of Law in Opposition to Motion filed by Beltram Hirsch, Igor Romanov, 6 Declaration in Support of Motion filed by Citibank, N.A., 8 Memorandum of Law in Support of Motion filed by Citibank, N.A., 5 MOTION to Compel Arbitration filed by Citibank, N.A., 17 Reply Memorandum of Law in Support of Motion filed by Citibank, N.A., 21 Order on Motion to Compel Arbitration, 14 Declaration in Opposition to Motion filed by Igor Romanov, 19 Order on Motion to Appear Pro Hac Vice were transmitted to the U.S. Court of Appeals. (tp) (Entered: 03/29/2013)

| 04/19/2013 | 23 | STIPULATION EXTENDING TIME TO ANSWER COMPLAINT: IT IS HEREBY STIPULATED, by the parties and/or their respective counsel that Citibank's answer to the Complaint shall be due by May 8, 2013. Citibank, N.A. answer due 5/8/2013. (Signed by Judge Deborah A. Batts on 4/19/2013) (cd) Modified on 4/24/2013 (cd). (Entered: 04/22/2013) |
| 05/08/2013 | 24 | ANSWER to 1 Complaint. Document filed by Citibank, N.A..(Strauss, Joseph) (Entered: 05/08/2013) |
| 05/13/2013 | 25 | ENDORSED LETTER addressed to Judge Deborah A. Batts from Joseph E. Strauss dated 5/1/2013 re: We represent defendant Citibank, N.A. ("Citibank") in the above-referenced action. Pursuant to Rule II.B.1 of Your Honor's Rules, we respectfully write to request a pre-motion conference prior to moving, pursuant to Federal Rule of Appellate Procedure 8(a)(1)(A), for an Order staying this matter pending Citibank's appeal of the Court's Memorandum and Order dated March 28, 2013 (the "Decision"). ENDORSEMENT: Stay pending appeal denied. Rule 16 conference scheduled for Thursday September 12, 2013 at 11:30 AM. (Initial Conference set for 9/12/2013 at 11:30 AM before Judge Deborah A. Batts.) (Signed by Judge Deborah A. Batts on 5/13/2013) (ft) (Entered: 05/14/2013) |
| 07/08/2013 | 26 | ORDER of USCA (Certified Copy) as to 22 Notice of Interlocutory Appeal, filed by Citibank, N.A. USCA Case Number 13-1172. Appellant, through counsel, moves for a stay of further proceedings in the district court pending its interlocutory appeal of the district court's order denying its motion to compel arbitration. Upon due consideration, it is hereby ORDERED that the Appellant's motion for a stay pending appeal is DENIED. First, contrary to the Appellant's argument, its interlocutory notice of appeal does not divest the district court of jurisdiction to conduct further proceedings in this matter. See Motorola Credit Corp. v. Uzan, 388 F.3d 39, 53-54 (2d Cir. 2004). Second, the Appellant has not met its burden of showing that a stay of the district court proceedings is justified in this situation. See McCue v. City of New York (In re World Trade Ctr. DisasterSite Litig.), 503 F.3d 167, 170 (2d Cir. 2007). It is further ORDERED that, pursuant to |

| | | |
|---|---|---|
| | | Federal Rule of Appellate Procedure 2, this appeal shall be heard on an expedited basis. Appellant's brief shall be filed 21 days after the entry of this order. Appellee's brief shall be filed 21 days after Appellant's brief is filed. A reply brief, if any, shall be filed 7 days after Appellee's brief is filed. There will be no extensions of the briefing schedule. Argument may be set as early as the second week in September. Catherine O'Hagan Wolfe, Clerk USCA for the Second Circuit. Certified: 07/08/2013. (nd) (Entered: 07/09/2013) |
| 08/09/2013 | 27 | ENDORSED LETTER addressed to Judge Deborah A. Batts from Joseph E. Strauss dated 8/08/2013 re: I respectfully request no more than a one week adjournment of the initial case management conference currently scheduled for September 12, 2013. ENDORSEMENT: GRANTED. Conference to be held on September 19, 2013 at 10:30 a.m., ( Initial Conference set for 9/19/2013 at 10:30 AM before Judge Deborah A. Batts.) (Signed by Judge Deborah A. Batts on 8/09/2013) (ama) (Entered: 08/09/2013) |
| 09/12/2013 | 28 | INITIAL REPORT OF PARTIES BEFORE PRETRIAL CONFERENCE. Document filed by Beltram Hirsch, Igor Romanov. (Attachments: # 1 Exhibit A) (Kelly, James) (Entered: 09/12/2013) |
| 09/19/2013 | 29 | SCHEDULING ORDER: Estimated trial time is 3 days. This is a jury trial. Discovery due by 9/9/2014. Expert Discovery due by 9/9/2014. Status Conference set for 10/23/2014 at 11:00 AM before Judge Deborah A. Batts. Parties to keep Court apprised of status of this case in the 2nd Circuit. (Signed by Judge Deborah A. Batts on 9/19/2013) (ft) (Entered: 09/19/2013) |
| 10/22/2013 | 30 | ORDER of USCA (Certified Copy) as to 22 Notice of Interlocutory Appeal, filed by Citibank, N.A. USCA Case Number 13-1172-cv. Upon due consideration, it is hereby ordered, adjudged, and decreed that the judgment of the District Court is VACATED and the case is REMANDED to the District Court for further proceedings. Catherine O'Hagan Wolfe, Clerk USCA for the Second Circuit. Certified: 10/22/2013. (nd) (Entered: 10/22/2013) |
| 11/14/2013 | 31 | MANDATE of USCA (Certified Copy) as to 22 Notice of Interlocutory Appeal, filed by Citibank, N.A. USCA Case Number 13-1172-cv. Upon due consideration, it is hereby ordered, adjudged, and decreed that the judgment of the District Court is VACATED and the case is REMANDED to the District Court for further proceedings. Catherine O'Hagan Wolfe, Clerk USCA for the Second Circuit. Issued As Mandate: 11/14/2013. (nd) (Entered: 11/14/2013) |
| 11/21/2013 | 32 | NOTICE OF APPEARANCE by Samuel P. Sporn on behalf of Beltram Hirsch, Igor Romanov. (Sporn, Samuel) (Entered: 11/21/2013) |
| 11/25/2013 | 33 | ORDER: The Court shall hold a hearing on the issues raised in the November 14, 2013 Mandate and Summary Order of the United States Court of Appeals for the Second Circuit. In preparation for the hearing, Parties shall immediate commence discovery, limited solely to the issues raised in the Mandate and Summary Order, and shall conclude discovery by January 10, 2014. The hearing will be held on Monday, January 27, 2014 at 10:00 a.m. Discovery due by 1/10/2014. Status Conference set for 1/27/2014 at 10:00 AM before Judge Deborah A. Batts. (Signed by Judge Deborah A. Batts on 11/25/2013) (ft) (Entered: 11/25/2013) |
| 12/11/2013 | | ***DELETED DOCUMENT. Deleted document number 34 ORDER OF REFERENCE TO A MAGISTRATE JUDGE. The document was incorrectly |

filed in this case. (ft)  (Entered: 12/12/2013)

| 12/11/2013 | 34 | ORDER REFERRING CASE TO MAGISTRATE JUDGE. Order that case be referred to the Clerk of Court for assignment to a Magistrate Judge for Specific Non-Dispositive Motion/Dispute: Discovery Dispute in Defendant's 12/10/13 Letter and Plaintiffs' 12/9/13 Letter. Referred to Magistrate Judge James L. Cott. (Signed by Judge Deborah A. Batts on 12/11/2013) (ft) (Entered: 12/12/2013) |
| --- | --- | --- |
| 12/13/2013 | 35 | ORDER: On December 11, 2013, Judge Batts referred this case to me to resolve a specific discovery dispute. (Dkt. No. 34). Accordingly, the Court will hold a conference on December 20, 2013 at 9:30 a.m. in Courtroom 21-D, United States Courthouse, 500 Pearl Street, New York, New York. SO ORDERED.( Discovery Hearing set for 12/20/2013 at 09:30 AM in Courtroom 21D, 500 Pearl Street, New York, NY 10007 before Magistrate Judge James L. Cott.) (Signed by Magistrate Judge James L. Cott on 12/13/2013) (ama) (Entered: 12/13/2013) |
| 12/20/2013 | | Minute Entry for proceedings held before Magistrate Judge James L. Cott: Interim Pretrial Conference held on 12/20/2013. (Tam, David) (Entered: 01/08/2014) |
| 01/07/2014 | 36 | ORDER: The Court is in receipt of Plaintiffs' January 3, 2014 letter requesting an extension of discovery, and Defendant's January 6, 2014 reply letter. The discovery, which is limited solely to the issues raised in the November 14, 2013 Mandate and Summary Order of the United States Court of Appeals for the Second Circuit, is HEREBY extended and shall conclude by January 17, 2014. The hearing shall go forward as scheduled on Monday, January 27, 2014 at 10:00 a.m. Discovery due by 1/17/2014. (Signed by Judge Deborah A. Batts on 1/7/2014) (ft) (Entered: 01/07/2014) |
| 01/10/2014 | 37 | TRANSCRIPT of Proceedings re: CONFERENCE held on 12/20/2013 before Magistrate Judge James L. Cott. Court Reporter/Transcriber: Sabrina D'Emidio, (212) 805-0300. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 2/3/2014. Redacted Transcript Deadline set for 2/13/2014. Release of Transcript Restriction set for 4/14/2014.(McGuirk, Kelly) (Entered: 01/10/2014) |
| 01/10/2014 | 38 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT Notice is hereby given that an official transcript of a CONFERENCE proceeding held on 12/20/13 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days...(McGuirk, Kelly) (Entered: 01/10/2014) |
| 01/23/2014 | 39 | BRIEF : Pre-Hearing Brief . Document filed by Citibank, N.A.. (Attachments: # 1 Appendix, # 2 Ashley Transcript, # 3 Hirsch Transcript, # 4 Lewis Transcript, # 5 Romanov Transcript, # 6 Safir Transcript, # 7 Zubair Transcript, # 8 Exhibit A, # 9 Exhibit B, # 10 Exhibit C, # 11 Exhibit D, # 12 Exhibit E - 1, # 13 Exhibit E - 2, # 14 Exhibit E - 3, # 15 Exhibit E - 4, # 16 Exhibit F, # 17 Exhibit G - 1, # 18 Exhibit G - 2, # 19 Exhibit G - 3, # 20 Exhibit H, # 21 Exhibit I, # 22 Exhibit J, # 23 Exhibit K, # 24 Exhibit L, # 25 Exhibit M, # 26 Exhibit N)(Strauss, Joseph) (Entered: 01/23/2014) |

| 01/27/2014 | [40](#) | BRIEF Plaintiffs' Pre-Hearing Brief . Document filed by Beltram Hirsch, Igor Romanov. (Attachments: # [1](#) Exhibit A, # [2](#) Exhibit B, # [3](#) Exhibit C, # [4](#) Exhibit D)(Kelly, James) (Entered: 01/27/2014) |
|---|---|---|
| 01/27/2014 | | Minute Entry for proceedings held before Judge Deborah A. Batts: Post-Remand Hearing held on 1/27/2014. Samuel P. Sporn and James C. Kelly appeared as counsel for the plaintiffs. Joseph Strauss and Julia Strickland appeared for the defendants. Plaintiff's witness was Bertram Hirsch. Defendant's witness was George Lotto. The hearing was held and adjourned. Hearing will reconvene on 2/19/14. (sc) (Entered: 01/28/2014) |
| 02/05/2014 | [41](#) | TRANSCRIPT of Proceedings re: HEARING held on 1/27/2014 before Judge Deborah A. Batts. Court Reporter/Transcriber: Paula Speer, (212) 805-0300. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 3/3/2014. Redacted Transcript Deadline set for 3/13/2014. Release of Transcript Restriction set for 5/9/2014.(Rodriguez, Somari) (Entered: 02/05/2014) |
| 02/05/2014 | [42](#) | NOTICE OF FILING OF OFFICIAL TRANSCRIPT Notice is hereby given that an official transcript of a HEARING proceeding held on 1/27/14 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days... (Rodriguez, Somari) (Entered: 02/05/2014) |
| 02/12/2014 | [43](#) | Exhibit List Deposition Designations. Document filed by Beltram Hirsch, Igor Romanov. (Attachments: # [1](#) Michael Ashley, # [2](#) Bertram Hirsch, # [3](#) Nancy Lewis, # [4](#) Igor Romanov, # [5](#) Vivian Safir, # [6](#) Jackline Sarraf, # [7](#) Fazri Zubair) (Kelly, James) (Entered: 02/12/2014) |
| 02/14/2014 | [44](#) | Exhibit List : Defendant Citibank, N.A.'S Deposition Designations And Counter-Designations. Document filed by Citibank, N.A.. (Attachments: # [1](#) Michael Ashley, # [2](#) Bertram Hirsch, # [3](#) Nancy Lewis, # [4](#) Igor Romanov, # [5](#) Vivian Safir, # [6](#) Jackline Sarraf, # [7](#) Fazri Zubair)(Strauss, Joseph) (Entered: 02/14/2014) |
| 02/19/2014 | | Minute Entry for proceedings held before Judge Deborah A. Batts: Evidentiary Hearing held and concluded on 2/19/2014. Summations are heard. Decision reserved. (Landers, Rigoberto) (Entered: 02/19/2014) |
| 02/28/2014 | [45](#) | LETTER addressed to Judge Deborah A. Batts from Joseph E. Strauss dated February 28, 2014 re: Mandatory Arbitration. Document filed by Citibank, N.A.. (Strauss, Joseph) (Entered: 02/28/2014) |
| 03/25/2014 | [46](#) | TRANSCRIPT of Proceedings re: ARGUMENT held on 2/19/2014 before Judge Deborah A. Batts. Court Reporter/Transcriber: Pamela Utter, (212) 805-0300. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 4/18/2014. Redacted Transcript Deadline set for 4/28/2014. Release of Transcript Restriction set for 6/26/2014.(Rodriguez, Somari) (Entered: 03/25/2014) |
| 03/25/2014 | [47](#) | NOTICE OF FILING OF OFFICIAL TRANSCRIPT Notice is hereby given that an |

| | | |
|---|---|---|
| | | official transcript of a ARGUMENT proceeding held on 2/19/14 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days... (Rodriguez, Somari) (Entered: 03/25/2014) |
| 06/10/2014 | 48 | MEMORANDUM AND ORDER: For the foregoing reasons, Defendant's Motion to Compel Arbitration and Request to Stay the Action is DENIED. All discovery, including expert discovery, shall be completed by October 31, 2014. A conference in this matter will be held on November 20, 2014 at 11:00 a.m. (Discovery due by 10/31/2014, Expert Discovery due by 10/31/2014.) (Status Conference set for 11/20/2014 at 11:00 AM before Judge Deborah A. Batts.) (Signed by Judge Deborah A. Batts on 6/10/2014) (tn) (Entered: 06/10/2014) |
| 06/13/2014 | 49 | NOTICE OF APPEARANCE by Monica Hanna on behalf of Citibank, N.A.. (Hanna, Monica) (Entered: 06/13/2014) |
| 07/09/2014 | 50 | NOTICE OF APPEAL from 48 Order, Set Deadlines, Set Hearings,,,,,,. Document filed by Citibank, N.A.. Filing fee $ 505.00, receipt number 0208-9866781. Form C and Form D are due within 14 days to the Court of Appeals, Second Circuit. (Strauss, Joseph) (Entered: 07/09/2014) |
| 07/09/2014 | | Transmission of Notice of Appeal and Certified Copy of Docket Sheet to US Court of Appeals re: 50 Notice of Appeal,. (nd) (Entered: 07/09/2014) |
| 07/09/2014 | | Appeal Record Sent to USCA (Electronic File). Certified Indexed record on Appeal Electronic Files for 50 Notice of Appeal, filed by Citibank, N.A. were transmitted to the U.S. Court of Appeals. (nd) (Entered: 07/09/2014) |
| 08/28/2014 | 51 | ENDORSED LETTER addressed to Judge Deborah A. Batts from Joseph E. Strauss, dated 8/6/2014 re: request a pre-motion conference prior to moving, pursuant to Federal Rule of Appellate Procedure 8(a)(1)(A), for an Order staying this matter.... ENDORSEMENT: Stay pending appeal granted. Conference scheduled for 11/20/2014 adjourned sine die. SO ORDERED.. (Signed by Judge Deborah A. Batts on 8/28/2014) (ja) (Entered: 08/28/2014) |

| PACER Service Center | | |
|---|---|---|
| Transaction Receipt | | |
| 10/13/2014 13:39:37 | | |
| PACER Login: | ss0143:2639384:0 | Client Code: | 720675-0436-5710 |
| Description: | Docket Report | Search Criteria: | 1:12-cv-01124-DAB-JLC |
| Billable Pages: | 8 | Cost: | 0.80 |

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------- X
                                  :

BERTRAM HIRSCH and IGOR ROMANOV, on   :
behalf of themselves and all others similarly situated, :

                Plaintiffs,         :

                :       Case No. 12 Civ. 1124 (DAB)
    vs.                    :

                          :      **DECLARATION OF**
CITIBANK, N.A.,                 :      **JOSEPH E. STRAUSS**

                Defendant.      :
-------------------------------------------------------------- X

        JOSEPH E. STRAUSS, under penalty of perjury, declares:

        1.       I am an attorney with Stroock & Stroock & Lavan LLP, counsel for Defendant

Citibank, N.A. ("Citibank") in the above-captioned action.  I submit this Declaration to present

to the Court documents cited in, but not annexed to, Citibank's memorandum of law in support

of its Motion, pursuant to the Federal Arbitration Act, 9 U.S.C. § 1 <u>et seq.</u>, to Compel Arbitration

and Stay the Action.

        2.       Attached hereto as Exhibit A is a true and correct copy of the Class Action

Complaint (the "Complaint"), dated February 14, 2012, and the exhibit annexed to the

Complaint.

        I declare under penalty of perjury that the foregoing is true and correct.

Dated: New York, New York
       March 16, 2012

                         <u>/s/ Joseph E. Strauss</u>
                          Joseph E. Strauss

# Exhibit A

Case 1:12-cv-01124-DAB-JLC Document 36-1 Filed 03/16/12 Page 2 of 26
JA 12
Case 1:12-cv-01124-DAB Document 1 Filed 02/14/12 Page 1 of 25

JUDGE BATTS

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT NEW YORK**

12 CIV 1124

| | |
|---|---|
| BERTRAM HIRSCH and IGOR ROMANOV, on behalf of themselves and all others similarly situated, | Case No. |
| Plaintiffs, | CLASS ACTION COMPLAINT |
| | JURY TRIAL DEMANDED |
| vs. | ECF CASE |
| CITIBANK N.A., | |
| Defendant | |

DOC #

FILED
U.S. DISTRICT COURT
S.D. OF N.Y.
12 FEB 14 PM 1:55

## CLASS ACTION COMPLAINT

Plaintiffs Bertram Hirsch and Igor Romanov ("Plaintiffs"), by and through their undersigned counsel, upon personal knowledge as to themselves and upon information and belief as to all other matters, allege as follows:

1. Plaintiffs bring this action against defendant Citibank, N.A. ("Citibank" or "Defendant"), on behalf of themselves and all other similarly situated individuals and entities who opened up bank accounts with Citibank in exchange for airline miles during the period between January 1, 2009 and the date of the final disposition of this action (as defined below, the "Class").

## SUMMARY

2. This is a class action against Citibank for unfair and deceptive trade practices concerning airline miles Citibank provides to customers for opening up bank accounts and depositing money at the bank.

Case 1:12-cv-01124-DAB-JLC Document 106-1, Filed 03/16/21 Page 3 of 26
JA 13
Case 1:12-cv-01124-DAB Document 1 Filed 02/14/12 Page 2 of 25

3. Citibank regularly offers promotional American Airline miles to induce customers to open up checking or savings accounts at Citibank, usually with a minimum deposit of $25,000.

4. What Citibank does not disclose to customers who take advantage of the American Airline miles promotions is that Citibank will file with the Internal Revenue Service ("IRS") a 1099-MISC reporting that they received miscellaneous income, in the amount of 2.5 cents per mile, for the American Airlines miles provided to such customers.

5. It is widely understood in the marketplace that airline miles are not reported to the IRS as being taxable for income tax purposes. Indeed, Citibank expressly informed Plaintiff Hirsch that the American Airline miles that he would receive for opening up Citibank checking and savings accounts were not taxable.

6. Even if the airline miles were taxable, Citibank's practice of valuing the airline miles at 2.5 cents per mile is grossly unfair and deceptive. Airline miles have no value to Citibank customers that can be fixed at the time they are awarded. If redeemed, these miles typically have an average value to customers of between .76 cents per mile and 1.2 cents per mile. At least one study recently concluded that American Airline miles in particular are only worth about .76 cents per mile.

7. Citibank failed to make these material disclosures because it knew that very few customers, if any, would take advantage of the airline miles offers because they did not make economical sense. Citibank benefits from this practice by gaining additional banking business and savings deposits from which it could lend out at much higher interests rates than the low interest rates paid to Plaintiffs and the members of the Class.

Case 1:12-cv-01124-DAB Document 46-1 Filed 03/16/12 Page 4 of 26
JA 14
Case 1:12-cv-01124-DAB Document 1 Filed 02/14/12 Page 3 of 25

8.    On January 30, 2012, United States Senator Sherrod Brown, Chairman of the U.S. Senate Banking Subcommittee on Financial Institutions and Consumer Protection, sent a letter to Citigroup's CEO, requesting that Citibank stop issuing 1099 forms to customers and noted that Citibank "arbitrarily calculates the value of each frequent flier mile as 2.5 cents." In a newspaper interview response, Citibank stated that it is required by law to issue 1099 forms to customers, and implied that it would continue the practice notwithstanding it was grossly misstating the value of the airline miles.

9.    Plaintiffs, on behalf of themselves and all others similarly-situated, seek 1) monetary damages fully compensating all individuals and entities for the taxes that they paid or owe, and any other financial injury suffered as a result of Citibank's deceptive practices, including the lost opportunity of investment for the money provided to Citibank in exchange for the airline miles; 2) injunctive relief requiring Citibank to clearly disclose in future airline miles promotions: a) that Citibank will report to the IRS that a customer has received miscellaneous taxable income as a result of the receipt of the airline miles; and b) the amount of additional income that would be reported by Citibank on the 1099; and 3) such other relief as the Court deems necessary and appropriate.

## THE PARTIES

10.    Plaintiff Bertram Hirsch is a citizen of the State of New York. Plaintiff Hirsch opened up Citibank checking and savings accounts in the state of New York and was financially injured as a result of Defendant's improper conduct as alleged herein.

11.    Plaintiff Igor Romanov is a citizen of the State of California. Mr. Romanov opened up a Citibank bank account in the state of California and was financially injured as a result of Defendant's improper conduct as alleged herein.

3

Case 1:12-cv-01124-DAB Document 16-1 Filed 03/16/12 Page 5 of 26
JA 15
Case 1:12-cv-01124-DAB Document 1 Filed 02/14/12 Page 4 of 25

12.     Defendant Citibank N.A. ("Citibank") is a commercial bank and wholly owned subsidiary of Citigroup, Inc.  Citibank is incorporated in Delaware and its principal place of business is located at 399 Park Avenue, New York, New York.  Citibank has retail banking operations in more than 100 countries and territories around the world.  More than half of its 1,400 offices are in the United States, mostly in New York City, Chicago, Los Angeles, the San Francisco Bay Area, Washington, D.C. and Miami.  More recently, Citibank has expanded its operations in the Boston, Philadelphia, Houston, and Dallas metropolitan areas.

13.     Whenever, in this Complaint, reference is made to any act, deed, or conduct of Citibank, the allegation means that Citibank engaged in the act, deed, or conduct by or through one or more of its officers, directors, agents, employees or representatives who was actively engaged in the management, direction, control or transaction of the ordinary business and affairs of Citibank.

## JURISDICTION AND VENUE

14.     This Court has original diversity jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2) ("CAFA").  Plaintiffs are citizens of the State of California and New York, and Defendant is a citizen of the State of Delaware and is headquartered with its principal place of business in the State of New York.  The matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and this is a class action in which the number of members of the proposed class is not less than 100.

15.     In addition, this Court has diversity jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1332(a).  The matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and members of the proposed class are citizens of States different from the State in which Defendant is a citizen.

16.     Venue is proper pursuant to 28 U.S.C. § 1391.  A substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this judicial district.  Further, Defendant resides in this judicial district for purposes of § 1391.  Also, Defendant has used the laws within, and has done substantial business in, this judicial district in that it has promoted, marketed, distributed, and sold the promotional airline products at issue in this judicial district.  The unlawful conduct complained of herein arose in and emanated from business decisions made in this judicial district.  Finally, there is personal jurisdiction over Defendant in this judicial district

## FACTUAL ALLEGATIONS

**Plaintiff Bertram Hirsch is Financially Injured as a Result of Citibank's Unfair and Deceptive Banking Practices**

17.     On October 6, 2010, Mr. Hirsch received an offer from Citibank in the mail stating that it was offering its Citi/AAdvantage customers with Citibank's "most rewarding AAdvantage bonus miles offer yet for new accounts." *See* Exhibit A attached hereto.  Citibank offered 40,000 American Airline miles to new banking customers if they opened up a checking and savings account with a minimum deposit of $25,000 and used the debit card associated with these accounts for a certain number of times thereafter.

18.     Mr. Hirsch was interested in the promotion but concerned as to whether the airline miles would be taxable because the fine print in the offer letter stated, "Customer is responsible for taxes, if any."

19.     Mr. Hirsch, a semi-retired lawyer had to be careful that his earned income and income from miscellaneous sources did not exceed a certain threshold because he could lose a portion of his social security retirement benefits if the threshold was exceeded.

Case 1:12-cv-01124-DAB Document 46-1 Filed 03/16/12 Page 21 of 26
Case 1:12-cv-01124-DAB Document 1 Filed 02/14/12 Page 6 of 25
JA-17

20.    Mr. Hirsch went to his local branch and asked the Citibank representative if the airline miles in the promotion were taxable, to which the Citibank representative responded that they were not.

21.    Mr. Hirsch then signed up for a banking and checking account and fulfilled the remaining terms of the offer, and received 40,000 American Airline miles in early 2011.

22.    In January 2012, Mr. Hirsch received a 1099 form from Citibank stating that he must report $1,000 as miscellaneous income. Mr. Hirsch did not understand what the 1099 was for and went back to his local branch. At the branch, Citibank representatives also did not know what the 1099 was for, again confirmed that the 40,000 American Airline miles that Mr. Hirsch received were not taxable, and stated that he should initiate an internal investigation with Citibank in an attempt to resolve the issue. Mr. Hirsch did so.

23.    Finally, Mr. Hirsch received a letter from Citibank stating that the American Airline miles were taxable under federal law and that the bank was correct in reporting the income to the IRS. No Internal Revenue Code provision or associated regulation was referenced.

24.    Citibank valued the 40,000 miles that Mr. Hirsch received at 2.5 cents per mile, or $1,000.

25.    Mr. Hirsch has not redeemed any of the 40,000 American Airline miles he received from Citibank.

26.    If Citibank adequately disclosed that Mr. Hirsch would have had to report $1,000 in additional miscellaneous income for tax purposes as a result of receiving the 40,000 American Airline miles, Plaintiff would have never opened up a bank account with Citibank.

Case 1:12-cv-01124-DAB Document 4 Filed 03/16/12 Page 7 of 26
JA 18
Case 1:12-cv-01124-DAB Document 1 Filed 02/14/12 Page 7 of 25

**Plaintiff Igor Romanov is Financially Injured as a Result of Citibank's Unfair and Deceptive Banking Practices**

27.     Citibank offered Mr. Romanov a bonus of 40,000 American Airline miles if he opened up an account with an initial deposit of $25,000 at Citibank and used his debit card for a certain amount of times thereafter.

28.     In, or around, November 2010, Mr. Romanov opened up an account at Citibank, deposited a minimum of $25,000, used his debit card for the required amount of times, and soon thereafter, received his American Airline miles.

29.     In early 2012, Mr. Romanov received a 1099 form from Citibank stating that he must report $1,000 as additional income on his tax return, for the 40,000 American Airline miles he received. This amounts to 2.5 cents per mile.

30.     Mr. Romanov was never informed that he would have to pay income tax on the American Airline miles or that the income was based on a grossly overstated value of 2.5 cents per mile.

31.     If Citibank adequately disclosed that Mr. Romanov would have had to report $1,000 in additional income for tax purposes as a result of receiving the 40,000 American Airline miles, he would have never opened up a bank account with Citibank.

32.     Mr. Romanov complained to Citibank about the 2.5 per cent valuation. Mr. Romanov offered to sell airline miles back to Citibank and, alternatively, requested that Citibank help him pay the taxes on the airline miles. Citibank declined to help him and stated that there was nothing that Citibank could do about it.

Case 1:12-cv-01124-DAB Document 1 Filed 08/16/12 Page 9 of 26
JA-19
Case 1:12-cv-01124-DAB Document 1 Filed 02/14/12 Page 8 of 25

**Citibank Regularly Deceives Customers Through American Airline Promotions in Order to Obtain Banking Business and Build Up Cash Deposits at the Bank**

33.     Citibank regularly offers promotional American Airline miles to customers as an incentive to induce the opening of new checking and savings accounts.

34.     What Citibank does not tell customers who take advantage of the American Airline miles promotions is that for income tax purposes, Citibank will report to the Internal Revenue Service ("IRS") that the miles that the customers receive are to be reported by the customer as taxable miscellaneous income at a value of 2.5 cents per mile, even though the miles have no value to Citibank customers that can be fixed at the time they are awarded and have an average value to customers of between .76 cents per mile and 1.2 cents per mile if redeemed.

35.     For at least the past two years, Citibank has been sending 1099 forms to customers that sign up for the airline miles promotions. The 1099 forms state that customers would have to report as additional income, for tax purposes, the American Airline miles they received, at a value of 2.5 cents per mile. The 1099 forms are also sent to the IRS so that the IRS can assure that the customers properly report the 1099 additional income on their tax returns.

36.     Airline miles have no value to customers that can be fixed at the time they are awarded given the fact that many airline miles go unused, and the fact that the airline miles expire within a short time period. Upon redemption, airline miles have an average value to customers of between .76 cents per mile and 1.2 cents per mile, given, among other things, the difficulty of finding award seats.

37.     Citibank customers have been furious as a result of Citibank's actions, with hundreds of them complaining on internet message boards as to why the airline miles are taxable, how Citibank could have possibly valued the airline miles at 2.5 cents per mile, that the rate of

Case 1:12-cv-01124-DAB-JLC Document 26-1, Filed 03/16/12 Page 10 of 26
JA 20
Case 1:12-cv-01124-DAB Document 1 Filed 02/14/12 Page 9 of 25

return from the sign-up bonus was much lower than they expected, and that they would not take advantage of such offers in the future.

38.     Citibank's actions are causing customers to not only be liable for taxes on the American Airline miles that they should not be, but also to pay more than double the income tax because Citibank values the miles at more than double their typical redemption worth.  For example, a typical promotion would provide Citibank customers with 40,000 American Airline miles, and the 1099 form sent to customers would state that the customer must report $1,000 as additional income, amounting to 2.5 cents per mile.  Applying an average federal and state tax rate of approximately 35%, customers are required to pay $350 in taxes for the receipt of said 40,000 airline miles.  Plaintiffs take the position that the airline miles do not have a value at all upon receipt for tax reporting purposes, and therefore, Citibank should not have issued 1099 forms to the IRS or its customers.  However, even if they did have a value, and Citibank had valued the American Airline miles at 1 cent per mile, which is still overvalued according to a recent study, the tax would have been $140, based on additional income of $400.

39.     Citibank does not disclose in its American Airline promotional offering materials that Citibank will report to the IRS that its customers received miscellaneous income as the result of the receipt of airline miles, or that the American Airline miles would be valued at 2.5 cents per mile by Citibank, because Citibank knew that very few customers, if any, would take advantage of the offer if the disclosures were made.

40.     On January 30, 2012, United States Senator Sherrod Brown, Chairman of the U.S. Senate Banking Subcommittee on Financial Institutions and Consumer Protection, sent a letter to Citigroup's CEO, requesting that Citibank stop issuing 1099 forms to customers and noted that Citibank "arbitrarily calculates the value of each frequent flier mile as 2.5 cents."  In a

Case 1:12-cv-01124-DAB-JLC Document 26-11 Filed 03/16/12 Page 11 of 26
JA 21
Case 1:12-cv-01124-DAB Document 1 Filed 02/14/12 Page 10 of 25

newspaper interview response, Citibank stated that it is required by law to issue 1099 forms to customers, and implied that it would continue the practice of valuing the airline miles at 2.5 cents per mile without adequate disclosure.

    41.    In the letter, United States Senator Sherrod Brown stated, among other things:

> During these challenging economic times, middle-class families are pinching pennies to help pay for the cost of a flight to fly home from college, visit an ailing relative, or see friends. To some, signing up for a bank account in exchange for frequent-flier miles to help make a trip more affordable is an offer that is too good to resist. However, your actions are leaving working families with the seemingly incorrect impression that when they rack up miles, they are hiking up their taxes, too.

    42.    Plaintiffs, on behalf of themselves and all others similarly-situated, seek 1) monetary damages fully compensating all individuals and entities for the taxes that they paid or owe and any other financial injury suffered as a result of Citibank's deceptive practices, including the lost opportunity of investment for the money provided to Citibank in exchange for the airline miles; 2) injunctive relief requiring Citibank to clearly disclose in future airline miles promotions: a) that Citibank will report to the IRS that a customer has received miscellaneous taxable income as a result of the receipt of the airline miles; and b) the amount of additional income that would be reported by Citibank on the 1099; and 3) such other relief as the Court deems necessary and appropriate.

## CLASS ACTION ALLEGATIONS

    43.    Plaintiffs bring this action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(2) and (b)(3) on behalf of the following class:

> All persons or entities in the United States who received a 1099 form from Citibank as a result of the receipt of American Airline miles through Citibank promotions in which Citibank valued the American Airline miles at 2.5 cents per mile, during the period between January 1, 2009 and the date of the final disposition of this action, and/or such class or subclass as the Court may deem appropriate (the "Class").

Case 1:12-cv-01124-DAB-JLC Document 26-1 Filed 03/16/12 Page 12 of 26
JA 22
Case 1:12-cv-01124-DAB Document 1 Filed 02/14/12 Page 11 of 25

44.     Plaintiffs reserve the right to amend the definition of the Class if discovery and further investigation reveals that the Class should be expanded or otherwise modified.

45.     Plaintiffs reserve the right to establish sub-classes as appropriate.

46.     This action is brought and may properly be maintained as a class action under the provisions of Federal Rules of Civil Procedure 23(a)(l)-(4) and 23(b)(2) and (b)(3), and satisfies the requirements thereof.

47.     There is a well-defined community of interest among members of the Class, and the disposition of the claims of these members of the Class in a single action will provide substantial benefits to all parties and to the Court.

48.     The members of the Class are so numerous that joinder of all members of the Class is impracticable. At this time, Plaintiffs believe that the Class includes tens of thousands of members.  Therefore, the Class is sufficiently numerous that joinder of all members of the Class in a single action is impracticable under Federal Rule of Civil Procedure Rule 23(a)(l), and the resolution of their claims through the procedure of a class action will be of benefit to the parties and the Court.

49.     Plaintiffs' claims are typical of the claims of the members of the Class whom they seek to represent because Plaintiffs and each member of the Class has been subjected to the same deceptive and improper practices by Defendant and have been damaged in the same manner.

50.     Plaintiffs will fairly and adequately represent and protect the interests of the members of the Class as required by Federal Rule of Civil Procedure Rule 23(a)(4). Plaintiffs have no interests that are adverse to those of the members of the Class that they seek to represent.  Plaintiffs are committed to the vigorous prosecution of this action and, to that end,

Case 1:12-cv-01124-DAB-JLC Document 6-1, Filed 03/16/12 Page 13 of 26
JA 23
Case 1:12-cv-01124-DAB   Document 1   Filed 02/14/12   Page 12 of 25

Plaintiffs have retained counsel who is competent and experienced in handling complex class action litigation on behalf of consumers.

51.     A class action is superior to all other available methods of the fair and efficient adjudication of the claims asserted in this Complaint under Federal Rule of Civil Procedure 23(b)(3) because:

a)   The expense and burden of individual litigation would not be economically feasible for members of the Class to seek to redress their claims other than through the procedure of a class action.

b)   If separate actions were brought by individual members of the Class, the resulting multiplicity of lawsuits would cause members to seek to redress their claims other than through the procedure of a class action; and

c)   Absent a class action, Defendant likely would retain the benefits of its wrongdoing, and there would be a failure of justice.

52.     Common questions of law and fact exist as to the members of the Class, as required by Federal Rule of Civil Procedure 23(a)(2), and predominate over any questions that affect individual members of the Class within the meaning of Federal Rule of Civil Procedure 23(b)(3).

53.     The common questions of fact include, but are not limited to, the following:

a)   Whether the nationwide practice by Defendant of failing to disclose to customers who open up bank accounts in return for American Airline miles, that they would have to report the value of the American Airline miles as additional miscellaneous income, violates the applicable consumer protection statutes;

b) Whether the nationwide practice by Defendant of failing to disclose to customers who open up bank accounts in return for American Airline miles, that Citibank would value the American Airline miles, that customers receive in Citibank promotional offers, at 2.5 cents per mile, violates the applicable consumer protection statutes;

c) Whether the nationwide practice by Defendant of issuing 1099 forms to customers valuing American Airline miles at 2.5 cents per mile constitutes a breach of contract or, alternatively, a breach of the implied covenant of good faith and fair dealing;

d) Whether Defendant engaged in unlawful, unfair, misleading, or deceptive business acts or practices;

e) Whether Defendant engaged in consumer fraud, deceptive trade practices, or other unlawful acts;

f) Whether Defendant made any negligent misrepresentations;

g) Whether Defendant was unjustly enriched; and

h) Whether Plaintiffs and members of the Class are entitled to an award of reasonable attorneys' fees, pre-judgment interest, and costs of this suit.

54.     In the alternative, this action is certifiable under the provisions of Federal Rule of Civil Procedure 23(b)(2) because Defendant has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole and necessitating that any such relief be extended to members of the Class on a mandatory, class-wide basis.

Case 1:12-cv-01124-DAB-JLC Document 1 Filed 03/16/12 Page 15 of 26
Case 1:12-cv-01124-DAB Document 1 Filed 02/14/12 Page 14 of 25

JA 29

55.     Plaintiffs are not aware of any difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.

## COUNT I
### Violation of State Consumer Protection Laws

56.     Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

57.     Plaintiffs bring this claim on their own behalf under the laws of the states in which they opened up a Citibank account in return for American Airline miles on behalf of: (a) all other persons or entities who opened up a Citibank account in return for American Airline miles in the same state as Plaintiffs; and (b) all other persons who opened up a Citibank account in return for American Airline miles in states having similar consumer protection laws.

58.     Plaintiffs and each member of the Class is a consumer, purchaser or other person entitled to the protection of the consumer protection laws of the state in which he/she opened up a Citibank account in return for American Airline miles.

59.     The consumer protection laws of the state in which Plaintiffs and each member of the Class opened up a Citibank account in return for American Airline miles declares that unfair or deceptive acts or practices in the conduct or trade or commerce are unlawful.

60.     Each of the fifty states and the District of Columbia have enacted statutes designed to protect consumers against unfair, deceptive, fraudulent and unconscionable trade and business practices and false advertising. These statutes are:

a) Alabama Deceptive Trade Practices Act, Ala. Statues Ann. §§ 8-19-1, *et seq.*;

b) Alaska Unfair Trade Practices and Consumer Protection Act, Ak. Code § 45.50.471, *et seq.*;

c) Arizona Consumer Fraud Act, Arizona Revised Statutes, §§ 44-1521, *et seq.*;

d) Arkansas Deceptive Trade Practices Act, Ark. Code § 4-88-101, *et seq.*;

Case 1:12-cv-01124-DAB-JLC Document 26-11, Filed 03/15/12 Page 16 of 26
**JA 26**
Case 1:12-cv-01124-DAB Document 1 Filed 02/14/12 Page 15 of 25

e) California Consumer Legal Remedies Act, Cal. Civ. Code § 1750, *et seq.*, and California's Unfair Competition Law, Cal. Bus. & Prof Code § 17200, *et seq.*;

f) Colorado Consumer Protection Act, Colo. Rev. Stat. § 6-1-101, *et seq.*;

g) Connecticut Unfair Trade Practices Act, Conn. Gen. Stat § 42-110a, *et seq.*;

h) Delaware Deceptive Trade Practices Act, 6 Del. Code § 2511, *et seq.*;

i) District of Columbia Consumer Protection Procedures Act, D.C. Code § 28 3901, *et seq.*;

j) Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. Ann. § 501.201, *et seq.*;

k) Georgia Fair Business Practices Act, § 10-1-390 *et seq.*;

l) Hawaii Unfair and Deceptive Practices Act, Hawaii Revised Statues § 480 1, *et seq.*, and Hawaii Uniform Deceptive Trade Practices Act, Hawaii Revised Statutes § 481A-l, *et seq.*;

m) Idaho Consumer Protection Act, Idaho Code § 48-601, *et seq.*;

n) Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS § 505/1, *et seq.*;

o) Indiana Deceptive Consumer Sales Act, Indiana Code Ann. §§ 24-5-0.5-0.1, *et seq.*;

p) Iowa Consumer Fraud Act, Iowa Code §§ 714.16, *et seq.*;

q) Kansas Consumer Protection Act, Kan. Stat. Ann §§ 50 626, *et seq.*;

r) Kentucky Consumer Protection Act, Ky. Rev. Stat. Ann. §§ 367.110, *et seq.*, and the Kentucky Unfair Trade Practices Act, Ky. Rev. Stat. Ann §§ 365.020, *et seq.*;

s)   Louisiana Unfair Trade Practices and Consumer Protection Law, La. Rev. Stat. Ann. §§ 51:1401, *et seq.*;

t)   Maine Unfair Trade Practices Act, 5 Me. Rev. Stat. § 205A, *et seq.*, and Maine Uniform Deceptive Trade Practices Act, Me. Rev. Stat. Ann. 10, § 1211, *et seq.*;

u)   Maryland Consumer Protection Act, Md. Com. Law Code § 13-101, *et seq.*;

v)   Massachusetts Unfair and Deceptive Practices Act, Mass. Gen. Laws ch. 93A;

w)   Michigan Consumer Protection Act, §§ 445.901, *et seq.*;

x)   Minnesota Prevention of Consumer Fraud Act, Minn. Stat. §§ 325F.68, *et seq.*; and Minnesota Uniform Deceptive Trade Practices Act, Minn. Stat. § 325D.43, *et seq.*;

y)   Mississippi Consumer Protection Act, Miss. Code Ann. §§ 75-24-1, *et seq.*;

z)   Missouri Merchandising Practices Act, Mo. Rev. Stat. § 407.010, *et seq.*;

aa) Montana Unfair Trade Practices and Consumer Protection Act, Mont. Code §30-14-101, *et seq.*;

bb) Nebraska Consumer Protection Act, Neb. Rev. Stat. § 59 1601, *et seq.*, and the Nebraska Uniform Deceptive Trade Practices Act, Neb. Rev. Stat. § 87-301, *et seq.*;

cc) Nevada Trade Regulation and Practices Act, Nev. Rev. Stat. §§ 598.0903, *et seq.*;

dd) New Hampshire Consumer Protection Act, N.H. Rev. Stat.§ 358-A:l, *et seq.*;

ee) New Jersey Consumer Fraud Act, N.J. Stat. Ann. §§ 56:8 1, *et seq.*;

ff)  New Mexico Unfair Practices Act, N.M. Stat. Ann.§§ 57 12 1, *et seq.*;

gg) New York Deceptive Acts and Practices Act, N.Y. Gen. Bus. Law§§ 349, *et seq.*;

hh) North Dakota Consumer Fraud Act, N.D. Cent. Code §§ 51 15 01, *et seq.*;

Case 1:12-cv-01124-DAB-JLC Document 6-11, Filed 03/16/12 Page 18 of 26
Case 1:12-cv-01124-DAB Document 9 Filed 02/14/12 Page 17 of 25
JA-48

ii) North Carolina Unfair and Deceptive Trade Practices Act, North Carolina General Statutes §§ 75-1, *et seq.*;

jj) Ohio Deceptive Trade Practices Act, Ohio Rev. Code. Ann. §§ 4165.01. *et seq.*;

kk) Oklahoma Consumer Protection Act, Okla. Stat. 15 § 751, *et seq.*;

ll) Oregon Unfair Trade Practices Act, Rev. Stat § 646.605, *et seq.*;

mm) Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 Penn. Stat. Ann. §§ 201-1, *et seq.*;

nn) Rhode Island Unfair Trade Practices And Consumer Protection Act, R.I. Gen. Laws § 6-13.1-1, *et seq.*;

oo) South Carolina Unfair Trade Practices Act, S.C. Code Laws § 39-5-10, *et seq.*;

pp) South Dakota's Deceptive Trade Practices and Consumer Protection Law, S.D. Codified Laws §§ 37 24 1, *et seq.*;

qq) Tennessee Trade Practices Act, Tennessee Code Annotated §§ 47-25-101, *et seq.*;

rr) Texas Stat. Ann. §§ 17.41, *et seq.*, Texas Deceptive Trade Practices Act;

ss) Utah Unfair Practices Act, Utah Code Ann. §§ 13-5-1, *et seq.*;

tt) Vermont Consumer Fraud Act, Vt. Stat. Ann. tit. 9, § 2451, *et seq.*;

uu) Virginia Consumer Protection Act, Virginia Code Ann. §§ 59.1-196, *et seq.*;

vv) Washington Consumer Fraud Act, Wash. Rev. Code § 19.86.010, *et seq.*;

ww) West Virginia Consumer Credit and Protection Act, West Virginia Code § 46A-6-101, *et seq.*;

xx) Wisconsin Deceptive Trade Practices Act, Wis. Stat. §§ 100.18, *et seq.*;

yy) Wyoming Consumer Protection Act, Wyoming Stat. Ann. §§ 40-12-101, *et seq.*

61.     The American Airline miles promotions marketed and sold by Defendant constitute products to which these consumer protection laws apply.

62.     Citibank violated the above stated consumer protections laws by failing to disclose in its American Airline promotional offering materials that Citibank would send a 1099 to the IRS stating that customers have received miscellaneous income as a result of their receipt of American Airlines miles, and that the American Airline miles would be valued at 2.5 cents per mile by Citibank.  Citibank failed to make said material disclosures because Citibank knew that very few customers, if any, would take advantage of the offer if the disclosures were made.

## COUNT II
### Breach of Contract

63.     Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

64.     Plaintiffs and each member of the Class entered into a contract with Citibank. The contract provided that Citibank would grant Plaintiffs and each member of the Class a certain number of American Airline miles in return for opening up a bank account and/or savings account and adhering to certain conditions.   Under the contract, the redemption value of the miles was approximately .76 to 1.2 cents per mile.

65.     Plaintiffs and the members of the Class performed all of the conditions required in accordance with the terms of the contract.

66.     Citibank breached the contract by providing Plaintiffs and each member of the Class with airline miles that were worth significantly less than .76 to 1.2 cents per mile upon redemption because Citibank reported to the IRS that the miles were taxable and worth 2.5 cents per mile.

67.     Citibank's breach of the contract and continued breach of contracts has damaged, and continues to damage Plaintiffs and members of the Class.

18

Case 1:12-cv-01124-DAB-JLC Document 26-11, Filed 03/16/12 Page 20 of 26
**JA 30**
Case 1:12-cv-01124-DAB Document 1 Filed 02/14/12 Page 19 of 25

68.     There is no adequate remedy at law.

## COUNT III
### Breach of Implied Covenant of Good Faith and Fair Dealing

69.     Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

70.     The contracts entered into between Citibank and Plaintiffs and each member of the Class includes the implied covenant of good faith and fair dealing.

71.     Defendant has a duty not to commit acts that would improperly deprive Plaintiffs and Class Members of the benefit of contract.

72.     A principal benefit for which Plaintiffs and the Class contracted was the receipt of American Airline miles valued at approximately .76 to 1.2 cents per mile upon redemption.

73.     The implied covenant prevents Citibank from taking any action that would reduce the per mile value of the American Airline miles. By reporting to the IRS that the American Airline miles were taxable and that the miles were worth 2.5 cents per mile, more than double the redemption value of the miles, Citibank breached the implied covenant of good faith and fair dealing by taking improper action that substantially reduced the redemption value of the American Airline miles that Plaintiffs and each member of the class received.

74.     As a result of Citibank's wrongful conduct, Plaintiffs and Class Members have suffered and continue to suffer economic losses and other general and specific damages, all in an amount to be determined according to proof at time of trial.

## COUNT IV
### Negligent Misrepresentation

75.     Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

76.     Defendant, directly or through its agents and employees, made false representations, concealments, and nondisclosures to Plaintiffs and members of the Class.

Case 1:12-cv-01124-DAB Document 1 Filed 02/14/12 Page 20 of 25
JA 31
Case 1:12-cv-01124-DAB Document 1 Filed 02/14/12 Page 20 of 25

77.     In making the representations of fact to Plaintiff and members of the Class described herein, Defendant has failed to fulfill its duties to disclose the material facts set forth above.  The direct and proximate cause of this failure to disclose was Defendant's negligence and carelessness.

78.     Defendant, in making the misrepresentations and omissions, and in doing the acts alleged above, knew or reasonably should have known that the representations were not true.

79.     Defendant made and intended the misrepresentations to induce the reliance of Plaintiff and members of the Class.

80.     Plaintiff and members of the Class relied upon these false representations and nondisclosures by Defendant when opening up a Citibank account in return for American Airline miles, which reliance was justified and reasonably foreseeable.

81.     As a result of Defendant's wrongful conduct, Plaintiff and members of the Class have suffered economic losses and other general and specific damages, including but not limited to the amounts of income tax paid or to be paid for receipt of the American Airline miles, the lost of opportunity of investment for the money provided to Citibank, and any interest that would have been accrued on those monies, all in an amount to be determined according to proof at time of trial.

## COUNT V
### Unjust Enrichment

82.     Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

83.     Citibank knew that it would value the airline miles at issue at approximately 2.5 cents per mile.  Not only did Citibank fail to disclose in its American Airline promotional offering materials that Citibank would send a 1099 to the IRS claiming that its customers received miscellaneous income as a result of the receipt of promotion airline miles, but failed to

20

Case 1:12-cv-01124-DAB-JLC Document 26-11 Filed 03/16/12 Page 22 of 26
JA 32
Case 1:12-cv-01124-DAB Document 1 Filed 02/14/12 Page 21 of 25

disclose that Citibank would value the airline miles at 2.5 cents per mile, more than double the redemption value of the airline miles. Citibank failed to make these disclosures because it knew that very few customers, if any, would take advantage of the airline miles offers because they did not make economical sense.

84. By its wrongful acts and omissions, Defendant has been unjustly enriched at the expense of Plaintiff and members of the Class, who did not receive the value of the airline miles that they were entitled to, and thus Plaintiff and members of the Class were unjustly deprived of time, money provided to Defendant, and additional taxes that they paid or owe.

85. It would be inequitable and unconscionable for Defendant to retain the profit, benefit, and other compensation it obtained from its deceptive, misleading, unfair and unlawful conduct alleged herein.

86. Plaintiff and members of the Class seek restitution from Defendant, and seek an order of this Court disgorging all profits, benefits, and other compensation obtained by Defendant from its wrongful conduct.

## RELIEF REQUESTED

Accordingly, Plaintiffs, on behalf of themselves and the members of the Class, seek judgment as follows:

1. Certifying the Class as requested herein, certifying Plaintiffs as the representatives of the Class, and appointing Plaintiffs' counsel as counsel for the Class;

2. Ordering that Defendant is financially responsible for notifying all members of the Class of the alleged misrepresentations and omissions set forth herein;

3. Awarding Plaintiffs and the members of the Class compensatory damages in an amount according to proof at trial;

Case 1:12-cv-01124-DAB-JLC Document 26-11 Filed 03/16/12 Page 23 of 26
**JA 33**
Case 1:12-cv-01124-DAB Document 1 Filed 02/14/12 Page 22 of 25

4.      Awarding restitution and disgorgement of Defendant's revenues to Plaintiff and members of the Class;

5.      Awarding declaratory and injunctive relief, including: enjoining Defendant from continuing the unlawful practices as set forth herein, and directing Defendant to identify, with Court supervision, victims of its conduct and pay them restitution and disgorgement of all monies acquired by Defendant by means of any act or practice declared by this Court to be wrongful or unlawful;

6.      Awarding to Plaintiffs and the Class punitive damages;

7.      Ordering Defendant to engage in corrective advertising;

8.      Awarding interest on the monies wrongfully obtained from the date of collection through the date of entry of judgment in this action;

9.      Awarding attorneys' fees, expenses, and recoverable costs reasonably incurred in connection with the commencement and prosecution of this action; and

10.     Directing such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs and the Class demand a trial by jury as to all matters so triable.

Dated: February 14, 2012

James C. Kelly (JK-9616)
**The Law Office of James C. Kelly**
477 Madison Avenue, Sixth Floor
New York, New York 10022
Tel: 212-920-5042
Fax: 888-224-2078
Email: jkelly@jckellylaw.com

22

Case 1:12-cv-01124-DAB-JLC Document 11, Filed 03/16/12 Page 24 of 26
JA 34
Case 1:12-cv-01124-DAB Document 1 Filed 02/14/12 Page 23 of 25

# EXHIBIT A

Case 1:12-cv-01124-DAB-JLC Document 26-11 Filed 03/16/12 Page 25 of 26
Case 1:12-cv-01124-DAB Document 1 Filed 02/14/12 Page 24 of 25
JA 35



**A Special Offer for Citi® / A'Advantage®**
**Credit Cardmembers**

October 6, 2010



Bertram E. Hirsch

# Earn up to 40,000 American Airlines A'Advantage® bonus miles.

We're thanking Citi® / A'Advantage® cardmembers with our most rewarding A'Advantage® bonus miles offer yet for new accounts. Now you can qualify to earn up to 40,000 A'Advantage® bonus miles when you open eligible Citibank checking and savings accounts and perform qualifying activities.¹

That's in addition to the A'Advantage® miles you earn when you make purchases with your Citi® / A'Advantage® credit card. Plus, you'll enjoy all the other benefits that come with a Citibank account, including Citi Mobile℠² and Citibank® Online to help you stay on top of your account from virtually any mobile device, whether you're at home or traveling.

**Enjoy all the benefits of banking with Citibank:**

- NEW: Citi Text Banking and enhanced mobile alerts²
- Access to over 28,000 fee-free³ ATMs across the USA
- Free Online Bill Payment
- Convenient account linking between your checking account and your credit card

## ⟫ How to qualify to earn your first 20,000 A'Advantage® bonus miles.

To get on your way to earn more A'Advantage® miles, open a new regular checking account in the Citibank or Citigold® account package by 10/31/10. Then complete at least one of the following qualifying activities for two consecutive months within 60 days of opening your regular checking account to qualify to earn 20,000 A'Advantage® bonus miles:

- One or more direct deposits
- Two or more electronic bill payments
- Five or more purchases with your Citibank debit card

Plus, you can earn A'Advantage® miles even faster by requesting a Citibank® / A'Advantage® debit card when you open your account.⁴

## ⟫ How to qualify to earn an additional 20,000 A'Advantage® bonus miles.

For twice the travel rewards, deposit a minimum of $25,000 by 10/31/10 in funds that are not currently held at Citibank, or an affiliate of Citi, into a new or existing Citibank® Savings Plus Account. Then complete any of the above qualifying activities for an additional third month to qualify to earn another 20,000 A'Advantage® bonus miles. Together, that's 40,000 A'Advantage® bonus miles for great awards like flights, hotels, car rentals and more through the A'Advantage® program.⁵

## ⟫ Don't wait — this offer expires 10/31/10.

Open your accounts today to start earning A'Advantage® bonus miles. Just use code C2KB when you visit your nearest Citibank branch.

citibank.com/branchlocator

**For Personal Banker Use Only:**

Step 1: Go to The Retail Bank website; click on "Consumer Products"; choose "Direct Marketing Campaign System" from drop-down menu.

Step 2: Enter your Citibank branch information and Customer's Zip, First Name and Last Name, found on the letter. DMCS will auto-suggest customer names as you type; select one from the list at any time.

Step 3: If there are multiple matches for name within a Zip, DMCS will ask you to select customer's record from a list of names and addresses. Select your customer from the list.

Step 4: All of the offers that your customer is eligible for will be listed. If multiple offers appear, click on "C2B Direct Mail: AAdvantage Checking offer September 2010" and then click on the green button.

Step 5: Proceed to Concierge/OSRO account opening session.

---

[1] Terms and conditions of accounts, products, programs and services are subject to change. This offer is available to Citi® / AAdvantage® credit cardmembers who receive this communication. One offer per customer only. All accounts subject to approval and applicable terms and fees. Existing checking customers are not eligible for this offer. Offer may be modified or withdrawn at any time without notice, expires 10/31/10, is not transferable and cannot be combined with any other offer. Persons under 18 years of age are not eligible. To qualify for the initial 20,000 American Airlines AAdvantage® bonus miles you must open a regular checking account in the Citibank® or Citigold® Account package by 10/31/10. Within 60 days of opening the regular checking account in the Citibank or Citigold Account package the customer must complete one of the qualifying activities in the checking account for two consecutive months: one direct deposit to, or two electronic bill payments, or five or more debit card purchases from the checking account, to qualify to earn the first 20,000 AAdvantage® bonus miles. Electronic bill payments are those made using Citibank® Online, Citi Mobile℠ or CitiPhone Banking®. A bill that is paid by making a transfer between linked accounts does not qualify as a bill payment for this offer.

To qualify for an additional 20,000 AAdvantage® bonus miles, the customer must make a minimum deposit of $25,000 by 10/31/10 in new money (funds that are not from another account at Citibank or an affiliate of Citi) into a new or existing Citibank® Savings Plus Account linked to the new checking account and complete one of the above qualifying activities for an additional third month.

The 20,000 AAdvantage® bonus mile increments will be credited to your AAdvantage® account within 90 days from the end of the statement period in which you met all qualifying requirements stated in this offer. Your Citibank regular checking account in the Citibank Account or Citigold® account package and Citi® / AAdvantage® credit card account must be open and in good standing at the time the AAdvantage® bonus miles are posted to your AAdvantage® account. Offer limited to United States (U.S.) citizens or resident aliens with a valid U.S. taxpayer identification number. Customer is responsible for taxes, if any.

For a Citibank Savings Plus Account opened online via www.citibank.com, the Annual Percentage Yield (APY) as of 9/14/10 is: a balance under $9,999.99 earns .25% APY, a balance of $10,000 to $24,999.99 earns a .40% APY, and a balance of $25,000 or more earns a .70% APY. Rates are variable and may change without notice. $100 minimum opening deposit required. Fees may reduce account earnings. Deposits are subject to Citibank's standard funds availability schedule. Interest rates for accounts opened at a Citibank branch may differ.

[2] Citibank does not charge you a fee for using Citi Mobile℠, including Citi® Text Banking. However, you must have a Web-enabled cell or smartphone to use Citi Mobile, and your wireless carrier may charge you for this service.

[3] Get cash, get information and transfer balances between eligible linked Citibank accounts at Citibank branches and Citibank-branded ATMs at participating 7-ELEVEN® locations and other retail locations. Not all ATMs are owned or operated by Citibank. Not all functions available at all ATMs. 7-ELEVEN® is a registered trademark of 7-Eleven, Inc.

[4] The annual fee for the Basic Citibank® / AAdvantage® debit card is $25. The annual fee for the Premium Citibank® / AAdvantage® debit card is $65 but is waived for Citigold customers.

[5] For AAdvantage® award redemption details, see Redeem Miles at www.aa.com/aadvantage

American Airlines reserves the right to change AAdvantage® program rules, regulations, travel awards and special offers at any time without notice and to end the AAdvantage® program with six months' notice. Any such changes may affect your ability to use the mileage awards or credits that you have accumulated. Members may not be able to obtain all offered awards at all times or use awards for all destinations or on all flights. AAdvantage® travel awards, mileage accrual and special offers are subject to government regulations. American Airlines is not responsible for products or services offered by other participating companies. For complete details about the AAdvantage® program, visit www.aa.com/aadvantage

AAdvantage® and AAdvantage® with Scissor Eagle Design are marks of American Airlines Inc.

Checking accounts are offered by Citibank, N.A., an affiliate of Citibank (South Dakota, N.A. the bank that issued our credit card)

©2010 Citibank. Citibank, N.A. Member FDIC. Citi, Citibank, Citibank with Arc Design, Citi Prime Banking and Citi Gold are registered service marks of Citigroup Inc. Citi Mobile is a service mark of Citigroup Inc.

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------ X
                                                                    :
BERTRAM HIRSCH and IGOR ROMANOV, on                                 :
behalf of themselves and all others similarly situated,             :
                                                                    :
                              Plaintiffs,                           :
                                                                    :          Case No. 12 Civ. 1124 (DAB)
                    vs.                                              :
                                                                    :          **DECLARATION OF**
CITIBANK, N.A.,                                                     :          **JOAN HASLAM**
                                                                    :
                              Defendant.                            :
------------------------------------------------------------------ X

I, Joan Haslam, declare and state as follows:

1.      I am a Vice President and Senior Program Manager for Citibank, N.A.

("Citibank").  Citibank is a national banking association with its principal place of business in

New York, New York.  I have been employed by Citibank or its predecessors/affiliates in

different capacities for approximately 23 years.  In connection with my employment at Citibank,

I have become, and am, familiar with the retail banking operations and practices of Citibank and

its predecessors and affiliates, and I have access to the business records relating to the retail bank

accounts of accountholders, including consumer and business deposit and checking accounts.  In

addition, I am familiar with, and have knowledge of, the various forms of retail banking account

agreements, generally referred to as "Client Manuals," used by Citibank and its predecessors and

affiliates.

2.      The exhibits to this declaration are all true and correct business records created

and maintained by Citibank, or its affiliates, in the course of regularly conducted business

activity, and as part of the regular practice of Citibank to create and maintain such records, and

also were made at the time of the act, transaction, occurrence or event or within a reasonable

time thereafter.  The statements set forth in this declaration are true and correct to the best of my knowledge, information and belief.  Except where based upon information provided by persons working under my direction and supervision, the statements contained herein are based on my personal knowledge or review of Citibank's records, including records pertaining to deposit accounts opened by Plaintiffs Bertram Hirsch ("Hirsch") and Igor Romanov ("Romanov") (collectively, "Plaintiffs").  If called as a witness, I am competent to testify to the statements contained herein.

3.     On October 25, 2010, Hirsch opened a deposit account with Citibank at Citibank's branch in Great Neck, New York (the "Hirsch Account").  On October 25, 2010, Romanov opened a deposit account with Citibank at Citibank's branch in Marina Del Rey, California (the "Romanov Account" and, together with the Hirsch Account, the "Accounts").

4.     At the time Plaintiffs opened the Accounts, Citibank was offering a promotion to new banking customers.  Specifically, new banking customers would receive 20,000 American Airlines miles if they opened a checking account with Citibank by October 31, 2010 and an additional 20,000 American Airlines miles if they deposited a minimum of $25,000 in a Citibank savings account and completed one of three qualifying activities.  Both Hirsch and Romanov met these requirements.  Accordingly, Citibank credited 20,000 American Airlines miles to Hirsch on February 28, 2011 and again on March 3, 2011, and credited 20,000 miles to Romanov on February 2, 2011 and again on February 5, 2011.

5.     In January 2012, Citibank submitted 1099 forms for both Hirsch and Romanov, in the amount of $1000, to the Internal Revenue Service ("IRS") attributable to the value each of the Plaintiffs received for the American Airlines miles in connection with opening their Accounts.

6.      At the time Plaintiffs opened their Accounts, each of the Plaintiffs executed a signature card, acknowledging that they would "be bound by any agreement governing [the Account]" (the "Signature Cards").  True and correct copies of the Signature Cards for the Hirsch Account and the Romanov Account are attached hereto as Exhibits 1 and 2, respectively.

7.      Like any other deposit account opened with Citibank in October 2010, the Accounts are subject to the Citibank Client Manual effective January 1, 2010 (the "Client Manual").  Attached hereto as Exhibit 3 is an exemplar of the Client Manual.  In addition to the Client Manual, the Romanov Account is also subject to the Citibank California & Nevada Marketplace Addendum effective January 1, 2010 (the "Marketplace Addendum").  Together, the Client Manual and the Marketplace Addendum contain the terms and conditions applicable to the Romanov Account.  Attached hereto as Exhibit 4 is an exemplar of the Marketplace Addendum.

8.      I have personal knowledge of Citibank's regular practices and procedures regarding Citibank employees providing the Client Manual and the Marketplace Addendum to customers opening a new deposit account at a Citibank branch that were in place at the time Plaintiffs opened the Accounts in October 2010, and at all times thereafter.  It was and is the practice and requirement of Citibank to give new customers the Client Manual (and, in California, the Marketplace Addendum) at the time they open a deposit account at a Citibank branch and sign the same form of signature card that each of the Plaintiffs signed.

9.      Based on my personal review of Plaintiffs' records and my personal knowledge of Citibank's regular office practices and procedures in place at the time Plaintiffs opened the Accounts, the policy and practice described above applied to Plaintiffs when they opened their Accounts.

10.    The Client Manual provides that all claims or disputes relating to the Accounts must be resolved through mandatory, binding arbitration if either Plaintiffs or Citibank so elects. <u>See</u> Exhibit 3 at 8, 44-47.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on March 14, 2012
Long Island City, New York

_Joan Haslam_
                     Joan Haslam

# EXHIBIT 1

FEB-16-2012 09:57 FROM:                          TO:718 248 1249          P.4/4

DATE: 10/25/2010          FIMP 000          Citibank Account          citi

ACCOUNT TITLE: BERTRAM E HIRSCH

ADDRESS:3 ARBOR STREET, GREAT NECK, NY 11021

ACCOUNT NUMBER(S): ████████████

| NAME / SIGNER | TAX ID NUMBER | ISSUE/LINK TO CARD |
|---|---|---|
| BERTRAM E HIRSCH | ████████ | YES |
| | | |

Check appropriate box:     ☒ Individual     ☐ Other:          ☐ Check if Exempt Payee

By signing below, I (1) certify my tax status; (2) agree to be bound by any agreement governing any account opened in the title indicated on this card.

TAX CERTIFICATION

Under penalties of perjury, I certify that: (1) The number shown on this form is my correct taxpayer identification number, and (2) I am not subject to backup withholding because: (a) I am exempt from backup withholding, or (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding, and (3) I am a U.S. citizen, U.S. Resident Alien or other U.S. person (as defined in the instructions).

Certification Instruction: You must cross out item (2) above if you have been notified by the IRS that you are currently subject to backup withholding because you have failed to report all interest and dividends on your tax return.

The Internal Revenue Service does not require your consent to any provision of this Document other than the certifications required to avoid backup withholding.

| Signer 1 Signature | Signer 2 Signature |
|---|---|
| X Bertram E. Hirsch | |
| Signer 3 Signature | Signer 4 Signature |
| | |

DATE: 10/25/2010          FIMP: 000          Citibank Account          citi

ACCOUNT TITLE: BERTRAM E HIRSCH

ACCOUNT NUMBER(S): ████████████

| SIGNER 1 NAME (Please sign within the box below.) | DATE | SIGNER 2 NAME (Please sign within the box below.) | DATE |
|---|---|---|---|
| BERTRAM E HIRSCH | | | |
| X Bertram E. Hirsch | | | |
| SIGNER 3 NAME (Please sign within the box below.) | DATE | SIGNER 4 NAME (Please sign within the box below.) | DATE |
| | | | |

Forward to Signature Verification Unit

# EXHIBIT 2

DATE. 10/25/2010          FIMP:013          C I T I G O L D®          citi

ACCOUNT TITLE: IGOR ROMANOV

ADDRESS:330 S REEVES DR APT# 203 BEVERLY HILLS, CA 90212
ACCOUNT NUMBER(S)

| NAME / SIGNER | TAX ID NUMBER | ISSUE LINK TO CARD |
|---|---|---|
| IGOR ROMANOV | | YES |
| | | |
| | | |

Check appropriate box      ☒ Individual      ☐ Other: _____      ☐ Check if Exempt Payee

By signing below, I (1) certify my tax status; (2) agree to be bound by any agreement governing any account opened in the title indicated on this card.

**TAX CERTIFICATION**

Under penalties of perjury, I certify that: (1) The number shown on this form is my correct taxpayer identification number, and (2) I am not subject to backup withholding because: (a) I am exempt from backup withholding, or (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding, and (3) I am a U.S. citizen, U.S. Resident Alien or other U.S. person (as defined in the instructions).
Certification Instructions: You must cross out item (2) above if you have been notified by the IRS that you are currently subject to backup withholding because you have failed to report all interest and dividends on your tax return.
   The Internal Revenue Service does not require your consent to any provision of this Document other than the certifications required to avoid backup withholding.

| Signer 1 Signature | Signer 2 Signature |
|---|---|
| | |
| Signer 3 Signature | Signer 4 Signature |
| | |

---

DATE. 10/25/2010          FIMP:013          C I T I G O L D®          citi

ACCOUNT TITLE: IGOR ROMANOV

ACCOUNT NUMBER(S)

| SIGNER 1 NAME (Please sign within the box below.) | DATE | SIGNER 2 NAME (Please sign within the box below.) | DATE |
|---|---|---|---|
| IGOR ROMANOV | 10. 25. 10 | | |
| | | | |
| SIGNER 3 NAME (Please sign within the box below.) | DATE | SIGNER 4 NAME (Please sign within the box below.) | DATE |
| | | | |

Forward to Signature Verification Unit

# EXHIBIT 3

# Client Manual

## Consumer Accounts
### Including our Privacy Notice

**U.S. Markets**

**Effective January 1, 2010**



Item US70001-ALL (Rev. 11/09) Pkg. 25

## Table of Contents

**General Terms**......................................................5
  Definitions...........................................................5
  Definitions of Types of Accounts ......................7
**Account Opening/Ownership/Maintenance/Closing** ......8
  Amendments/Changes to this Agreement .........8
  Arbitration ..........................................................8
  Conflicting Demands/Disputes ...........................8
  FDIC Insurance ...................................................8
  Governing Law ...................................................8
  Indemnification ..................................................9
  Information Sharing ...........................................9
  Limitation on Time to Sue or Arbitrate .............9
  Recording Your Service Requests ......................9
  Your Consent For Us to Call You........................9
  Security Interest .................................................9
  Severability .........................................................9
  Waiver ...............................................................10
  Account Opening ..............................................10
  Consumer Reporting Agency Information........10
  Checking Account Sub-accounts.......................10
  Updating Your Account Information .................11
  Transferring Account Ownership......................11
  Spanish Language Preference ...........................11
    Account Documents .....................................11
    Account Communications..............................11
    Availability of Products and Services in Spanish ......11
    Customer Service ..........................................11
  Account Errors and Adjustments......................11
  Assignments......................................................12
**Account Transactions**..........................................13
  What This Section Covers..................................13
  Checkbooks and Checks ...................................13
  Deposits ............................................................13
  Remotely Created Checks .................................14
  Endorsements....................................................14
  Items Sent for Collection..................................15
  Verification and Collection ...............................15
  ACH Provisional Credits....................................15
  Notice of Incoming Transfer .............................15
  Returned Items/Transactions...........................15
  Reconstructing Lost or Destroyed Deposits......16
  Account Balance and Transaction Information...16
  Limits on Transfers...........................................16
  Funds Transfers.................................................17
    Security Procedures.....................................18
    Claims...........................................................18
    Delays or Non-Execution of Transfers ........18
    Canceling or Changing a Transfer................18
    Rejecting a Transfer Request .......................18
    Cut-Off Time for Executing your Transfer Request ......18

    Incoming Funds Transfers...........................18
    International Transfers.................................19
  Withdrawals.......................................................19
    Where to make a Withdrawal......................19
    Cash Withdrawals ........................................19
    Writing a Check............................................19
    Paying your Checks ......................................20
      Electronic Presentment of Checks...........20
      Check Processing Cut-off Hour ................20
      Notations on Checks.................................20
      Post-Dated Checks ...................................20
      Stale Dated Checks ..................................21
    Stop Payment Orders...................................21
      General.....................................................21
      Contents of Stop Payment Order..............21
      Effective Period of Stop Payment Order: Renewal...21
      Payment over Valid Stop Payment Order...21
      Replacement Check ..................................22
      Official Checks and Money Orders............22
    Insufficient Account Balances......................22
    Overdrawing your Account...........................22
    Withdrawal Refusals ....................................23
    Withdrawal Notice .......................................23
    Check Cashing...............................................24
      Your Own Checks......................................24
      Third Party Checks ...................................24
      Payee Check Cashing ...............................24
      Check Cashing for Others.........................24
**Account Statements and Notices, Periodic Statements**...25
  Cancelled Check Options...................................25
  Substitute Checks and Your Rights ...................26
    What is a Substitute Check ..........................26
    Your Rights...................................................26
  Filing a Claim.....................................................27
**Special Circumstances**........................................28
  Forfeited Accounts ...........................................28
  Death or Legal Determination of Incompetence......28
  Dormant Accounts.............................................28
  Legal Process ....................................................29
  Right of Setoff ..................................................29
  Restricted Access ..............................................29
  Closing a Deposit Account.................................30
**Foreign Currency Exchange** ................................30
  Limitation of Liability........................................30
**Electronic Banking**.............................................31
  General..............................................................31
    Limitations on Transfers..............................31
    Limitations on Withdrawals and Right to Suspend or Discontinue Services ...................................31
    Terminal Transactions.................................31

## Table of Contents continued

Access Device .................................................................31
Withdrawal Posting Cut Off Times .................................32
Types of Transactions; Limitations ................................32
  Cash Withdrawals ......................................................32
  Fees for Cash Withdrawals ........................................33
  Deposits .....................................................................33
  Payments to Us and to Our Affiliates ........................34
  Bill Payments ............................................................34
  Electronic Check Conversion .....................................35
  Transfers ....................................................................35
    Fees ......................................................................36
    Transfer Limits .....................................................36
    Destinations .........................................................36
  Canceling an Automatic Transfer ...............................36
  Point-of-Sale (POS) Transactions ...............................36
    "PIN Based" Transactions ....................................36
    "Signature" Transactions .....................................37
  Citi Mobile® Mobile Banking .....................................38
  Security Tips ...............................................................39
  Transactions Made Outside the U.S. and Puerto Rico....39
    ATM Cash and POS Transactions Outside the U.S:
    Transaction Charge .............................................39
    Currency Conversion Methods .............................40
  Lost or Stolen Citibank® Banking Cards, or Other Access
  Devices and Unauthorized Electronic Transactions ....40
    Consumer Liability ...............................................40
    Citibank® Debit MasterCard® ...............................41
    Contact in Event of Unauthorized Transfer ..........41
  Error Resolution and Notice Procedures .....................41
  Our Responsibility to You ..........................................42
  Confidentiality at Citibank .........................................42
Limitation of Liability .....................................................43
Resolution of Disputes by Arbitration ............................44
  Agreement to Arbitrate Disputes ...............................44
  Disputes Covered by Arbitration ................................44
  Disputes Excluded from Arbitration ...........................44
  Commencing an Arbitration .......................................45
  Administration of Arbitration .....................................45
  Costs ..........................................................................45
  No Class Action or Joinder of Parties .........................46
  Right to Resort to Provisional Remedies Preserved....46
  Arbitration Award .....................................................46
  Governing Law ..........................................................46
  Severability, Survival .................................................46
Signature Card (Reference Copy) ....................................47
Our Privacy Notice ............................................................i
  Privacy Choices Form .................................................v
CitiPhone Banking® and Other Customer Service
Telephone Numbers...........................................back cover

## General Terms

When you open a Citibank deposit account, you are agreeing that your account will be governed by this Client Manual (sometimes referred to as "Manual") and any and all accompanying Marketplace Addenda (sometimes referred to as "Addendum"). Together, the Manual and Addendum are referred to as "Agreement," which contain important terms and conditions, details, rules and procedures applicable to each of your accounts. If you open a CitiBusiness account, a retirement account, a Citi Private Bank account, or an International Personal Banking or Global Executive Banking account, you will receive other specific terms and conditions applicable to that account.

Unless otherwise expressly agreed in writing, our relationship with you will be that of debtor and creditor. That is, we owe you the amount of your deposit. No fiduciary, quasi-fiduciary or other special relationship exists between you and us. We owe you a duty of ordinary care. Any internal policies or procedures that we may maintain in excess of reasonable commercial standards and general banking usage are solely for our own benefit and shall not impose a higher standard of care than otherwise would apply in their absence.

### Definitions

When used in this Agreement:

**"We," "us," "our,"** and **"Citibank"** mean Citibank, N.A. and **"you"** and **"your"** mean you, the customer.

**"Access Device"** means a card or code, or other means of identification and authentication, used to access your account. In this Agreement, it means your **"Citibank® Banking Card"** including your Citibank® ATM Card; Citibank® Debit MasterCard®; Citibank® / AAdvantage® Debit MasterCard®; Citibank® Debit MasterCard® with PayPass™; Citibank® / AAdvantage® Debit MasterCard® with PayPass™ and any other PayPass™ or other type of device issued by Citibank along with or in lieu of your Citibank Banking Card. It also includes these account access codes: your Personal Identification Number (PIN), your Telephone Personal Identification Code ("TPIC"), and your Citibank® Online Password.

**"Business Day"**

• when referring to Citibank, means any day of the week that is not a Saturday, Sunday or bank holiday. Non-Business Days are considered part of the following Business Day. For funds availability purposes, see the "Funds Availability at Citibank" section of the Marketplace Addendum.

• when referring to Citigroup Global Markets Inc. or Morgan Stanley Smith Barney LLC, means any day of the week Monday through Friday except days when the New York Stock Exchange is closed. Non-Business Days are considered part of the following Business Day.

**"Citibank® Banking Card"** means all Access Devices that may be used at ATMs, including Citibank ATM cards and all versions of Citibank debit cards bearing a MasterCard® logo ("Debit Card").

**"Citigroup Global Markets Inc."** ("CGMI"), member SIPC, is an investment advisor and broker-dealer registered with the Securities and Exchange Commission. CGMI and Citibank are affiliated companies under the common control of Citigroup Inc.

**"Citi Personal Wealth Management"** ("CPWM") is a business of Citigroup Inc., which offers investments through Citigroup Global Markets Inc. ("CGMI"), member SIPC.

---

**SECURITIES:**
- **NOT FDIC INSURED**
- **NO BANK GUARANTEE**
- **MAY LOSE VALUE**

---

**"Electronic Funds Transfers" ("EFT")** means any transfer of funds, other than a transaction originated by check, draft or similar paper instrument, or computer or magnetic tape, so as to order, instruct or authorize a financial institution to debit or credit a consumer checking, savings or other asset account (such as brokerage). Examples of EFT transactions are:

- ACH transactions
- Point-of-Sale ("POS") transactions
- ATM transactions
- Direct deposit or withdrawal of funds
- Transfers initiated by telephone.

Non-EFT transactions include: transfers related to bona fide trust and custodial accounts; Fedwires and similar network transactions (CHIPS, SWIFT, and telex); and transfers to cover overdrafts (such as Safety Check transfers).

**"Home Branch"** means the Citibank branch in which you opened your account or to which your account was assigned or transferred.

**"Linked Accounts"** or **"Linking"** refers to eligible Citibank deposit and/or credit accounts that are combined for different benefits, which may include pricing, statements, Safety Check and the ability to perform certain transactions between accounts. Certain accounts that you maintain with our affiliates may also be linked. Generally, accounts that you maintain in different geographies cannot be linked.

**"Morgan Stanley Smith Barney LLC ("MSSB"),** member SIPC, is an investment advisor and broker-dealer registered with the Securities and Exchange Commission, and is affiliated with, but distinct from, Citibank and CGMI.

**"Network ATM"** refers to an automated teller machine ("ATM") other than a Proprietary Citibank ATM that is operated by or on behalf of a financial institution that is a member of a qualifying payment processing network as identified on your Citibank Banking Card including MasterCard® and bearing the MasterCard®, Maestro® or Cirrus® logos.

**"Point-of-Sale" ("POS")** means a Citibank® Banking Card EFT from your primary checking account at locations displaying the MasterCard® or Maestro® logos to purchase goods and services and/or receive cash using your Debit Card for signature transactions (see the "Electronic Banking" section of this Manual) or using your Debit Card or Citibank ATM card for a PIN-based EFT to purchases goods and services.

**"Proprietary Citibank ATM"** means an ATM that is owned or operated by Citibank, usually only found in Citibank branches.

**"Remotely Created Check(s)"** means an item not bearing the drawer's (your) actual signature, but purporting to be authorized by the drawer (you).

## Definitions of Types of Accounts

**"Estate Account"** means an account opened by a fiduciary on behalf of a formal estate. The estate will have its own Taxpayer Identification Number issued by the Internal Revenue Service (IRS). Additional documentation is required to open the account.

**"Individual Account"** means an account owned in the name of one person only.

**"Joint Account"** means an account owned in the names of more than one person in joint tenancy. If one owner dies, ownership of the account will automatically pass to the surviving joint owner(s). Unless you designate otherwise on your signature card, application or other bank documentation, we will assume that personal accounts opened by two or more individuals are intended to be joint tenancy accounts with the right of survivorship. We can act on the instruction of any one or more of the joint account owners. In the event of conflicting instructions or a dispute among you, we may require all joint account owners to act together in giving us instructions or performing transactions. Any joint account owner may close a joint account.

*EACH ACCOUNT OWNER IS JOINTLY AND SEVERALLY RESPONSIBLE FOR ALL ACTIVITY RELATED TO THE JOINT ACCOUNT, INCLUDING RESPONSIBILITY FOR PAYING OVERDRAFTS CREATED BY ANY AUTHORIZED SIGNER(S) OR PARTY TO THE ACCOUNT, WHETHER OR NOT THEY PARTICIPATE IN THE TRANSACTION OR BENEFIT FROM ITS PROCEEDS. WE MAY BE REQUIRED BY LEGAL PROCESS TO PAY ALL THE FUNDS IN A JOINT ACCOUNT TO SATISFY A JUDGMENT AGAINST ANY OR ALL ACCOUNT OWNERS.*

**"In-Trust-For ("ITF") Account"** means an account where you designate another person as beneficiary of the account. You can open an individual or joint ITF account as long as it is not a checking account. The beneficiary receives the funds in the account only upon the death of all account owners and cannot make any withdrawals or account changes before that time. If more than one beneficiary is named in our records, they will share equally in the account proceeds. During the lifetime of one or more of the account owners, this account will be treated as an individual account or joint account, as applicable. To change the beneficiary, all account owners must sign our documentation naming the new beneficiary.

**"Trust Account"** means an account owned by a trust. In some cases, the trust must have its own Taxpayer Identification Number issued by the Internal Revenue Service (IRS). Additional documentation is required to open the account.

**"Uniform Transfers to Minors Account" ("UTMA Account")** means an account owned by a minor, who receives the funds as a permanent (irrevocable) gift. A custodian controls and manages the account for the benefit of the minor. The definition of a minor varies by state; however, generally, one custodian and one minor are allowed per account, unless the account is established under Maryland's UTMA rules. We act only upon the custodian's instructions. You may wish to consult your tax advisor or attorney before opening a UTMA account.

6

7

## Account Opening/Ownership/ Maintenance and Closing

### Amendments/Changes to This Agreement

We may change (add to, delete or alter) the terms of our Agreement with you by mailing, e-mailing or delivering a notice, a statement message or an amended Agreement to any of you at the last address (location or e-mail) on file for you, your account, or the service in question. Unless otherwise required by law, we may amend the Agreement without prior notice by posting the information in our offices, on our/your web site, or otherwise making it available to you). You should retain all notifications of change with copies of your account documentation. You can always request a copy of our current Agreement at any branch or by calling CitiPhone Banking®. If you opened your account remotely by using Citibank® Online, you can obtain a copy of our current Agreement at www.CitibankOnline.com or by calling CitiPhone Banking® and indicating that you opened your account through Citibank® Online.

### Arbitration

This Agreement contains an arbitration provision that authorizes either party to elect mandatory and binding arbitration of certain disputes. The terms of the arbitration provision are set forth in the section entitled "Resolution of Disputes by Arbitration." *PLEASE READ THIS ARBITRATION PROVISION CAREFULLY.*

### Conflicting Demands/Disputes

If there is any uncertainty or conflicting demand regarding the ownership of an account or its funds; or we are unable to determine any person's authority to give us instructions; or we are requested by law enforcement or a state or local agency to freeze the account or reject a transaction due to the suspected financial abuse of an elder or dependent adult; or we believe a transaction may be fraudulent or may violate any law, we may, in our sole discretion: (1) freeze the account and refuse transactions until we receive written proof (in form and substance satisfactory to us) of each person's right and authority over the account and its funds; (2) refuse transactions and return checks, marked "Refer to Maker" (or similar language); (3) require the signatures of all authorized signers for the withdrawal of funds, the closing of an account, or any change in the account regardless of the number of authorized signers on the account; (4) request instructions from a court of competent jurisdiction at your expense regarding the account or transaction; and/or (5) continue to honor checks and other instructions given to us by persons who appear as authorized signers according to our records. The existence of the rights set forth above shall not impose an obligation on us to assert such rights or to deny a transaction.

### FDIC Insurance

Your Citibank deposits are insured by the Federal Deposit Insurance Corporation (FDIC) up to applicable limits. The FDIC website at www.fdic.gov allows you to determine the amount of your deposits which are insured. For more information, please contact the FDIC directly at 1-877-ASKFDIC (1-877-275-3342).

### Governing Law

Accounts and services are governed by federal laws and regulations. To the extent that such laws and regulations do not apply, these accounts and services shall be governed by and be construed in accordance with the laws of the state where your Home Branch is located, unless a specific agreement states otherwise, or as provided under abandoned property statutes.

8

### Indemnification

Except as otherwise set forth in this Agreement, you agree to indemnify, defend and hold us harmless from all claims, actions, proceedings, fines, costs and expenses (including, without limitation, attorney fees) related to or arising out of: (a) your actions and omissions in connection with your accounts or our services, and (b) our actions and omissions, provided that they are taken/ omitted in accordance with this Agreement or your instructions. This provision shall survive the termination of this Agreement.

### Information Sharing

Our Privacy Notice describes personal information we may collect about you, including your name, address, telephone number, and other information we receive from you, information about your account and transactions, and information we receive from credit reporting agencies and other sources. You authorize us to disclose this information to affiliates and nonaffiliated third parties as permitted by applicable law except as you or we limit those disclosures under the terms of our Privacy Notice. We provide a copy of our Privacy Notice with this Agreement and will provide it thereafter as required by applicable law. You can also obtain a copy at any branch, by calling us toll-free within the U.S. at 1-888-214-0017, by calling CitiPhone Banking® (see the back cover of this Manual for telephone numbers) or by visiting www.citibank.com. You may change your Privacy preferences at any time by indicating your choices on the Privacy Choices Form and mailing it to us. The form and mailing address can be found in the last section of our Privacy Notice. We may take as long as thirty (30) days from our receipt of your privacy choices to process your request.

### Limitation on Time to Sue or Arbitrate

Unless otherwise required by law, an action, proceeding or arbitration by you to enforce an obligation, duty or right arising under this Agreement or by law with respect to your account or any account service must be commenced within one (1) year after the cause of action accrues (two (2) years if your Home Branch is located in Texas).

### Recording Your Service Requests

We may monitor or record your conversations with us or with an agent acting on our behalf. We do this from time to time to monitor the quality of service and accuracy of information given to you and to ensure that your instructions are followed.

### Your Consent for Us to Call You

You understand that we or our agents may contact you at any telephone number you provide to us, including your cell phone number. You agree to receive these calls and messages, such as text messages or prerecorded or autodialed calls. You understand your service provider may charge you for these calls/messages.

### Security Interest

You grant us a security interest in your account for amounts owing to us under this Agreement by any owner. This provision does not apply to IRA or tax-qualified retirement accounts or where otherwise prohibited by law.

### Severability

Unless otherwise stated, if any of the provisions of this Agreement are determined to be void or invalid, the remainder of the Agreement shall remain in full force and effect.

9

## Waiver

We may delay in enforcing any of our rights under this Agreement without losing them. Any waiver by us shall not be deemed a waiver of any other right or of the same right at another time. You waive diligence, demand, presentment, protest and notice of every kind, except as set forth in this Agreement.

## Account Opening

All accounts are opened subject to our ability to verify your identity by requiring acceptable types of identification. To help the government fight the funding of terrorism and money laundering activities, federal law requires us to obtain, verify, and record information that identifies each person who opens an account. When you apply for an account, we will ask for information that will allow us to identify you. We may also ask for your driver's license or other identifying documents.

## Consumer Reporting Agency Information

You authorize us to obtain a consumer report in connection with the application, update or renewal of any deposit or loan account you apply for and you understand that we may also obtain such reports at any time once you become a customer. You also authorize us to use these consumer reports to consider you for other programs with Citibank.

We may report information about you and any joint account owners or authorized signers on the account to a Consumer Reporting Agency. If you disagree with the accuracy of the information that we submit to a Consumer Reporting Agency, please call CitiPhone Banking® (see the back cover of this Manual for telephone numbers) or write to us at Citibank – Consumer Report Inquiry, P.O. Box 769004, San Antonio, TX 78245-9989. We will review our files and respond to you in writing.

## Checking Account Sub-accounts

For regulatory reporting and accounting purposes, all Citibank consumer checking accounts consist of two sub-accounts: a transaction sub-account to which all financial transactions are posted; and a savings sub-account into which available balances above a pre-set level are transferred daily.

Funds will be transferred to your transaction sub-account to meet your transactional needs. For Regular Checking (all non-interest bearing checking accounts), both sub-accounts are non-interest bearing. For all types of Interest Checking, the savings sub-accounts pay the same interest rate as their corresponding transaction sub-accounts. Transfers can occur on any Business Day. Transfers to the savings sub-account will be made whenever available balances in the transaction sub-account exceed a preset level. Transfers from the savings sub-account to the transaction sub-account will be made whenever the transaction sub-account balances fall below a predetermined level. Because banking regulations limit the number of transfers between these types of sub-accounts, all balances in the savings sub-account will be transferred to the transaction sub-account within the sixth transfer in any statement period. Both sub-accounts are treated as a single account for purposes of the customer's deposits and withdrawals, access and information, tax reporting, fees, etc.

## Updating Your Account Information

It is important that your account records are kept up-to-date. You must inform us of any change in your name or address. For your convenience, you can do this:

- By signing on to your account at www.CitibankOnline.com;
- By calling CitiPhone Banking®;
- At a Citibank branch.

If you meet the required criteria, we will complete your address change request over the phone; however, it may be necessary to have you place your request in writing. Be sure to change the address on each of your accounts. Address changes will not change your Home Branch and any additional accounts you open by phone, mail or using Citibank® Online will also be assigned to the same Home Branch.

## Transferring Account Ownership

OWNERSHIP OF CHECKING, SAVINGS, MONEY MARKET AND CERTIFICATE OF DEPOSIT ACCOUNTS IS TRANSFERABLE ONLY WITH OUR WRITTEN PERMISSION AFTER YOU COMPLETE OUR APPROPRIATE FORMS AND, IN MOST CASES, WOULD REQUIRE THE ACCOUNT TO BE CLOSED AND RE-OPENED.

## Spanish Language Preference

This section applies if you select Spanish as your preferred language for communicating with us. Please note that we may not be able to accommodate this preference at all of our branches or for all products and services.

**Account Documents.** English is the controlling language governing your banking relationship with us, and the English version of this Agreement is the governing Agreement. However, as a courtesy, at your request, and for your convenience only, when you open a deposit account with us we may provide you with an unofficial Spanish translation as well as an official English version of this Agreement. If we do so, you should retain both the English and Spanish versions for your records.

**Account Communications.** Although we may send you a Spanish version of your account statement, you can obtain an English version upon request. Currently, Citigold® Account statements are available only in English. Certain other notices, disclosures and communications may also only be available in English.

**Availability of Products and Services in Spanish.** Online banking and ATM services are offered in Spanish; however, some products and services provided in our branches may be available only in English.

**Customer Service.** You can receive customer service in Spanish by calling Citiphone Banking®.

## Account Errors and Adjustments

We may make adjustments to your account whenever a correction or change is required. Adjustments might occur, for example, if deposits are recorded in the wrong amount or items you deposit are returned unpaid. We may elect, in our discretion, not to make an adjustment to your account to correct an error which you or a third party (e.g., another financial institution) cause if the adjustment is less than $5.00 or our cost to make the adjustment is greater than the amount in question.

You have a responsibility to review your account statement in a timely manner and to notify us promptly of any errors. Within thirty (30) days after we send or make available to you your account statement and accompanying items, you must notify us in writing of any errors, discrepancies, or unauthorized transactions

not involving an electronic funds transfer. If you fail to do so, we will not be liable for debits or charges to your account resulting from such errors, discrepancies or lack of authorization, or for losses resulting from subsequent related occurrences.

You also agree that any suit or demand for arbitration that you assert based on an account error, discrepancy, or unauthorized transaction must be brought within one (1) year (two (2) years in Texas) after the date of the first account statement on which the error, discrepancy, or unauthorized transaction appears.

If you think an error has been made or if you need more information about a transaction, call CitiPhone Banking® at the number on the back of your Citibank® Banking Card. If your account is debited with a substitute check that you have received from us and you believe that there is an error or discrepancy or that the transaction is unauthorized, you are entitled to additional rights under the law. Please refer to the "Substitute Checks and Your Rights" section of this Manual. Please read the "Error Resolution and Notice Procedures" provisions of the "Electronic Banking" section of this Manual for additional information about problems with such transactions.

If funds to which you are not entitled are deposited into your account, we have the right to remove these funds from the account at any time without prior notice to you. If there are insufficient funds in the account, we may charge your other accounts to recoup the funds, as more fully explained in the "Right of Setoff" section of this Agreement.

## Assignments

Most accounts can be assigned as collateral for a loan from us or another lender. Unless we agree in writing, any such assignment to another lender will remain subject and subordinate to our right of setoff. For the assignment to be effective, we must receive written notice of the assignment and agree to it in writing. We will then reflect the change on our records.

---

# Account Transactions

## What This Section Covers

This section governs transaction activity in the following Citibank accounts: all types of checking, savings and money market accounts. It does not apply to certificate of deposit accounts.

## Checkbooks and Checks

When you open a checking or money market account with a check-writing feature, you can order personalized checks through us. When we place an order for your checks, we act as sales and billing agent for the check supplier, and we are compensated for our services. We will automatically deduct the cost from your account balance after your order is processed. You are responsible for verifying the accuracy of all information shown on your checks. If you find an error, you must notify us immediately.

If you arrange for the printing of your own checks, the form, encoding and format of the checks must follow our check specification requirements and be approved by us in advance. If you do not purchase your checks through us, we may charge a fee for each check that rejects during processing due to poor print quality, or if it fails to meet our specifications. You agree not to issue checks with features or marks that obscure, alter or impair information on the front or back of a check or that otherwise prevents us or another bank from capturing such information during automated check processing.

Checks ordered through us can include fraud prevention features. If you choose not to use them or other checks that include fraud prevention features, you agree to assume a heightened degree of responsibility for safeguarding your checks, and for reviewing all returned checks and statements as soon as you receive them.

You agree to safeguard your blank and canceled checks, and to take reasonable steps to prevent their unauthorized use. If your checks are lost or stolen, you agree to notify us immediately. For security reasons, we reserve the right to close your account and transfer the balance to a new account. If we do, all checks written but not yet paid may be returned to payees as "Account Closed" or "Refer to Maker". You will be responsible for issuing any replacement checks.

## Deposits

You can make deposits:

- At any Proprietary Citibank ATM in the U.S., 24 hours a day, 7 days a week, by using a deposit envelope and your Citibank® Banking Card. Envelopes are available at all Proprietary Citibank ATM locations;

- At ATMs located in select 7-ELEVEN² Convenience Stores (deposits of checks only);

- With a teller, during regular banking hours, at any Citibank branch in the United States;

- By using our Deposit/Payment Express boxes which are located at select Citibank branch locations;

- By mail;

- By Direct Deposit of your pay, pension, social security or any other federal or state payment to your checking, savings or money market accounts. Forms for establishing direct deposits can be obtained at any Citibank branch or through Citibank® Online;

- By Citibank® Global Transfer Service (where available); or

- By an ACH or wire transfer.

We may accept items payable to you, or to any of you, from any source without questioning the authority of the person making the deposit. We also may give cash back to any authorized account signer(s) or agent(s) in connection with items payable to any owner, whether or not the items have been endorsed by the owner. If you make a deposit or payment that is not accompanied by instructions indicating how or where it is to be credited, we may apply it at our discretion, to any loan or deposit account any of you maintain with us.

### Remotely Created Checks

You may not deposit remotely created checks to an account with us without our prior, express written consent. If you deposit remotely created checks with us, you agree that we may withhold a portion of the proceeds of such remotely created checks in a reserve account, in an amount that we reasonably believe may be needed to cover future charge backs, returned items, and/or claims that such remotely created checks were unauthorized. You grant us a security interest in the reserve account. Unless we agree otherwise in writing with you, reserve funds shall not bear interest. Our right to charge your account for returned remotely created checks will not be limited by the balance or existence of any reserve fund. Our rights with respect to the reserve fund, as well as the security interest granted to us, shall survive the termination of this Agreement. We may discontinue accepting remotely created checks at any time without cause or prior notice.

If you provide your account number to a third party with instructions to charge your account by means of one or more remotely created checks, you authorize us to pay such remotely created checks, even though they do not contain your signature and may exceed the amounts you authorized to be charged. This provision shall not obligate us to honor remotely created checks. We may refuse to honor remotely created checks without cause or prior notice, even if we have honored similar items previously.

### Endorsements

To ensure that your check is processed without delay, you must endorse your check correctly. The area reserved for your signature is on the back of the check, within 1-1/2 inches from the "top" edge (as shown in the picture below). Turn the check over, and sign your name and write your account number. Do not make any additional marks or notations on the back of the check. The portion of the check not reserved for your endorsement must remain blank for processing purposes. We will not be responsible for any loss you incur if your check is improperly endorsed. You will be liable for unpaid checks returned late because your endorsement, a prior endorsement, or information you have printed on the back of the check obscures other endorsements.

We may endorse and/or collect items deposited to your account without your endorsement, but may require your personal

endorsement prior to accepting an item for deposit. If you deposit an item that bears the endorsements of more than one person or persons who are not known to us, we may refuse the item, require all endorsers to be present, or require that the endorsements be guaranteed by another financial institution acceptable to us before we accept the item. If you routinely request that we deposit third party checks, we may require that you enter into a separate agreement with us for that purpose. We may also refuse to accept such an item for encashment.

### Items Sent for Collection

We and other institutions may refuse to accept a check or other item for deposit or may accept it on a collection basis only. This often occurs with foreign, questionable or damaged items. If we accept an item for collection, we will send it to the institution upon which it is drawn, but will not credit your account for the amount until we receive the funds from the other institution. If we elect to credit your account before then, we may charge the amount back against your account if we do not receive payment for any reason. We may impose a fee in connection with sending and receiving items for collection (e.g., by charging your account or deducting the fee from the amount remitted). Other institutions that send or receive items for collection involving your account also may impose a fee for their services.

### Verification and Collection

Any item that we cash or accept for deposit is subject to later verification and final payment. We may deduct funds from your account if an item is lost, stolen or destroyed in the collection process, if it is returned to us unpaid, or if it was improperly paid, even if you have already used the funds. Cash deposits are also subject to later verification.

### ACH Provisional Credits

Credit for an automated clearing house ("ACH") transfer is provisional until final payment is received by the payee's financial institution. Until that happens, the party originating the transfer is not deemed to have made payment to the beneficiary, and the payee's bank is entitled to a refund of the provisional credit. If we give you provisional credit for an ACH transfer, but do not receive final payment, you become obligated to us for the full amount without prior notice or demand.

### Notice of Incoming Transfer

We are not required to give you a separate notice of our receipt of an ACH transfer. If we accept ACH credits to your account, you will receive notice of the credit on your next regular periodic statement. Although we may send notice of a non-ACH incoming funds transfer (e.g., a wire), we assume no obligation to do so. Transfers to your account will be reflected on your regular periodic statement. You may also contact your Home Branch during normal business hours to determine if a transfer has been credited to your account. This information is available to you anytime via CitiPhone Banking®, Citi Mobile® or Citibank® Online.

### Returned Items/Transactions

When checks or other items that you deposit to your account are returned for insufficient or uncollected funds, we may, at our discretion, re-present those checks or other items for payment a second time without notifying you that the check or item was returned. You agree that we are not responsible for any loss or damage you may incur as a result of our not notifying you when such check or other item was first returned. At our option, we may re-present the check electronically. We may also place a hold on

the funds in question (see "Funds Availability at Citibank" section in the Marketplace Addendum) or charge your account for the amount (and any interest earned on it) whether or not the return or notice of non-payment is proper or timely.

This also applies to checks drawn on us which are not paid for any reason, and to checks that are returned to us in accordance with any law, regulation or rule (including a clearinghouse rule). We may assess a fee for each returned item and notify you of the return orally, electronically or in writing.

If we receive an affidavit or a declaration under penalty of perjury stating that an endorsement on an item deposited to your account is forged, that the item contains an alteration, or that there has been a breach of warranty in connection with the item, we may charge the item back against your account or place a hold on the funds pending an investigation, without prior notice to you.

### Reconstructing Lost or Destroyed Deposits

When you cash or deposit a check or other item with us, we act as your agent to collect the item. You assume all risk of loss for an item in the process of collection. We may reverse any credit given and any interest earned or accrued for a deposited item that is lost in transit and we may recover from any account you maintain with us the funds given to you for a cashed item which is lost in transit. You will do everything reasonably within your ability to promptly assist us to find, identify or replace a lost item, including but not limited to, maintaining a record of the maker of items delivered to us for deposit and collection. We shall not be liable to you if an item is lost in the process of collection, provided we exercised ordinary care in handling the item. In no event shall we be liable to you if you cannot identify the maker of the lost item.

### Account Balance and Transaction Information

Although you may view your account information on Citibank® Online, Citi Mobile® or at an ATM and you may receive account information through CitiPhone Banking®, the information provided through any of these means may not include recent transactions and may also include funds that are not available for immediate withdrawal.

### Limits on Transfers

Federal regulations require us to limit the number of transfers from any savings account, including money market accounts, of the following transaction types:

- Checks you write;
- Debit Card or similar orders made by you and payable to a third party;
- Automatic transfers (including Safety Check transfers);
- Recurring payments you set up in advance;
- Payments and transfers you authorize via CitiPhone Banking®, Citi Mobile® and Citibank® Online or other electronic means;
- Transfers to third party institutions at an ATM (i.e. Transfers made at an ATM for mortgage and/or credit card payments), including those you make using the Citibank® Global Transfer Service.

The maximum number of transfers you can make is limited to no more than six (6) per statement period. For money market accounts, our policy is that we do not permit more than three (3) of those six (6) transactions to be made by check, Debit Card or similar order. If you have reached either of these limits, we may refuse to honor additional transactions. We count checks for purposes of the transaction limitation as of the date we post them to your account (not as of the date you write them). As such, a check you write during one statement period may not be counted until a subsequent statement period. If these limits are exceeded three (3) times within

a twelve (12) month period, we will, in our sole discretion, either: restrict your account access; or, transfer the funds in your account into another Citibank account you have (or that we open for you) that is not subject to these transaction limits, as will be further described in the notice that we send concerning such excessive transaction activity; or, close your account and mail you a check for your balance, if any. We may also impose an excessive activity fee. There is no limit on the number of transfers that you make in person with a teller or from our branches or transfers between your linked deposit accounts at a Citibank ATM.

The chart below provides some examples of transactions that count toward the six transaction limit as well as those that do not.

| Does this transaction in a savings or money market account... | ...count toward the 6 transaction limit? |
|---|---|
| Citibank® Online transfers from savings to a linked Citibank account (such as checking) | Yes |
| Outgoing Inter Institution Transfers or Online Wires through Citibank® Online | Yes |
| Transfers made via CitiPhone Banking® | Yes |
| Transfers from savings to cover checking overdrafts via our Safety Check service | Yes |
| Pre-authorized (ACH) deductions by a third party | Yes |
| Checks written from a money market account | Yes |
| Outgoing Citibank® Global Transfers made via Citibank® Online, at a Citibank ATM or in a branch | Yes |
| Cash Withdrawals made at an ATM | No |
| Withdrawals or transfers with a teller in a Citibank branch | No |

### Funds Transfers

The following terms apply to domestic or international wire transfers of funds which are initiated at or through a Citibank branch, including wire or cable transfers. Examples of funds transfers covered by this section are Fedwires and similar network transactions (CHIPS, SWIFT and telex). In addition to the information provided here, please refer to any funds transfer agreement you may receive when you initiate such a request. The terms of that agreement will supersede any conflicting terms in this Agreement. When you place an order to transfer money, you authorize us to debit your account for the amount of the order, and you authorize us to charge your account a service fee in accordance with our fee schedule in effect at the time of your order. In placing the order, you must select a financial institution ("beneficiary bank") to receive it. You may instruct the beneficiary bank to credit an account or hold the funds for the beneficiary. The beneficiary bank is responsible for following your instructions and letting the beneficiary know when the funds become available. If you specify an account number to credit, you are acknowledging three things:

- You know that the beneficiary bank may credit an account based on that account number;
- The beneficiary bank is not obligated to verify that the account number belongs to the intended beneficiary of the transfer;
- Any losses resulting from an incorrect account number or other misidentification of the beneficiary are your responsibility and not ours.

**Security Procedures.** When you place an order for a funds transfer, we will follow a security procedure established for your protection and ours to verify that the transfer has been properly authorized. You understand that the security procedure is designed only to verify the source of the funds transfer instruction and not to detect errors in the content of that instruction or to prevent duplicate transfers. The procedure depends on the means by which you provide instructions to us. Unless we agree on another security procedure, you agree that we may confirm the authenticity and content of instructions by placing a call to any authorized signer on your account. By placing a transfer order, you agree to our use of the applicable security procedure. You agree to be bound by the resulting transfer, whether or not authorized by you, provided we have accepted the transfer order in accordance with our established security procedure.

**Claims.** You have the responsibility to let us know of any error, delay or other problem with your funds transfer within thirty (30) days from the date you receive notification that we have transferred the funds. In the event that we cause an error or delay with respect to your funds transfer, our sole obligation to you is to pay or refund such amounts as may be required under applicable law. In no event will we be liable for any consequential or incidental damages in connection with your funds transfer. Any claim for interest payable by us shall be at our savings account rate. If you fail to notify us of any claim concerning your funds transfer within one year from the date that you received notification that your funds transfer order has been executed, any claim by you will be barred under applicable law.

**Delays or Non-Execution of Transfers.** We will usually use electronic means to transfer money for you. We may, however, use any banking channel or other facility. We will not be liable for any delay or failure to send your funds transfer due to circumstances beyond our control. We will not be liable to you for any delay or failure to execute your funds transfer due to the acts or omissions of any intermediary or beneficiary bank.

**Canceling or Changing a Transfer.** If you decide to cancel or change your funds transfer order, you may do so only if we receive your instructions before we have sent the funds transfer and provided we have a reasonable time to act on your instructions. In general, after we have sent your funds transfer, you will not be able to cancel or change it unless the beneficiary bank consents to such a request. We and/or the beneficiary bank may impose a charge for canceling or changing a funds transfer and/or any required currency conversion. We will not be liable to you for any losses resulting from the failure of the beneficiary bank to cancel or change your funds transfer.

**Rejecting a Transfer Request.** We reserve the right to reject your order for a funds transfer. We may reject the order if you have insufficient funds in your account or if your order is unclear or incomplete or if for any other reason the order is unsatisfactory to us. See "Withdrawal Refusals" for some of the other reasons that we may reject a funds transfer request.

**Cut-Off Time for Executing Your Transfer Request.** If your order for a funds transfer is received by us at or after our established cut-off hour for processing wires (check with your local Citibank branch for cut-off hours), or on a non-Business Day, your order may not be processed until the next Business Day.

**Incoming Funds Transfers.** Notice of your incoming funds transfers will be deemed to have occurred when you receive your periodic bank statement, or another notice from us, containing a credit to your account for the funds received. Also, you can call CitiPhone Banking® or view your account information on Citibank® Online (or Citi Mobile) to determine if a funds transfer has been credited to your account.

**International Transfers.** For funds transferred to beneficiaries and beneficiary banks in other countries, we will normally convert the funds to the currency of the destination country at our current currency conversion rate. If you want the funds sent in U.S. dollars, we cannot guarantee that the beneficiary will receive the funds in U.S. currency. The local bank may charge a fee for currency conversion. The actual amount that the beneficiary receives may be reduced by charges imposed by the beneficiary bank, or a correspondent bank, including charges for exchange of currency. An international transfer of funds into your account may be reduced by fees that we impose or that are imposed by the sending bank or by any correspondent bank. Unless you advise us otherwise, we may charge your account to pay for fees imposed by beneficiary or correspondent banks or instruct such banks to obtain payment of their charges for services and expenses by deducting the amount from your order. A portion of those charges may be shared with us. In some instances we may also act as the correspondent bank. In addition, in the case of transfers into your account which are sent in foreign currencies, we will convert the funds into U.S. dollars at our current conversion rate. Our conversion rate for both outgoing and incoming foreign fund transfers includes a commission for the conversion service.

## Withdrawals

### Where to Make a Withdrawal

*At a Citibank branch.* You can withdraw up to your available balance by cashing a check or making a withdrawal at a Citibank branch. We may require you to present identification.

*At a Proprietary Citibank ATM or at an ATM Network Machine.* You can use your Citibank® Banking Card to withdraw cash from your eligible linked accounts at a Proprietary Citibank ATM and from certain accounts at ATM Network Machines. Depending on the terms of your account, there may be a Citibank transaction fee for cash withdrawals from non-Proprietary Citibank ATM Network Machines. In addition, the company that owns or operates the machine may charge you a fee for the withdrawal. For more information on ATM withdrawals, refer to the "Electronic Banking" section of this Manual.

### Cash Withdrawals

Cash withdrawals or payments at any Citibank branch may be restricted due to the limited amount of currency on hand. If we do not have sufficient cash for a large withdrawal or payment, we may make arrangements for a later cash payment or offer to make payment with an Official Check. We assume no responsibility to provide personal protection for customers who elect to carry large sums of money off our premises.

### Writing a Check

You can write a check for any amount up to the available balance (including any Checking Plus® or Safety Check availability) in your checking account or money market account, provided your account offers a check-writing feature, by using one of the personalized checks you receive from us or one of the compliant checks that you have ordered elsewhere. Checks must be written in U.S. dollars.

## Paying Your Checks

*Electronic Presentment of Checks.* We may charge your account on the day that a check or other transaction is presented (or returned) to us directly or electronically for payment. We may charge your account or place a hold on funds at an earlier time if we receive notice that a check or other item deposited to your account is being returned, or if we receive notice that your check or electronic payment (e.g., at a point-of-sale) is being processed for collection. Please note: Some merchants may obtain authorizations in advance for point-of-sale transactions in an amount greater than the final transaction amount. You agree that we may place a hold on sufficient funds to cover the amount of the authorized transaction, pending its final settlement through the system even if that amount exceeds the actual amount of the transaction. This could affect the balance available to cover other transactions.

*Check Processing Cut-off Hour.* In order to handle the large volume of checks processed each day, we may treat any check you have written that is presented for payment after 2:00 PM on a Business Day as if it were received on the next Business Day. Our cut-off hour with respect to any notice, knowledge, stop payment or post-dated check order, or legal process received by us involving a check we have received for payment is one hour after the opening of the Business Day following the Business Day on which we received the check. Our cut-off hour for check processing purposes with respect to our right of setoff is midnight of the Business Day following the Business Day on which we received the check, or such later time by which we must return the check.

*Notations on Checks.* We may ignore any legal copy appearing on your checks (such as "Void after 60 days"). Our decision to pay or not to pay a check is based on funds available in your account and other factors. It may not be affected by any subsequent deposits to your account.

**PLEASE NOTE:** As checks you have written are presented to us for payment during the course of a Business Day, we may place a hold on available funds in your account for the amount of those checks resulting in a reduction in your available account balance throughout that day. The held funds may be applied against processing of those checks or other transactions later that day.

We process most checks by automated means based on information encoded on the checks. As such, we may not physically examine all checks to determine if they are properly signed or completed. You agree that we may rely on such a process and that it will be deemed an acceptable standard of care on our part.

*Post-Dated Checks.* You agree not to write post-dated checks. If you do, we may or may not pay the check on the day it is presented.

The following applies to you if your Home Branch is located in a state other than New York: If you write a post-dated check on your account and intend that the check will not be paid by us until the date written on the check, you must notify us to register it at the time you write the check. In order for your registration notice to be effective, you must call CitiPhone Banking® and provide the number, payee, amount and date of the check. You may also send written notice of your post-dated check request to us at the address printed on your periodic statement. An oral or written request to register a post-dated check is good for six (6) months and may be renewed for additional six (6) month periods by giving written notice to us within the period during which the original notice is in effect. A post-dated check will be registered only if the notice is received at such a time and in such a manner as to afford us a reasonable opportunity to act on it before we take action with respect to the check. We may pay any post-dated check that has not been properly registered with us or not registered in a timely manner. If we re-credit your account after paying a postdated check over a valid and timely

postdated check notice, you agree to transfer to us all of your related rights against the payee or other holder of the check, and to assist us in legal action taken against that person.

*Stale Dated Checks.* You agree that we may pay or reject a check which is presented to us for payment more than six months after its date (a "stale dated" check), even if the presentment occurs after the expiration of a stop payment order. We normally do not examine the date on checks presented for payment. You agree that we are not required to identify stale dated checks or to seek your permission to pay them. To make sure that a check will not be paid, you should place a stop payment order on the check.

## Stop Payment Orders

*General.* Any signer on the account can instruct us to stop payment on a check that has not been paid by issuing a stop payment order at a Citibank branch, through Citibank® Online or by calling CitiPhone Banking®. A stop payment order must be received in a time and manner that gives us a reasonable opportunity to act on it before paying, accepting, certifying, cashing or otherwise becoming obligated to pay the item. Payment cannot be stopped on a check that has already been paid or that is in the process of being paid. At the time that you place a stop payment order, we may not be able to tell you whether the check has been paid or is in the process of being paid. Under certain circumstances, the law may allow the party in possession of the check to enforce payment, despite the stop payment order. You agree to indemnify us against any claim or loss resulting from honoring your stop payment request.

You may not be able to stop the payment of a check that is converted to an electronic transaction by a merchant. Please contact the CitiPhone Banking® number on the back of this Manual if you wish to stop such a payment.

A stop payment fee may apply. Please refer to "Service Fees and Charges for All Accounts" in the Marketplace Addendum for schedule of applicable fees.

*Contents of Stop Payment Order.* You will need to accurately provide:

- Your account number;
- The date of the check;
- The check number;
- The exact amount (dollars and cents) of the check; and
- The payee's name.

We may use some or all of the information, in our sole discretion, to identify a check. If the information is not exactly correct, the stop payment may not be effective.

*Effective Period of Stop Payment Order: Renewal.* A stop payment order will stay in effect for six (6) months from the date we accept the stop payment order, unless you instruct us to cancel it or to renew it, provided that we have not already returned the check. The order may be renewed for additional six (6) month periods. Your instructions to revoke or renew a stop payment order must be received in a time and manner that gives us a reasonable opportunity to act upon it.

*Payment over Valid Stop Payment Order.* If you believe that we have paid a check over a valid stop payment order, we may require you to provide us with evidence of our acceptance of a valid stop payment order and an affidavit describing in detail your loss resulting from the payment of the check, and, if applicable, further describing in detail your dispute with the payee. If we subsequently determine that you were indebted to the payee for the amount of the check or less, you agree that we will have the right to debit your account for the amount of the indebtedness. If your account has insufficient funds to cover the indebtedness we may also exercise our right of setoff.

*Replacement Check.* If you write a new check to replace one on which you have placed a stop payment order, be sure it has a different check number and date. It is also helpful if you write the word "replacement" on it so it is not mistaken for the original check.

*Official Checks and Money Orders.* You may not as a matter of right place a stop payment on an official check, money order, or international cheque. If such an instrument has been lost, stolen, or destroyed, you and/or the payee may, under certain circumstances, be allowed to place a stop payment by completing a "Stop Payment Request and Indemnity Agreement" form. We may require that you wait ninety (90) days before reissuing the check or reimbursing you. You may also be required to purchase a surety bond for twice the amount of the instrument.

**Insufficient Account Balances**

We may accept, pay, certify, or charge to the appropriate account, checks and other items in the order we choose. For purposes of this "Insufficient Account Balance" section and the following "Overdrawing your Account" section, an "item" includes checks, substitute checks, service charges, purported substitute checks, electronic items or transactions, drafts, remotely created checks, image replacement documents, indemnified copies, preauthorized payments, automatic transfers, telephone initiated transfers, ACH transactions, online banking transfers or bill payment instructions, withdrawal slips, in-person transfers or withdrawals, adjustments, and any other instruments or instructions for the payment, transfer or withdrawal of funds including an image or photocopy of any of these. We may establish different processing orders and/or categories for processing checks and certain other items from time to time. We may, in our sole discretion, change our payment hierarchy, priorities, categories or order at any time without notice to you. Even if we provisionally post checks or other items to your account during the day, we may treat them as if we received all of them at the end of the day and process them in any order we choose. We do not necessarily process transactions in the order in which they occurred.

In the event the available balance in your account is insufficient to cover your day's transactions, including fees and charges, we may choose the processing order of your items without regard to the fees that you may incur as a result of our selection and without notice to you. With regard to the category of "checks," we generally will pay your checks in the order of largest to smallest dollar amount. For accounts maintained with a Citibank branch located in the state of Texas, we generally will pay your checks in order of the smallest to the largest dollar amount; however, we may change this order and process items in the category of "checks" by whichever method we choose in our sole discretion without prior notice to you.

**Overdrawing Your Account**

In the event of insufficient funds to pay all of your items or permit one or more transactions, we may return one or more of your items and/or not allow one or more of the requested transactions; or, in our sole discretion, we may create an overdraft by paying some or all of them. Regardless of the option we choose, we will charge you a fee (or fees) as stated in the "Service Fees and Charges for All Accounts" Fee Schedule located in the Marketplace Addendum. Our payment of any items or allowance of transactions that create overdrafts in no way obligates us to continue that practice at a later time. We may discontinue permitting overdrafts without cause or notice to you. We discourage the practice of overdrawing accounts.

We offer a line of credit account called Checking Plus® (variable rate), which can cover your incoming items (as defined in the "Insufficient Account Balances" section) and prevent returned items up to your

available credit line. This overdraft protection is not automatic and you must apply for and be approved for this account. You can also enroll in our Safety Check service, which lets you link a money market or Day-to-Day Savings account to cover overdrafts or use of unavailable funds in your checking account. For more information on Checking Plus® (variable rate) and Safety Check, please refer to the "Overdraft Protection" section of the Marketplace Addendum.

**Withdrawal Refusals**

In some instances, we may refuse a request for a withdrawal or transfer from an account. The following list includes, but is not limited to, the most common reasons we might refuse such requests:

· If the funds you wish to withdraw are not yet available; (See the "Funds Availability at Citibank" section of the Marketplace Addendum.)

· If we decide to require seven (7) days advance written notice and we have not received such notice;

· If there are insufficient funds in your account;

· If you use a type of check not acceptable to us;

· If the funds you wish to withdraw are being held to cover a checking account withdrawal under our Safety Check service;

· If the funds you wish to withdraw are being held due to cashing of a third party check against the account or for any other reason;

· If the withdrawal would consist of money owed to us;

· If the withdrawal you are requesting is of the type that is limited by federal regulations, and you have already reached the applicable limit;

· If, in the case of a joint account, any account signer gives us written instructions not to permit a withdrawal;

· If the account is pledged as collateral for a loan;

· If an account owner has died and we have not received all documents required to release funds in the account;

· If we have not received documents or identification required to permit access to the account, such as when the account is new and documentation remains missing;

· If we have been ordered by a court or other legal process not to permit the withdrawal;

· If you do not present us with appropriate identification or any other information that we may require;

· If we are aware of any dispute relating to the account or funds in the account;

· If we have some suspicion of fraud, irregularity, or illegality; or

· If we believe that the signature on a check or item drawn on your account and presented for payment does not appear similar to that appearing in our records.

**Withdrawal Notice**

We reserve the right to require seven (7) days advance notice before permitting a withdrawal from all checking, savings and money market accounts. We currently do not exercise this right and have not exercised it in the past.

22                                                                 23

## Check Cashing

*Your Own Checks.* You can cash a check at any Citibank branch, for any amount up to the available balance with your Citibank® Banking Card or other identification that is acceptable to us.

*Third Party Checks.* In certain instances we may allow you to cash a third party check (i.e. a check originally payable to another person) at a Citibank branch, up to the available balance in your account using your Citibank Banking Card as identification. If the check is payable to a party other than yourself, we may require that the other party's endorsement be verified or guaranteed before we accept the check. In any case, we may refuse to accept any third party check for encashment for any reason. If you routinely request that we cash third party checks we may require that you enter into a separate agreement with us for that purpose. If we do cash a third party check, a hold may be placed on your account for the amount of the check until the check clears. The amount of the check cashed may also reduce your daily balance or average daily balance for interest and/or fee calculation purposes for up to the number of days it takes for us to collect the check.

*Payee Check Cashing.* When you write one of your checks to another person, that person, with proper identification, may be able to cash it at a Citibank branch up to the applicable limit which is currently $5,000*. This limit may change from time to time without notice to you. We may charge a person who cashes your check a fee, or refuse to cash your check, if that person is not a deposit or loan customer of ours. Otherwise, the payee will be required to deposit the check to an account with us or elsewhere. For checks presented for encashment to a Citibank branch located in California or Nevada by a payee who does not bank with us, we may also require the payee to provide a fingerprint before cashing the check. If the payee refuses to provide a fingerprint, or, if a payee refuses to pay our check cashing fee, we may refuse to cash the check. You agree that our refusal to do so is reasonable and that we will not be liable to you for our refusal.

*\* Certain checks drawn on a Delaware branch must be presented at a Citibank branch located in Delaware for encashment.*

*Check Cashing for Others.* You should not use your account to cash checks for others who are not well known to you. Although we may make funds provisionally available to you and may take steps to determine whether a check will be paid, you are responsible for any loss that occurs if the check is returned to us for any reason (e.g., because it is counterfeit). Our employees cannot promise that checks drawn on or issued by other institutions, including cashier's checks or official checks, will be paid.

## Account Statements and Notices, Periodic Statements

We will send you periodic account statements showing all activity for the statement period, all transactions made with your Citibank® Banking Card, all transfers you authorize in advance, and other account information for the statement period. Passbook and CD accounts do not receive periodic statements unless electronic funds transfer activity has occurred in the account. Your periodic statement will include a summary of your linked account balances and an itemized listing of your transactions by date, including information about checks presented against your account. We use postage-paid ordinary mail to send you statements or notices to the postal mail address reflected in our records for the account.

Instead of receiving a paper statement, any signer on an account may elect to enroll into our paperless statement service. If you elect to use the paperless statement service when available, we will notify you, using electronic mail at the electronic mail address you provided for this service as reflected in our records for the account, of the availability of your statement and other notices.

Regardless of the number of account owners, we only mail to one owner per account. Notification given to any one account owner is considered notification to all account owners and is considered delivered to you on the date we first place the statement or notice in the mail or the date that the electronic mail is first sent, regardless of whether or not you receive it.

If two consecutive statements and/or notices are returned to us for any reason, you agree that we may hold subsequent notices and statements until we receive forwarding information from you. Statements and notices held for you will be deemed delivered to you on the date that they are prepared (for held statements), mailed (for returned statements) or otherwise made available to you. At our discretion, we may destroy mail that is returned to us as determined to be undeliverable. If you have a checking, Checking Plus®, or Checking Plus® (variable rate) account, you will receive a statement each month and that statement will include information regarding all of your other linked accounts. If you have any other type of account that is not linked to a checking, Checking Plus®, Checking Plus® (variable rate) or linked retirement plan account and that would otherwise receive periodic statements, you will receive a statement whenever there is EFT transaction activity or quarterly, whichever comes first. Quarterly statements are produced for statement cycles ending during January, April, July and October of every year.

You can arrange to receive separate statements for your linked Citibank, N.A. accounts by calling CitiPhone Banking® (see the back cover of this Manual for telephone numbers).

### Cancelled Check Options

Unless you have an account package that allows you to elect otherwise and you have done so, we will retain copies of your cancelled checks for a period of time and we will not send you either your original cancelled checks or images of your cancelled checks.

If you have an Everything Counts® Package or a Citibank® Account Package, you may elect to have your check images delivered with your periodic statements. If you have a Citigold® Account Package, you may request that either check images or your original cancelled checks be returned to you with your periodic statement. You must speak with an Account Representative to sign up for this service. Please note that if you receive check images with your statement,

24

25

Included among those images may be some checks which were presented for payment but which were returned unpaid after your statement was prepared and sent to you.

Images of your cancelled checks presented within the past twelve months are also available to you through Citibank® Online. Additionally, you may request a copy of any of your cancelled checks by calling CitiPhone Banking®. Please refer to "Service Fees and Charges for All Accounts" in the Marketplace Addendum for applicable fees.

## Substitute Checks and Your Rights

### What is a Substitute Check

A substitute check is a paper reproduction created from a digital image of the front and back of the original check and bears the legend "This is a legal copy of your check." You can use it the same way you would use the original check. The following information applies to those customers who receive a "substitute" check from us instead of the original check (such as those customers receiving original paid checks with their periodic account statements). Federal law allows banks to replace original checks with "substitute checks." Under the law, a substitute check is the "legal equivalent" of the original check. In other words, it can be used in the same way and for all purposes for which you would use the original check.

### Your Rights

The following rights apply if you receive a substitute check from us in lieu of the original check. These rights do not apply to original checks or to electronic debits. Your rights as to those transactions remain unchanged and are described in other sections of this Agreement. Please note these rights also do not apply to images of checks furnished to you or viewed through Citibank® Online.

In certain cases, federal law provides a special procedure that allows you to request a refund for losses you incur if you believe a substitute check is incorrectly posted to your account (for example, if you think your account was debited for the wrong amount) and production of the original check is needed to determine the validity of the debit. The losses you may attempt to recover may include the amount that was withdrawn from your account and fees that were charged as a result of the withdrawal (for example, overdraft check fees.) The amount of the refund you may request under this procedure is limited to the amount of your loss or the amount of the substitute check, whichever is less. You are also entitled to interest if your account is an interest-bearing account. If your loss exceeds the amount of the substitute check, you may be able to recover additional amounts under other laws.

Under federal law, you may receive up to $2,500 of your refund (plus interest if you have an interest-bearing account) within ten (10) Business Days after we receive a complete claim from you and the remainder of your refund not later than forty-five (45) calendar days after we receive a complete claim from you. You will not be entitled to a refund if we determine that the substitute check was correctly posted to your account. Alternatively, we may reverse the refund (including any interest on the refund) if we later determine that the substitute check was correctly posted to your account.

## Filing a Claim

If you believe a substitute check you have received from us was improperly debited to your account, please call CitiPhone Banking® at the number indicated on the back cover of this Manual. You must contact us within forty (40) calendar days of the date we mailed, or otherwise made available to you, the substitute check in question. We may extend the time period if you were prevented from contacting us for extenuating reasons. In certain situations, such as forgery claims, we may require that you put your claim in writing. If so, we must receive the information in writing within ten (10) Business Days from the day you first notified us of your claim. If you are not able to contact us by telephone, you may also write to us at the following address: Citibank Client Services, P.O. Box 769014, San Antonio, TX 78245-9989.

In investigating your claim, we may request the following information from you:

- Description of how you suffered a loss;
- Amount of your loss;
- Explanation as to why the original check is needed to determine the validity of the amount charged to your account; and
- A copy of the substitute check and/or information to help us identify the substitute check (such as check number, the amount of the check and payee).

## Special Circumstances

### Forfeited Accounts

If your account is seized by or forfeited to the United States government or a state government, you no longer have title to the account, and the funds in the seized or forfeited account will no longer earn interest during such period of seizure or forfeiture, even if the funds are eventually returned to you.

### Death or Legal Determination of Incompetence

You agree to notify us immediately of the death or court-ordered legal determination of incompetence of any owner or authorized signer on your account. We may disregard any notice of incompetence unless the person in question has been declared incompetent by a court of appropriate jurisdiction and we receive written notice and instructions from the court or court appointed fiduciary regarding the account. We also may freeze, offset, refuse and/or reverse deposits and transactions (e.g., governmental or retirement benefits payments payable to the deceased) if an owner dies or is legally determined incompetent.

In case of death or legal determination incompetence of an account owner, we will continue to honor checks written on that account as well as other withdrawal instructions until we are notified of the death or the legally determined incompetence. We may continue to honor checks for up to ten (10) days following the death of the account owner unless a validly appointed representative of the decedent or another account owner provides us with stop payment instructions.

Upon notification of death or legal determination of incompetence, we will block individual accounts; joint accounts may remain unblocked for up to thirty (30) days after we have been notified of an account owner's death. Certain documents must be presented to us before funds in such an account can be paid out and the account closed. For more information about which documents are required, please visit your Home Branch or contact CitiPhone Banking® (see the back cover of this Manual for telephone numbers).

### Dormant Accounts

Under applicable state abandoned property statutes, your account will be considered dormant (inactive) and we may be required to send to the appropriate state the balances in your deposit account unless you have done at least one of the following during a specified period of time:

- Deposited or withdrawn funds, or, in the case of your Passbook Savings account, presented it to us to have us record your interest;
- Signed and returned our active account confirmation form; or
- Written to us concerning the account.

A certificate of deposit account that has not reached initial maturity will not be considered inactive, but if the account renews automatically, it can become inactive starting after the initial maturity date.

In complying with these requirements, the laws of the state of your last known address (as recorded on our bank records) govern the inactivity period and specific requirements applicable to your account. If we do not have a good address recorded on your account or if your address, as recorded on our bank records, is outside of the United States, Nevada law will govern. You may contact CitiPhone Banking® or your Home Branch for specific information that we may have concerning the current inactivity period and any specific requirements of the state law or other specific requirements that we may have that apply to your account.

### Legal Process

Regardless of where or how we are served, we may comply with any state or federal legal process, including, without limitation, any writ of attachment, adverse claim, execution, garnishment, tax levy, restraining order, subpoena or warrant relating to you or your account which we believe to be valid. You agree that we may honor legal process that is served personally, by mail, or by facsimile transmission at any of our offices (including locations other than where the funds, records or property sought is held), even if the law requires personal delivery at the office where your account or records are maintained. You agree that we will have no liability to you for honoring any such legal process. We will also have and may enforce a right of setoff and security interest against any of your accounts in order to reimburse us for our fees and expenses, including attorney's fees, court costs and expenses, in complying with legal process.

We may comply with process we deem appropriate even if it appears to affect the interest of only one owner of a joint account. We may refuse to permit withdrawals or transfers from your account until such legal process is satisfied or dismissed even if such action results in insufficient funds to pay a check you have written or otherwise satisfy an obligation you may have incurred.

Accounts opened with trust or fiduciary designations (e.g., "XYZ, Inc. client trust account") may be subject to legal process unless our records contain an express written trust or court order that provides otherwise.

Upon receipt of any legal process, you will be liable to us for our processing fee, and reimbursement for our record research, reproduction and handling costs. We may deduct such fee, as well as any expenses, including, without limitation, attorneys' fees in connection with any such document or legal process, from your account or any other account you may have with us without prior notice to you, or we may bill you directly for such expenses and fees.

You agree to release and indemnify, defend and hold us harmless from all actions, claims, liabilities, losses, costs and damages including, without limitation, attorneys' fees, associated with our compliance with any legal process we believe to be valid.

When we receive an order instructing us to restrict access to funds in an account, we may remove the funds from the account and maintain them separately. These funds will not earn interest and will not be considered as part of your combined balances when we determine account fees and rates.

### Right of Setoff

Subject to applicable law, we may exercise our right of setoff against any or all of your accounts (except IRA, Keogh plans and certain trust accounts) without notice, for any liability or debt of any of you, whether joint or individual, direct or contingent, now or hereafter existing, and whether arising from our fees or charges, overdrafts, endorsements, guarantees, loans, attachments, garnishments, levies, attorneys' fees, or other obligations. If an account is a joint or multiple-party account, each joint or multiple-party account owner authorizes us to exercise our right of setoff against any and all accounts of each account owner.

You expressly agree that our right of setoff extends to, and may be directed towards, any federal or state benefit payments (including Social Security benefits) directly deposited into your account. You also agree to allow us to apply any subsequently credited deposit made to your account against any overdrafts and against any fees and charges or other obligations owed us in whichever order we determine and that we may use any federal or state benefits payment

that is deposited into the account (including direct deposit of Social Security) for this purpose. You acknowledge and agree that if you do not want your electronically deposited benefits applied in this way, you have the option of changing your direct deposit instructions by providing notice to the benefits payor at any time.

## Restricted Access

There are occasions when we restrict access to deposits, such as when your account application is being processed, when funds are assigned as collateral or when we are required by law to restrict access. If funds assigned as collateral are in interest-bearing accounts, they will continue to earn interest as usual. They may not, however, be used in connection with our Safety Check service.

## Closing a Deposit Account

You may close your account at any time (except as stated otherwise in this Manual). We may allow one owner/signer to close an account without the consent or signature(s) of any other owner(s)/signer(s). Except in limited circumstances, if you close a Certificate of Deposit account before maturity, you will be subject to an early withdrawal penalty.

We may close your account at any time with or without cause. We may try to notify you in advance should this be necessary, but we are not obliged to do so. If we close your account, we will send you a check for your final balance, if any, minus any applicable account fees and charges. If your account balance is insufficient to pay applicable account fees and charges owed to us, you will continue to be liable to us for the unpaid amount and interest thereon until it is paid in full. Your obligations for transactions conducted prior to account closure will survive the termination of the account and this Agreement.

## Foreign Currency Exchange

Citibank's World Wallet® offers you the convenience of ordering foreign currency at competitive exchange rates quickly and easily. You can order foreign currency simply by visiting your local Citibank branch during normal business hours or by calling CitiPhone Banking® for delivery by the end of the next Business Day to a Citibank branch you select, or directly to your address on record in the U.S. – no delivery to P.O. Boxes or to locations outside of the United States (including Puerto Rico) – for an additional nominal charge. For California, Nevada, Illinois and Texas, orders must be placed before 4:00 PM Eastern Time. For all other marketplaces, orders must be placed before 3:00 PM Eastern Time. Ordering limits apply. Contact us for details on limits. Foreign currency is available in 50 different currencies. For more information about these services, you may call CitiPhone Banking® or 1-800-756-7050 toll-free within the United States. Your account will be automatically charged by us for the amount of your order, plus any applicable service and shipping charges. For redemptions of foreign currency, your account will be credited in U.S. dollars, less any applicable service charges. The exchange rate for a purchase or redemption of foreign currency is the Citibank foreign currency banknote conversion rate in effect at the time you place your purchase order or redeem your currency. This rate includes a commission to Citibank for the conversion service.

**Limitation of Liability.** We assume no responsibility and make no representation regarding (a) comparative exchange rates available from other sources, and (b) foreign laws relating to currencies, including, without limitation, the importation of currencies and laws affecting the free convertibility of local currencies.

30

## Electronic Banking

The following terms apply to Electronic Fund Transfers (EFT) governed by the Electronic Fund Transfer Act (e.g., consumer ATM, point-of-sale (POS) and ACH transfers). Any authorized signer on an account may apply for EFT services on behalf of all authorized signers.

### General

Please note that each withdrawal, transfer, purchase and cash advance is limited by the amount available in your account or available to you via an overdraft protection program such as Checking Plus®, Checking Plus® (variable rate) or Safety Check. Some ATM Network Machine operators may impose lower limits on cash withdrawals.

*Limitations on Transfers.* In addition to the limits imposed on each Business Day transfer, transfers from savings or money market accounts are subject to the federal limitations described in the "Limits on Transfers" section of this Agreement.

*Limitations on Withdrawals and Right to Suspend or Discontinue Services.* At any time we may change the withdrawal limits that apply when you use an Access Device, and at any time we may suspend or discontinue operation of certain electronic banking services based upon security issues and other factors.

*Terminal Transactions.* You can get a record detailing the transactions you perform at Citibank ATMs and ATM network machines. For deposits and payments made at Citibank ATMs, your deposits and payments are accepted subject to bank verification.

### Access Device

Your Citibank® Banking Card, your Personal Identification Number (PIN), your Telephone Personal Identification Code (TPIC), and your Citibank® Online password are "Access Devices" as defined in this Agreement and each individually is referred to as an Access Device. Additional Access Devices to which this section also applies are included in the "Definitions" section of this Manual under "Access Devices".

You generally will receive your Citibank® Banking Card Access Device when you open your account. If you did not select your Personal Identification Number (PIN) at account opening, you will receive the PIN in a separate mailing. Your PIN is required for all Citibank® Banking Card transactions at Proprietary Citibank ATMs, at ATM network machines or for PIN based POS purchase transactions. You agree to keep your PIN confidential. No bank employee knows your PIN or will ever ask for it. For your protection, we encourage you to periodically change your PIN. You can change your PIN at any time:

- At a Proprietary Citibank ATM;
- At any Citibank branch in the United States;
- By signing on to Citibank® Online.

If you are unable to change your PIN at an ATM or through the CitiPhone Banking® automated system, you may contact CitiPhone Banking® to request a PIN mailer. The sealed mailer contains a confidential, pre-set PIN that is systemically generated and mailed directly to you. When you receive the PIN mailer, you will need to call CitiPhone Banking® to activate the PIN.

The PIN you select must consist of four numbers and cannot begin with a zero. Many institutional ATMs do not have keys with both letters and numbers. If your PIN contains letters, please learn their corresponding numbers, as letters may not always be noted on the keys. You should also be aware that non-Citibank ATMs and

31

International ATMs may limit access to a primary checking account. To initially sign on to Citibank® Online, for additional security, in addition to your Citibank® Banking Card number and your PIN, you will need to choose a Citibank® Online User ID and Password. Together, the User ID and Password you select will be your Access Device for Citibank® Online.

To use CitiPhone Banking® or Citi Mobile®, in addition to your Citibank® Banking Card, you will need a Telephone Personal Identification Code (TPIC). Once you have received your Citibank® Banking Card, you can set up this code at www.CitibankOnline.com or by calling CitiPhone Banking® (at the number on the back of your Citibank Banking Card) for instructions on how to establish your TPIC. If an unauthorized person has obtained access to your Citibank® Banking Card, your PIN, your Citibank® Online User ID and Password or your TPIC, notify Citibank immediately.

Your rights and obligations in the case of unauthorized use of any of your Access Devices are the same as for lost or stolen Citibank® Banking Cards.

We will automatically send you a new Citibank® Banking Card before your current card expires. When you receive your new card, you will need to activate the card by following the instructions enclosed with the card. You will need to sign your new card and destroy your old card.

Please note that the Citibank® Banking Card we issue you is and remains the property of Citibank. We have the right to take possession of it, to demand its return, and to cancel it at any time. You may also cancel your Citibank® Banking Card at any time and for any reason. To do so, cut your card in half and notify us through CitiPhone Banking®, Citibank® Online or at a Citibank branch. You agree to return the Citibank® Banking Card to us upon request.

### Withdrawal Posting Cut-Off Times

For purposes of determining the Business Day for posting of cash withdrawals from Proprietary Citibank ATMs, the following applies: a Business Day is any day of the week that is not a Saturday, Sunday or bank holiday ending at the time shown in the chart below. Withdrawals done on non-Business Days will post to your account on the following Business Day.*

| Marketplace: | Business Day Ends: |
|---|---|
| CT, DC, DE, FL, MA, MD, NJ, NY, PA, VA | 7:30 PM ET |
| California and Nevada | 8:30 PM PT |
| Illinois | 6:30 PM CT |
| Texas | 6:30 PM CT |

*\* Cash withdrawals made at California/Nevada ATMs from an account whose Home Branch is not located in either of those states will post to the account on the following Business Day.*

### Types of Transactions; Limitations

**Cash Withdrawals**

The cash withdrawal limits apply to each Citibank® Banking Card issued on the account, whether to a single signer or multiple signers. You can use your Citibank® Banking Card to withdraw a maximum of $1,000 in cash, per card, during a timeframe, which may extend beyond a Business Day, from your checking, savings or money market accounts. For Citibank Everything Counts® Accounts, your cash withdrawal limit is $2,000. The stated limits are per card issued on one account, whether to a single signer or multiple signers. The cash withdrawal limits are not affected by additional accounts or the balances in those accounts, which are linked to your Citibank® Banking Card.

For Citigold®, you can use your Citibank® ___ard to withdraw cash up to a maximum of $2,000 ($5,_ _or Citigold accounts with a combined average balance of $5b0,000 or more for the month which is two calendar months prior to the date of the withdrawal, and for all Citi Private Bank customers regardless of balance), during a timeframe which may extend beyond a Business Day, from your checking, savings or money market accounts. The cash withdrawal limit on the Citigold and Citi Private Bank accounts for single signer or multiple signers is based on the balances in the linked accounts as stated above. The number of cards issued to a Citigold or Citi Private Bank account customer does not affect the maximum withdrawal limit per account.

For Citibank Banking Card cash withdrawal limits related to account packages available through *International Personal Banking* or *Global Executive Banking*, please refer to your respective Marketplace Addendum.

There is no limit to the number of withdrawals you can make.

You can use your Citibank® Banking Card to:

* Withdraw cash at a Proprietary Citibank ATM from your linked checking, savings, money market, Ready Credit®, Checking Plus®, Checking Plus® (variable rate), Citibank Home Equity Line of Credit/Equity Source Accounts® and from any linked Citibank® MasterCard® and Citibank® Visa® credit card accounts. If you have a Citigold® account linked to an eligible Morgan Stanley Smith Barney LLC account, you will also be able to withdraw cash at a Proprietary Citibank ATM located in the U.S. (excluding Puerto Rico) directly from that account (including amounts available under the account's Portfolio CreditLine® margin);

* Withdraw cash at a Network ATM;

* Withdraw cash and transfer funds, fee-free, between eligible linked Citibank accounts at participating 7-ELEVEN®, Murphy Oil USA®, MoneyPass® and Publix® supermarket locations. These ATMs are not owned or operated by Citibank and not all functions are available at all of these ATMs.

**Fees for Cash Withdrawals**

There is no charge for making cash withdrawals with a Citibank® Banking Card at Citibank ATM locations in the U.S. Our charges for cash withdrawals at non-Citibank ATM locations will vary based on the account package you selected. When you use a Network ATM, you may be charged a fee by the ATM operator or any network used and you may be charged a fee for a balance inquiry even if you do not complete a transaction. For fees imposed due to withdrawing cash from your linked Citibank credit accounts (including credit cards), or your Morgan Stanley Smith Barney LLC account, see your applicable customer agreements.

**Deposits**

* You can make deposits at a Proprietary Citibank ATM, or at ATMs located in select 7-ELEVEN® Convenience Stores (check deposits only), to your linked checking, savings and money market accounts. ATM deposits received before the cut-off time for that Business Day will be considered deposited on that day. ATM deposits received after the cut-off time for that Business Day will be considered deposited on the next Business Day.

* You may have funds, such as your pay, your pension, or your social security payments sent to your checking, savings and money market accounts by Direct Deposit.

## Payments to Us and to Our Affiliates

- You can make payments at a Proprietary Citibank ATM to your linked CitiMortgage loan, Citibank Home Equity Line of Credit/ Equity Source Account®, Ready Credit®, Checking Plus® and Checking Plus® (variable rate) accounts, and Citibank® MasterCard® and Citibank® Visa credit card accounts by transferring funds from your Citibank checking, savings or money market accounts or by envelope payment.

- You can also pay certain linked Citibank personal loans, lines of credit, mortgage loans, as well as Checking Plus® and Checking Plus® (variable rate) with automatic monthly transfer payments from your checking, savings, or money market account. You authorize these transfers in advance and they do not require a Citibank® Banking Card or any further action on your part. If you have arranged for this type of transfer, you can use Citibank® Online, visit any Proprietary Citibank ATM location or call CitiPhone Banking® to confirm that the payment was made.

## Bill Payments

- You can make payments to third parties by calling CitiPhone Banking® or by using Citibank® Online or Citi Mobile®. When you pay your bills through our bill payment service, your payment is transferred electronically or by an official check. Your account or invoice number can be included with your payment, whether it is made electronically or by check. You can schedule a bill payment up to one year in advance and you can schedule a series of recurring payments.

- If you want to cancel a scheduled bill payment, you must do so by 11:59 PM Eastern Time on the day prior to the scheduled payment date. You can cancel a payment via Citibank® Online or by calling CitiPhone Banking® directly at 1-800-374-9700. A CitiPhone Banking® Services representative will be able to assist you whether the bill payment was scheduled via CitiPhone Banking® or via Citibank® Online. *If you cancel one of a series of recurring payments, all subsequent payments of the series will be canceled.* If a bill payment is made by check, a stop payment order can be accepted under certain circumstances. Stop payment orders cannot be accepted for bill payments made electronically.

- Your periodic Citibank account statement will include all bill payment transactions made through our bill payment service. If you suspect any error in these statements, or if you have questions or need help, you should write to us at Citibank Client Services, P.O. Box 769004, San Antonio, Texas 78245-9989, or call CitiPhone Banking®.

- A pre-authorized bill payment can be verified online or via CitiPhone Banking®. If you believe an unauthorized bill payment has been or might be made, you should call CitiPhone Banking® directly at 1-800-374-9700.

- There is no monthly charge or transaction fee for paying your bills using Citibank® Online or the Telephone Automated Bill Payment Service. However, if you schedule a single payment or multiple bill payments with the assistance of a CitiPhone representative, your account will be charged a fee to cover the bill payment(s) that are debited during each periodic statement cycle. For fee information, please refer to "Staff Assisted Bill Payments" under "Service Fees and Charges for All Accounts" in the Marketplace Addendum.

- If we are making a pre-authorized payment to a person or company for you and the amount of that payment will vary from the previous amount, it is the responsibility of that person or company to notify you of that fact. Please contact the payee and/or service provider, and not Citibank, regarding varying payments.

34

## Electronic Check Conversion

- You may authorize a merchant or other payee to make a one-time electronic payment from your checking account using information from your check to:
  (i) pay for purchases; or
  (ii) pay bills.

## Transfers

- Transfer funds using Citibank® Online, Citi Mobile®, CitiPhone Banking® or at a Proprietary Citibank ATM between your checking, savings and money market accounts and any linked credit card account. If you have a Citigold® Account linked to an eligible Morgan Stanley Smith Barney LLC account, you will also be able to transfer funds between your checking, savings and money market accounts and that account on Citibank® Online or at a Proprietary Citibank ATM located in the U.S. (excluding Puerto Rico) subject to any account restrictions. Transfer funds between your checking, savings or money market accounts at a Network ATM displaying one of the network symbols shown on the back of your Citibank® Banking Card. For transfer limits on your linked Citibank credit accounts (including credit cards) or your Morgan Stanley Smith Barney LLC account, refer to your applicable customer agreements.

  Transfers can be arranged on a weekly, every-other-week or monthly basis. All checking, savings and money market accounts permit automatic transfer withdrawals and accept automatic transfer deposits. Examples of these are monthly interest transfers from your savings to your checking or monthly transfers to fund your Individual Retirement Account.

- With Citibank® Global Transfer Service, you can use any eligible Citibank checking, savings, or money market account at Proprietary Citibank ATMs¹, via Citibank® Online, or at a Citibank branch, to transfer funds real-time to the account of another Citibank customer in the U.S. or in select markets outside the U.S. or receive funds into your account from another Citibank customer in the U.S. The minimum transaction amount is $1, exclusive of the transaction fee. There is no fee for receiving a Citibank Global Transfer into your account. When you send a Citibank Global Transfer, the funds will be debited from your designated eligible account and immediately credited to the recipient's account. For transfers to U.S. accounts, the transfer will be made in U.S. dollars. For transfers to foreign accounts, the transfer will be made in the currency of the foreign recipient's account. Citibank's exchange rate includes a commission for the conversion service.

  *Mexico only:* Citibank, N.A. customers can use the optional Account to Cash feature to send money to Mexico for cash pick-up at any Banamex branch in Mexico.

- ¹ *Citibank® Global Transfers made through Proprietary Citibank ATMs or on Citibank® Online are included in the six pre-authorized or automatic transfers permitted each statement period from a savings or money market account as described elsewhere in this Agreement.*

35

**Fees*:**

Account to Account per transfer fee for funds sent to:

U.S., Mexico or India.................................................No Fee
Philippines or Poland...............................................$ 8.00
All other international destinations............................$10.00

For Citigold customers, if the combined average balance of your Citigold® Account for the month which is two calendar months prior to the Account to Account transfer was $500,000 or more, and for all Citi Private Bank customers regardless of balance, we waive Account to Account transfer fees to all countries.

* *For Citibank Global Transfer service fees related to account packages available through International Personal Banking or Global Executive Banking, please refer to your respective Marketplace Addendum.*

**Citibank® Global Transfer Service Limits for Account to Account Transfers (transfer limits are stated in U.S. dollars):**

| Account Package | Citibank® Online | Citibank branch or ATM | Weekly Limit |
|---|---|---|---|
| Citigold Citi Private Bank | $2,000 | $5,000 | $25,000 |
| All Other Account Packages | $1,000 | $3,000 | $10,000 |

* *For Citibank Global Transfer service fees and limits related to account packages available through International Personal Banking or Global Executive Banking, please refer to your respective Marketplace Addendum.*

*Account to Cash (Mexico Only)*

Transfers are limited to US$1,000 per calendar day, and US$2,500 per calendar week;

Both Account to Cash and Account to Account combine into total transfer limits from a single account.

**PLEASE NOTE:** The transfer limits described in this section may vary at our discretion and without prior notice based on risk factors relevant to this service and your personal transaction activity.

**Destinations:** We may change the permitted destinations for Citibank Global Transfers from time to time based on security issues and other factors. Approved destination countries may change. Information on available countries can be obtained through CitiPhone Banking®, Citibank® Online or at Proprietary Citibank ATMs.

**Canceling an Automatic Transfer**

You can cancel an automatic withdrawal or payment from your account by calling or writing to us. To cancel an automatic transaction, we must receive your instructions at least three Business Days before the transfer is scheduled to be made. Write or call us at CitiPhone Banking® (see the back cover of this Manual and your periodic statement for telephone numbers and address). If you request a cancellation by phone, we may ask you to confirm your instructions in writing within two weeks. If you order us to cancel a scheduled transfer in a timely manner and we do not do so, we will be liable for your losses or damages.

**Point-of-Sale (POS) Transactions**

*"PIN Based" Transactions.* You can use your Citibank® Banking Card to perform an EFT to purchase goods or services from a location displaying the Maestro® or Cirrus® network logos by authorizing these transactions using your PIN. When asked, select "debit" for these transactions. PIN based transactions include "Direct Bill Pay" transactions.[1]

*"Signature" Transactions.* If you have a Debit Card, you can also use your card to perform an EFT to purchase goods or services and/or receive cash from locations that accept MasterCard®. These transactions are those for which you do not use your PIN and either you or a merchant designates as a "credit" transaction (including purchases you sign for, small dollar purchases that do not require a signature and use of your Citibank® Debit MasterCard® with PayPass™ (or other similar Access Device), internet, phone and mail-order transactions.

All POS transactions made with your Citibank® Banking Card are deducted from your linked Citibank primary checking account. You agree to only use your Citibank Banking Card for lawful transactions. We reserve the right to block or deny certain merchant categories when you attempt to make purchases with your Citibank® Banking Card. These merchants include, but are not limited to, internet gambling sites.

When you use your Citibank® Banking Card for a POS transaction, certain merchants may ask us to authorize the transaction in advance and may estimate its final value. When we authorize the transaction, we commit to make the requested funds available when the transaction finally settles and may place a temporary hold on your account for the amount indicated by the merchant. Until the transaction finally settles or we determine that it is unlikely to be processed, the funds subject to the hold will not be available to you for other purposes. We will only charge your account for the correct amount of the final transaction, however, and we will release any excess amount when the transaction finally settles.

Your maximum purchase limits on your Citibank® Banking Card per Business Day, per account, are shown below limited by the amount available in your account, whichever is lower:

| Transaction Type | Package | | |
|---|---|---|---|
| | Citigold® | Everything Counts® | All other packages |
| PIN Based Purchase | $10,000 $25,000[2] | $7,500 | $5,000 |
| Signature Purchase | $10,000 $25,000[2] | $7,500 | $5,000 |

For Citi Private Bank customers, the following limits apply regardless of balance: PIN Based Purchase $25,000 and Signature Purchase $25,000.

[1] *"Direct Bill Pay" transactions may not require a PIN.*

[2] *This higher limit applies to Citigold Accounts with a combined average balance of $500,000 or more for the month which is two calendar months prior to the date of the transaction.*

In addition to our right to change withdrawal limits or to suspend or discontinue operation of certain electronic banking services at any time based on security or other factors, we also reserve the right to set a lower dollar limit for POS transactions occurring during a disruption of the electronic connection between a merchant and Citibank.

For Citibank® Banking Card purchase limits on International Personal Banking or Global Executive Banking account packages, please refer to your respective Marketplace Addendum.

## Citi Mobile® Mobile Banking

You may enroll to obtain account information and make selected transactions using your Eligible Mobile Device via Citi Mobile®. Citi Mobile® is a service available to every banking customer with an activated Citibank® Banking Card, a compatible wireless web-enabled cell phone or other type of mobile device ("Eligible Mobile Device") and a Telephone Personal Identification Code (TPIC).

The list of Eligible Mobile Devices is published at Citibank® Online and is subject to change without notice. There is no charge by Citibank for using the Citi Mobile service. However, your wireless carrier may charge you a fee for data access, which is required to use Citi Mobile.

You agree to use the Citi Mobile service, and all related software provided to you by us ("Software"), solely to access and use the service and agree not to decompile or reverse engineer the Software. Certain Software that we use to provide the Citi Mobile service has been licensed from a third party ("Licensor") that is not affiliated with us. Transactions initiated using the Citi Mobile service may constitute EFTs under federal law and regulation. Instructions for reporting unauthorized EFTs are contained in each periodic statement for your account(s). You may only receive information about and/or make transfers between the accounts that are linked to your Citibank® Banking Card. You may only make bill payments to payees that are included in the Citibank bill payment Merchant Directory or to other personal payees that you previously set up in your account.

The standard limitations on transfers and bill payments apply to transactions made through Citi Mobile. The Citi Mobile service is provided "as is" and without warranty. You acknowledge and agree that from time to time, the Citi Mobile service may be delayed, interrupted or disrupted for an indeterminate period of time due to circumstances beyond our reasonable control, including, without limitation, any inaccuracy, interruption or delay in transmission by the telecommunications carrier used with the Eligible Mobile Device to access the wireless web, or any interruption, disruption or failure in the provision of the service, whether caused by strikes, power failures, equipment malfunctions or other reasons. We, our affiliates and our Licensors shall not, individually or jointly, be liable for any claim related to the Citi Mobile service arising from any such delay, interruption, disruption or similar failure. In no event will we or any affiliate or Licensor be liable for indirect, consequential or special damages, including lost profits, arising from your use of the Citi Mobile service, even if such damages were reasonably foreseeable and notice was given regarding them. These limitations will apply to all causes of action, whether arising from breach of contract, tort (including negligence) or any other legal theory. By identifying a cell phone or other device as an Eligible Mobile Device for use with the Citi Mobile service, we do not recommend, endorse or make any representation or warranty of any kind regarding the performance or operation of such device. You are responsible for the selection of an Eligible Mobile Device and for all issues relating to the operation, performance and costs associated with such device with your telecommunications carrier. Except as otherwise required by applicable law or regulation, we may terminate your use of the Citi Mobile service and expand, reduce and/or suspend the type and or dollar amounts of transactions allowed using the service, and change the enrollment process and transaction limits associated with it from time to time based on security issues and other factors at any time in our sole discretion without prior notice.

Regular account charges will apply to services and features that are accessible through the Citi Mobile service. The telecommunications carrier for your Eligible Mobile Device may impose an extra fee in order to make such device 'wireless web' enabled.

In addition to the limits imposed on each Business Day transfer, transfers from a savings and money market account are subject to the federal law restrictions in the "Limits on Transfers" section of this Agreement.

## Security Tips

You can help prevent unauthorized access to your accounts by following these common sense rules:

- Keep your Citibank® Banking Card to yourself. Never use it to assist others as you might be allowing them to take money from your account;
- Treat your Citibank® Banking Card like cash. Do not leave it where others can find it. Do not give it to anyone to hold as "security" for any reason or under any circumstance;
- Keep your PIN, TPIC and other Access Devices secret. Do not tell it to anyone. Do not write it on your Citibank® Banking Card or keep it in your wallet or purse;
- Change your PIN periodically;
- Review your account statements regularly and notify us promptly of any discrepancies;
- Always be aware of your surroundings when using ATMs, particularly after dark;
- Be sure to close the door behind you when you enter or leave the facility, as appropriate;
- Never begin an ATM transaction if there is insufficient light or you notice anything suspicious – go to a different location or return at another time;
- Always cancel a transaction-in-progress and end your session, place your Citibank® Banking Card in your pocket, and leave the ATM location if you notice anything suspicious;
- Immediately report crimes and suspicious activity at ATM locations to local law enforcement officials as well as to the owners/operators of the ATMs;
- Never display cash at ATM locations. Place cash and your Citibank® Banking Card in a pocket as soon as you complete your transaction. Count cash in a safe location, such as a locked car, home, or office;
- Be sensible about using Citibank ATMs and ATM network machines. Remember to use the same caution and common sense you would use in any 24-hour facility.

We cannot guarantee your safety at an ATM.

Please address any complaints concerning security at Citibank ATMs to CitiPhone Banking® (see the back cover of this Manual for telephone numbers).

For emergency assistance at any Citibank or Network ATM, please call 911.

### Transactions Made Outside the U.S. and Puerto Rico

*ATM Cash and POS Transactions Outside the U.S. Transaction Charge.* Whenever you use your Citibank Banking Card outside of the U.S. and Puerto Rico to get cash at an ATM or to purchase goods or services, we will apply a foreign exchange fee equal to 3% of the transaction amount (including credits and reversals). This fee is waived for Citigold, Citi Private Bank, Global Executive Banking and International Personal Banking customers.

*Currency Conversion Methods.* Transactions made in foreign currency will be converted into U.S. dollars according to the current policies of the merchant, network or card association that processes the transaction:

- Transactions processed by Citibank are converted into a U.S. dollar amount using Citibank's procedures in effect at the time the transaction is processed. Currently, the currency conversion rate used to determine the transaction amount in U.S. dollars is based on either (1) a wholesale market rate or (2) a government-mandated rate in effect one day prior to the processing date. Transaction types currently processed by Citibank include ATM withdrawals made at many Citibank ATMs outside the United States or Puerto Rico.

- Transactions processed by MasterCard currently use a conversion rate that is either: (a) selected from a range of rates available in the wholesale currency markets on the processing date (note: this rate may be different from the rate that MasterCard receives), or (b) the government-mandated rate. Transaction types currently processed by MasterCard include POS transactions (both PIN-based and Signature-based) and ATM withdrawals (including those at certain Citibank ATMs).

The currency conversion rate in effect on the processing date may differ from the rate in effect on the transaction date or the posting date.

### Lost or Stolen Citibank® Banking Cards or Other Access Devices and Unauthorized Electronic Transactions

#### Consumer Liability

If any of your Access Devices are lost or stolen, it is your responsibility to notify us immediately. Please call CitiPhone Banking® at the number on the back cover of this Manual.

Please remember that your Citibank® Banking Card and all of your Access Devices are valuable, and it is important for you to exercise care with them. To protect your personal and account information, be sure to keep your PIN and other Access Devices secure. As a general practice, we recommend that you periodically change your PIN.

Tell us at once if you believe any of your Access Devices, including but not limited to your Citibank® Banking Card, has been lost or stolen, or if you believe that an electronic fund transfer has been made without your permission using information from your check. Telephoning is the best way of keeping your possible losses down. You could lose all the money in your account (plus your maximum overdraft line of credit). If you have linked your Morgan Stanley Smith Barney LLC account to your Citigold® Account you could also lose all of the available funds in that account (including your maximum Portfolio CreditLine® (margin). You should refer to your Morgan Stanley Smith Barney LLC Customer Agreement and Morgan Stanley Smith Barney LLC Linkage Agreement related to your obligations for EFTs involving your linked Morgan Stanley Smith Barney LLC account. Call CitiPhone Banking® at 1-888-CITIBANK or use the number located on the back cover of this Agreement. Customer service representatives are available to assist you 24 hours a day, 7 days a week. If you tell us within two (2) Business Days after you learn of the loss or theft of your Access Device, you can lose no more than $50 if someone uses your Access Device without your permission.

If you do NOT tell us within two (2) Business Days after you learn of the loss or theft of your Access Device, and we can prove we could have stopped someone from using your Access Device without your permission if you had told us, you could lose as much as $500.

### Citibank® Debit MasterCard®

If your Citibank® Banking Card bears the MasterCard® logo and is used in conjunction with an unauthorized transaction that does not require use of your Personal Identification Number (PIN), your liability for unauthorized use as described above, will not exceed:

(i)     $0 if
  - you report the loss or theft of your card within 24 hours of discovery of such loss or theft; and
  - you exercised reasonable care in safeguarding your card from the risk of loss or theft; and
  - you have not reported two or more incidents of unauthorized use to the bank in the immediately preceding 12 month period; and
  - the account to which transactions initiated with your card were posted is in good condition; or

(ii)    The lesser of $50 or the amount of money, property, labor or services obtained by the unauthorized user before notification to the bank if all conditions listed above in the Citibank Debit MasterCard paragraph have not been met.

Also, if your statement shows transfers that you did not make, including those made by card, code or other means, tell us at once. If you do not tell us within sixty (60) days after the statement was mailed to you, you may not get back any money you lost after the sixty (60) days if we can prove that we could have stopped someone from taking the money if you had informed us in time. If a good reason (such as a long trip or a hospital stay) kept you from telling us, we will extend the time periods.

#### Contact in Event of Unauthorized Transfer

If you believe your Access Device has been lost or stolen call: CitiPhone Banking® at 1-888-CITIBANK or write: Citibank Client Services, P.O. Box 769004, San Antonio, Texas 78245-9989. You should also call the number or write to the address listed above if you believe a transfer has been made using the information from your check without your permission.

### Error Resolution and Notice Procedures

If your statement or transaction record is wrong or if you need more information about a transfer listed on your statement or record, contact us as soon as possible at the phone number or address listed above.

NOTE: If the error concerns an ATM network transaction, be sure to contact Citibank or Morgan Stanley Smith Barney LLC or Citigroup Global Markets Inc. – depending on the account from which you were attempting to withdraw funds – not the financial institution that operates the machine. We need to hear from you no later than sixty (60) days after we sent the FIRST statement on which the problem or error appeared.

(1)   Tell us your name and account number (if any)

(2)   Describe the error or the transfer you are unsure about, and explain as clearly as you can why you believe it is an error or why you need more information

(3)   Tell us the dollar amount of the suspected error.

If you tell us orally, we may require that you send us your complaint or question in writing within ten (10) Business Days. We will determine whether an error occurred within ten (10) Business Days after we hear from you and will correct any error promptly. If we need more time, however, we may take up to forty-five (45) days to investigate your complaint or question. If we decide to do this, we will provisionally credit your account within ten (10) Business Days for the amount

you think is in error, so that you will have the use of the money during the time it takes us to complete our investigation. For new accounts (where the notice of error involves an electronic funds transfer to or from your account, that occurred within thirty (30) days after the first deposit to the account was made), we can take up to twenty (20) Business Days to determine whether an error occurred and up to twenty (20) days to provisionally credit your account for the amount you think is in error. If we need more time, however, we may take up to ninety (90) days to investigate your complaint or question. For errors involving point-of-sale or foreign-initiated transactions, we may also take up to ninety (90) days to investigate your complaint or question.

If we ask you to put your complaint or question in writing and we do not receive it within ten (10) Business Days, we may not provisionally credit your account.

In any case, we will tell you the results of our investigation within three (3) Business Days after completing our investigation. If we decide that there was no error, we will send you a written explanation. You may ask for copies of the documents that we used in our investigation.

## Our Responsibility to You

If we do not complete a transfer to or from your account on time or in the correct amount according to our Agreement with you, we will be liable for your losses or damages. However, there are some exceptions. We will not be liable, for instance:

(1)  If, through no fault of ours, you do not have enough money in your account to make the transfer;

(2)  If the transfer would go over the credit limit on your overdraft line;

(3)  If the automated teller machine where you are making the transfer does not have enough cash and you continue to request the transfer when you know the ATM does not have sufficient cash;

(4)  If the automated teller machine or POS terminal was not working properly and you knew about the breakdown when you started the transfer;

(5)  If circumstances beyond our control (such as fire or flood or other conditions listed under "Limitation of Liability") prevent the transfer, despite reasonable precautions that we have taken.

There may be other exceptions stated in our Agreement with you.

## Confidentiality at Citibank

We will disclose information to third parties about your account or the transfers you make:

(i)  When it is necessary for completing transfers;

(ii)  In order to verify the existence and condition of your account for a third party such as a credit bureau or merchant;

(iii)  In order to comply with government agency or court orders; or

(iv)  If you give us your permission.

Because our statements may include information about linked accounts belonging to more than one individual and your accounts with other Citibank affiliates, statements released under a subpoena or as otherwise required or permitted by law may contain information regarding those other persons and accounts.

For additional information about our privacy practices, see "Our Privacy Notice."

42

## Limitation of Liability

Except as otherwise required by law, we are not liable to you for any claim, cost, loss or damage caused by an event that is beyond our reasonable control. In particular, we are not liable to you if circumstances beyond our reasonable control prevent us from, or delay us in, performing our obligations for a service, including acting on a payment order, crediting a funds transfer to your account, processing a transaction or crediting your account. Circumstances beyond our reasonable control include, but are not limited to, natural disasters such as a tornado, hurricane, earthquake or flood, emergency conditions, such as a war, terrorist attack, riot, fire, theft or labor dispute; a legal constraint or governmental action or inaction; the breakdown or failure of our equipment for any reason, including a loss of electric power, the breakdown of any private or common carrier communication or transmission facilities, any time-sharing supplier or any mail or courier service; the potential violation of any guideline, rule or regulation of any government authority; suspension of payments by another bank; or your act, omission, negligence or fault. We will never be liable for special, incidental, exemplary, punitive or consequential losses or damages of any kind resulting from the conditions stated in this Limitation of Liability section.

43

## Resolution of Disputes by Arbitration

PLEASE READ THIS PROVISION OF THE AGREEMENT CAREFULLY. THIS SECTION CONTAINS IMPORTANT INFORMATION REGARDING YOUR DEPOSIT, READY CREDIT®, CHECKING PLUS® OR CHECKING PLUS® (VARIABLE RATE) ACCOUNTS AND THE SERVICES RELATED THERETO. IT PROVIDES THAT EITHER YOU OR WE CAN REQUIRE THAT ANY DISPUTES BE RESOLVED BY BINDING ARBITRATION. ARBITRATION REPLACES THE RIGHT TO GO TO COURT, INCLUDING THE RIGHT TO PARTICIPATE IN A CLASS ACTION OR SIMILAR PROCEEDING. IN ARBITRATION, THE DISPUTE IS SUBMITTED TO A NEUTRAL PARTY, AN ARBITRATOR, INSTEAD OF A JUDGE OR JURY. ARBITRATION PROCEDURES ARE SIMPLER AND MORE LIMITED THAN RULES APPLICABLE IN COURT.

### Agreement to Arbitrate Disputes

Either you or we may elect, without the other's consent, to require that any dispute between us, or concerning your Citibank deposit, Ready Credit®, Checking Plus® or Checking Plus® (variable rate) accounts, except those disputes specifically excluded below, be resolved by binding arbitration.

### Disputes Covered by Arbitration

Any claim or dispute relating to or arising out of your deposit, Ready Credit®, Checking Plus® or Checking Plus® (variable rate) account, this Agreement, or our relationship will be subject to arbitration. All disputes are subject to arbitration, no matter what legal theory they are based on or what remedy (damages, or injunctive or declaratory relief) they seek. Disputes include any unresolved claims concerning any services relating to such account, including, without limitation, safe deposit box services, wire transfer services, and use of a Citibank® Banking Card or Citibank® Banking Card displaying the MasterCard logo. Disputes include not only claims made directly by you, but also made by anyone connected with you or claiming through you, such as a joint account owner, account beneficiary, employee, representative, agent, predecessor or successor, heir, assignee, or trustee in bankruptcy. Disputes include not only claims that relate directly to Citibank, but also its parent, affiliates, successors, assignees, employees, and agents and claims for which we may be directly or indirectly liable, even if we are not properly named at the time the claim is made. Disputes include claims based on any theory of law, contract, statute, regulation, tort (including fraud or any intentional tort), or any other legal or equitable ground, and include claims made as counterclaims, cross-claims, third party claims, interpleaders or otherwise. A party who initiates a proceeding in court may elect arbitration with respect to any dispute advanced in that proceeding by any other party. Disputes include claims made as part of a class action or other representative action, it being expressly understood and agreed to that the arbitration of such claims must proceed on an individual (non-class, non-representative) basis. Disputes also include claims relating to the enforceability or interpretation of any of these arbitration provisions. Any questions about whether disputes are subject to arbitration shall be resolved by interpreting this arbitration provision in the broadest way the law will allow it to be enforced.

### Disputes Excluded from Arbitration

Disputes filed by you or by us individually in a small claims court are not subject to arbitration, so long as the disputes remain in such court and advance only an individual claim for relief.

### Commencing an Arbitration

The party filing an arbitration must choose one of the following neutral arbitration forums and follow its rules and procedures for initiating and pursuing an arbitration: American Arbitration Association or JAMS. If you initiate the arbitration, you must notify us in writing at Citibank, Litigation/Arbitration Unit, One Court Square, 43rd Floor/Zone 10, Long Island City, NY 11120. If we initiate the arbitration, we will notify you in writing at your last known address on file. You may obtain a copy of the arbitration rules for these forums, as well as additional information about initiating an arbitration by contacting these arbitration forums:

American Arbitration Association
1-800-778-7879 (toll-free)
Website: www.adr.org

JAMS
1-800-352-5267 (toll-free)
Website: www.jamsadr.com

The arbitration shall be conducted in the same city as the U.S. District Court closest to your home address, unless the parties agree to a different location in writing.

### Administration of Arbitration

The arbitration shall be decided by a single, neutral arbitrator. The arbitrator will be either a lawyer with at least ten years experience or a retired or former judge, selected in accordance with the rules of the arbitration forum. The arbitrator shall follow procedures and rules of the arbitration forum in effect on the date the arbitration is filed unless those rules and procedures are inconsistent with this arbitration provision, in which case this arbitration provision will prevail. Those procedures and rules may limit the discovery available to you or us. The arbitrator will take reasonable steps to protect customer account information and other confidential information if requested to do so by you or us. The arbitrator shall decide the dispute in accordance with applicable substantive law consistent with the Federal Arbitration Act and applicable statutes of limitations, will honor claims of privilege recognized at law, and will be empowered to award any damages or other relief provided for under applicable law. The arbitrator will not have the power to award relief to, or against, any person who is not a party to the arbitration. An award in arbitration shall determine the rights and obligations between the named parties only, and only in respect of the claims in arbitration, and shall not have any bearing on the rights and obligations of any other person, or on the resolution of any other dispute. You or we may choose to have a hearing and be represented by counsel. The decision rendered by the arbitrator shall be in writing; however, the arbitrator need not provide a statement of his reasons unless one is requested by you or us.

### Costs

The party initiating the arbitration shall pay the initial filing fee. If you file the arbitration and an award is rendered in your favor, we will reimburse you for your filing fee. If there is a hearing, we will pay the fees and costs for the first day of that hearing. All other fees and costs will be allocated in accordance with the rules of the arbitration forum. However, we will advance or reimburse filing and other fees if the arbitrator rules that you cannot afford to pay them or finds other good cause for requiring us to do so, or if you ask us and we determine there is good reason for doing so. Each party shall bear the expense of their respective attorneys, experts, and witnesses and other expenses, regardless of who prevails, but a party may recover any or all expenses from another party if the arbitrator, applying applicable law, so determines.

44

45

## No Class Action or Joinder of Parties

You and we agree that no class action, private attorney general or other representative claims may be pursued in arbitration, nor may such action be pursued in court if either you or we elect arbitration. Unless mutually agreed to by you and us, claims of two or more persons may not be joined, consolidated, or otherwise brought together in the same arbitration (unless those persons are joint account owners or beneficiaries on your account and/or related accounts, or parties to a single transaction or related transaction); this is so whether or not the claim may have been assigned.

## Right to Resort to Provisional Remedies Preserved

Nothing herein shall be deemed to limit or constrain our right to resort to self-help remedies, such as the right of setoff or the right to restrain funds in an account, to interplead funds in the event of a dispute, to exercise any security interest or lien we may hold in property, or to comply with legal process, or to obtain provisional remedies such as injunctive relief, attachment, or garnishment by a court having appropriate jurisdiction; provided, however, that you or we may elect to arbitrate any dispute related to such provisional remedies.

## Arbitration Award

The arbitrator's award shall be final and binding unless a party appeals it in writing to the arbitration forum within fifteen days of notice of the award. The appeal must request a new arbitration before a panel of three neutral arbitrators selected in accordance with the rules of the same arbitration forum. The panel will consider all factual and legal issues anew, follow the same rules that apply to a proceeding using a single arbitrator, and make decisions based on the vote of the majority. Costs will be allocated in the same way they are allocated before a single arbitrator. An award by a panel is final and binding on the parties after fifteen (15) days have passed. A final and binding award is subject to judicial intervention or review only to the extent allowed under the Federal Arbitration Act. A party may seek to have a final and binding award entered as a judgment in any court having jurisdiction.

## Governing Law

You and we agree that our relationship includes transactions involving interstate commerce and that these arbitration provisions are governed by, and enforceable under, the Federal Arbitration Act. To the extent state law is applicable, the laws of the state governing your account relationship apply.

## Severability, Survival

These arbitration provisions shall survive:

(i)  termination or changes to your deposit, Checking Plus® or Checking Plus® (variable rate) or Ready Credit® accounts, or any related services we provide;

(ii)  the bankruptcy of any party; and

(iii)  the transfer or assignment of your deposit, Checking Plus® or Checking Plus® (variable rate) or Ready Credit® accounts, or any related services we provide.

If any portion of this arbitration provision is deemed invalid or unenforceable, the entire arbitration provision shall not remain in force. No provision of this arbitration provision may be amended, severed or waived absent a written agreement between you and us.

46

---

citi

*This is a copy of the signature card signed by customers at account opening.*

CITIBANK ACCOUNT

DATE: _____

FIMP: _____

Account Title: _____

Address: _____

Account Number(s): _____

| NAME/SIGNER | TAX ID NUMBER | ISSUE/LINK TO CARD |
|---|---|---|
| | | |
| | | |

Check appropriate box:  ○ Individual  ○ Other

By signing below, I: (1) certify my tax status; (2) agree to be bound by any agreement governing any account opened in the title indicated on this card.

TAX CERTIFICATION: Under penalties of perjury, I certify that: (1) The number shown on this form is my correct taxpayer identification number, and (2) I am not subject to backup withholding because (a) I am exempt from backup withholding, or (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding, and (3) I am a U.S. citizen, U.S. Resident Alien or other U.S. person (as defined in the instructions).

Certification instruction: You must cross out item (2) above if you have been notified by the IRS that you are currently subject to backup withholding because you have failed to report all interest and dividends on your tax return.

The Internal Revenue Service does not require your consent to any provision of this Document other than the certifications required to avoid backup withholding.

○ Check if Exempt Payee

Signer 1 Signature _____

Signer 2 Signature _____

Signer 3 Signature _____

Signer 4 Signature _____

47



## Our Privacy Notice for New Customers

Our goal is to maintain your trust and confidence when handling personal information about you.

### YOU HAVE CHOICES

As a Citibank* customer you have the opportunity to make choices about how personal information about you may be shared and used. As you consider this, we encourage you to make choices that enable us to provide you with quality products and services that help you meet your financial needs and objectives.

### SECURITY OF PERSONAL INFORMATION

The security of personal information about you is our priority. We protect this information by maintaining physical, electronic, and procedural safeguards that meet applicable law. We train our employees in the proper handling of personal information. When we use other companies to provide services for us, we require them to protect the confidentiality of personal information they receive.

### ABOUT THIS NOTICE

This notice tells you how we collect, handle, and disclose personal information about you and how you can limit this disclosure. It also tells you how you may limit our affiliates from using certain information to market their products or services to you. Please see the **Privacy Choices Form** on panel v of this notice for how to make your choices. If you are a joint account holder, we will accept instructions from either of you and apply them to the entire account.

This notice applies to both current and former customers. We may change this notice from time to time. If we do, we will notify you as required by applicable law.

\* All references to Citibank refer to the Citibank, N.A. retail banking business in the United States.

i

## Personal Information We Collect and May Disclose

The personal information we collect about you comes from the following sources:

- Information we receive from you, such as your name, address, and telephone number,

- Information about your transactions, such as your account balances, payment history, and account activity, and

- Information we receive from consumer reporting agencies and other sources, such as your credit bureau report and your credit score.

We may disclose any of the above information that we collect to affiliates and nonaffiliated third parties as described below.

The term "personal information," as used in this notice, means information that identifies you personally. We may use information which does not personally identify you to help manage our businesses and to provide us, our affiliates, and other companies insight into consumer spending behavior. We may do this even if you ask us to limit disclosure of personal information about you, as described in the **Privacy Choices Form.**

## Affiliates to Whom We May Disclose Personal Information

Our affiliates are the family of companies controlled by Citigroup. Affiliates to whom we may disclose personal information about you are in several different businesses, including banking, credit cards, consumer finance, insurance, and securities. Our affiliates include those doing business under the Citi name, such as CitiFinancial and CitiMortgage, as well as Morgan Stanley Smith Barney and Primerica.

## Nonaffiliated Third Parties to Whom We May Disclose Personal Information

Nonaffiliated third parties are those not part of the family of companies controlled by Citigroup. We may disclose personal information about you to the following types of nonaffiliated third parties:

- Financial services providers, such as companies engaged in banking, credit cards, consumer finance, securities, and insurance, and

- Non-financial companies, such as companies engaged in direct marketing and the selling of consumer products and services.

If you fill in **Box 1** on the **Privacy Choices Form,** we will not disclose personal information about you to nonaffiliated third parties except as follows. First, we may disclose personal information about you as described above in "Personal Information We Collect and May Disclose" to third parties that perform marketing services on our behalf or to other financial institutions with whom we have joint marketing agreements. Second, we may disclose personal information about you to third parties as permitted by law, such as disclosures necessary to process and service your account, to protect against fraud, and to protect the security or confidentiality of our records.

## YOUR PRIVACY CHOICES

This section describes your privacy choices. Please remember that we will continue to protect personal information about you regardless of your privacy choices.

If you are a customer of another Citigroup affiliate or Citibank business and you receive its privacy notice, you should also review that privacy notice since you may need to separately notify that entity of your privacy choices.

### Limit Disclosure to Nonaffiliated Third Parties (Box 1)

As described in this notice, we will limit the personal information about you that we disclose to nonaffiliated third parties if you fill in **Box 1** on the **Privacy Choices Form.**

### Limit Sharing with Citigroup Affiliates (Box 2)

Our ability to share information with our affiliates helps us to more easily provide you with quality products and services to meet your financial needs and goals.

ii

iii

The law allows us to share with our affiliates information about our transactions or experiences with you, such as your account history, and also your name, address, and telephone number. Unless otherwise permitted by law, we will not share with our affiliates other information that you provide to us or that we obtain from third parties (for instance, credit bureaus) if you fill in **Box 2** on the **Privacy Choices Form**.

## Limit Marketing by Citigroup Affiliates (Box 3)

Federal law gives you the right to limit some, but not all marketing from our affiliates. You may limit our affiliates from marketing their products and services to you based upon personal information about you that we collect and share with them. This information may include your account history with us and your credit score. If you fill in **Box 3** on the **Privacy Choices Form**, we will tell our affiliates to limit their marketing to you based upon this information, unless otherwise permitted by law, such as if you currently do business with one of our affiliates.

## Information for Vermont and California Customers

In response to Vermont regulation, we will automatically treat accounts with Vermont home addresses as if you filled in **Box 1, Box 2** and **Box 3** on the **Privacy Choices Form**. And if we disclose personal information about you to nonaffiliated third parties with whom we have joint marketing agreements, we will only disclose your name, address, other contact information, and information about our transactions or experiences with you.

In response to California law, we will automatically treat accounts with California home addresses as if you filled in **Box 1** on the **Privacy Choices Form** and will not disclose personal information about you to nonaffiliated third parties except as permitted by the applicable California law. We will also limit the sharing of personal information about you with our affiliates to comply with all California privacy laws that apply to us. To further restrict sharing with and marketing by affiliates as described in this notice, you can fill in **Box 2** and **Box 3** on the **Privacy Choices Form**.

iv

## PRIVACY CHOICES FORM
### Your Choices to Limit Information Sharing and Marketing

To limit disclosures of personal information about you, or to limit marketing offers by our affiliates, as described in this notice, you can call us toll free at the number shown below. Or you can fill in the appropriate box or boxes to indicate your privacy choices and send the form to the address listed below.

1. ☐ Limit the personal information about me that you disclose to nonaffiliated third parties.

2. ☐ Limit the personal information about me that you share with Citigroup affiliates.

3. ☐ Limit Citigroup affiliates from marketing to me using personal information about me that you share with them.

The privacy choices you make will apply until you tell us to make a change. If you already made any of these privacy choices with us, you need not make that choice again.

Please allow approximately 30 days from our receipt of your privacy choices for them to become effective.

My Citibank® Banking Card or
Citibank account number is:_____

(PLEASE PRINT)
Name _____

☐ Please fill in this box if you are providing a new address

Address _____

City_____State_____ZIP_____

If you filled in any of the boxes above, please mail this form in a stamped envelope to:

**Citibank Processing Center
Mail Stop CBL
P.O. Box 769022
San Antonio, TX  78245-9022**

**Or call us toll-free at 1-888-214-0017 to inform us of your privacy choices**

v

You can use your Citibank® Banking Card
wherever you see these symbols.

  

Citibank® Banking Card with the MasterCard logo
will be accepted at participating merchants.

 

To find the most convenient location, you can call:
1-800-CITI-ATM, 24 hours a day, 7 days a week. Also visit us
at www.citibank.com/locations.

Note: Not all accounts are accessible at every ATM network machine. Assistance is also
available 24 hours a day, 7 days a week, at phones located in Citibank ATMs.

| CitiPhone Banking® | |
|---|---|
| Toll-Free | 1-888-CITIBANK |
| To call collect from outside the U.S. | 1-210-677-0065 |
| For the speech and hearing impaired call our Text Telephone TDD | 1-800-945-0258 |

- To report errors or to ask questions about electronic transfers;
- To obtain current interest rates and Annual Percentage Yields;
- For balance inquiries or other kinds of account information;
- To transfer funds between your accounts;
- To report a stolen, missing or damaged Citibank® Banking Card;
- To order checks;
- To request a stop payment on a check

**Other Customer Service Telephone Numbers***

| | |
|---|---|
| Citibank® Online | 1-800-374-9700 |
| | www.CitibankOnline.com |
| Contact your Financial Advisor or Citi Personal Wealth Management | 1-800-846-5200 |
| Text Telephone (TDD) | 1-800-568-3405 |
| Retirement Plan Services | 1-800-695-5911 |
| Text Telephone (TDD) | 1-800-788-6775 |
| Citigold Customer Service for Accounts with linked | 1-888-CITIGOLD |
| Citi Personal Wealth Management Investment Accounts or for relationships which do not contain a linked Citi Personal Wealth Management Investment account | (1-888-248-4465) |
| Citigold Customer Service for Accounts with linked Morgan Stanley Smith Barney LLC Investment Accounts | 1-866-793-3977 |
| Citibank MasterCard or Visa | 1-800-950-5114 |

Citibank MasterCard and Visa credit cards are issued by Citibank (South Dakota), N.A.
* To ensure quality service, calls are randomly monitored and may be recorded.



© 2010 Citibank, N.A., Member FDIC.
Citibank, Citibank with Arc Design, Citi, and Citi with Arc Design are registered service marks of Citigroup, Inc.
MasterCard and the MasterCard Brand Mark are registered trademarks and PayPass is a trademark of
MasterCard International Incorporated.
Maestro is a registered trademark of MasterCard International Incorporated and affiliates.
Cirrus is a registered trademark of Cirrus System, LLC, formerly known as Cirrus System, Inc.
7-ELEVEN® is a registered trademark of 7-Eleven, Inc.
Murphy USA® is a registered trademark of Murphy Oil USA, Inc.
MoneyPass® is a registered trademark of US Bank NA.
Publix® is a registered trademark of Publix Asset Management Company.



# EXHIBIT 4

Now includes Citigold

# Marketplace Addendum

California & Nevada

Effective January 1, 2010

This Marketplace Addendum supplements and incorporates all of the terms and conditions contained in the Citibank Client Manual — Consumer Accounts, including, but not limited to, the definitions. It also contains additional information about deposit products and services available in your marketplace, including:

**Checking and Savings Accounts**

**Interest Accruals and Computation**

**Balance Requirements**

**Early Withdrawal Penalties**

**Overdraft Protection**

**Funds Availability**

**Fees and Charges**

**...and other important information**

citibank®

© 2010 Citibank, N.A. Member FDIC.
Citibank, Citibank with Arc Design, Citi, and Citi with Arc Design are registered service marks of Citigroup Inc.

MasterCard and the MasterCard Brand Mark are registered trademarks and PayPass is a trademark of MasterCard International Incorporated.

Maestro is a registered trademark of MasterCard International Incorporated and affiliates.

Cirrus is a registered trademark of Cirrus System, LLC, formerly known as Cirrus System, Inc.

7-ELEVEN® is a registered trademark of 7-Eleven, Inc.

Murphy USA® is a registered trademark of Murphy Oil USA, Inc.

MoneyPass® is a registered trademark of US Bank NA.

Publix® is a registered trademark of Publix Asset Management Company.



EQUAL HOUSING LENDER

ITEM US70002-CANV (Rev. 11/09) Pkg. 25

# Contents

General Information ................................................................. 1

Information About Account Packages ................................... 2
  Basic Banking Package ........................................................ 2
  Citibank® EZ Checking Package .......................................... 3
  Citibank® Student Account Package .................................... 5
  The Citibank® Account Package ........................................... 7
  The Citigold® Account Package .......................................... 10
  Access Account Package ..................................................... 14
  Citibank Everything Counts® Package ................................ 15

Information About Specific Accounts ................................. 18
  Regular Checking ................................................................ 18
  Interest Checking ............................................................... 18
  Citigold® Interest Checking ............................................... 19
  Day-to-Day Savings ........................................................... 21
  Citibank® Money Market Plus Account .............................. 22
  Citibank® Rate Accelerator Money Market Account .......... 24
  Citibank® Premier Money Market Account ......................... 28
  Citibank® Savings Plus Account ......................................... 31
  Citibank Market Rate Account ............................................ 33
  Citibank Market Rate Plus Account .................................... 33
  Certificates of Deposit ....................................................... 35

Investment Account Linking ............................................... 38

Household Linking of Account Packages ........................... 39

Overdraft Protection .......................................................... 40
  Checking Plus® (variable rate) ........................................... 40
  Safety Check ....................................................................... 40
  Overdraft Protection Transfer Fee ..................................... 41

Funds Availability at Citibank ........................................... 42

Service Fees and Charges for All Accounts ....................... 46

# General Information

## Choose an Account Package Right for You

At Citibank, we're committed to giving our customers superior service and value by providing you with solutions designed to meet your individual needs. You can achieve your financial goals and simplify the way you manage your money with our various offerings of account packages. The banking and financial services you need today – and tomorrow – are available to you at any time.

Now, you can keep track of your finances in one place and receive the personalized service and recognition you deserve. This is possible because Citibank account packages can provide you with more rewards when you bank with Citibank and certain of its affiliates. By bringing together your deposits, loans, credit cards, and investments through either Citigroup Global Markets Inc. ("CGMI") or Morgan Stanley Smith Barney LLC ("MSSB")*, you can reduce or even eliminate service fees on some account packages. In some cases you may be able to earn better rates on your deposits and gain easier access to your accounts – you may even be able to see certain of your accounts summarized on one statement.

*Investment products and services are provided through either Citigroup Global Markets Inc., member SIPC, or Morgan Stanley Smith Barney LLC, member SIPC. Citigroup Global Markets Inc. and Citibank are affiliated companies under the common control of Citigroup Inc. Morgan Stanley Smith Barney LLC is an affiliate of Citibank.*

---

**SECURITIES:**
- **NOT FDIC INSURED**
- **NO BANK GUARANTEE**
- **MAY LOSE VALUE**

---

There are several ways to bring your accounts together and each package is tailored with specialized pricing to make the most of your resources. Based on your account balances and monthly transaction activity, one of these packages can provide the right solutions for your particular needs:

Basic Banking

Citibank® EZ Checking

Citibank® Student Account

The Citibank® Account

The Citigold® Account

1

# Information About Account Packages

## Basic Banking Package

### Package Features

The Basic Banking Package is designed for people who want a simple, low fee bank account. The Basic Banking Package can only contain one Basic Checking or Basic Savings account. Upon application and approval, a Checking Plus® (variable rate) credit line for overdraft protection can be linked to the checking account. No other products are allowed in the package.

### Minimum Opening Deposit

There is no minimum deposit required to open a Basic Checking account or a Basic Savings account in a Basic Banking Package.

### When Deposits Are Credited to an Account

Deposits received before the end of a Business Day (Refer to the Client Manual — Consumer Accounts for definition of "Business Day") will be credited to your account that day. However, there may be a delay before these funds are available for your use.

See the "Funds Availability at Citibank" section of this Marketplace Addendum for more information.

### Household Linking

Balances from accounts in a Basic Banking Package can contribute to the combined product level balances of a household that has another Citibank account package to avoid monthly maintenance fees, except for the Access Account or other Basic Banking Packages. If a Basic Banking Package is linked to a Citibank® Account Package that meets the requirements for eliminating monthly maintenance and non-Citibank ATM fees — or if there is a Citigold® Account Package that is part of the linked household regardless of the balance — there will be no monthly maintenance fee, non-Citibank ATM fee or per check fee (if applicable) for the Basic Banking Package. For additional information about household linking, please see the section of this Marketplace Addendum titled "Household Linking of Account Packages".

### BASIC CHECKING

Basic Checking is a regular (non-interest bearing) checking account.

The following fees and charges apply to this account package when the fees are not otherwise waived:

| | Monthly Maintenance Fee | Non-Citibank ATM Fee[1]* | Checking Account Per Check Fee |
|---|---|---|---|
| | $3.50 | $1.50 per withdrawal | 8 free per statement period; $0.50 each thereafter |
| Debit Transactions include: | Checks paid, Citibank ATM cash withdrawals, Automatic payments to a third party, Bill payments (automatic and staff assisted**), teller withdrawals | | |

[1] *Citibank customers can get cash, get information and transfer balances between eligible linked Citibank accounts (fee-free) at ATMs at participating 7-ELEVEN® stores, Murphy Oil USA®, MoneyPass® and Publix® supermarket locations. These ATMs are not owned or operated by Citibank. Not all functions are available at all ATMs. 7-ELEVEN® is a registered trademark of 7-Eleven, Inc.

* Fees charged to you by other institutions for transactions on non-Citibank ATMs are beyond Citibank's control and are in addition to the fees listed here. If you are charged a fee for the use of a Citibank ATM, please contact us for a full refund.

2

*\*\* Staff assisted bill payments are subject to a fee for each statement cycle that you utilize this service. Please refer to "Service Fees and Charges for All Accounts" in this Addendum for applicable fees.*

## Cancelled Checks

Neither original cancelled checks nor images of checks are included with your statement. You can view and print copies of checks presented within the past 12 months on www.CitibankOnline.com. If you need a copy of a cancelled check you may request a photocopy by calling CitiPhone Banking® at 1-800-627-3999 or stop by your nearest Citibank branch. Please refer to "Service Fees and Charges for All Accounts" in this Addendum for applicable fees.

## BASIC SAVINGS

Basic Savings is a Day-to-Day Savings account. The following fees and charges apply to this account package when they are not otherwise waived:

| Average Monthly Savings Balance* | Monthly Maintenance Fee | Non-Citibank ATM Fee** |
|---|---|---|
| $0 – $499.99 | $6.50 | 2 free; $1.50 each thereafter |
| $500 – $9,999.99 | None | 2 free; $1.50 each thereafter |
| $10,000+ | None | None |

*\* Average Monthly Savings Balance for the calendar month prior to the end of the monthly statement period will be used to determine monthly maintenance fee.*

*† Citibank customers can get cash, get information and transfer balances between eligible linked Citibank accounts fee-free at ATMs at participating 7-ELEVEN® stores, Murphy Oil USA, MoneyPass and Publix supermarket locations. These ATMs are not owned or operated by Citibank. Not all functions are available at all ATMs. 7-ELEVEN® is a registered trademark of 7-Eleven, Inc.*

*\*\* Fees charged to you by other institutions for your transactions on non-Citibank ATMs are beyond Citibank's control and are in addition to the fees listed here. If you are charged a fee for the use of a Citibank ATM, please contact us for a full refund.*

### Fees

Monthly maintenance and non-Citibank ATM fees, when owed, will be deducted from your checking account and will appear on your next monthly statement. If you do not have a checking account, these fees will be deducted from your Basic Savings account.

## Citibank℠ EZ Checking Package

### Package Features

The Citibank® EZ Checking Package is ideal for customers looking for a deposit account package. Balances from all eligible linked deposit accounts will count toward meeting average monthly balance requirements. The Citibank® EZ Checking Package consists of at least one of these component accounts: Regular Checking, Day-to-Day Savings, money market, or certificate of deposit. Only one checking account can be included in any Citibank® EZ Checking Package. Upon application and approval, a Checking Plus® (variable rate) credit line for overdraft protection can be linked to the checking account. For additional information about the various accounts in this package, please see the sections of this Marketplace Addendum titled "Information About Specific Accounts".

### Minimum Opening Deposit

There is a $100 minimum deposit required to open a Regular Checking account in a Citibank® EZ Checking Package. Please refer to the Rate Sheet for information about the minimum opening deposit requirements that may apply to all other accounts that may be included in this account package.

3

### When Deposits Are Credited to an Account

Deposits received before the end of a Business Day (Refer to the Client Manual − Consumer Accounts for definition of "Business Day") will be credited to your account that day. However, there may be a delay before these funds are available for your use. See the "Funds Availability at Citibank" section of this Marketplace Addendum for more information.

### COMBINED AVERAGE BALANCES FOR FEES AND CHARGES

#### Linked Accounts

The combined average monthly balances in the linked accounts within your Citibank® EZ Checking Package for the calendar month prior to the last Business Day of your monthly statement period will be used to determine whether or not you will be charged monthly maintenance fees and per check fees for the statement period. Any fees will appear as a charge on your next statement. With a minimum combined average balance in your Citibank® EZ Checking Package, your monthly maintenance fees and per check fees will be waived. Upon application and approval, a Checking Plus® (variable rate) credit line for overdraft protection can be linked to the checking account in your Citibank® EZ Checking Package.

Balances in the linked accounts listed below will be included to determine your combined average balance.

| Deposits |
| --- |
| Regular Checking |
| Day-to-Day Savings |
| Money Market Accounts |
| Certificates of Deposit |
| Market Rate Account |
| Market Rate Plus Account |

| Combined Average Monthly Balance Range* | Monthly Maintenance Fee | Non-Citibank ATM Fee†** | Per Check Fee |
| --- | --- | --- | --- |
| $0 - $1,499.99 | $9.50*** | $1.50 per withdrawal | $0.50 per check |
| $1,500+ | None | $1.50 per withdrawal | None |

\* *Average monthly balance or combined average monthly balances for the calendar month prior to the last Business Day of your monthly statement period will be used to determine monthly maintenance fee which will appear as a charge on the statement you receive for the next monthly period.*

† *Citibank customers can get cash, get information and transfer balances between eligible linked Citibank accounts fee-free at ATMs at participating 7-ELEVEN® stores, Murphy Oil USA, MoneyPass and Publix supermarket locations. These ATMs are not owned or operated by Citibank. Not all functions are available at all ATMs. 7-ELEVEN® is a registered trademark of 7-Eleven, Inc.*

\*\* *Fees charged to you by other institutions for your transactions on non-Citibank ATMs are beyond Citibank's control and are in addition to the fees listed here. If you are charged a fee for the use of a Citibank ATM, please contact us for a full refund.*

\*\*\**If your account is charged a monthly maintenance fee, you can receive a $1.00 rebate off that fee if during the statement period there is an automatic deduction by a third party that you have authorized.*

4

### Household Linking

If you have linked your Citibank® EZ Checking Package within a household, we will add the average monthly balances for the prior calendar month of the eligible linked accounts in the packages within the household (which includes those accounts in your Citibank® EZ Checking Package) to determine the combined average monthly balance range ("combined household balance") for purposes of determining your Citibank EZ Checking Package monthly maintenance fee. For the calendar months where the combined household balance equals or exceeds the Citibank® EZ Checking Package requirement for eliminating monthly maintenance fees, you will not be charged a monthly maintenance fee for your Citibank® EZ Checking Package in your next monthly statement. For additional information about household linking, please see the section of this Marketplace Addendum titled "Household Linking of Account Packages".

### Fees

Monthly maintenance fees, non-Citibank ATM fees, and per check fees, when owed, will be deducted from your Regular Checking account and will appear on your next monthly statement. If you do not have a Regular Checking account, these fees will be deducted from accounts in the order displayed below, depending on the combination of linked components you have in your Citibank® EZ Checking Package:

- Money market account (generally, in the order of first money market account opened); or
- Day-to-Day Savings account (generally, if no money market account, in the order of first opened Day-to-Day Savings account).

### Cancelled Checks

Neither original cancelled checks nor images of checks are included with your statement. You can view and print copies of checks presented within the past 12 months on www.CitibankOnline.com. If you need a copy of a cancelled check you may request a photocopy by calling CitiPhone Banking® at 1-800-627-3999 or stop by your nearest Citibank branch. Please refer to "Service Fees and Charges for All Accounts" in this Addendum for applicable fees.

### Rate Calculations for Money Market Accounts

The interest that you earn on your money market account that is linked within a Citibank® EZ Checking Package will be paid at the lowest tiered rate established for the money market account, regardless of the balance in your money market account, except for the Citibank® Money Market Plus Account.

## Citibank® Student Account Package

### Package Features

The Citibank® Student Account Package is designed for students enrolled in an accredited undergraduate or graduate degree granting institution. The Citibank® Student Account Package consists of at least one of these component accounts: Regular Checking, Day-to-Day Savings, money market, or certificate of deposit. There is no monthly maintenance fee, non-Citibank ATM fee or per check fee as long as the student is enrolled in an eligible accredited institution. Upon application and approval, a Checking Plus® (variable rate) credit line for overdraft protection can be linked to the checking account. For additional information about the various accounts in this package, please see the sections of this Marketplace Addendum titled "Information About Specific Accounts".

5

After the expected date of the student's graduation, which you will provide to us at account opening, this package will be converted to a Citibank® EZ Checking Package and your accounts will be subject to the terms and conditions then in effect for that package.

## Minimum Opening Deposit

There is a $100 minimum deposit required to open a Regular Checking account in the Citibank® Student Account Package. Please refer to the Rate Sheet for information about the minimum opening deposit requirements that may apply to all other accounts that may be included in this account package.

## When Deposits Are Credited to an Account

Deposits received before the end of a Business Day (Refer to the Client Manual – Consumer Accounts for definition of "Business Day") will be credited to your account that day. However, there may be a delay before these funds are available for your use.

See the "Funds Availability at Citibank" section of this Marketplace Addendum for more information.

## Household Linking

Balances from accounts in a Citibank® Student Account Package can contribute to the combined balances of a household that has another Citibank account package to avoid monthly maintenance fees, except for a Basic Banking Package or an Access Account Package. For additional information about household linking, please see the section of this Marketplace Addendum titled "Household Linking of Account Packages".

| Citibank® Student Account Package Fees | | |
|---|---|---|
| Monthly Maintenance Fee | Non-Citibank ATM Fee[◆] | Per Check Fee |
| None | None | None |

† Citibank customers can get cash, get information and transfer balances between eligible linked Citibank accounts fee-free at ATMs at participating 7-ELEVEN® stores, Murphy Oil USA, MoneyPass and Publix supermarket locations. These ATMs are not owned or operated by Citibank. Not all functions are available at all ATMs. 7-ELEVEN® is a registered trademark of 7-Eleven, Inc.

◆ Fees charged to you by other institutions for your transactions on non-Citibank ATMs are beyond Citibank's control and are in addition to the fees listed here. If you are charged a fee for the use of a Citibank ATM, please contact us for a full refund.

## Cancelled Checks

Neither original cancelled checks nor images of checks are included with your statement. You can view and print copies of checks presented within the past 12 months on www.CitibankOnline.com. If you need a copy of a cancelled check you may request a photocopy by calling CitiPhone Banking® at 1-800-627-3999 or stop by your nearest Citibank branch. Please refer to "Service Fees and Charges for All Accounts" in this Addendum for applicable fees.

6

## The Citibank® Account Package

### Package Features

The Citibank® Account Package is a full service banking package which links all your eligible accounts together for ultimate control and simplicity. The Citibank® Account Package consists of at least one of these component accounts: Regular Checking or Interest Checking, Day-to-Day Savings, money market, or certificate of deposit. Only one checking account can be included in any Citibank® Account Package. The Citibank® Account Package includes unlimited check writing and ATM transactions with no non-Citibank ATM fee when you meet minimum balance requirements. For additional information about the various accounts in this package, please see the sections of this Marketplace Addendum titled "Information About Specific Accounts".

### Minimum Opening Deposit

There is a $100 minimum deposit required to open a Regular Checking or Interest Checking account in a Citibank® Account Package. Please refer to the Rate Sheet for information about the minimum opening deposit requirements that may apply to all other accounts that may be included in this account package.

### When Deposits Are Credited to an Account

Deposits received before the end of a Business Day (Refer to the Client Manual — Consumer Accounts for definition of "Business Day") will be credited to your account that day. However, there may be a delay before these funds are available for your use.

See the "Funds Availability at Citibank" section of this Marketplace Addendum for more information.

### COMBINED AVERAGE BALANCES FOR FEES AND CHARGES

### Linked Accounts

The combined average monthly balances in the linked accounts within your Citibank® Account Package for the calendar month prior to the last Business Day of your monthly statement period will be used to determine whether or not you will be charged monthly maintenance fees, non-Citibank ATM fees, or per check fees for the statement period. Any fees will appear as a charge on your next monthly statement. With a minimum combined average balance in your Citibank Account Package, your monthly maintenance fees, non-Citibank ATM fees, and per check fees will be waived. It's easy to maintain the minimum combined average monthly balance needed for fee waivers, because all your eligible Citibank linked accounts, including deposits, loans, and credit card balances, as well as investments through either Citigroup Global Markets Inc. or Morgan Stanley Smith Barney LLC* can contribute towards meeting your minimum combined average monthly balance. Upon application and approval, a Checking Plus® (variable rate) credit line for overdraft protection can also be linked to the Citibank® Account Package.

* Investment products and services are provided through either Citigroup Global Markets Inc., member SIPC or Morgan Stanley Smith Barney LLC, member SIPC. Citigroup Global Markets Inc. and Citibank are affiliated companies under the common control of Citigroup Inc. Morgan Stanley Smith Barney LLC is an affiliate of Citibank.

> **SECURITIES:**
> - NOT FDIC INSURED
> - NO BANK GUARANTEE
> - MAY LOSE VALUE

Balances in the linked accounts listed below will be included to determine your combined balance range.

7

| Deposits | Retirement Accounts | Loans and Lines of Credit | Investments | Credit Cards* |
|---|---|---|---|---|
| Checking (Non-Interest Regular Checking or Interest Checking)<br><br>Day-to-Day Savings<br><br>Money Market Accounts<br><br>Certificates of Deposit<br><br>Market Rate Account<br><br>Market Rate Plus Account | IRAs and Roth IRAs, CGMI IRAs and Roth IRAs, and Keoghs (except Keogh plans with participants other than the account owner and spouse, or partners and their spouses) | Personal Loan<br><br>Home Equity Line of Credit<br><br>Home Equity Loan<br><br>Checking Plus*<br><br>Checking Plus* (variable rate)<br><br>Ready Credit*<br><br>Preferred Line<br><br>Preferred Loan<br><br>Mortgage | Investments held in your Linked CGMI or MSSB Accounts, margin loans provided by CGMI or MSSB and annuity positions shown on Linked CGMI or MSSB Account statements** | Citi* branded credit cards* |

*  Citibank MasterCard and Visa credit cards are issued by Citibank (South Dakota), N.A.
** Refer to your Linkage Agreement with Morgan Stanley Smith Barney LLC for information on eligible investments and Morgan Stanley Smith Barney LLC Accounts.

## Linked Loans and Lines of Credit Balances

When considering loan and line of credit balances for combined balance calculations, the outstanding principal balance will be recognized — not the amount of the original loan or the total approved credit line. With your Citibank MasterCard and Visa credit cards, your combined balance will include any current purchases and cash advances as well as any unpaid previous balances. Your combined balances do not include: balances in delinquent accounts; balances that exceed your approved credit limit for any line of credit or credit card; or outstanding balances in any line of credit or credit card account that is no longer open.

The following combined average monthly balance ranges have been established for the Citibank* Account Package.

| Combined Average Monthly Balance Range* | Monthly Maintenance Fee | Non-Citibank ATM Fee*** | Checking Account Per Check Fee |
|---|---|---|---|
| $0 - $5,999.99 | $12.50*** for Regular (Non-Interest) Checking or money market accounts or savings; $15.00*** for Interest Checking | $1.50 per withdrawal | $0.50 |
| $6,000+ | None | None | None |

*   Combined average monthly balances for the calendar month prior to the last Business Day of your monthly statement period will be used to determine monthly maintenance fee which will appear as a charge on the statement you receive for the next monthly period.

†   Citibank customers can get cash, get information and transfer balances between eligible linked Citibank accounts fee-free at ATMs at participating 7-ELEVEN* stores, Murphy Oil USA, MoneyPass and Publix supermarket locations. These ATMs are not owned or operated by Citibank. Not all functions are available at all ATMs. 7-ELEVEN* is a registered trademark of 7-Eleven, Inc.

**  Fees charged to you by other institutions for your transactions on non-Citibank ATMs are beyond Citibank's control and are in addition to the fees listed here. If you are charged a fee for the use of a Citibank ATM, please contact us for a full refund.

*** If your account is charged a monthly maintenance fee, you can receive a rebate of up to $3.00 off that fee by earning $100 for each category of account transactions during the statement period:
   • Direct Deposit
   • Two (2) or more electronic bill payments you have made with CitiPhone Banking* (automated), Citi Mobile* or Citibank* Online
   • An automatic deduction initiated by a third party that you have authorized.

8

**NOTE:** The Citibank® Accounts opened prior to 5/1/00 are subject to a separate pricing schedule. Please refer to the agreement you received at your account opening, as may have been amended, for details.

### Household Linking

If you have linked your Citibank® Account Package within a household, we will add the average monthly balances for the prior calendar month of the eligible linked accounts in the packages within the household (which includes those accounts in your Citibank® Account Package) to determine the combined average monthly balance range ("combined household balance") for purposes of determining your Citibank® Account Package monthly maintenance fee. For the calendar months where the combined household balance equals or exceeds the Citibank® Account Package requirement for eliminating monthly maintenance fees, you will not be charged a monthly maintenance fee for your Citibank® Account Package in your next monthly statement. For additional information about household linking, please see the section of this Marketplace Addendum titled "Household Linking of Account Packages".

### Fees

Monthly maintenance fees, non-Citibank ATM fees, and per check fees when owed, will be deducted from your checking account and will appear on your next monthly statement. If you do not have a checking account, these fees will be deducted from accounts in the order displayed below, depending on the combination of linked components you have in your Citibank® Account Package:

• Money market account (generally, in the order of first money market account opened); or
• Day-to-Day Savings account (generally, if no money market account, in the order of first opened Day-to-Day Savings account).

### Cancelled Checks

Neither original cancelled checks nor images of checks are included with your statement. Check images can be included upon request. You must speak to a Customer Service Representative in order to sign up for this service. You can view and print copies of checks presented within the past 12 months on www.CitibankOnline.com. If you need a copy of a cancelled check you may request a photocopy by calling CitiPhone Banking® at 1-800-627-3999 or stop by your nearest Citibank branch. Please refer to "Service Fees and Charges for All Accounts" in this Addendum for applicable fees.

9

## The Citigold® Account Package

### Package Features

Citigold is our premium account package. The Citigold® Account Package allows you to combine your banking, credit, insurance, and investment information in one place. The Citigold® Account Package gives you access to:

- A dedicated team of professionals to help you plan and reach your financial goals;
- Financial planning tools, educational seminars and other resources to help broaden your financial knowledge;
- A wide range of investment products and services from either Citigroup Global Markets Inc. or Morgan Stanley Smith Barney LLC;*
- Risk management and estate planning through long term care and life insurance*;
- Exclusive benefits, features and services including preferred pricing and fees on various bank and credit products that we offer.

*Investment products and services are provided through either Citigroup Global Markets Inc., member SIPC, or Morgan Stanley Smith Barney LLC, member SIPC. Insurance products are offered through Citigroup Life Agency LLC ("CLA") or SBHU Life Agency, Inc. ("SBHU"). In California, CLA does business as Citigroup Life Insurance Agency, LLC (license number 0G56760). Citigroup Global Markets Inc., CLA, SBHU and Citibank are affiliated companies. Each company is responsible for its own obligations.*

---

**SECURITIES AND INSURANCE PRODUCTS:**
- **NOT A BANK DEPOSIT**
- **NOT FDIC INSURED**
- **NOT INSURED BY ANY FEDERAL GOVERNMENT AGENCY**
- **NO BANK GUARANTEE**
- **MAY LOSE VALUE**

---

The Citigold® Account Package must contain a Regular Checking or Citigold Interest Checking account. Only one checking account can be included in any Citigold® Account Package. It may also include Day-to-Day Savings, money market, or certificates of deposit. Upon application and approval, a Checking Plus® (variable rate) credit line for overdraft protection can be linked to the checking account. For additional information about the various accounts in this package, please see the sections of this Marketplace Addendum titled "Information About Specific Accounts".

### Minimum Opening Deposit

There is a $500 minimum deposit required to open a checking account in a Citigold® Account Package. Please refer to the Rate Sheet for information about the minimum opening deposit requirements that may apply to all other accounts that may be included in this account package.

### When Deposits Are Credited to an Account

Deposits received before the end of a Business Day (Refer to the Client Manual – Consumer Accounts for definition of "Business Day") will be credited to your account that day. However, there may be a delay before these funds are available for your use. See the "Funds Availability at Citibank" section of this Marketplace Addendum for more information.

## COMBINED AVERAGE BALANCES FOR FEES AND CHARGES

### Linked Accounts

The combined average balances in the linked accounts within your Citigold® Account Package for the calendar month prior to the last Business Day of your monthly statement period will be used to determine your combined average balance. Your combined balance range during this period will be used to determine whether or not you will be charged a monthly maintenance fee for the statement period.

Balances in the linked accounts listed below will be included to determine your combined balance range.

| Deposits | Retirement Accounts | Loans and Lines of Credit | Investments | Credit Cards* |
|---|---|---|---|---|
| Checking (non-interest Regular Checking or Citigold Interest Checking)<br><br>Day-to-Day Savings<br><br>Money Market Accounts<br><br>Certificates of Deposit<br><br>Market Rate Account<br><br>Market Rate Plus Account | IRAs and Roth IRAs, CGMI IRAs and Roth IRAs, and Keoghs (except Keogh plans with participants other than the account owner and spouse, or partners and their spouses) | Personal Loan<br><br>Home Equity Line of Credit<br><br>Home Equity Loan<br><br>Checking Plus*<br><br>Checking Plus* (variable rate)<br><br>Ready Credit*<br><br>Preferred Line<br><br>Preferred Loan<br><br>Mortgage | Investments held in your Linked CGMI or MSSB Accounts, margin loans provided by CGMI or MSSB and annuity positions shown on Linked CGMI or MSSB Account statements** | Citi® branded credit cards |

\*   Citibank MasterCard and Visa credit cards are issued by Citibank (South Dakota), N.A.

\*\* Refer to your Linkage Agreement with Morgan Stanley Smith Barney LLC for information on eligible investments and Morgan Stanley Smith Barney LLC Accounts.

### Linked Loans and Lines of Credit Balances

When considering loan and line of credit balances for combined balance calculations, the outstanding principal balance will be recognized – not the amount of the original loan or the total approved credit line. With your Citibank MasterCard and Visa credit cards, your combined balance will include any current purchases and cash advances as well as any unpaid previous balances. Your combined balances do not include: balances in delinquent accounts; balances that exceed your approved credit limit for any line of credit or credit card; or outstanding balances in any line of credit or credit card account that is no longer open.

The following combined average monthly balance ranges have been established for the Citigold® Account Package. Your combined monthly balance range will be determined by computing an average of your monthly balances for your linked accounts during the prior calendar month. Your combined average balance will be calculated using end-of-month newly-linked balances when (i) the account was linked after the first of the month and (2) the account has not previously contributed balances to any household.

Monthly maintenance fees are applied only to accounts with a combined average monthly balance range under the specified limits starting two (2) months after account opening. Maintenance fees assessed will appear as a charge on your next statement.

| Combined Average Monthly Balance Range* | Monthly Maintenance Fee | Non-Citibank ATM Fee†** | Per Check Fee |
|---|---|---|---|
| $0 - $99,999.99 | $25.00 | None | None |
| $100,000 or more (excluding 1st mortgage) | None | None | None |
| $250,000 or more (including 1st mortgage) | None | None | None |

\*   Combined average monthly balances for the calendar month prior to the last Business Day of your monthly statement period will be used to determine monthly maintenance fee which will appear as a charge on the statement you receive for the next monthly period.

†   Citibank customers can get cash, get information and transfer balances between eligible linked Citibank accounts fee-free at ATMs at participating 7-ELEVEN® stores, Murphy Oil USA, MoneyPass and Publix supermarket locations. These ATMs are not owned or operated by Citibank. Not all functions are available at all ATMs. 7-ELEVEN® is a registered trademark of 7-Eleven, Inc.

**  Fees charged to you by other institutions for your transactions on non-Citibank ATMs are beyond Citibank's control and are in addition to the fees listed here. If you are charged a fee for the use of a Citibank ATM, please contact us for a full refund.

## Household Linking

If you have linked your Citigold® Account Package within a household, we will add the average monthly balances for the prior calendar month of the eligible linked accounts in the packages within the household (which includes those accounts in your Citigold® Account Package) to determine the combined average monthly balance range ("combined household balance") for purposes of determining your Citigold® Account Package monthly maintenance fee. For the calendar months where the combined household balance equals or exceeds the Citigold® Account Package requirement for eliminating monthly maintenance fees, you will not be charged a monthly maintenance fee for your Citigold® Account Package in your next monthly statement. For additional information about household linking, please see the section of this Marketplace Addendum titled "Household Linking of Account Packages".

## Fees

Monthly maintenance fees when owed, will be deducted from your checking account and will appear on your next monthly statement. If you close your checking account, these fees will be deducted from accounts in the order displayed below, depending on the combination of linked components you have in your Citigold® Account Package:

• Money market account (generally, in the order of first money market account opened); or

• Day-to-Day Savings account (generally, if no money market account, in the order of first opened Day-to-Day Savings account).

## Cancelled Checks

Neither original cancelled checks nor images of checks are automatically included with your statement. Check images or original cancelled checks can be included upon request. You must speak to a Customer Service Representative in order to sign up for this service. You can view and print copies of checks presented within the past 12 months on www.CitibankOnline.com. If you need a copy of a cancelled check you may request a photocopy by calling CitiPhone Banking® at 1-800-627-3999 or stop by your nearest Citibank branch. Please refer to "Service Fees and Charges for All Accounts" in this Addendum for applicable fees.

**Reimbursement of Other Bank ATM Fees**

Other banks and ATM service providers may charge you a fee when you conduct a Citibank deposit account transaction using their ATMs. In any statement period, the first six (6) times that you use another bank's ATMs to conduct an ATM transaction from your Citibank deposit accounts you will receive reimbursement from Citibank for up to $5.00 per transaction each statement, if you meet one of the following criteria:

**#1:** Your Citigold® Account Package had a combined balance range of $500,000 or more for the calendar month prior to the ATM transaction (regardless of whether it was opened in a Citibank branch or via Citibank® Online, or by calling either CitiPhone Banking® or Citigold® Services, or with the assistance of a Morgan Stanley Smith Barney LLC Financial Advisor);

**OR**

**#2:** Your Citigold® Account Package was opened outside of a Citibank branch via Citibank® Online and, as of three (3) months after establishing your banking relationship online, your mailing address is outside a county where Citibank operates a Citibank branch;

**OR**

**#3:** Your Citigold® Account Package was opened in a Citibank branch in Delaware/Massachusetts/Pennsylvania or outside of a Citibank branch (via Citibank® Online, by calling either CitiPhone Banking® or Citigold® Services, or with the assistance of a Morgan Stanley Smith Barney LLC Financial Advisor) and your account address at the time of account opening was in Delaware/ Massachusetts/Pennsylvania.

13

The following packages are available only to customers who opened an Access Account Package or Citibank Everything Counts® Package on or before July 1, 2009:

## Access Account Package

### Package Features

The Access Account Package contains a Regular Checking account that does not offer a check writing feature and is designed as a standalone account package. With one low monthly fee you can utilize the benefits of a Regular Checking account such as electronic bill payment, Citibank® Banking Card with the MasterCard® logo, and Citibank® Global Transfer Service. Upon application and approval, a Checking Plus® (variable rate) credit line for overdraft protection can be linked to your checking account package.

### Minimum Opening Deposit

There is a $50 minimum deposit required to open a Regular Checking account in the Access Account Package.

### When Deposits Are Credited to an Account

Deposits received before the end of a Business Day (Refer to the Client Manual – Consumer Accounts for definition of "Business Day") will be credited to your account that day. However, there may be a delay before these funds are available for your use.

See the "Funds Availability at Citibank" section of this Marketplace Addendum for more information.

### Household Linking

The Access Account Package is a standalone package. Balances from other packages in the household are not used to offset monthly fees. Balances from accounts in an Access Account Package can contribute to the combined average monthly balances of a household that has another Citibank account package to avoid monthly maintenance fees in that package, except for a Basic Banking or Access Account Package. For additional information about household linking, please see the section of this Marketplace Addendum titled "Household Linking of Account Packages".

### Access Account Fees

| Monthly Maintenance Fee | Non-Citibank ATM Fee[1][*] |
| --- | --- |
| $3.00 | $1.50 per withdrawal |

[1] Citibank customers can get cash, get information and transfer balances between eligible linked Citibank accounts fee-free at ATMs at participating 7-ELEVEN® stores; Murphy Oil USA, MoneyPass and Publix supermarket locations. These ATMs are not owned or operated by Citibank. Not all functions are available at all ATMs. 7-ELEVEN® is a registered trademark of 7-Eleven, Inc.

[*] Fees charged to you by other institutions for your transactions on non-Citibank ATMs are beyond Citibank's control and are in addition to the fees listed here. If you are charged a fee for the use of a Citibank ATM, please contact us for a full refund.

### Fees

Monthly maintenance, and non-Citibank ATM fees when owed, will be deducted from your checking account and will appear on your next monthly statement.

14

## Citibank Everything Counts® Package

**Package Features**

The Citibank Everything Counts® Package provides premier banking services with access to brokerage products and services through either Citigroup Global Markets Inc. or Morgan Stanley Smith Barney LLC* including:

- Online stock trading and mutual fund trading status;
- Online access to your order and positions;
- Gold Citibank ATM card;
- Free checkbook orders; and
- No fee for stop payments, official checks, traveler's checks and money orders.

*Investment products and services are provided through either Citigroup Global Markets Inc., member SIPC, or Morgan Stanley Smith Barney LLC, member SIPC. Citigroup Global Markets Inc. and Citibank are affiliated companies under the common control of Citigroup Inc. Morgan Stanley Smith Barney LLC is an affiliate of Citibank.*

> **SECURITIES:**
> - **NOT FDIC INSURED**
> - **NO BANK GUARANTEE**
> - **MAY LOSE VALUE**

The Citibank Everything Counts® Package consists of at least one of these component accounts: Regular Checking, Interest Checking, Day-to-Day Savings, money market, or certificates of deposit. Only one checking account can be included in any Citibank Everything Counts® Package. Upon application and approval, a Checking Plus® (variable rate) credit line for overdraft protection can be linked to the checking account. For additional information about the various accounts in this package, please see the sections of this Marketplace Addendum titled "Information About Specific Accounts".

**Minimum Opening Deposit**

There is a $100 minimum deposit required to open a checking account in a Citibank Everything Counts® Package. Please refer to the Rate Sheet for information about the minimum opening deposit requirements that may apply to all other accounts that may be included in this account package.

**When Deposits Are Credited to an Account**

Deposits received before the end of a Business Day (Refer to the Client Manual – Consumer Accounts for definition of "Business Day") will be credited to your account that day. However, there may be a delay before these funds are available for your use.

See the "Funds Availability at Citibank" section of this Marketplace Addendum for more information.

## COMBINED AVERAGE BALANCES FOR FEES AND CHARGES

**Linked Accounts**

Combined average balances in the linked accounts within your Citibank Everything Counts® Package for the calendar month prior to the last Business Day of your monthly statement period will determine whether or not your Citibank Everything Counts® Package will be charged monthly maintenance fees, non-Citibank ATM fees, per check fees or staff assisted bill payment fees on your next monthly statement.

Balances in the linked accounts listed below will be included to determine your combined balance range.

15

| Deposits | Retirement Accounts | Loans and Lines of Credit | Investments | Credit Cards* |
|---|---|---|---|---|
| Checking (Non-Interest Regular Checking or Interest Checking) Day-to-Day Savings Passbook Savings Money Market Accounts Certificates of Deposit Market Rate Account Market Rate Plus Account | IRAs and Roth IRAs, CGMI IRAs and Roth IRAs, and Keoghs (except Keogh plans with participants other than the account owner and spouse, or partners and their spouses) | Personal Loan Home Equity Line of Credit Home Equity Loan Checking Plus* Checking Plus* (variable rate) Ready Credit* Preferred Line Preferred Loan Mortgage | Investments held in your Linked CGMI or MSSB Accounts, margin loans provided by CGMI or MSSB and annuity positions shown on Linked CGMI or MSSB Account statements** | Citi* branded* credit cards |

* Citibank MasterCard and Visa credit cards are issued by Citibank (South Dakota), N.A.
** Refer to your Linkage Agreement with Morgan Stanley Smith Barney LLC for information on eligible investments and Morgan Stanley Smith Barney LLC Accounts.

### Linked Loans and Lines of Credit Balances

When considering loan and line of credit balances for combined balance calculations, the outstanding principal balance will be recognized – not the amount of the original loan or the total approved credit line. With your Citibank MasterCard and Visa credit cards, your combined balance will include any current purchases and cash advances as well as any unpaid previous balances. Your combined balances do not include: balances in delinquent accounts; balances that exceed your approved credit limit for any line of credit or credit card; or outstanding balances in any line of credit or credit card account that is no longer open.

| Combined Average Monthly Balance Range* | Monthly Maintenance Fee | Non-Citibank ATM Fee†** | Per Check Fee | Staff Assisted Bill Payment Fee |
|---|---|---|---|---|
| **Deposits ONLY** | | | | |
| $0 - $9,999.99 | $25.00 | $1.50 per withdrawal | $0.50 | $4.95 |
| $10,000 or more | None | None | None | None |
| **Deposits PLUS retirement accounts, loans, investments, margin loans, credit cards and mortgages** | | | | |
| $0 - $19,999.99 | $25.00 | $1.50 per withdrawal | $0.50 | $4.95 |
| $20,000 or more | None | None | None | None |

* Combined average monthly balances from the calendar month prior to the last Business Day of your monthly statement period will be used to determine monthly maintenance fee which will appear as a charge on your next monthly statement.
† Citibank customers can get cash, get information and transfer balances between eligible linked Citibank accounts fee-free at ATMs at participating 7-ELEVEN* stores, Murphy Oil USA, MoneyPass and Publix supermarket locations. These ATMs are not owned or operated by Citibank. Not all functions are available at all ATMs. 7-ELEVEN* is a registered trademark of 7-Eleven, Inc.
** Fees charged to you by other institutions for your transactions on non-Citibank ATMs are beyond Citibank's control and are in addition to the fees listed here. If you are charged a fee for the use of a Citibank ATM, please contact us for a full refund.

16

### Household Linking

If you have linked your Citibank Everything Counts® Package within a household, we will add the average monthly balances for the prior calendar month of the eligible linked accounts in the packages within the household (which includes those accounts in your Citibank Everything Counts® Package) to determine the combined average monthly balance range ("combined household balance") for purposes of determining your Citibank Everything Counts® Package monthly maintenance fee. For the calendar months where the combined household balance equals or exceeds the Citibank Everything Counts® Package requirement for eliminating monthly maintenance fees, you will not be charged a monthly maintenance fee, non-Citibank ATM fee, per check fee, or a staff assisted bill payment fee for your Citibank Everything Counts® Package in your next monthly statement. For additional information about household linking, please see the section of this Marketplace Addendum titled "Household Linking of Account Packages".

### Fees

Monthly maintenance fees, non-Citibank ATM fees, per check fees, and staff assisted bill payment fees, when owed, will be deducted from your checking account and will appear on your next monthly statement. If you do not have a checking account, these fees will be deducted from accounts in the order displayed below, depending on the combination of linked components you have in your Citibank Everything Counts® Package:

• Money market account (generally, in the order of first money market account opened); or

• Day-to-Day Savings account (generally, if no money market account, in the order of first opened Day-to-Day Savings account).

### Cancelled Checks

Neither original cancelled checks nor images of checks are included with your statement. Check images can be included upon request. You must speak to a Customer Service Representative in order to sign up for this service. You can view and print copies of checks presented within the past 12 months on www.CitibankOnline.com. If you need a copy of a cancelled check you may request a photocopy by calling CitiPhone Banking® at 1-800-627-3999 or stop by your nearest Citibank branch. Please refer to "Service Fees and Charges for All Accounts" in this Addendum for applicable fees.

17

# Information About Specific Accounts

This section of the Addendum describes the features of the following accounts that are available:

- Regular Checking
- Interest Checking
- Citigold Interest Checking
- Day-to-Day Savings
- Citibank® Money Market Plus Account
- Citibank® Rate Accelerator Money Market Account
- Citibank® Premier Money Market Account
- Citibank® Savings Plus Account
- Citibank Market Rate Account
- Citibank Market Rate Plus Account
- Certificates of Deposit

## Regular Checking

**Account Features**

Regular Checking is a non-interest bearing account available in all account packages.

**Minimum Opening Deposit**

The minimum opening deposit requirement for Regular Checking varies by account package type. See the applicable account package for details.

**Fees**

There is no separate monthly maintenance fee for a Regular Checking account. When a Regular Checking account is opened, it must be in a package and is subject to the applicable monthly maintenance, non-Citibank ATM and per check fees of the applicable account package as disclosed in the "Information About Account Packages" section of this Addendum.

## Interest Checking

**Account Features**

Interest Checking is an interest bearing account available in the Citibank® Account Package and in the Citibank Everything Counts® Package.

**Minimum Opening Deposit**

There is a $100 minimum deposit required to open an Interest Checking account.

**Interest Rates**

The interest rates for Interest Checking are variable, determined by Citibank at its sole discretion and can change at any time. For current interest rates and Annual Percentage Yields please refer to a current rate sheet, call CitiPhone Banking® at 1-800-627-3999 or stop by your nearest Citibank branch.

**When Interest Begins To Accrue**

Money deposited to this account at a teller or a Citibank ATM before the end of any Business Day (or earlier posted time) begins to earn interest on the day you make the deposit; funds deposited at a Citibank ATM after the end of a Business Day (or earlier posted time) or on a non-Business Day earn interest from the next Business Day. (Please see the Client Manual – Consumer Accounts for definition of "Business Day".)

**Interest Calculation Method and Rate Information**

We use the average daily balance method to calculate the interest on Interest Checking accounts. This method applies a periodic rate to the average daily balance for the applicable monthly period. The average daily balance is calculated by adding the principal balance in the account for each day of the applicable monthly period and dividing that figure by the number of days in the period. The rate used to calculate interest for the period is the average of the daily periodic rates in effect during the period.

The principal in the account is reduced based upon the transaction date when a withdrawal or other debit transaction occurs, which is not always the same as the posting date. The principal balance on which interest is calculated may not be the same as that appearing on your periodic statement if there have been intervening transactions.

**Interest Compounding and Crediting**

Interest is compounded daily for the actual number of days your money is on deposit and is credited to your account monthly. Interest is computed using a 365-day year except in leap years when interest may be computed on a 366-day basis.

**Interest Adjustments**

An interest adjustment for a transaction occurring during a statement period may be reflected on your statement in the next statement period rather than in the statement period in which it occurs.

**Interest on Closed Accounts**

No interest is paid on the account for the monthly period in which the account is closed.

**Fees**

There is no separate monthly maintenance fee for an Interest Checking account. When an Interest Checking account is opened, it must be in a package and is subject to the applicable monthly maintenance, non-Citibank ATM and per check fees of the applicable account package as disclosed in the "Information About Account Packages" section of this Addendum.

## Citigold™ Interest Checking

**Account Features**

Citigold Interest Checking is an interest bearing account only available in the Citigold® Account Package.

**Minimum Opening Deposit**

There is a $500 minimum deposit required to open a Citigold Interest Checking account.

**Interest Rates**

The interest rates for the Citigold Interest Checking account are variable, determined by Citibank at its sole discretion and can change at any time. For current interest rates and Annual Percentage Yields please refer to a current rate sheet, call CitiPhone Banking® at 1-800-627-3999 or stop by your nearest Citibank branch.

19

### When Interest Begins To Accrue

Money deposited to this account at a teller or a Citibank ATM before the end of any Business Day (or earlier posted time) begins to earn interest on the day you make the deposit; funds deposited at a Citibank ATM after the end of a Business Day (or earlier posted time) or on a non-Business Day earn interest from the next Business Day. (Please see the Client Manual – Consumer Accounts for definition of "Business Day".)

### Interest Calculation Method and Rate Information

We use the average daily balance method to calculate the interest on Citigold Interest Checking accounts. The average daily balance method applies a daily periodic rate to the average daily balance for the statement period. The average daily balance for the statement period is calculated by adding the principal balance in the account for each day during the statement period and dividing that figure by the number of days during the period that your account was open. The average daily balance is not used for the calculation of the interest rate paid on the account.

The rate used to calculate interest for the statement period is the average of the daily periodic rates in effect during the statement period. The rates paid on the account are tiered so that amounts in higher balance levels in the account can earn a different rate. When the balance exceeds the upper limit of a tier only the incremental amount in the higher tier will receive the rate paid for the higher balance range. This can result in your account earning a daily periodic rate that is a weighted average of the rates paid for the balances in each of the applicable tiers.

The daily periodic rate used in the interest calculation is determined by the average daily balance for interest calculation which is different than the average daily balance for the statement period because it is based upon the period that starts the Business Day before the first day of the statement period and ends the Business Day before the last day of the statement period. We will add the principal in the account for each day during this period and then divide that figure by the number of days during this period that your account was open to determine the average daily balance for interest rate calculation.

The following tiers have been established for interest rates for Citigold Interest Checking. The same rate may be assigned to more than one tier.

| Average Daily Balance Tiers for Interest Rate Calculation | | |
|---|---|---|
| 0 - $24,999.99 | $25,000 - $49,999.99 | $50,000 & over |

The principal in the account is reduced based upon the transaction date when a withdrawal or other debit transaction occurs, which is not always the same as the posting date. The principal balance on which interest is calculated may not be the same as that appearing on your periodic statement if there have been intervening transactions.

### Interest Compounding and Crediting

Interest is compounded daily for the actual number of days your money is on deposit and is credited to your account monthly. Interest is computed using a 365-day year except in leap years when interest may be computed on a 366-day basis.

### Interest Adjustments

An interest adjustment for a transaction occurring during a statement period may be reflected on your statement in the next statement period rather than in the statement period in which it occurs.

20

### Interest on Closed Accounts

No interest is paid on the account for the monthly period in which the account is closed.

### Fees

There is no separate monthly maintenance fee for a Citigold Interest Checking account. When a Citigold Interest Checking account is opened, it must be in a Citigold® Account Package and is subject to the applicable monthly maintenance fees for that account package as disclosed in the "Information About Account Packages" section of this Addendum.

## Day-to-Day Savings

### Account Features

Day-to-Day Savings is a statement savings account that can be linked to most Citibank account packages. With your Citibank® Banking Card you can make deposits, transfer funds and make withdrawals conveniently at a Citibank ATM, over the phone or through Citibank® Online or Citi Mobile®. Your activity will be summarized in a periodic statement.

### Minimum Opening Deposit

There is a $100 minimum deposit required to open a Day-to-Day Savings account. We reserve the right to close the account if the account balance falls below the minimum balance.

### Interest Rates

The interest rates for the Day-to-Day Savings account are variable, determined by Citibank at its sole discretion and can change at any time. For current interest rates and Annual Percentage Yields please refer to a current rate sheet, call CitiPhone Banking® at 1-800-627-3999 or stop by your nearest Citibank branch.

### Fees

Monthly maintenance fees for a Day-to-Day Savings account are based on the linked banking package that contains the Day-to-Day Savings account. If the Day-to-Day Savings account is part of the Basic Banking Package, please see the "Basic Banking Package" section of this Marketplace Addendum.

### Interest Calculation Method

We use the daily balance method to calculate the interest on Day-to-Day Savings accounts. This method applies a daily periodic rate to the principal in the account each day. The principal in the account is reduced based upon the transaction date when a withdrawal or other debit transaction occurs, which is not always the same as the posting date. The principal balance on which interest is calculated may not be the same as that appearing on your periodic statement if there have been intervening transactions.

Please refer to the rate sheet for additional rate information.

### When Interest Begins To Accrue

Money deposited to this account before the end of any Business Day (or earlier posted time) begins to earn interest on the day you make the deposit; funds deposited at a Citibank ATM after the end of a Business Day (or earlier posted time) or on a non-Business Day earn interest from the next Business Day. (Please see the Client Manual – Consumer Accounts for definition of "Business Day".)

### Interest Compounding and Crediting

Interest is compounded daily for the actual number of days your money is on deposit and is credited to your account monthly. Interest is computed using a 365-day year except in leap years when interest may be computed on a 366-day basis.

### Interest Adjustments

An interest adjustment for a transaction occurring during a statement period may be reflected on your statement in the next statement period rather than in the statement period in which it occurs.

### Interest on Closed Accounts

No interest is paid on the account for the monthly period in which the account is closed.

### Transfer Limitations

The "Limits on Transfers" section of the Client Manual – Consumer Accounts applies to the Day-to-Day Savings account.

## Citibank® Money Market Plus Account

### Account Features

Your Citibank® Money Market Plus Account is a money market account that gives you the ability to earn short-term market rates in an FDIC-insured account. It also provides the convenience of account access through check writing, ATMs, via Citibank® Online, Citi Mobile® or through CitiPhone Banking®, our automated telephone service. To open a Citibank® Money Market Plus Account we require you to have or open a linked checking account in one of the following account packages: Citibank® EZ Checking Package, Citibank® Student Account Package, The Citibank® Account Package, Citibank Everything Counts® Package or The Citigold® Account Package ("Eligible Packages"). The Citibank® Money Market Plus Account cannot be linked to or opened in a Basic Banking Package or an Access Account Package. You cannot open a Citibank® Money Market Plus Account as a standalone account in any account package.

### Minimum Opening Deposit

There is a $100 minimum deposit required to open a Citibank® Money Market Plus Account. We reserve the right to close the account if the account balance falls below the minimum balance.

### Interest Rates

The interest rates for the Citibank® Money Market Plus Account are variable, determined by Citibank at its sole discretion and can change at any time. For current interest rates and Annual Percentage Yields please refer to a current rate sheet, call CitiPhone Banking® at 1-800-627-3999 or stop by your nearest Citibank branch.

### When Interest Begins To Accrue

Non-Cash items, such as checks, deposited to a money market account begin to earn interest on the date Citibank receives credit for the funds. This date will be no later than the second Business Day after the Business Day the check deposit is received. Cash deposits begin to earn interest on the Business Day the cash deposit is received. (Please see the Client Manual – Consumer Accounts for definition of "Business Day".)

### Fees

There is no separate monthly maintenance fee for the Citibank® Money Market Plus Account. When a Citibank® Money Market Plus Account is opened, it must be in a package and is subject to the applicable monthly maintenance, non-Citibank ATM and per check fees of the applicable account package as disclosed in the "Information About Account Packages" section of this Addendum.

### Interest Calculation Method and Rate Information

We use the average daily balance method to calculate the interest on Citibank® Money Market Plus Accounts. The average daily balance method applies a periodic rate to the average daily balance for the monthly period. The average daily balance is calculated by adding the principal balance in the account for each day of the applicable monthly period and dividing that figure by the number of days in the period.

The average daily balance in your Citibank® Money Market Plus Account for the calendar month prior to the end of the statement period determines the applicable tier for the statement period.

| Account Balance Ranges for Rate Calculations |
|---|
| $0 - $9,999.99 |
| $10,000 - $24,999.99 |
| $25,000 - $49,999.99 |
| $50,000 - $99,999.99 |
| $100,000 - $499,999.99 |
| $500,000 - $999,999.99 |
| $1,000,000 + |

The same rate may be assigned to more than one balance range. We may pay different rates for the Citibank® Money Market Plus Account based upon which account package contains your Citibank® Money Market Plus Account and whether there is a linked checking account. Your rate(s) for the entire statement cycle will be based upon which account package contains your Citibank® Money Market Plus Account, and if the account contains a linked checking account, on the last day of that statement cycle. Please refer to the rate sheet for additional rate information

The principal in the account is reduced based upon the transaction date when a withdrawal or other debit transaction occurs, which is not always the same as the posting date. The principal balance on which interest is calculated may not be the same as that appearing on your periodic statement if there have been intervening transactions

### Special Circumstances

When you open a new Citibank® Money Market Plus Account, if your first account statement is issued in the same calendar month that you opened your account, the rate your Citibank® Money Market Plus Account earns for your first statement period will be based upon the balance in your Citibank® Money Market Plus Account at the start of business on the date of your statement.

If a Citibank® Money Market Plus Account is converted to another type of money market account during a statement period, the account will earn the rate assigned to the new money market account during the entire statement period, including the period in which the account was the old money market account.

If at any time your Citibank® Money Market Plus Account is not linked to a Citibank® Money Market Plus Eligible Package, the entire balance in your Citibank® Money Market Plus Account will earn interest at the lowest tiered rate established for the account regardless of the balance in your Citibank® Money Market Plus Account.

23

### Interest Compounding and Crediting

Interest is compounded daily for the actual number of days your money is on deposit and is credited to your account monthly. Interest is computed using a 365-day year except in leap years when interest may be computed on a 366-day basis.

### Interest Adjustments

An interest adjustment for a transaction occurring during a statement period may be reflected on your statement in the next statement period rather than in the statement period in which it occurs.

### Linking

The balances in other Citibank accounts that are linked to the Citibank® Money Market Plus Account will not be included in the average balance calculation for the Citibank® Money Market Plus Account. The balance in the Citibank® Money Market Plus Account may be linked to contribute to the minimum balance requirements of eligible Citibank account packages.

### Interest on Closed Accounts

If the account is closed before the end of the monthly statement period, interest will be paid for the number of days the account was open during the period in accordance with the following terms:

• If the account was open for more than a full monthly statement period, interest will be paid at the rate paid on the account for the prior monthly statement period;

• If the account was not open for a full monthly statement period, interest will be paid at the lowest rate paid on the account in any Citibank account package that was in effect on the day the account was opened regardless of the balance in the account or the account package containing your account.

### Transfer Limitations

The "Limits on Transfers" section of the Client Manual – Consumer Accounts applies to the Citibank® Money Market Plus Account.

## Citibank™ Rate Accelerator Money Market Account

### Account Features

Your Citibank® Rate Accelerator Money Market Account is a money market account that gives you the ability to earn short-term market rates in an FDIC-insured account. It also provides the convenience of account access through ATMs, via Citibank® Online, Citi Mobile® or through CitiPhone Banking®, our automated telephone service. The Citibank® Rate Accelerator Money Market Account does not provide check-writing access. To open a Citibank® Rate Accelerator Money Market Account we require you to have or open a linked checking account in one of the following account packages: Citibank® EZ Checking Package, Citibank® Student Account Package, The Citibank® Account Package, Citibank Everything Counts® Package or The Citigold® Account Package ("Eligible Packages"). The Citibank® Rate Accelerator Money Market cannot be linked to or opened in a Basic Banking Package or an Access Account Package. You cannot open a Citibank® Rate Accelerator Money Market Account as a standalone account in any account package.

### Minimum Opening Deposit

There is a $1,000 minimum opening deposit required to open a Citibank® Rate Accelerator Money Market Account. We reserve the right to close the account if the account balance falls below the minimum balance.

### Interest Rates

The interest rates for the Citibank® Rate Accelerator Money Market Account are variable, determined by Citibank at its sole discretion and can change at any time. For current interest rates and Annual Percentage Yields, please call CitiPhone Banking® at 1-800-627-3999 or stop by your nearest Citibank branch.

### When Interest Begins To Accrue

Non-Cash items, such as checks, deposited to a money market account begin to earn interest on the date Citibank receives credit for the funds. This date will be no later than the second Business Day after the Business Day the check deposit is received. Cash deposits begin to earn interest on the Business Day the cash deposit is received. (Please see the Client Manual – Consumer Accounts for definition of "Business Day".)

### Fees

There is no separate monthly maintenance fee for the Citibank® Rate Accelerator Money Market Account. When a Citibank® Rate Accelerator Money Market Account is opened, it must be in a package and is subject to the applicable monthly maintenance, non-Citibank ATM and per check fees of the applicable account package as disclosed in the "Information About Account Packages" section of this Addendum.

### Interest Calculation Method and Rate Information

We use the average daily balance method to calculate the interest on Citibank® Rate Accelerator Money Market Account. The average daily balance method applies a periodic rate to the average daily balance for the applicable monthly period. The average daily balance is calculated by adding the principal balance in the account for each day of the applicable monthly period and dividing that figure by the number of days in the period.

The Citibank® Rate Accelerator Money Market Account earns interest determined by the average daily balance in the Citibank® Rate Accelerator Money Market Account and whether certain qualifying activity occurred in the linked Citibank checking account during the calendar month that ends prior to the last Business Day in the statement period. The average daily balance in the Citibank® Rate Accelerator Money Market Account for the calendar month prior to the end of the statement period determines the applicable tier for the statement period.

| Account Balance Ranges for Rate Calculations |
| --- |
| $0 – $9,999.99 |
| $10,000 – $24,999.99 |
| $25,000 – $49,999.99 |
| $50,000 – $99,999.99 |
| $100,000 – $499,999.99 |
| $500,000 – $999,999.99 |
| $1,000,000 + |

The same rate(s) may be assigned to more than one balance range. We may offer different base and accelerated rates for the Citibank® Rate Accelerator Money Market Account depending upon which Citibank account package contains the account and whether there is a linked checking account. Your rate(s) for the entire statement cycle will be based upon which account package contains your Citibank® Rate Accelerator Money Market Account, and if the account contains a linked checking account, on the last day of that statement cycle. Please see the applicable rate sheet for details.

24

25

The principal in the account is reduced based upon the transaction date when a withdrawal or other debit transaction occurs, which is not always the same as the posting date. The principal balance on which interest is calculated may not be the same as that appearing on your periodic statement if there have been intervening transactions.

**Citibank® Rate Accelerator Money Market Account
Qualifying Activity**

To qualify for an accelerated rate in an interest rate tier during a statement period, one of the following qualifying activities must occur in your linked checking account during the calendar month prior to the end of the statement period ("Citibank® Rate Accelerator Money Market Account Qualifying Activity"):

· Two (2) or more qualifying electronic bill payments with a combined minimum amount of $25. Qualifying electronic bill payments are individual or recurring bill payments made via CitiPhone Banking®, Citibank® Online, CitiBusiness® Online, Citi Mobile® and Staff Assisted Bill Payments¹, (Qualifying electronic bill payments do not include payments made by checks or internal transfer payments made to accounts of Citibank or its Citi affiliates); or

  ¹ Staff assisted bill payments are subject to a fee for each statement cycle that you utilize this service. Please refer to "Service Fees and Charges for All Accounts" in this Marketplace Addendum for fee information.

· Five (5) signature debit card purchases using your Citibank Debit card. Qualifying purchases must be submitted through the MasterCard® Network and are those for which you do not use your PIN and either you or a merchant designates as a "credit" transaction (including purchases you sign for, small dollar purchases that do not require a signature and use of your Citibank® Debit MasterCard® with PayPass™ (or other similar Access Device), Internet, phone and mail-order transactions, (Qualifying purchases do not include those initiated using a Personal Identification Number (PIN) or other transactions submitted through other payment processing networks); or

· One (1) direct deposit.

**Special Circumstances**

If you open a new Citibank® Rate Accelerator Money Market Account in a Citibank® Rate Accelerator Money Market Account Eligible Package, other than a Citibank® EZ Checking Package, and your first account statement is issued in the same calendar month that you open your account, the daily periodic rate used in the computation of interest is determined by the average daily balance for interest calculation. It is different than the average daily balance for the statement period because it is based upon the period that starts the first day that the account is opened and ends the Business Day before the last day of the statement period. We will add the principal in the account for each day during this period and then divide that figure by the number of days during this period that your account was open to determine the average daily balance for interest rate calculation.

A new Citibank® Rate Accelerator Money Market Account regardless of qualifying activity will earn interest at an accelerated rate for the first two statement periods that the account is open provided that the account was not converted from an existing Citibank money market account. An existing Citibank money market account that is converted into Citibank® Rate Accelerator Money Market Account will earn an accelerated rate during the first two statement periods only if Citibank® Rate Accelerator Money Market Account Qualifying Activity occurred in a linked checking account in the prior calendar month.

26

If a Citibank® Rate Accelerator Money Market Account is converted to another type of money market account during a statement period, the account will earn the rate assigned to the new money market account during the entire statement period, including the period in which the account was the old money market account.

The interest that you earn on a Citibank® Rate Accelerator Money Market Account that is linked to a Citibank® EZ Checking Package will be paid at the lowest tiered rate established for the account, regardless of the balance in your Citibank® Rate Accelerator Money Market Account; however it is eligible for the base or accelerated rate of the lowest tier.

If at any time during any statement period a Citibank® Rate Accelerator Money Market Account is not linked to a checking account in an Eligible Package, then the account will not earn an accelerated rate even if there was Citibank® Rate Accelerator Money Market Account Qualifying Activity in the linked checking account during the calendar month prior to the end of the statement period.

### Interest Compounding and Crediting

Interest is compounded daily for the actual number of days your money is on deposit and is credited to your account monthly. Interest is computed using a 365-day year except in leap years when interest may be computed on a 366-day basis.

### Interest Adjustments

An interest adjustment for a transaction occurring during a statement period may be reflected on your statement in the next statement period rather than in the statement period in which it occurs.

### Linking

The balances in other Citibank accounts that are linked to the Citibank® Rate Accelerator Money Market Account will not be included in the average balance calculation for the Citibank® Rate Accelerator Money Market Account. The balance in the Citibank® Rate Accelerator Money Market Account may be linked to contribute to the minimum balance requirements of eligible Citibank account packages.

### Interest on Closed Accounts

If the account is closed before the end of the monthly statement period, interest will be paid for the number of days the account was open during the period in accordance with the following terms:

If the account was open for more than a full monthly statement period, interest will be paid at the rate paid on the account for the prior monthly statement period;

If the account was not open for a full monthly statement period, interest will be paid at the lowest rate paid on the account in any Citibank account package that was in effect on the day the account was opened regardless of the balance in the account or the account package containing your account.

### Transfer Limitations

The "Limits on Transfers" section of the Client Manual – Consumer Accounts applies to the Citibank® Rate Accelerator Money Market Account.

27

## Citibank™ Premier Money Market Account

### Account Features

Your Citibank® Premier Money Market Account is a money market account that gives you the ability to earn short-term market rates in an FDIC-insured account. It also provides the convenience of account access through ATMs, via Citibank® Online, Citi Mobile® or through CitiPhone Banking®, our automated telephone service. The Citibank® Premier Money Market Account does not provide check writing access. To open a Citibank® Premier Money Market Account, we require you to have or open a linked checking account in one of the following account packages: Citibank® EZ Checking Package, Citibank® Student Account Package, The Citibank® Account Package, Citibank Everything Counts® Package or The Citigold® Account Package ("Eligible Packages"). The Citibank® Premier Money Market Account cannot be linked to or opened in a Basic Banking Package or an Access Account Package. You cannot open a Citibank® Premier Money Market Account as a standalone account in any account package.

### Minimum Opening Deposit

There is a $1,000 minimum opening deposit required to open a Citibank® Premier Money Market Account. We reserve the right to close the account if the account balance falls below the minimum balance.

### Interest Rates

The interest rates for the Citibank® Premier Money Market Account are variable, determined by Citibank at its sole discretion and can change at any time. For current interest rates and Annual Percentage Yields, please call CitiPhone Banking® at 1-800-627-3999 or stop by your nearest Citibank branch.

### When Interest Begins To Accrue

Non-Cash items, such as checks, deposited to a money market account begin to earn interest on the date Citibank receives credit for the funds. This date will be no later than the second Business Day after the Business Day the check deposit is received. Cash deposits begin to earn interest on the Business Day the cash deposit is received. (Please see the Client Manual — Consumer Accounts for definition of "Business Day".)

### Fees

There is no separate monthly maintenance fee for the Citibank® Premier Money Market Account. When a Citibank® Premier Money Market Account is opened, it must be in a package and is subject to the applicable monthly maintenance, non-Citibank ATM and per check fees of the applicable account package as disclosed in the "Information About Account Packages" section of this Addendum.

### Interest Calculation Method and Rate Information

We use the average daily balance method to calculate the interest on Citibank® Premier Money Market Accounts. The average daily balance method applies a periodic rate to the average daily balance for the monthly period. The average daily balance is calculated by adding the principal balance in the account for each day of the applicable monthly period and dividing that figure by the number of days in the period.

The Citibank® Premier Money Market Account earns interest determined by the average balance in the account and whether certain qualifying activity (defined below) occurred in the linked Citibank checking account during the calendar month that ends prior to the last Business Day in the statement period. The average balance in the Citibank® Premier Money Market Account for the calendar month prior to the end of the statement period determines the applicable tier for the statement period.

28

| Account Balance Ranges for Rate Calculations |
| --- |
| $0 - $9,999.99 |
| $10,000 - $24,999.99 |
| $25,000 - $49,999.99 |
| $50,000 - $99,999.99 |
| $100,000 - $499,999.99 |
| $500,000 - $999,999.99 |
| $1,000,000 + |

The same rate(s) may be assigned to more than one balance range. We may offer different base and accelerated rates for the Citibank® Premier Money Market Account depending upon which Citibank account package contains the account. Please see the applicable rate sheet for details.

The principal in the account is reduced based upon the transaction date when a withdrawal or other debit transaction occurs, which is not always the same as the posting date. The principal balance on which interest is calculated may not be the same as that appearing on your periodic statement if there have been intervening transactions.

### Citibank® Premier Money Market Account Qualifying Activity

To qualify for an accelerated rate in an interest rate tier during a statement period, one of the following qualifying activities must occur in your linked personal checking account during the calendar month prior to the end of the statement period ("Qualifying Activity"):

Three (3) or more qualifying electronic bill payments with a combined minimum amount of $25. Qualifying electronic bill payments are individual or recurring bill payments made via CitiPhone Banking®, Citibank® Online, CitiBusiness® Online, Citi Mobile®, and Staff Assisted Bill Payments¹, (Qualifying electronic bill payments do not include payments made by checks or internal transfer payments made to accounts of Citibank or its Citi affiliates); or

¹ Staff assisted bill payments are subject to a fee for each statement cycle that you utilize this service. Please refer to "Service Fees and Charges for All Accounts" in this Marketplace Addendum for fee information.

Seven (7) or more qualifying signature debit card purchases using your Citibank Debit card. Qualifying purchases must be submitted through the MasterCard® Network and are those for which you do not use your PIN and either you or a merchant designates as a "credit" transaction (including purchases you sign for, small dollar purchases that do not require a signature and use of your Citibank® Debit MasterCard® with PayPass™ (or other similar Access Device), Internet, phone and mail-order transactions. Qualifying purchases do not include those initiated using a Personal Identification Number (PIN) or other transactions submitted through other payment processing networks; or

One (1) direct deposit.

### Special Circumstances

If you open a new Citibank® Premier Money Market Account in a Citibank® Premier Money Market Account Eligible Package, other than a Citibank® EZ Checking Package, and your first account statement is issued in the same calendar month that you open your account, the daily periodic rate used in the computation of interest is determined by the average daily balance for interest calculation. It is different than the average daily balance for the statement period because it is based upon the period that starts the first day that the account is opened and ends the Business Day before the last day of the statement period. We will add the principal in the account for each day during this period and then divide that figure by the number of

29

days during this period that your account was open to determine the average daily balance for interest rate calculation.

Both an existing Citibank money market account that is converted into Citibank® Premier Money Market Account and a new Citibank® Premier Money Market Account will earn an accelerated rate for the first two statement periods regardless of qualifying activity in the linked checking account.

If a Citibank® Premier Money Market Account is converted to a new type of money market account during a statement period, the account will earn the rate assigned to the new money market account during the entire statement period, including the period in which the account was the old money market account.

The interest that you earn on a Citibank® Premier Money Market Account that is linked to a Citibank® EZ Checking Package will be paid at the lowest tiered rate established for the account, regardless of the balance in your Citibank® Premier Money Market Account. A Citibank® Premier Money Market Account that is linked to a Citibank® EZ Checking Package is eligible for the base or accelerated rate of the lowest tier.

If at any time during any statement period a Citibank® Premier Money Market Account is not linked to a checking account in an Eligible Package, then the account will not earn an accelerated rate even if there was Qualifying Activity in the linked checking account during the calendar month prior to the end of the statement period.

### Interest Compounding and Crediting

Interest is compounded daily for the actual number of days your money is on deposit and is credited to your account monthly. Interest is computed using a 365-day year except in leap years, when interest may be computed on a 366-day basis.

### Interest Adjustments

An interest adjustment for a transaction occurring during a statement period may be reflected on your statement in the next statement period rather than in the statement period in which it occurs.

### Linking

The balances in other Citibank accounts that are linked to the Citibank® Premier Money Market Account will not be included in the average balance calculation for the Citibank® Premier Money Market Account. The balance in the Citibank® Premier Money Market Account may be linked to contribute to the minimum balance requirements of eligible Citibank account packages.

### Interest on Closed Accounts

If the account is closed before the end of the monthly statement period, interest will be paid for the number of days the account was open during the period in accordance with the following terms:

- If the account was open for more than a full monthly statement period, interest will be paid at the rate paid on the account for the prior monthly statement period;

- If the account was not open for a full monthly statement period, interest will be paid at the lowest rate paid on the account in any Citibank account package that was in effect on the day the account was opened, regardless of the balance in the account or the account package containing your account.

### Transfer Limitations

The "Limits on Transfers" section of the Client Manual – Consumer Accounts applies to the Citibank® Premier Money Market Account.

30

# Citibank® Savings Plus Account

## Account Features

A Citibank® Savings Plus Account is a money market account that gives you the ability to earn short-term market rates in an FDIC-insured account. It also provides the convenience of account access through ATMs, Citibank® Online, Citi Mobile® or through CitiPhone Banking®, our automated telephone service. The Citibank® Savings Plus Account does not provide check-writing access. To open a Citibank® Savings Plus Account we require you to have or open a checking account which must be opened in one of the following account packages: Citibank® EZ Checking Package, Citibank® Student Account Package, The Citibank® Account Package, Citibank Everything Counts® Package or The Citigold® Account Package ("Eligible Packages"). The Citibank® Savings Plus Account cannot be linked to or opened in a Basic Banking Package or an Access Account Package. You cannot open a Citibank® Savings Plus Account as a standalone account in any account package.

## Minimum Opening Deposit

There is a minimum opening deposit of $100 required to open the Citibank® Savings Plus Account. We reserve the right to close the account if the account balance falls below the minimum balance.

## Interest Rates

The interest rates for the Citibank® Savings Plus Account are variable, determined by Citibank at its sole discretion and can change at any time. For current interest rates and Annual Percentage Yields, please call CitiPhone Banking® at 1-800-627-3999 or stop by your nearest Citibank branch.

## When Interest Begins To Accrue

Non-Cash items, such as checks, deposited to a money market account begin to earn interest on the date Citibank receives credit for the funds. This date will be no later than the second Business Day after the Business Day the check deposit is received. A cash deposit begins to earn interest on the Business Day the cash deposit is received. (Please see the Client Manual – Consumer Accounts for definition of "Business Day".)

## Fees

There is no separate monthly maintenance fee for the Citibank® Savings Plus Account. When a Citibank® Savings Plus Account is opened, it must be in a package and is subject to the applicable monthly maintenance, non-Citibank ATM and per check fees of the applicable account package as disclosed in the "Information About Account Packages" section of this Addendum.

## Interest Calculation Method and Rate Information

We use the average daily balance method to calculate the interest on Citibank® Savings Plus accounts. The average daily balance method applies a periodic rate to the average daily balance for the monthly period. The average daily balance is calculated by adding the principal balance in the account for each day of the applicable monthly period and dividing that figure by the number of days in the period.

The average daily balance in your Citibank® Savings Plus Account for the calendar month prior to the end of the statement period determines the applicable tier for the statement period. However, for Citibank® Savings Plus Accounts linked to a Citibank® EZ Checking Package, the interest rate you earn will always be paid at the lowest tiered rate established for the account regardless of account balance.

31

| Account Balance Ranges for Rate Calculations |
|---|
| $0 - $9,999.99 |
| $10,000 - $24,999.99 |
| $25,000 - $49,999.99 |
| $50,000 - $99,999.99 |
| $100,000 - $499,999.99 |
| $500,000 - $999,999.99 |
| $1,000,000 + |

The same rate may be assigned to more than one balance range. We may offer different rates for the Citibank® Savings Plus Account depending upon which Citibank account package contains the account and if that account package contains a linked checking account. Please refer to the rate sheet for additional rate information.

The principal in the account is reduced based upon the transaction date when a withdrawal or other debit transaction occurs, which is not always the same as the posting date. The principal balance on which interest is calculated may not be the same as that appearing on your periodic statement if there have been intervening transactions.

### Special Circumstances

If you open a new Citibank® Savings Plus Account in a Citibank® Savings Plus Account Eligible Package, other than a Citibank® EZ Checking Package, and your first account statement is issued in the same calendar month that you open your account, the daily periodic rate used in the computation of interest is determined by the average daily balance for interest calculation. It is different than the average daily balance for the statement period because it is based upon the period that starts the first day that the account is opened and ends the Business Day before the last day of the statement period. We will add the principal in the account for each day during this period and then divide that figure by the number of days during this period that your account was open to determine the average daily balance for interest rate calculation.

If a Citibank® Savings Plus Account is converted to another type of money market account during a statement period, the account will earn the rate assigned to the new money market account during the entire statement period, including the period in which the account was the old money market account.

For a Citibank® Savings Plus Account that is linked to a Citibank® EZ Checking Package, interest will be paid at the lowest tiered rate established for the account, regardless of the balance in your Citibank® Savings Plus Account.

### Interest Compounding and Crediting

Interest is compounded daily for the actual number of days your money is on deposit and is credited to your account monthly. Interest is computed using a 365-day year except in leap years when interest may be computed on a 366-day basis.

### Interest Adjustments

An interest adjustment for a transaction occurring during a statement period may be reflected on your statement in the next statement period rather than in the statement period in which it occurs.

### Linking

The balances in other Citibank accounts that are linked to the Citibank® Savings Plus Account will not be included in the average balance calculation for the Citibank® Savings Plus Account. The balance in the Citibank® Savings Plus Account may be linked to contribute to the minimum balance requirements of eligible Citibank account packages.

### Interest on Closed Accounts

If the account is closed before the end of the monthly statement period, interest will be paid for the number of days the account was open during the period in accordance with the following terms:

- If the account was open for more than a full monthly statement period, interest will be paid at the rate paid on the account for the prior monthly statement period;
- If the account was not open for a full monthly statement period, interest will be paid at the lowest rate paid on the account in any Citibank account package that was in effect on the day the account was opened, regardless of the balance in the account or the account package containing your account.

### Transfer Limitations

The "Limits on Transfers" section of the Client Manual − Consumer Accounts applies to the Citibank® Savings Plus Account.

## Citibank Market Rate Account
## Citibank Market Rate Plus Account

### Account Features

The Citibank Market Rate Account and the Citibank Market Rate Plus Account are special savings accounts with limited access and with special terms and conditions.

### Interest Rates

The interest rates for the Citibank Market Rate Account and the Citibank Market Rate Plus Account are determined by Citibank at its sole discretion and can change at any time. For current interest rates and Annual Percentage Yields, please call CitiPhone Banking® at 1-800-627-3999 or stop by your nearest Citibank branch.

### Minimum Opening Deposit and Maximum Balance

The minimum opening deposit is $10,000. We reserve the right to close the account if the account balance falls below the minimum balance. The maximum balance (exclusive of interest) may not exceed $1,000,000 without the consent of Citibank.

### Additional Deposits and Withdrawals

*Citibank Market Rate Account:* Additional deposits and/or withdrawals can be made at any time after the first seven (7) days that your account is opened.

*Citibank Market Rate Plus Account:* Additional deposits and/or withdrawals can be made at any time after the first fourteen (14) days that your account is opened.

Withdrawals can be made only in the form of a transfer to a linked Citibank checking account. You may request a withdrawal at a Citibank branch, through CitiPhone Banking®, or by mail. Instructions to make transfers through CitiPhone Banking® must be received by CitiPhone Banking® no later than 2:00 PM Central Time to be effective on that Business Day.

### Fees

There is no separate monthly maintenance fee for a Citibank Market Rate Account or a Citibank Market Rate Plus Account. When a Citibank Market Rate Account or Citibank Market Rate Plus Account is opened, it must be in a package and is subject to the applicable monthly maintenance, non-Citibank ATM and per check fees of the applicable account package as disclosed in the "Information About Account Packages" section of this Addendum.

### Interest Calculation Method and Rate Information

We use the daily balance method to calculate the interest on the Citibank Market Rate Account and the Citibank Market Rate Plus Account. This method applies a daily periodic rate to the balance in the account each day.

The principal in the account is reduced based upon the transaction date when a withdrawal or other debit transaction occurs, which is not always the same as the posting date. The principal balance on which interest is calculated may not be the same as that appearing on your periodic statement if there have been intervening transactions. Please refer to the rate sheet for current rate and yield information.

### When Interest Begins To Accrue

Money deposited to this account at a teller or a Citibank ATM before the end of any Business Day (or earlier posted time) begins to earn interest on the day you make the deposit; funds deposited at a Citibank ATM after the end of a Business Day (or earlier posted time) or on a non-Business Day earn interest from the next Business Day. (Please see the Client Manual – Consumer Accounts for definition of "Business Day".)

### Interest Compounding and Crediting

*Citibank Market Rate Account:* Interest is compounded daily starting on the Business Day when the account is opened, and is credited every seven (7) days.

*Citibank Market Rate Plus Account:* Interest is compounded daily starting on the Business Day when the account is opened, and is credited every fourteen (14) days.

For both the Citibank Market Rate Account and Citibank Market Rate Plus Account, interest is computed using a 365-day year except in leap years when interest may be computed on a 366-day basis.

### Interest Adjustments

An interest adjustment for a transaction occurring during a statement period may be reflected on your statement in the next statement period rather than in the statement period in which it occurs.

### Linking

The balances in other Citibank products that are linked to the Citibank Market Rate Account or the Citibank Market Rate Plus Account will not be included in the average balance calculation for the Citibank Market Rate Account or the Citibank Market Rate Plus Account. The balance in the Citibank Market Rate Account or the Citibank Market Rate Plus Account may be linked to contribute to the minimum balance requirements of eligible Citibank account packages.

### Interest on Closed Accounts

If the account is closed before interest is credited, you will not receive the accrued interest.

### Transfer Limitations

The "Limits on Transfers" section of the Client Manual – Consumer Accounts applies to the Citibank Market Rate Account and the Citibank Market Rate Plus Account.

34

## Certificates of Deposit

**Account Features**

Citibank offers a variety of Certificates of Deposit (CDs):

- 3-, 4-, 5-, 6-, 7-, 8-, 9-, and 10-Month CDs with monthly interest or interest at maturity.
- 1-Year CD with monthly interest or interest at maturity
- 13-, 18-, and 30-Month CDs, and 2-Year, 3-Year, 4-Year, and 5-Year CDs with monthly interest.

All our certificates are time deposits. With a time deposit, you agree to leave your funds in the account for a specific period, called the term. The last day of the term is called the maturity date. The maturity date is the first day on which you may withdraw funds without paying an early withdrawal penalty, explained below.

**Minimum Opening Deposit**

There is a $1,000 minimum opening deposit required to open a Certificate of Deposit. No additional deposits are permitted during the term of the account. We reserve the right to close the account if the account balance falls below the minimum balance.

**Rate Information**

The interest rate and Annual Percentage Yield (APY) for all new and renewing CDs are fixed for the term of the CD. For a new CD, the interest rate and APY are based on the balance you deposit into the CD as disclosed on the applicable rate sheet delivered when your CD is opened.

| CD Balance Ranges for Rate Calculations |
| :---: |
| $0 - $9,999.99 |
| $10,000 - $24,999.99 |
| $25,000 - $49,999.99 |
| $50,000 - $99,999.99 |
| $100,000 - $499,999.99 |
| $500,000 - $999,999.99 |
| $1,000,000 + |

The same rate may be assigned to more than one balance range. We may offer different rates for CDs depending upon which Citibank account package contains the CD and whether that Citibank account package contains a linked checking account on the day the CD is funded. Please see the applicable rate sheet for details.

For a renewing CD, the interest rate and APY will be those in effect on the date of CD renewal. Your interest rate and APY will be based on a number of factors related to your CD's status on the close of business on the last day of the 7-day grace period, including: the balance in your CD account; the Citibank account package that contains the CD account; and whether the Citibank account package contains a checking account.

If you change the term of the CD during the grace period, the rate for the renewal term will be determined based on the rate sheet in effect on the date of CD renewal.

35

## Interest Rate Determination

We use the daily balance method to calculate the interest on CDs. This method applies a daily periodic rate to the balance in the account each day.

## When Interest Begins To Accrue

For a new CD, the opening deposit – whether a non-cash item, such as a check, or a cash deposit – begins to earn interest as of the Business Day the account is opened. For a renewing CD, non-cash items and cash deposits begin to earn interest on the Business Day the deposit is received. (Please see the Client Manual – Consumer Accounts for definition of "Business Day".)

## Interest Compounding and Crediting

Interest is compounded daily starting on the Business Day when the account is opened, and is credited to your account monthly (except on CDs with the interest at maturity feature, where interest is credited to the account on the maturity date). Interest is computed using a 365-day year except in leap years when interest may be computed on a 366-day basis. Interest is credited to your account after the close of business on the last day of the month for all CDs. You may also choose a CD of one year or less that pays interest at maturity instead of monthly. Since some months are slightly longer than others, the amount of interest you earn may vary slightly from one month to another. Interest is paid up to but not including the maturity date. If you open your account during the last week of any month, interest from the date opened to the end of the month may be included in the interest payment for the first full month that the account is open.

## Early Withdrawal Penalties

When you open a Certificate of Deposit, you agree to keep the principal on deposit with us for the term you have selected. We will impose a substantial penalty if you withdraw any principal before the maturity date. It may be necessary to deduct all or a portion of the penalty from the principal amount of the deposit.

The early withdrawal penalty based on the term of the CD will be assessed according to the chart below:

| CD Term | Penalty |
|---|---|
| 1 year or less | 90 days simple interest |
| More than 1 year | 180 days simple interest |

Early withdrawal penalties are calculated on the amount of the principal withdrawn. There is no early withdrawal penalty if the account owner dies or is declared legally incompetent.

## Automatic Renewal and Grace Period

All CDs renew automatically at maturity for the same term unless we receive other instructions. The renewal CD will be for the same term, but at the interest rate currently being offered. There is a 7-calendar day grace period after the maturity date, during which additional funds can be deposited and funds can be withdrawn without paying an early withdrawal penalty.

36

### Interest Withdrawal

You may withdraw interest from your Certificate of Deposit at any time during the term after it has been credited without an early withdrawal penalty. You may request to have credited interest deposited to another account you have with us or sent to you in the form of a check. If your account renews automatically, after the grace period your interest will be added to your principal balance and will no longer be available for withdrawal without penalty.

The Annual Percentage Yield on your account assumes interest will remain on deposit until maturity. A withdrawal will reduce earnings.

### Fees

There is no separate monthly maintenance fee for a Certificate of Deposit.

### Linking

The balances in other Citibank accounts that are linked to the account will not be included in the balance calculation for rate determination of your Certificate of Deposit account. The balances in your Certificate of Deposit account may contribute to the balances of eligible Citibank account packages for the purposes of package fee determination.

## CITIBANK OPTION CERTIFICATE OF DEPOSIT

### Account Features

The Citibank Option Certificate of Deposit is a special one-year term CD that allows you to transfer the entire balance during the term to a Citibank one-year CD, without penalty.

All terms and conditions for Certificate of Deposit accounts as contained in the Certificates of Deposit section of this addendum apply to the Citibank Option CD except as noted below.

### Additional Deposits

Additional deposits of funds to the account at the time you exercise your option to convert the account to a standard one-year CD are allowed. The original deposit amount and accrued interest will be converted at the prevailing one-year CD rate.

### Rate Information

The interest rate and Annual Percentage Yield (APY) for all new and renewing CDs are fixed for the term of the CD or to the point that you exercise your option to convert to a standard one-year CD. If you exercise your option, the term for the regular one-year CD will begin on the following Business Day and extend for one year. The rate for the one-year CD will be determined using the rate sheet in effect on the Business Day that your one-year CD begins.

### Option Limitations

You may exercise your option to transfer the entire balance to a standard one-year CD only once without penalty. Once you have exercised your option and the CD is converted to a Citibank one-year CD, all standard terms and conditions governing Citibank CDs will apply.

### Automatic Rollover

If you do not exercise your option during the term of the Citibank Option CD, the CD will automatically renew for another term of one year as a Citibank Option CD with the same terms and conditions.

If you do exercise your option, your account will renew as a standard Citibank one-year CD without the option feature.

37

# Investment Account Linking

> The section deals with your ability to link certain investment accounts available through Citigroup Global Markets Inc. and Morgan Stanley Smith Barney LLC, both of which are our affiliates, to certain account packages.

**Linking Your Account to either a Citigroup Global Markets Inc. or a Morgan Stanley Smith Barney LLC Investment Account**

You can open a Citigroup Global Markets Inc. investment account and link that account to your Citibank® Student Account Package, Citibank® Account Package, Citibank Everything Counts® Package, or your Citigold® Account Package, provided that the account titles are identical.

Alternatively, an eligible Morgan Stanley Smith Barney LLC investment account may also be linked to your Citibank® Account Package or Citigold® Account Package provided the same Citibank® Account Package or Citigold® Account Package is not linked to a Citigroup Global Markets Inc. Account. Citigold® Accounts from Citi Private Bank and Citibank accounts for Non-Resident Aliens are ineligible for linking to a Morgan Stanley Smith Barney LLC investment account.

Linking your Citibank® Account Package, Citibank® Student Account Package, Citibank Everything Counts® Package or Citigold® Account Package to either a Citigroup Global Markets Inc. or a Morgan Stanley Smith Barney LLC Account (collectively, "Linked Investment Account") has many advantages, such as being able to view the balances in your Linked Investment Account using Citibank® Online or Citi Mobile®, and at ATMs located in Citibank branches. In addition, eligible balances in your Linked Investment Account will be counted toward relationship pricing of your Citibank® Account Package, Citibank Everything Counts® Package, or Citigold® Account Package.

Morgan Stanley Smith Barney LLC may have additional linking requirements concerning the Morgan Stanley Smith Barney LLC Accounts that can be linked and may also require you to sign a Morgan Stanley Smith Barney LLC Linkage Agreement. To arrange for this linkage, please contact your Morgan Stanley Smith Barney LLC Financial Advisor.

If your Citibank account package is linked to a Morgan Stanley Smith Barney LLC Account the following additional terms apply:

a. You can choose to link your Morgan Stanley Smith Barney LLC Account to your Citibank account package provided that one of the Citibank account owners is also an account owner of the Morgan Stanley Smith Barney LLC Account meeting Morgan Stanley Smith Barney LLC's requirements for such linkage;

b. Only one common owner of the accounts in a Citibank account package needs to agree to this arrangement and that agreement will bind all Citibank account owners;

c. An account in your Citibank account package cannot be used as a transaction account for settlement of your securities trades in your Morgan Stanley Smith Barney LLC Account; and

d. The Citibank account package cannot also be linked to a Citigroup Global Markets Inc. Account.

38

# Household Linking Of Account Packages

This section explains certain features of linking account packages within a household. When you link together eligible account packages of two or more members of a household, the combined balances of the accounts in those account packages can provide each household member with certain additional benefits.

If you reside in a household where two or more eligible members each have at least one account in a separate eligible Citibank account package, and you link those eligible account packages together, we can make the features and benefits of our relationship pricing structure available to those household members. In most cases, eligible accounts belonging to all household members can be counted towards the combined household balance for purposes of determining whether account maintenance fees and certain other account charges will be assessed and for determining eligibility for benefits associated with higher balance tiers or ranges.

Certain Citibank account packages opened through International Personal Banking, Global Executive Banking, Citi Private Bank, and account packages opened for Non-Resident Aliens, may be ineligible for linking to another account package.

We define a "household" as an account owner and members of the account owner's immediate family who reside at the same address. When asking us to link account packages you agree that your request will comply with any limitations applicable to the account packages that you ask to be linked. Under federal regulations:

- When any account package includes an account with one of our affiliates, immediate family members whose accounts can contribute pricing benefits are limited to the account owner and spouse; the account owner's parents, step-parents, siblings, step-brothers, step-sisters, children, step-children, grandchildren and their spouses.

- When any account package includes a retirement account, that package can only contribute to pricing benefits for the retirement account owner and spouse; the retirement account owner's parents and grandparents, and the retirement account owner's children, siblings and their spouses.

Important: When household members' account packages are linked for combined balances, statements for each linked account package may show the household combined balance range. As a result, household members may be able to deduce approximate balances of other members in the household when account packages are linked. Therefore, when deciding whether to link household account packages, customers should evaluate their privacy needs within the household, along with their need for the rate and fee advantages.

39

## Overdraft Protection

This section outlines two optional services that are designed to help you cover overdrafts in your checking account. Availability is not automatic. Ask us for application and enrollment information.

### Checking Plus® (variable rate)

Checking Plus is a revolving personal line of credit account linked to your Citibank checking account that provides overdraft protection and allows you to borrow the extra cash you need. You can write checks or withdraw cash at any time directly from your credit account – without overdrawing your checking account – up to your available credit limit. The terms of a Checking Plus (variable rate) account are included in a separate agreement and disclosure which you will receive at account application or shortly thereafter.

**For all Checking Plus® and
Checking Plus® (variable rate) customers:**

Please refer to your Checking Plus or Checking Plus (variable rate) Agreements and Disclosures, as applicable, for terms and conditions relating to transfers from Checking Plus or Checking Plus (variable rate) Accounts.

### Safety Check

Safety Check covers overdrafts with transfers from your linked Money Market or Day-to-Day Savings account. Safety Check will not permit you to get cash or transfer funds from your checking to other accounts if there are insufficient funds in your checking account. Safety Check will also not permit transfers for Bill Payments made out of your checking account. The linked contributing account also covers the use of deposited funds that are not yet available in your checking account.

#### Contributing Accounts

When you sign up for Safety Check, you may select one account you maintain at Citibank as your "Contributing Account." It can be either a Day-to-Day Savings or money market account. Other types of deposit accounts are not eligible Contributing Accounts. Only available funds in your Contributing Account can be used for Safety Check coverage. If the checking or Contributing Account is a joint account, all owners must authorize Safety Check coverage.

When Safety Check is used to cover your use of deposited funds in your checking account that are not yet available (uncollected), a like amount in your Contributing Account will be held until the deposited funds become available. The funds held in your Contributing Account are not transferred to the checking account and will continue to earn interest. Since no transfer of funds occurs, there is no transfer fee for use of this service in this circumstance.

#### Safety Check Transfers

Safety Check transfers from your Contributing Account will be made in the amount needed to cover your overdraft and any applicable fees, rounded up to the next $100 increment, not to exceed the available balance in your contributing account.

40

**Transfers**

No more than $99,999.99 per calendar month will be transferred from your Day-to-Day Savings account, or per monthly period from your money market account, to cover overdrafts or use of uncollected funds in your checking account. If one or more transactions cause your checking account to have a negative available balance on a given day, and if you have available funds in your Contributing Account to cover them, only one transfer will be processed for the total amount transferred to cover the transactions. Federal regulations require Citibank to limit the total number of certain kinds of transfers (including Safety Check transfers) from your Contributing Account. The total permitted from Day-to-Day Savings and money market accounts is six per statement period. For details, see "Limits on Transfers" under "Account Transactions" in your Client Manual. If the total number of transfers has reached the applicable limit, no Safety Check transfers will be made for the remainder of that calendar month or statement period, and checks which overdraw your checking account will be returned.

## Overdraft Protection Transfer Fee

We will charge an Overdraft Protection Transfer Fee each day we cover an overdraft by transferring money from your Checking Plus account, Checking Plus (variable rate) account, or Safety Check Contributing Account. The Overdraft Protection Transfer Fee will be charged once per day to the account that receives the transfer. This fee is waived for Citigold and Citi Private Bank customers. Please refer to "Service Fees and Charges for All Accounts" in this Marketplace Addendum for fee information.

41

## Funds Availability at Citibank

**GENERAL POLICY**

Our policy is to generally make funds from checks you deposit to your checking, savings, or money market account available to you immediately on the same Business Day we receive your deposit. Funds from electronic direct deposits and incoming wire transfers are available to you on the same Business Day we receive your deposit. Deposits of cash are generally available to you immediately, except if made at a Proprietary Citibank ATM in which case they will be made available for withdrawal no later than the Business Day after the Business Day of deposit. Check deposits made at ATMS located in 7-ELEVEN[1] Convenience Stores are generally made available in accordance with the policies set forth on page 43 of this Section.

[1] *7-ELEVEN[1] is a registered trademark of 7-Eleven, Inc. ATMs at 7-ELEVEN[1] locations are not owned or operated by Citibank. Not all functions, including deposits of cash, can be performed at these ATMs.*

### Check Deposits Given Special Availability

Funds from the following types of checks are available immediately on the Business Day of deposit if made with a teller:

• U.S. Treasury Checks, Federal Reserve Bank Checks, Federal Home Loan Bank Checks, U.S. Postal Money Orders

• Citibank, N.A. Checks (Checks drawn on a Citibank branch located in the same geographical area[2] as the Citibank branch accepting the check for deposit.)

• Cashier's Checks, Teller Checks, Certified Checks, Travelers Checks

• State and Local Government Checks issued by the State or by the general purpose units of the Local Government

[2] *California and Nevada are considered to be in the same geographical area.*

### Special Deposit Procedures

You must utilize the following procedures to receive special availability for deposits of State and Local Government Checks, Cashier's Checks, Teller's Checks, Certified Checks, and Travelers Checks: Take your check deposit to a teller and advise the teller that you have a check eligible for immediate availability. The teller will help you complete a special deposit ticket.

If you deposit any of the types of checks described above at a Proprietary Citibank ATM, your deposit will become available no later than the Business Day after the Business Day of deposit.

### Determining the Effective Date of Your Deposit

A Business Day is any day of the week that is not a Saturday, Sunday or bank holiday. Transactions you initiate on a non-Business Day will be considered to have an effective posting date of the next Business Day. The end of Business Day varies among our branches. The end of Business Day is posted at each branch. If you make a deposit after the close of a Business Day or on a weekend or holiday, your deposit will be considered received on the next Business Day. Please note that the end of Business Day for transactions at Proprietary Citibank ATMs may be different than transactions done in a branch. The end of Business Day for check deposits at ATMs located in select 7-ELEVEN[1] Convenience Stores is 4:30 PM. Deposits made at these locations after 4:30 PM will be considered received on the next Business Day. If you need specific information about transaction cut-off times, speak with a Financial Associate.

42

**Longer Delays May Apply**

In some cases we will not make all the funds that you deposit by check available to you in accordance with our general policies. Should this occur, we will notify you at the time you make the deposit. We will also tell you when the funds will be available. If your deposit is not made directly with one of our tellers, or if we decide to take this action after you have left the branch, we will mail you the notice by the next Business Day.

If you need the funds from a deposit right away, please ask us when the funds will be available.

Depending on the type of check that you deposit, funds will be available no later than the 4th Business Day after the Business Day of your deposit. The first $100 of your total Business Day's deposits will be available immediately on the Business Day of deposit if made with a teller or at a Proprietary Citibank ATM.

**Check Deposits at Automated Teller Machines located in 7-ELEVEN® Convenience Stores.**

Our general policy is to make funds from checks you deposit to your checking accounts made at these select locations available on the same Business Day we receive your deposit. Check deposits made to your money market account are generally available on the Business Day after the Business Day of deposit. Check deposits made to your savings account will be made available in accordance with our "Standard Availability Schedule" appearing on page 43. See the section entitled "Determining the Effective Date of Your Deposit" for important information for determining the Business Day of your deposit.

Check deposits to your checking, savings or money market account of the type described under the "Check Deposits Given Special Availability" section on page 42 will be made available on the same Business Day we receive your deposit.

**STANDARD AVAILABILITY SCHEDULE (CHECK DEPOSITS TO SAVINGS ACCOUNTS AT ATMS LOCATED IN SELECT 7-ELEVEN® CONVENIENCE STORES)**

**Citibank's Standard Availability Schedule**

The following schedule applies to check deposits to savings accounts made at ATMs located in 7-ELEVEN® Convenience Stores, and to any other check deposits that are not provided expedited availability in accordance with our general policy. The schedule shows the number of Business Days (after the Business Day of deposit) that it will take for check deposits to savings accounts to become available.

The second column in the schedule shows the number of Business Days (after the Business Day of deposit) that it will take for check deposits of $5,000 or less to become available for withdrawal.

The third column shows the number of Business Days (after the Business Day of deposit) that it will take for check deposits in excess of $5,000 to become available for withdrawal. When you make a deposit (or multiple check deposits) in the course of a Business Day, the portion in excess of $5,000 will likewise be available based on the third column.

| Standard Availability Schedule | | |
|---|---|---|
| | Deposits of $5,000 or less | Deposits of more than $5,000 |
| All Check Deposits | 3 Business Days | 4 Business Days |

43

### The First $100

The first $100 of the total amount of your Business Day's check deposits to your savings account will be made available on the Business Day following the Business Day of deposit.

### Additional $400

For check deposits of $5,000 or less, an additional $400 will be available on the second Business Day after the Business Day of deposit.

## SPECIAL RULES FOR NEW CUSTOMERS

You are considered a new customer if you have not had an account at Citibank for at least thirty (30) days prior to your opening the account. For the first thirty (30) days, the following exceptions to Citibank's funds availability policies and schedules apply:

1. You will be entitled to all the benefits described in the "Check Deposits Given Special Availability" section of your Marketplace Addendum.

2. For check deposits not entitled to special availability your deposit will become available on the 5th Business Day after the Business Day of deposit.

## EXCEPTIONS

### Collection Items

We may require that any check you present for deposit be sent out for collection. That is, your funds will be available after we have received payment from the bank on which the check is drawn. You will be charged a fee for this service. Please refer to "Service Fees and Charges for All Accounts" in this Marketplace Addendum for applicable fees.

### Checks That May Not Be Collectible

Occasionally, a check is given to Citibank that we decide not to accept for deposit or payment because we doubt the collectibility of the funds. When this happens, we will return the check to you or, if you request, send the check out for collection. On other occasions, we may learn that a check we accepted for deposit may not be honored. Should this happen, we will delay the availability of the deposit for a reasonable period of time until the check is either paid or returned. In all cases, we will notify you of the action we take.

### Foreign Checks

Checks that are drawn on banks outside the United States are generally sent for collection. Your account will be credited for the US dollar equivalent of the check based upon a timetable which reflects when we would customarily receive payment from the bank on which the item is drawn.

### Events Beyond Our Control

In the event that we are unable to conduct business due to an interruption of communication facilities, suspension of payments by another bank, war, other emergency conditions or other circumstances beyond our control, it may be necessary to increase some or all of the time periods specified in these availability schedules. If this happens, we will try to inform you if possible.

44

### Redeposit of Check(s) Returned Unpaid

We reserve the right to extend the time within which these checks become available.

### Overdrafts

We may delay the availability of the deposit if you have overdrawn your account or have had frequent returned deposits.

### Double-Endorsed Checks

When you deposit a check into your Citibank account, we ask you to endorse it with your signature or endorsement stamp. However, we reserve the right to refuse to accept for deposit any check that is not made payable directly to you. A double-endorsed check is one that is made payable to someone else and then endorsed to you by that person. In some cases, we will accept such checks on a "collection basis," which means that the funds will not be available to you until we have received payment from the bank on which the check is drawn. If you deposit a double-endorsed check by mail or at any of our automated facilities, we may return the check to you.

### Bank's Right to Chargeback

The Bank's policy on availability of funds from checks that you deposit will not affect your obligation to repay the Bank for any check that you deposit that is not paid, nor will it affect the Bank's right to charge back your account or to obtain reimbursement for any check that is not finally paid for any reason.

### Changes to Our Policy

We will notify you of any change to these Funds Availability policies as required by applicable law.

45

## JA 121

### Service Fees and Charges for All Accounts

| Service | Regular Fees* | Citigold Account Package Fees |
|---|---|---|
| Bond Coupon Redemption (per series) | $10.00 | WAIVED |
| Checkbook Orders | Varies | WAIVED[1] |
| Checking Account Closing (within 90 days of opening) | $25.00 | $25.00 |
| Citibank® Global Transfer Service[2] | Varies | Varies |
| Clerical Research (per hour, one-hour minimum) | $25.00 | $25.00 |
| Collection of Checks Drawn on Foreign Bank[3] | $30.00 | $30.00 |
| Collection of Notes and Sight Drafts on Domestic Bank | $25.00 | $25.00 |
| Consular/Verification Letter | $25.00 | WAIVED |
| Copy of Cancelled Checks[4] | $5.00 | WAIVED |
| Counter Checks | $5.00 | WAIVED |
| Deposited Check Returned Unpaid | $10.00 | WAIVED |
| Domestic Bank Collections[5] | $25.00 | $25.00 |
| Foreign Currency Exchange: | | |
| • $1,000 and over | No Charge | No Charge |
| • Under $1,000 | $5.00 | WAIVED |
| Interim Statement | $5.00 | WAIVED |
| Legal Process Compliance (levies, attachments, etc.) per defendant | $125.00 | $125.00 |
| Miscellaneous Copies (IRS Forms 1099, Deposit Ticket, etc.) | $5.00 | WAIVED |
| Money Order for Customers | $5.00 | WAIVED |
| Official Check | $10.00 | WAIVED |
| Overdraft Protection Transfer Fee | $10.00 | WAIVED |
| Overdraft Fee (for example, Check/Item Returned/Paid Against Insufficient/Unavailable Funds (An insufficient funds item may be created by check, in-person withdrawal, ATM withdrawal or other electronic means.)[6] | $34.00 | $34.00 |
| Quicken (Per Monthly Statement Period) | $9.95 | WAIVED[7] |
| Returning Original Checks in Statement | $2.00 | WAIVED |
| Safe Deposit Box Annual Rental | Varies | See below[8] |
| Staff Assisted Bill Payments (Per Monthly Statement Period) | $4.95 | WAIVED |
| Statement Copy (previous month) | $5.00 | WAIVED |
| Stop Payment Request | $30.00 | WAIVED |
| Travelers Checks | 1.5% | WAIVED |
| Wire Transfer: | | |
| • Incoming Domestic and International | $10.00 | WAIVED |
| • Outgoing Online Domestic | $18.75 | $12.50** |
| • Outgoing Domestic | $25.00 | $25.00 |
| • Outgoing Online International | $30.00 | $20.00** |
| • Outgoing International | $40.00 | $40.00 |
| • Outgoing International Remittance Wire[9] | Varies | Varies |
| Fees and Charges related to specific account types specified elsewhere are incorporated herein | As specified elsewhere | As specified elsewhere |
| Fees and Charges related to specific transactions or activities specified elsewhere are incorporated herein | As specified elsewhere | As specified elsewhere |

46

## Notes to "Service Fees and Charges for All Accounts"

\*    Regular fees apply to accounts that are not Citigold® Accounts.

\*\*    This fee will be waived for Citigold® Account Packages that had a combined balance of $500,000 or more for the monthly period that was two calendar months before the date of the transaction.

††    Overdraft fee will not be assessed more than four times per day. An overdraft fee may also be charged whenever a service fee or charge is deducted from your account and either causes your account to be overdrawn or increases the amount by which your account is overdrawn.

1    Fee for standard Citigold design checkbook is waived. A fee will be charged for non-standard design checkbook order. Fee for non-standard design checkbook order will be waived provided your Citigold® Account Package had a combined average balance of $500,000 or more for the monthly period that was two calendar months before the date of the transaction.

2    Fees for using the Citibank® Global Transfer Service, available at Citibank branches, Citibank ATMs and through Citibank® Online, are listed in the "Electronic Banking" section of the Client Manual – Consumer Accounts under "Types of Transfers; Limitations".

3    Additional fees may apply as a result of fees charged for collection of the item by other institutions.

4    If you do not receive checks or check images with your statement, you are permitted two (2) free per monthly statement period, then $5.00 per check.

5    Monthly fee of $9.95 will be waived for any statement cycle provided you maintain a combined average balance of $100,000 and above (or $250,000 and above with the inclusion of your Citibank first mortgage balance). Fee will be assessed if combined average balance requirement is not met.

6    One safe deposit box annual fee waiver of $125 or less per Citigold® Account Package. Safe deposit boxes valued in excess of $125 will be discounted by 50% (Fifty Percent). Safe deposit box discounts are subject to availability in the Citibank branches.

7    For Ecuador and the Dominican Republic, $5.00 for Account to Account transfers and $8.00 for Cash Pick-ups.

47

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| BERTRAM HIRSCH and IGOR ROMANOV, on behalf of themselves and all others similarly situated, | Case No. 12 Civ. 1124 (DAB) |
| Plaintiffs, | ECF Case |
| vs. | |
| CITIBANK, N.A., | |
| Defendant. | |

### DECLARATION OF BERTRAM HIRSCH IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO COMPEL ARBITRATION AND STAY THE ACTION

I, Bertram Hirsch, declare as follows:

1.    I have personal knowledge of the following facts and if called to testify about them, I could and would do so competently.

2.    On October 6, 2010, I received an offer from Citibank in the mail stating that it was offering its Citi/AAdvantage customers with Citibank's "most rewarding AAdvantage bonus miles offer yet for new accounts." Citibank offered 20,000 American Airline bonus miles to new customers that opened up a checking account and either 1) used the account for direct deposits; 2) made two or more electronic bill payments from the account; or 3) made five or more payments with the debit card associated with the account. Citibank also offered 20,000 additional miles to new customers that opened up a savings account with a minimum deposit of $25,000.

3.      I was interested in the promotion but concerned as to whether the airline miles would be taxable because the fine print in the offer letter stated, "Customer is responsible for taxes, if any."

4.      I had to be careful that my earned income and income from miscellaneous sources did not exceed a certain threshold because I could lose a portion of my social security retirement benefits if the threshold was exceeded.

5.      I went to my local branch, in Great Neck, New York, and asked the Citibank representative if the airline miles in the promotion were taxable, to which the Citibank representative responded that they were not.

6.      I then accepted the offer of 40,000 American Airline miles and signed up for a checking and savings account. After fulfilling the terms of the offer, I received 40,000 American Airline miles in early 2011.

7.      In January 2012, I received a 1099 form from Citibank stating that I must report $1,000 as miscellaneous income. I did not understand what the 1099 was for and went back to my local branch. At the branch, Citibank representatives also did not know what the 1099 was for, again confirmed to me that the 40,000 American Airline miles that I received were not taxable, and stated that I should initiate an internal investigation with Citibank in an attempt to resolve the issue, which I did.

8.      Finally, I received a letter from Citibank stating that the American Airline miles were taxable under federal law and that the bank was correct in reporting the income to the IRS. No Internal Revenue Code provision or associated regulation was referenced.

9.      Citibank valued the 40,000 miles that I received at 2.5 cents per mile, or $1,000. I have not redeemed any of the 40,000 American Airline miles I received from Citibank.

ii

10.     If Citibank had disclosed that I would have had to report $1,000 in additional miscellaneous income for tax purposes as a result of receiving the 40,000 American Airline miles, I would have never opened up a bank account with Citibank.

11.     When I opened up my Citibank checking and savings accounts, I was not informed by Citibank that any disputes related to the checking or savings account were subject to an arbitration agreement, nor did Citibank provide me with a copy of any arbitration agreement.

12.     In addition, when I opened up the accounts, I could not negotiate any aspect of my relationship with Citibank, and I was not given an opportunity to negotiate the terms of my relationship with Citibank.

13.     Similarly, there was no discussion about whether I was agreeing to a class action waiver or reduction in any of my rights under the law.

14.     I never received the Citibank Client Manual that Citibank refers to in it motion to compel arbitration.

15.     I kept all the papers the Citibank gave to me. I looked through all of them and I only received the following four documents upon opening my accounts:

        a.   A document entitled "CITI Products Opened Applied for Today" (This document is your basic account opening document showing the amount deposited and the account numbers);

        b.   Citibank's Privacy Notice;

        c.   A pre-approval letter for a Checking Plus account (which I declined); and

        d.   A pre-approval for a Home-Equity Line of Credit (which I also declined).

16.     In opening my accounts, I was not aware of entering into a contract requiring arbitration. I did not knowingly agree to any arbitration terms.

17.    I never would have knowingly agreed to arbitration anywhere outside of Great Neck, New York, which is my hometown area, and the location or the Citibank branch where I opened up the Citibank accounts in dispute.

18.    Citibank did not provide me with a copy of the American Arbitration Association rules or JAMS rules, and did not inform me of the specific fees that I would be required to pay to arbitrate any claims.

19.    I would have never knowingly agreed to a requirement that I pay any arbitration fees, when the arbitration agreement requires me to give up many of my legal rights.

20.    I would have never knowingly agreed to the shortened statute of limitations contained in the Citibank Client Manual.

21.    If I am required to pay for a tax expert and/or an airline mileage valuation expert to show that Citibank was wrong in issuing me a 1099 form, I will not pursue an individual action or initiate arbitration because it will not be worth it for me as the cost benefit does not make economical sense, especially if the court finds that the provision in the Client Manual shortening the statute of limitations is enforceable.

22.    I declare under penalty of perjury under the laws of the State of New York that the foregoing is true and correct.

Dated: APRIL 12, 2012            By: _____
                                     Bertram Hirsch

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| BERTRAM HIRSCH and IGOR ROMANOV, on behalf of themselves and all others similarly situated, | Case No. 12 Civ. 1124 (DAB) |
| Plaintiffs, | ECF Case |
| vs. | |
| CITIBANK, N.A., | |
| Defendant. | |

## DECLARATION OF IGOR ROMANOV IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO COMPEL ARBITRATION AND STAY THE ACTION

I, Igor Romanov, declare as follows:

1.      I have personal knowledge of the following facts.

2.      In late 2010, Citibank offered me a bonus of 40,000 American Airline miles if I opened up an account with an initial deposit of $25,000 at Citibank and used my debit card for a certain amount of times thereafter.

3.      On October 25, 2010, I accepted Citibank's offer and opened up an account at Citibank, deposited a minimum of $25,000, used my debit card for the required amount of times, and soon thereafter, received my 40,000 American Airline miles.

4.      In early 2012, I received a 1099 form from Citibank stating that I must report $1,000 as additional income on my tax return, for the 40,000 American Airline miles I received. This amounts to 2.5 cents per mile.

5.      I was never informed that I would have to pay income tax on the American Airline miles or that the income was based on a grossly overstated value of 2.5 cents per mile.

6.      If Citibank adequately disclosed that I would have had to report $1,000 in additional income for tax purposes as a result of receiving the 40,000 American Airline miles, I would have never opened up a bank account with Citibank.

7.      Immediately after receiving the 1099 form, I complained to Citibank about the 2.5 per cent valuation.  I offered to sell airline miles back to Citibank and, alternatively, requested that Citibank help him pay the taxes on the airline miles.  Citibank declined to help me and stated that there was nothing that Citibank could do about it.

8.      In January 2012, I filed a small claims lawsuit against Citibank in Los Angeles Superior Court, which Citibank subsequently removed to the United States District Court, Central District of California.  Citibank argued that my claim belongs in federal court because it depends on the resolution of a substantial question of federal law – i.e., whether Citibank wrongfully issued me an IRS Form 1099.  Citibank claimed that the requirement to issue a form 1099 is mandated by the Internal Revenue Code and associated Treasury Regulations, and that failure to issue a 1099 form may result in penalties under I.R.C. § 6721.

9.      When I opened up my Citibank account, I was not informed by Citibank that any disputes related to the account were subject to an arbitration agreement, nor did Citibank provide me with a copy of any arbitration agreement.

10.      In addition, when I opened the account, I could not negotiate any aspect of my relationship with Citibank, and I was not given an opportunity to negotiate the terms of my relationship with Citibank.

11. Similarly, there was no discussion about whether I was agreeing to a class action waiver or reduction in any of my rights under the law.

12. I never received the Citibank Client Manual that Citibank refers to in it motion to compel arbitration.

13. In opening my account, I was not aware of entering into a contract requiring arbitration. I did not knowingly agree to any arbitration terms.

14. Citibank did not provide me with a copy of the American Arbitration Association rules or JAMS rules, and did not inform me of the specific fees that I would be required to pay to arbitrate any claims.

15. I would have never knowingly agreed to a requirement that I pay any arbitration fees, when the arbitration agreement requires me to give up many of my legal rights.

16. I would have never knowingly agreed to the shortened statute of limitations contained in the Citibank Client Manual.

17. If I am required to pay for a tax expert to show that Citibank was wrong in issuing me a 1099 form, I will not continue the pursuit of an individual action or initiate arbitration because it will not be worth it for me as the cost benefit does not make economical sense, especially if the court finds that the provision in the Client Manual shortening the stature of limitations is enforceable.

18. I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Dated: 04·12·2012          By:

_____          Igor Romanov

3

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

BERTRAM HIRSCH and IGOR
ROMANOV, on behalf of themselves and
all others similarly situated,

              Plaintiffs,

vs.

CITIBANK, N.A.,

              Defendant.

Case No. 12 Civ. 1124 (DAB)

ECF Case

## DECLARATION OF JAMES C. KELLY IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO COMPEL ARBITRATION AND STAY THE ACTION

JAMES C. KELLY, under penalty of perjury, declares:

1.      I am an attorney at the Law Office of James C. Kelly, counsel for Plaintiffs in the above-captioned action.  I submit this Declaration in support of Plaintiffs' Opposition To Defendant's Motion To Compel Arbitration And Stay The Action.

2.      On April 13, 2012, I contacting Citibank's counsel and requested that Citibank agree to stay Igor Romanov's individual small claims lawsuit that was filed in the Los Angeles Superior Court, pending the deposition of this action, however, Citibank refused to agree to such a stay.

3.      Since Plaintiffs filed this action, I have received calls from numerous other potential class members, including Citibank customers from New Jersey and Illinois, seeking to file lawsuits against Citibank.

4. Attached hereto as Exhibit A is a true and correct copy of the Notice of Removal of Citibank, N.A, dated February 24, 2012, of Plaintiff Igor Romanov's individual small claims lawsuit in Los Angeles Superior Court (excluding Exhibit A, which is the complaint in the above-captioned action).

5. Attached hereto as Exhibit B is a true and correct copy of the complaint titled *Amer Safadi v. Citibank N.A.*, 12cv1356 (N.D. Cal. March 19, 2012).

6. Attached hereto as Exhibit C is a true and correct copy of the Notice of Removal of Citibank, N.A, dated February 24, 2012, of Citibank customer Zakmar Katz's individual small claims lawsuit in Los Angeles Superior Court (excluding Exhibit A, which is the complaint in the above-captioned action).

7. Attached hereto as Exhibit D is a true and correct copy of a document titled "JAMS Policy on Consumer Arbitrations Pursuant to Pre-Dispute Clauses Minimum Standards of Procedural Fairness, Effective July 19, 2009."

8. Attached hereto as Exhibit E is a true and correct copy of a document titled "AAA Review of Consumer Clauses."

9. Attached hereto as Exhibit F is a true and correct copy of a document titled "Consumer Due Process PROTOCOL."

10. Attached hereto as Exhibit G is a true and correct copy of a document titled Affidavit Of Joseph E. Matranga In Support Of Plaintiffs' Opposition To Defendant's Motion To Compel Arbitration And Stay The Action.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: New York, New York
April 17, 2012

/s/ James C. Kelly
James C. Kelly

2

# EXHIBIT A

1  STROOCK & STROOCK & LAVAN LLP
   JULIA B. STRICKLAND (State Bar No. 083013)
2  SHANNON E. PONEK (State Bar No. 261135)
   2029 Century Park East, Suite 1600
3  Los Angeles, CA 90067-3086
   Telephone: 310-556-5800
4  Facsimile: 310-556-5959
   Email: lacalendar@stroock.com
5
   Attorneys for Defendant
6    CITIBANK, N.A.

7

8                  UNITED STATES DISTRICT COURT

9                  CENTRAL DISTRICT OF CALIFORNIA

10

11  IGOR ROMANOV,                          Case No. CV12- 01603 MF (AGRx)

12              Plaintiff,
                                           NOTICE OF REMOVAL OF DEFENDANT
13        vs.                              CITIBANK, N.A.

14  CITIBANK, N.A.,                        [Pursuant to 28 U.S.C. §§ 1331, 1441(b),
                                           1446 – Federal Question]
15              Defendant.

16

17

18

19

20

21

22

23

24

25

26

27

28

LA 51516195

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East
Los Angeles, California 90067-3086

1    **TO THE UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT**

2    **OF CALIFORNIA:**

3        **PLEASE TAKE NOTICE THAT**, pursuant to 28 U.S.C. Sections 1331, 1441(b), and

4    1446, defendant Citibank, N.A. ("Citibank") hereby removes the action entitled <u>Igor Romanov v.</u>

5    <u>Citibank</u>, Superior Court of California, County of Los Angeles, Case No. SM 12A00214 (the

6    "Action"), to the United States District Court for the Central District of California on the following

7    grounds:

8        1.   <u>Removal Is Timely</u>.  Citibank received Plaintiff's Claim and Order to Go to Small

9    Claims Court ("Plaintiff's Claim") in the Action from plaintiff Igor Romanov ("Plaintiff") on

10   January 26, 2012.  A true and correct copy of Plaintiff's Claim received by Citibank in the Action

11   is attached hereto as Exhibit A.  Citibank has timely filed this Notice of Removal pursuant to 28

12   U.S.C. § 1446(b) because it has filed it within 30 days of service of Plaintiff's Claim, and within

13   one year after "commencement of the action" in state court.

14       2.   <u>This Court Has Removal Jurisdiction Over This Action</u>.  The Action is a civil action

15   of which this Court has original jurisdiction under 28 U.S.C. § 1331 and is one which Citibank may

16   remove to this Court pursuant to the provisions of 28 U.S.C. § 1441(b) in that Plaintiffs' claims

17   against Citibank arise under the laws of the United States.  Pursuant to 28 U.S.C. § 1331, original

18   jurisdiction of the district courts includes jurisdiction over "all civil actions arising under the

19   Constitution, laws, or treaties of the United States."  "An action may 'arise under' a law of the

20   United States if the plaintiff's right to relief necessarily turns on construction of federal law."

21   <u>Bright v. Bechtel Petroleum, Inc.</u>, 780 F.2d 766, 769 (1986) (citing <u>Franchise Tax Bd. of Cal. v.</u>

22   <u>Constr. Laborer's Vacation Trust</u>, 463 U.S. 1, 9 (1983)).  Put differently, claims "arise under"

23   federal law when a "well-pleaded complaint establishes . . . that the plaintiff's right to relief

24   necessarily depends on resolution of a substantial question of federal law, in that federal law is a

25   necessary element of one of the well-pleaded . . .claims."  <u>Christianson v. Colt Indus. Operating</u>

26   <u>Corp.</u>, 486 U.S. 800, 808 (1988) (quoting <u>Franchise Tax Bd.</u>, 463 U.S. at 13, 27-28) (internal

27   quotation marks and citations omitted).

28

3.      Here, Plaintiff's right to relief on its claim against Citibank necessarily depends only on the resolution of a substantial question of federal law – i.e., whether Citibank wrongfully issued Plaintiff an IRS 1099 form.  See, e.g., Grable & Sons Metal Products, Inc. v. Darue Engineering & Mfg., 545 U.S. 308 (2005) (holding that a quiet title action in state court alleging the Internal Revenue Service had given the plaintiff inadequate notice under a federal tax provision was "an important issue of federal law that sensibly belongs in a federal court"); Bright v. Bechtel Petroleum, Inc., 780 F.2d 766 (9th Cir. 1986) (holding that federal question jurisdiction existed in action for breach of an employment contract deriving from employer's withholding of federal income tax from a paycheck because "despite 'artfully pleading' his action as a breach of contract, [plaintiff's action] in fact is challenging federal income tax withholding laws and regulation"); Johnson v. LPL Fin. Servs., 517 F. Supp. 2d 1231, 1232 (S.D. Cal. 2007) ("An IRS form 1099 is an informational statement businesses are required to provide to the recipient of a payment in order to report certain transactions to the IRS.  The requirement to issue a form 1099 is mandated by the Internal Revenue Code (hereinafter "I.R.C.") and associated Treasury Regulations (hereinafter "Treas. Regs.").  Failure to issue a form 1099 may result in penalties under I.R.C. § 6721.").

4.      In Plaintiff's Claim, Plaintiff's only allegation states:  "Citibank sent [Plaintiff a] 1099 form for $1,000.  [Plaintiff] did not receive any money from them. . . [Plaintiff] want[s] to collect the amount of $1,000 in order to pay 1099."  Plaintiff's Claim, at 2.  As pled in Plaintiff's Claim, the only legal or factual issue contested in the case is an issue of federal tax law. Accordingly, the resolution of Plaintiff's Claim necessarily depends on the resolution of a substantial question of federal law.

5.      Supplemental Jurisdiction. To the extent any other claims in the Action arise under state law, supplemental jurisdiction over such claims would exist pursuant to 28 U.S.C. §§ 1367 and 1441(c).

6.      Pending Class Action Filed By Romanov.  Romanov filed a class action against Citibank in another federal court that involves all or a material part of the subject matter of this action:  Bertram Hirsch and Igor Romanov v. Citibank, N.A, United States District Court for the Southern District of New York, Case No. 12CIV1124, filed on February 14, 2012 ("Romanov

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East
Los Angeles, California 90067-3086

LA 51516195

1  Class Action"). The instant action involves all or a material part of the subject matter of the

2  Romanov Class Action because Igor Romanov is the plaintiff in both cases and they both involve

3  claims based on the same alleged conduct in connection with Citibank issuing I.R.S. 1099 forms to

4  customers relating to American Airline miles promotions. A copy of the Class Action Complaint

5  in the Romanov Class Action is attached hereto as Exhibit B.

6       7.    Copies Of All Documents Served On Citibank. Pursuant to 28 U.S.C. § 1446(a),

7  true and correct copies of all pleadings, process and orders served on Citibank in the Action are

8  attached as Exhibit A.

9       8.    This Is The Proper District Court. This Court is the proper district court for removal

10  because the Superior Court of the State of California for the County of Los Angeles is located

11  within the United States District Court for the Central District of California.

12       9.    Notice Has Been Effected. Citibank concurrently is filing a copy of this Notice of

13  Removal of Action with the Superior Court of the State of California for the County of Los

14  Angeles. Citibank will concurrently serve Plaintiff with copies of this Notice of Removal and the

15  Notice filed in the Action.

16

17  Dated: February 24, 2012             STROOCK & STROOCK & LAVAN LLP
                               JULIA B. STRICKLAND

18                                 SHANNON E. PONEK

19                                 By: _____

20                                                Shannon E. Ponek

21                               Attorneys for Defendant
                             CITIBANK, N.A.

22

23

24

25

26

27

28

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East
Los Angeles, California 90067-3086

LA 51516195

# EXHIBIT A

## SC-100

### Plaintiff's Claim and ORDER to Go to Small Claims Court

**Notice to the person being sued:**

- You are the Defendant if your name is listed in **(2)** on page 2 of this form. The person suing you is the Plaintiff, listed in **(1)** on page 2.

- You and the Plaintiff must go to court on the trial date listed below. If you do not go to court, you may lose the case.

- If you lose, the court can order that your wages, money, or property be taken to pay this claim.

- Bring witnesses, receipts, and any evidence you need to prove your case.

- Read this form and all pages attached to understand the claim against you and to protect your rights.

**Aviso al Demandado:**

- Usted es el Demandado si su nombre figura en **(2)** de la pagina 2 de este formulario. La persona que lo demanda es el Demandante, la que figura en **(1)** de la pagina 2.

- Usted y el Demandante tienen que presentarse en la corte en la fecha del juicio indicada a continuacion. Si no se presenta, puede perder el caso.

- Si pierde el caso la corte podria ordenar que le quiten de su sueldo, dinero u otros bienes para pagar este reclamo.

- Lleve testigos, recibos y cualquier otra prueba que necesite para probar su caso.

- Lea este formulario y todas las paginas adjuntas para entender la demanda en su contra y para proteger sus derechos.

*Clerk stamps date here when form is filed.*

**CONFORMED COPY**
OF ORIGINAL FILED
Los Angeles Superior Court

JAN 2 3 2012

John A. Clarke, Executive Officer/Clerk

By F. Sahara, Deputy

*Fill in court name and street address:*

Superior Court of California, County of
Los Angeles: WEST DISTRICT (19484   )
SANTA MONICA COURTHOUSE
1725 MAIN STREET
SANTA MONICA, CA. 90401
(310) 260-1887

*Clerk fills in case number and case name:*

Case Number:
SM 12A00214
Case Name:
ROMANOV, IGOR VS CITIBANK

### Order to Go to Court

The people in **(1)** and **(2)** must go to court: *(Clerk fills out section below.)*

| TRIAL DATE | DATE 03/23/2012 | TIME 01:30 PM | DEPARTMENT WEG | LOCATION RM. 117 |
|---|---|---|---|---|

Date: 01/23/2012

JOHN A. CLARKE, Executive Officer/Clerk
By FUMIKO SAHARA                              , Deputy

**Instructions for the person suing:**

- You are the Plaintiff. The person you are suing is the Defendant.

- *Before* you fill out this form, read Form SC-100-INFO, *Information for the Plaintiff* to know your rights. Get SC-100-INFO at any courthouse or county law library, or go to: *www.courts.ca.gov/smallclaims/forms*

- Fill out pages 2 and 3 of this form. Then make copies of **all** pages of this form. (Make 1 copy for each party named in this case and an extra copy for yourself.) Take or mail the original and these copies to the court clerk's office and pay the filing fee. The clerk will write the date of your trial in the box above.

- You must have someone at least 18--not you or anyone else listed in this case--give each Defendant a court-stamped copy of all 5 pages of this form and any pages this form tells you to attach. There are special rules for "serving," or delivering, this form to public entities, associations, and some businesses. See Forms SC-104, SC-104B, and SC-104C.

- **Go to court on your trial date listed above.** Bring witnesses, receipts, and any evidence you need to prove your case.

Judicial Council of California, www.courts.ca.gov
Revised January 1, 2012, Mandatory Form
Code of Civil Procedure, 116.110 et seq.,
116.220(c), 116.340(g)

**Plaintiff's Claim and ORDER
to Go to Small Claims Court**
(Small Claims)

SC-100. Page 1 of 5
-->

P.1/3     TO:718 248 1249     JAN-27-2012 10:55 FROM:CITIGROUP

**JA 139**

|  | Case Number:<br>SM 12A00214 |
|--|--|

Plaintiff (list names): ROMANOV, IGOR

----------------------------------------

## (1) The Plaintiff (the person, business, or public entity that is suing) is:

Name: ROMANOV, IGOR

Phone: (213) 590-3175

Street address: 330 S. REEVES DRIVE, #203  BEVERLY HILLS CA 90212
*Street*            *City*    *State* *Zip*

Mailing address *(if different):*
       *Street*        *City*    *State* *Zip*

### If more than one Plaintiff, list next Plaintiff here:

Name:

Phone:

Street address:
     *Street*        *City*    *State* *Zip*

Mailing address *(if different):*
       *Street*        *City*    *State* *Zip*

[ ] Check here if more than 2 Plaintiffs and attach Form SC-100A.
[ ] Check here if either Plaintiff listed above is doing business under a fictitious name. If so, attach Form SC-103.

## (2) The Defendant (the person, business, or public entity being sued) is:

Name: CITIBANK

Phone: (310) 754-3966

Street address: 4375 GLENCOE AVE.  MARINA DEL REY CA 90292
*Street*          *City*    *State* *Zip*

Mailing address *(if different):*
       *Street*        *City*    *State* *Zip*

### If more than one Defendant, list next Defendant here:

Name:

Phone:

Street address:
     *Street*        *City*    *State* *Zip*

Mailing address *(if different):*
       *Street*        *City*    *State* *Zip*

[ ] Check here if more than 2 Defendants and attach Form SC-100A.
[ ] Check here if any Defendant is on active military duty, and write his or her name here:

## (3) The Plaintiff claims the Defendant owes $ 1000.00. *(Explain below):*

a. Why does the Defendant owe the Plaintiff money?
CITIBANK SENT ME 1099 FORM FOR $1,000.00. I DID NOT RECEIVE ANY
MONEY FROM THEM.

b. When did this happen? *(Date):*
If no specific date, give the time period: *Date Started:* 01 / 01 / 2012 *Through:* 01 / 23 / 2012

c. How did you calculate the money owed to you? (Do not include court costs or fees for service.)
I WANT TO COLLECT THE AMOUNT OF $1,000 IN ORDER TO PAY 1099.

[ ] Check here if you need more space. Attach one sheet of paper or Form MC-031 and write  *"SC-100, Item 3"* at the top.

----------------------------------------

**Plaintiff's Claim and ORDER
to GO to Small Claims Court**
(Small Claims)

# EXHIBIT B

1  Jason E. Baker, Esq. (SBN: 197666)
   Brent Jex, Esq. (SBN: 235261)
2  **KEEGAN & BAKER, LLP**
   6255 Lusk Blvd., Suite 140
3  San Diego, CA 92121
   Telephone: (858) 558-9400
4  Facsimile:  (858) 558-9401

5  Patrick N. Keegan, Esq. (SBN: 167698)
   **KEEGAN & BAKER, LLP**
6  6870 Embarcadero Lane
   Carlsbad, CA  92011
7  Telephone: (760) 929-9303
   Facsimile: (760) 929-9260

8
   Attorneys for AMER SAFADI, individually
9  and on behalf of all others similarly situated
   and on behalf of the general public
10

11

12                    **UNITED STATES DISTRICT COURT**

13                    **NORTHEN DISTRICT OF CALIFORNIA**

14                        **SAN JOSE DIVISION**

15  AMER SAFADI,  individually, and on behalf     CASE NO.  **CV12 - 01356**
    of all others similarly situated, and on behalf of
16  the general public,
                                                  **CLASS ACTION**
17                    Plaintiff,
                                                  **COMPLAINT FOR DAMAGES AND
18  v.                                            INJUNCTIVE RELIEF**

19  CITIBANK N.A.,
                                                  **DEMAND FOR JURY TRIAL**
20
21                    Defendant.

22

23

24

25

26

27

28

                                    1

Plaintiff Amer Safadi, by and through his undersigned counsel, upon personal knowledge as to himself and upon information and belief as to all other matters, hereby alleges:

1.    This is a class action against Citibank, N.A. for damages and injunctive relief brought by Plaintiff Amer Safadi on behalf of himself and all persons in the United States who received Airline Miles and a 1099 from Citibank, N.A.

## I.
## PARTIES

2.    Plaintiff AMER SAFADI (hereinafter "Plaintiff") is an individual and a resident of the state of California.

3.    Defendant Citibank N.A. (hereinafter "Citibank") is a nationally chartered bank organized and existing under the laws of the state of Delaware. Citibank's principal place of business is located at 399 Park Avenue, New York, New York. Citibank is a wholly-owned subsidiary of Citigroup, Inc.

## II.
## STATEMENT OF FACTS

4.    In approximately February or March of 2011, Plaintiff received a promotional offer from Citibank in the mail. According to the terms of the offer, Plaintiff would receive a certain number American Airline frequent flyer miles (hereinafter the "Airline Miles") if Plaintiff met certain eligibility requirements, opened new checking and savings accounts with Citibank, deposited a certain amount of funds in the new accounts, and used the debit card associated with the new accounts a certain number of times within a certain time period thereafter.

5.    The offer failed to state that Citibank intended to issue a Form 1099 to Plaintiff for receipt of the Airline Miles, failed to state that Citibank had already calculated what it believed was the "value" of the Airline Miles for reporting purposes on the Form 1099; failed to state what that "value" to be reported on the Form 1099 would be; and failed to state whether the Airline

2

Miles would ever expire or otherwise lose the "value" that they may have. Rather, the Offer simply stated: "Customer is responsible for taxes, if any."

6.      After receiving the offer, Plaintiff thereafter undertook all actions required under the terms of the offer, including but not limited to opening new checking and savings accounts at the Morgan Hill branch office of Citibank. Plaintiff thereafter received 60,000 Airline Miles in his American Airlines frequent flyer account.

7.      In early 2012, Plaintiff was surprised to receive a Form 1099 from Citibank indicating Plaintiff had received $1,500 worth of "income" from Citibank for receipt of the Airline Miles. This was surprising to Plaintiff because the offer failed to state that Citibank intended to issue a Form 1099 to Plaintiff for receipt of the Airline Miles, failed to state that Citibank had already calculated what it believed was the "value" of the Airline Miles for reporting purposes on the Form 1099; failed to state what that "value" to be reported on the Form 1099 would be; and failed to state whether the Airline Miles would ever expire or otherwise lose the "value" that they may have. Rather, the offer simply stated: "Customer is responsible for taxes, if any."

8.      The Form 1099 issued by Defendant and received by Plaintiff has now created a tax obligation for which Plaintiff will incur financial liability and expense unless Plaintiff can obtain relief through this action.

9.      The Airline Miles have no "value" to Plaintiff that can be fixed at the time they were received by Plaintiff. Moreover, the Airline Miles, if unused, may expire and thereby be rendered valueless to Plaintiff.

10.     In fact, the problem with assigning a "value" to the Airline Miles has already been recognized by the Internal Revenue Service. In 2002, the IRS issued a policy brief noting that because there are "numerous technical and administrative issues" relating to miles, such as how

3

they're valued and used, the agency "has not pursued a tax enforcement program with respect to promotional benefits such as frequent-flier miles." "Consistent with prior practice," it said, "the IRS will not assert that any taxpayer has understated his federal tax liability by reason of the receipt or personal use of frequent-flier miles or other in-kind promotional benefits attributable to the taxpayer's business or official travel."

11. Notwithstanding the problems with assigning a "value" to the Airline Miles for reporting purposes and the IRS' position as set forth in its 2002 policy brief, Defendant issued a Form 1099 indicating the Airline Miles have a "value" of $1,500. This amount far over-states the actual "value" the Airline Miles may have, if indeed they have any "value" to Plaintiff at all. However, Defendant is motivated to over-state the "value" of the Airline Miles issued to Plaintiff since the amount reported on the Form 1099 may qualify as a business expense for Defendant, and may therefore decrease Defendant's tax obligations, resulting in a significant financial benefit to Defendant at Plaintiff's expense.

12. On January 30, 2012, Senator Sherrod Brown, Chairman of the U.S. Senate Banking Subcommittee on Financial Institutions and Consumer Protection, sent a letter to Citigroup's CEO, requesting that Citibank stop issuing Form 1099s to its customers. In a newspaper interview response, Citibank implied that it would continue the practice of issuing Form 1099s notwithstanding consumer complaints and the problem with assigning a "value" to the frequent flier miles.

### III.
### JURISDICTION AND VENUE

13. This Court has original federal question jurisdiction under 28 U.S.C. § 1331 over the claims for violations of 26 U.S.C. §7434. This Court has supplemental jurisdiction over the remaining claims predicated on violations of California's common law under 28 U.S.C. § 1367(a).

4

14.     Venue as to Defendant Citibank is proper in this judicial district pursuant to 28 U.S.C. § 1391 in that Defendant Citibank is a corporation and is subject to personal jurisdiction at the time this action was commenced as Defendant Citibank maintains numerous branch offices, conducts substantial business transactions, and transacts with thousands of persons within this judicial District.

**IV.**
**CLASS ALLEGATIONS**

15.     Plaintiff seeks to represent a class defined as all persons in the United States who received Airline Miles and a Form 1099 from Defendant (hereafter, the "Class").  Plaintiff also seeks to represent a subclass of all Class members who received Airline Miles and a Form 1099 from Defendant in the State of California (hereafter, the "California Subclass").

16.     Plaintiff reserves the right to amend the definition of the Class if discovery and further investigation reveals that the Class definition should be modified or if subclasses are warranted.

17.     This action is brought and may properly be maintained as a class action under the provisions of Federal Rules of Civil Procedure 23(a)(1)-(4) and 23 (b)(2) and (b)(3), and satisfies the requirements thereof.

18.     There is a well-defined community of interest among members of the Class, and the disposition of the claims of these members of the Class in a single action will provide substantial benefits to all parties and to the Court.

19.     The members of the Class are so numerous that joinder of all members of the Class is impracticable.  At this time, Plaintiff believes that the Class includes thousands of members. therefore, the Class is sufficiently numerous that joinder of all members of the Class in a single action is impracticable under Federal Rule of Civil Procedure Rule 23(a)(1), and the resolution of

their claims through the procedure of a class action will be of benefit to the parties and the Court.

20.    Plaintiff's claims are typical of the claims of the members of the Class whom they seek to represent because Plaintiff and each member of the Class has been subjected to the same deceptive and fraudulent practices by Defendant and have been damaged in the same manner.

21.    Plaintiff will fairly and adequately represent and protect the interests of the members of the Class as required by Federal Rule of Civil Procedure 23(a)(4). Plaintiff has no interests that are adverse to those of the members of the Class they he seeks to represent. Plaintiff is committed to the vigorous prosecution of this action and, to that end, Plaintiff has retained counsel who is competent and experienced in handling complex class actin litigation on behalf of consumers.

22.    A class action is superior to all other available methods of the fair and efficient adjudication of the claims asserted in this Complaint under Federal Rule of Civil Procedure 23(b)(3) because the expense and burden of individual litigation would not be economically feasible for members of the Class to seek to redress their claims other than through the procedure of a class action. If separate actions were brought by individual members of the Class, the resulting multiplicity of lawsuits would cause members to seek to redress their claims other than through the procedure of a class action. Absent a class action, Defendant likely would retain the benefits of its wrongdoing, and there would be a failure of justice.

23.    Common questions of law and fact exist as to the members of the Class, as required by Federal Rule of Civil Procedure 23(a)(2), and predominate over any questions that affect individual members of the Class within the meaning of Federal Rule of Civil Procedure 23(b)(3). The common questions of fact include, but are not limited to:

(a)    Whether Citibank's actions in issuing a Form 1099 to Plaintiff and members of the violated 26 U.S.C. § 7434;

6

(b)     Whether Citibank fraudulently concealed from Plaintiff and members of the Class that it would issue a Form 1099 relating to the Airline Miles;

(c)     Whether Citibank should be enjoined from continuing its practice of issuing a Form 1099 persons related to the receipt of the Airline Miles;

(d)     Whether Citibank should be required to take remedial and corrective actions by contacting the Internal Revenue Service and withdrawing the Form 1099s that were issued to Plaintiff and members of the Class;

(e)     Whether Citibank should be liable for the damages incurred by Plaintiff and members of the Class in an amount equal to the greater of $5,000 or the sum of any actual damages sustained by Plaintiff and the members of the Class; and

(f)     Whether Citibank should be liable for the attorney fees and costs of litigation incurred by Plaintiff and Class members in litigating this action.

24.     Alternatively, this action is certifiable under the provisions of Federal Rule of Civil Procedure 23(b)(2) because Defendant has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect the Class as a whole and necessitating that any such relief be extended to members of the Class on a mandatory, class-wide basis.

25.     Plaintiff is not aware of any difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.

## V.
## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
**(Fraudulent Filing of Information Returns - Violation of 26 U.S.C. §7434)**
**As Against Defendant Citibank**

26.     Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully

7

set forth herein.

27.    Plaintiff brings this cause of action individually and on behalf of the members of the Class and California Subclass against all Defendants.

28.    26 U.S.C. §7434, subd. (a)  prohibits any person from willfully filing a fraudulent information return with respect to payments purported to be made to any other person.

29.    The Form 1099s issued to Plaintiff and members of the Class during the Class Period are "information returns" as that term is defined by 26 U.S.C. §7434, subd. (f).

30.    During the Class Period, Defendant Citibank willfully filed fraudulent information returns with respect to the payments of the Airline Miles to Plaintiff and members of the Class.

31.    Pursuant to 26 U.S.C. §7434, subd. (b), Plaintiff and members of the Class now seek the greater of $5,000 or the sum of any actual damages sustained by Plaintiff and members of the Class, the costs of the action, and reasonable attorneys' fees.

### SECOND CAUSE OF ACTION
**(Fraudulent Concealment)**
**As Against Defendant Citibank**

32.    Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein.

33.    Plaintiff brings this cause of action individually and on behalf of the members of the California Subclass against all Defendants.

34.    Defendant disclosed some facts regarding the offer to Plaintiff and members of the Class, but intentionally failed to disclose other important facts, such as the fact that Citibank intended to issue a Form 1099 to Plaintiff for receipt of the Airline Miles, Citibank had already calculated what it believed was the "value" of the Airline Miles for reporting purposes on the Form 1099, what that "value" to be reported on the Form 1099 would be, and whether the Airline Miles would ever expire or otherwise lose the "value" that they may have (collectively the

8

1   "Nondisclosed Material Facts"), thereby making the disclosure deceptive and fraudulent. Rather,

2   the offer simply stated: "Customer is responsible for taxes, if any."

3       35.     Defendant intentionally failed to disclose the Nondisclosed Material Facts that

4   were known only to Defendant and could not have been discovered by Plaintiff and members of

5   the Class.

6

7       36.     Plaintiff and members of the Class did not know of these Nondisclosed Material

8   Facts.

9       37.     Defendant intended to deceive Plaintiff and members of the Class by concealing

10  the Nondisclosed Material Facts.

11

12      38.     Plaintiff and members of the Class members reasonably relied on Defendant's

13  deception in that Plaintiff and members of the Class had no means of suspecting or discovering

14  that Defendant was intentionally concealing the Nondisclosed Material Facts.

15      39.     Plaintiff and members of the Class members were harmed by Defendant's

16  intentional concealment of these Nondisclosed Material Facts.

17

18      40.     Defendant's concealment of the Nondisclosed Material Facts was a substantial

19  factor in causing harm to Plaintiff and members of the Class.

20                       **THIRD CAUSE OF ACTION**
                              **(Breach of Contract)**
21                        **As Against Defendant Citibank**

22      41.     Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully

23  set forth herein.

24      42.     Plaintiff brings this cause of action individually and on behalf of the members of

25  the Class and California Subclass against all Defendants.

26

27      43.     Within the six years preceding the filing of this Complaint, Defendant Citibank

28  communicated to Plaintiff and Class members that it was willing to enter into a Contract with

**JA 150**

1   Plaintiff and Class members if they accepted certain terms of the Contract. The terms of the

2   Contract were identical for Plaintiff and each of the Class members. Based on this

3   communication, Plaintiff and members of the Class reasonably concluded that a Contract with

4   these terms would result if they accepted the offer.

5

6       44.    By undertaking all the actions that were set forth in the terms of the offer,

7   including but not limited to opening new checking and savings accounts with Citibank and

8   depositing a certain amount of funds in the new accounts, Plaintiff and members of the Class

9   agreed to be bound by the terms of the offer and communicated their agreement to Defendant

10  Citibank.

11

12      45.    Plaintiff and members of the Class did all, or substantially all of the significant acts

13  that the Contract required them to do.

14      46.    All conditions required by the Contract for Defendant's performance have

15  occurred.

16      47.    The terms of the Contract did not include an agreement by Plaintiff and members

17  of the Class to receive a Form 1099 from Defendant, and did not include an agreement by Plaintiff

18  and members of the Class for an arbitrary value for the Airline Miles to be included on any Form

19  1099 issued by Defendant to Plaintiff and members of the Class. Further, the terms of the

20

21  Contract did not condition receipt of the Airline Miles by Plaintiff and members of the Class on a

22  willingness to receive or accept a Form 1099 issued by Defendant.

23

24      48.    Defendant breached the Contract with Plaintiff and members of the Class by, inter

25  alia, issuing a Form 1099 to Plaintiff and members of the Class regarding their receipt of the

26  Airline Miles and setting an arbitrary, unfair, and uniform value to the Airline Miles as indicated

27  on the Form 1099s issued to Plaintiff and members of the Class.

28      49.    Defendant's breach of the Contract has proximately and legally caused Plaintiff

10

1    and members of the Class to suffer financial damages and expense.

2                              **FOURTH CAUSE OF ACTION**
3                                    **(Unjust Enrichment)**
                               **As Against Defendant Citibank**
4

5          50.     Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully

6    set forth herein.

7          51.     Plaintiff brings this cause of action individually and on behalf of the members of

8    the Class and Subclass against all Defendants.

9          52.     "Although there are numerous permutations of the elements of the unjust

10   enrichment cause of action in the various states, there are few real differences. In all states, the

11   focus of an unjust enrichment claim is whether the defendant was *unjustly* enriched. At the core of

12   each state's law are two fundamental elements – the defendant received a benefit from the

13

14   plaintiff and it would be inequitable for the defendant to retain that benefit without compensating

15   the plaintiff. The focus of the inquiry is the same in each state." (*In re Mercedes-Benz Tele Aid*

16   *Contract Litig.*, 257 F.R.D. 46, 58 (D.N.J. 2009) (quoting *Powers v. Lycoming Engines*, 245

17   F.R.D. 226, 231 (E.D. Pa. 2007)).

18

19         53.     Plaintiff and Class members conferred a benefit on Defendant by opening and

20   depositing monies in Citibank Deposit Accounts.

21         54.     Defendant has been unjustly enriched in retaining the revenues derived from

22   Plaintiff and Class members' opening and depositing monies in Citibank Deposit Accounts and

23   sending them Form 1099s. Retention under these circumstances is unjust and inequitable because

24   Defendant disclosed some facts regarding the Offer to Plaintiff and members of the Class, but

25   intentionally failed to disclose other important facts, such as the fact that Citibank intended to

26   issue a Form 1099 to Plaintiff and Class members for receipt of the Airline Miles, Citibank had

27

28   already calculated what it believed was the "value" of the Airline Miles for reporting purposes on

1 the Form 1099, what that "value" to be reported on the Form 1099 would be, and whether the

2 Airline Miles would ever expire or otherwise lose the "value" that they may have, thereby making

3 the disclosure deceptive and fraudulent and which caused injuries to Plaintiff and Class members

4 because: (a) they would not have opened and deposited monies in Citibank Deposit Accounts on

5 the same terms if the true facts concerning their receipt of Airline Miles offer had been known; (b)

6 they incurred a tax liability due to the Form 1099; and (c) Plaintiff and Class members have paid

7 and will continue to pay costs for as long as the Form 1099s are in effect.

8

9 55.     Because Defendant's retention of the non-gratuitous benefit conferred on them by

10 Plaintiff and Class members is unjust and inequitable, Defendant must pay restitution to Plaintiff

11 and the Class members for their unjust enrichment, as ordered by the Court.

12

13 **FIFTH CAUSE OF ACTION**
**(Violation of the Consumers Legal Remedies Act ("CLRA"), Civil Code §§ 1750, *et. seq.*)**
**As Against Defendant Citibank**

14

15 56.     Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully

16 set forth herein.

17

18 57.     Plaintiff brings this Fifth Cause of Action on behalf of the California Subclass

19 under California law.

20 58.     CLRA § 1770(a)(5) prohibits "[r]epresenting that goods or services have

21 sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not

22 have or that a person has a sponsorship, approval, status, affiliation, or connection which he or she

23 does not have." Defendant violated this provision by representing the Citibank Deposit Accounts

24 and by misrepresenting the Airline Miles offer.

25

26 59.     CLRA § 1770(a)(7) prohibits "[r]epresenting that goods or services are of a

27 particular standard, quality, or grade, or that goods are of a particular style or model, if they are of

28 another." Defendant violated this provision by representing the Citibank Deposit Accounts and

12

by misrepresenting the Airline Miles offer.

60.    CLRA § 1770(a)(9) prohibits "[a]dvertising goods or services with intent not to sell them as advertised." Defendant violated this provision by representing the Citibank Deposit Accounts and by misrepresenting the Airline Miles offer.

61.    Plaintiff and the California Subclass members suffered injuries caused by Defendant's misrepresentations because: (a) they would not have opened and deposited monies in Citibank Deposit Accounts on the same terms if the true facts concerning their receipt of Airline Miles offer had been known; (b) they incur a tax liability due to the Form 1099; and (c) Plaintiff and Class members have paid and will continue to pay costs for as long as the Form 1099 are in effect.

62.    On March 1, 2012, prior to the filing of this Complaint, a CLRA notice letter was served on Defendant which complies in all respects with California Civil Code § 1782(a). Plaintiff sent Defendant a letter *via* certified mail, return receipt requested, advising Defendant that they are in violation of the CLRA and must correct, repair, replace or otherwise rectify the goods alleged to be in violation of § 1770. A true and correct copy of Plaintiff's CLRA letter is attached hereto as Exhibit "A."

63.    Wherefore, Plaintiff seeks damages, restitution, and injunctive relief for this violation of the CLRA.

## SIXTH CAUSE OF ACTION
**(Violation of the Unfair Competition Law, Bus. & Prof. Code §§ 17200 *et seq.*)**
**As Against Defendant Citibank**

64.    Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein.

65.    Plaintiff brings this Sixth Cause of Action on behalf of the California Subclass under California law.

CLASS ACTION COMPLAINT

66. Defendant is subject to the Unfair Competition Law ("UCL"), Bus. & Prof. Code §§ 17200 *et seq.* The UCL provides, in pertinent part: "Unfair competition shall mean and include unlawful, unfair or fraudulent business practices and unfair, deceptive, untrue or misleading advertising ...."

67. Defendant's conduct, described herein, violated the "unlawful" prong of the UCL by violating 26 U.S.C. §7434 and regulations promulgated thereunder governing Form 1099s.

68. Defendant's conduct, described herein, violated the "unfair" prong of the UCL by violating the policy or spirit of 26 U.S.C. §7434 and regulations promulgated thereunder, governing Form 1099s.

69. Defendant's conduct, described herein, violated the "fraudulent" prong of the UCL by representing the Citibank Deposit Accounts and by misrepresenting the Airline Miles offer.

70. Defendant knew or should have known, through the exercise of reasonable care that the statements were untrue and misleading.

71. Defendant's actions in violation of § 17500 were false and misleading such that the general public is and was likely to be deceived.

72. Plaintiff and California Subclass members suffered lost money or property as a result of Defendants' violations because: (a) they would not have opened and deposited monies in Citibank Deposit Accounts on the same terms if the true facts concerning their receipt of Airline Miles offer had been known; (b) they incured a tax liability due to the Form 1099s; and (c) Plaintiff and Class members have paid and will continue to pay costs for as long as the Form 1099s are in effect.

14

### SEVENTH CAUSE OF ACTION
#### (Violation of the Consumer Fraud Laws Of The Various States)
#### As Against Defendant Citibank

73.     Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein.

74.     Plaintiff brings this Seventh Cause of Action individually and on behalf of the members of the Class and California Subclass against Defendant.

75.     By representing the Citibank Deposit Accounts and by misrepresenting the Airline Miles offer, Defendant has engaged in unfair competition or unlawful, unfair, misleading, unconscionable, or deceptive acts in violation of the state consumer statutes listed below.

76.     Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of ALA. CODE § 8.19-1, et seq.

77.     Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of ALASKA STAT. CODE § 45.50.471, et seq.

78.     Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of ARIZ. REV. STAT. § 44-1522, et seq.

79.     Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of ARK. CODE ANN. § 4-88-107, et seq.

80.     Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of CAL. BUS. & PROF. CODE § 17200, et seq.

81.     Defendant has engaged in unfair competition or unfair or deceptive acts or practices or have made false representations in violation of COLO. REV. STAT. § 6-1-101, et seq.

82.     Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of CONN. GEN. STAT. § 42-110b, et seq.

83. Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of DEL. CODE ANN. tit. 6, § 2511, et seq.

84. Defendant has engaged in unfair competition or unfair or deceptive acts or practices or made false representations in violation of D.C. CODE ANN. § 28-3901, et seq.

85. Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of FLA. STAT. ANN. § 501.201, et seq.

86. Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of GA. CODE ANN. §10-1-392, et seq.

87. Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of HAW. REV. STAT. § 480, et seq.

88. Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of IDAHO CODE § 48-601, et seq.

89. Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of 815 ILL. COMP. STAT. 505/1, et seq.

90. Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of IND. CODE ANN. § 24-5-0.5-1, et seq.

91. Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of IOWA CODE §714.16, et seq.

92. Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of KAN. STAT. § 50-623, et seq.

93. Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of KY. REV. STAT. ANN. § 367.110, et seq.

94. Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of LA. REV. STAT. § 51:1404, et seq.

16

95.     Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of ME. REV. STAT. tit. 5, § 205-A, et seq.

96.     Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of MD. CODE. ANN., COM. LAW § 13-101, et seq.

97.     Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation MASS. GEN LAWS ch. 93A, §1, et seq.

98.     Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of MICH. COMP. LAWS § 445.901, et seq.

99.     Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of MINN. STAT. § 8.31, et seq.

100.    Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of MISS. CODE ANN. § 75-24-3, et seq.

101.    Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of MO. REV. STAT. § 407.010, et seq.

102.    Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of MONT. CODE ANN. § 30-14-101, et seq.

103.    Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of NEB. REV. STAT. § 59-1601, et seq.

104.    Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of NEV. REV. STAT. 598.0903, et seq.

105.    Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of N.H. REV. STAT. ANN. § 358-A:1, et seq.

106.    Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of N.M. STAT. ANN. § 57-12-1, et seq.

17

107.    Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of N.Y. GEN. BUS. LAW § 349, et seq.

108.    Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of N.J.S.A. 56:8-1, et seq.

109.    Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of N.C. GEN. STAT. § 75-1.1, et seq.

110.    Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of N.D. CENT. CODE § 51-15-01, et seq.

111.    Defendant has engaged in unfair competition or unfair or deceptive acts or practices or made false representations in violation of OKLA. STAT. tit. 15, § 751, et seq.

112.    Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of OR. REV. STAT. § 646.605, et seq.

113.    Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of 73 PA. CONS. STAT. § 201-1, et seq.

114.    Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of R.I. GEN. LAWS § 6-13.1-1, et seq.

115.    Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of S.C. CODE § 39-5-10, et seq.

116.    Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of S.D. CODIFIED LAWS § 37-24-1, et seq.

117.    Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of TENN. CODE ANN. § 47-18-101, et seq.

118.    Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of TEX. BUS. & COM. CODE ANN. § 17.41, et seq.

18

119.     Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of UTAH CODE. ANN. § 13-11-1, et seq.

120.     Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of VT. STAT. ANN. tit. 9, § 2451, et seq.

121.     Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of VA. CODE ANN. § 59.1-196, et seq.

122.     Defendant has engaged in unfair competition or unfair, deceptive or fraudulent acts or practices in violation of WASH. REV. CODE § 19.86.010, et seq.

123.     Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of W. VA. CODE § 46A-6-101, et seq.

124.     Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of WIS. STAT. § 100.18, et seq.

125.     Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of WYO. STAT. ANN. § 40-12-101, et seq.

126.     The acts, practices, misrepresentations and omissions by Defendant described above, and Defendant's dissemination of deceptive and misleading advertising and marketing materials in connection therewith, occurring in the course of conduct involving trade or commerce, constitutes unfair methods of competition and unfair or deceptive acts or practices within the meaning of each of the above-enumerated statutes, because each of these statutes generally prohibits deceptive conduct in consumer transactions, and Defendant violated each of these statutes by representing the Citibank Deposit Accounts and by misrepresenting the Airline Miles offer.

127.     Plaintiff and Class members were injured as a direct and proximate result of Defendant's unfair, deceptive and/or unconscionable acts and practices, because: (a) they would

19

1  not have opened and deposited monies in Citibank Deposit Accounts on the same terms if the true

2  facts concerning their receipt of Airline Miles offer had been known; (b) they incurred a tax

3  liability due to the Form 1099; and (c) Plaintiff and Class members have paid and will continue to

4  pay costs for as long as the Form 1099s are in effect.

5
                                            **VI.**
6                                 **PRAYER FOR RELIEF**

7          WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks

8  judgment against Defendant, as follows:

9
10         A.      For an order certifying the nationwide Class and the California Subclass under

11  Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiff as representative of the

12  Class and California Subclass and Plaintiff's attorneys as Class Counsel to represent the Class and

13  California Subclass members;

14
15         B.      For an order declaring Defendant's conduct violates the statutes referenced herein;

16         C.      For an order finding in favor of Plaintiff, the nationwide Class, and the California

17  Subclass on all causes of action asserted herein;

18         D.      For compensatory and punitive damages in amounts to be determined by the Court

19  and/or jury;

20
21         E.      For prejudgment interest on all amounts awarded;

22         F.      For an order of restitution and all other forms of equitable monetary relief;

23         G.      For injunctive relief as pleaded or as the Court may deem proper; and

24         H.      For an order awarding Plaintiff and the Class and California Subclass their

25  reasonable attorneys' fees and expenses and costs of suit.

26  / / /

27  / / /

28

CLASS ACTION COMPLAINT

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff and members of the Class demand a trial by jury as to all matters so triable.

**KEEGAN & BAKER, LLP**

Dated:  March 16, 2012           By: _____

Jason E. Baker, Esq.
Brent Jex, Esq.

Attorneys for Attorneys for AMER SAFADI, individually and on behalf of all others similarly situated and on behalf of the general public

21

JA 162

Exhibit A

# KEEGAN & BAKER, LLP

A LIMITED LIABILITY PARTNERSHIP
6255 LUSK BOULEVARD • SUITE 140
SAN DIEGO, CALIFORNIA 92121

TELEPHONE – 858.558.9400
FACSIMILE – 858.558.9401

March 1, 2012

***Via Certified Mail, Return Receipt Requested***

Citibank, N.A.                          Citibank, N.A.
ATTN: Legal Department                  ATTN: Legal Department
17085 Monterey Rd                       399 Park Avenue
Morgan Hill, CA  95037                  New York, NY  10022

Re:     Safadi v. Citibank, N.A.

Dear Sir or Madam:

This firm represents Amer Safadi and shall serve as a Notice and Demand for Correction and Remedy pursuant to California Civil Code §§1750 et seq., and specifically section 1782 of the California Consumer Legal Remedies Act ("CLRA").  As specifically set forth below, our client notifies you of the following statutory violations: a) CLRA §1770(a)(5);  b) CLRA §1770(a)(7); and c) CLRA §1770(a)(9).  The factual foundation for the referenced statutory violations is set forth below.

In approximately February or March of 2011, Amer Safadi (hereinafter "Plaintiff" or "Safadi") received a promotional offer from Citibank, N.A. (hereinafter "Citibank" or "Defendant") in the mail.  According to the terms of the offer, Plaintiff would receive a certain number of American Airline frequent flyer miles (hereinafter the "Airline Miles") if Plaintiff met certain eligibility requirements, opened new checking and savings accounts with Citibank, deposited a certain amount of funds in the new accounts, and used the debit card associated with the new accounts a certain number of times within a certain time period thereafter.

The offer failed to state that Citibank intended to issue a Form 1099 to Plaintiff for receipt of the Airline Miles, failed to state that Citibank had already calculated what it believed was the "value" of the Airline Miles for reporting purposes on the Form 1099; failed to state what that "value" to be reported on the Form 1099 would be; and failed to state whether the Airline Miles would ever expire or otherwise lose the "value" that they may have.  Rather, the Offer simply stated: "Customer is responsible for taxes, if any."

After receiving the offer, Plaintiff thereafter undertook all actions required under the terms of the offer, including but not limited to opening new checking and savings accounts at the Morgan Hill branch office of Citibank.  Plaintiff thereafter received 60,000 Airline Miles in his American Airlines frequent flyer account.

Citibank, N.A.
March 1, 2012
Page 2

In early 2012, Plaintiff was surprised to receive a Form 1099 from Citibank indicating Plaintiff had received $1,500 worth of "income" from Citibank for receipt of the Airline Miles. This was surprising to Plaintiff because the offer failed to state that Citibank intended to issue a Form 1099 to Plaintiff for receipt of the Airline Miles, failed to state that Citibank had already calculated what it believed was the "value" of the Airline Miles for reporting purposes on the Form 1099; failed to state what that "value" to be reported on the Form 1099 would be; and failed to state whether the Airline Miles would ever expire or otherwise lose the "value" that they may have. Rather, the offer simply stated: "Customer is responsible for taxes, if any."

The Form 1099 issued by Defendant and received by Plaintiff has now created a tax obligation for which Plaintiff will incur financial liability and expense unless Plaintiff can obtain relief through this action. The Airline Miles have no "value" to Plaintiff that can be fixed at the time they were received by Plaintiff. Moreover, the Airline Miles, if unused, may expire and thereby be rendered valueless to Plaintiff.

In fact, the problem with assigning a "value" to the Airline Miles has already been recognized by the Internal Revenue Service. In 2002, the IRS issued a policy brief noting that because there are "numerous technical and administrative issues" relating to miles, such as how they're valued and used, the agency "has not pursued a tax enforcement program with respect to promotional benefits such as frequent-flier miles." "Consistent with prior practice," it said, "the IRS will not assert that any taxpayer has understated his federal tax liability by reason of the receipt or personal use of frequent-flier miles or other in-kind promotional benefits attributable to the taxpayer's business or official travel."

Notwithstanding the problems with assigning a "value" to the Airline Miles for reporting purposes and the IRS' position as set forth in its 2002 policy brief, Defendant issued a Form 1099 indicating the Airline Miles have a "value" of $1,500. This amount far over-states the actual "value" the Airline Miles may have, if indeed they have any "value" to Plaintiff at all. However, Defendant is motivated to over-state the "value" of the Airline Miles issued to Plaintiff since the amount reported on the Form 1099 may qualify as a business expense for Defendant, and may therefore decrease Defendant's tax obligations, resulting in a significant financial benefit to Defendant at Plaintiff's expense.

On January 30, 2012, Senator Sherrod Brown, Chairman of the U.S. Senate Banking Subcommittee on Financial Institutions and Consumer Protection, sent a letter to Citigroup's CEO, requesting that Citibank stop issuing Form 1099s to its customers. In a newspaper interview response, Citibank implied that it would continue the practice of issuing Form 1099s notwithstanding consumer complaints and the problem with assigning a "value" to the frequent flier miles.

Citibank, N.A.
March 1, 2012
Page 3

## DEMAND

Based on the foregoing, Plaintiff contends that Defendant has failed to honor and abide by the consumer protections as contained in the CLRA. Unless full satisfaction is made as set forth below, please take notice that Plaintiff intends to file an individual and representative action against Defendant for violations of, inter alia, the CLRA.

To avoid further legal action, Plaintiff respectfully demands that Defendant agree to fund all of the following categories of relief:

1.  Actual damages to Plaintiff, plus interest;
2.  Actual damages to every California resident of Defendant who received Airline Miles and a Form 1099 from Defendant, plus interest; and
3.  For every "senior citizen" and/or "disabled" California resident who received Airline Miles and a Form 1099 from Defendant an additional amount of $5,000.

Please be advised that if Defendant does not agree to all of the above-referenced demands within 30 days of receipt of this notice, Plaintiff shall seek the following remedies by court action:

A.  For an order certifying the nationwide Class and the California Subclass under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiff as representative of the Class and California Subclass and Plaintiff's attorneys as Class Counsel to represent the Class and California Subclass members;
B.  For an order declaring Defendant's conduct violates the statutes referenced herein;
C.  For an order finding in favor of Plaintiff, the nationwide Class, and the California Subclass on all causes of action asserted herein;
D.  For compensatory and punitive damages in amounts to be determined by the Court and/or jury;
E.  For prejudgment interest on all amounts awarded;
F.  For an order of restitution and all other forms of equitable monetary relief;
G.  For injunctive relief as pleaded or as the Court may deem proper; and
H.  For an order awarding Plaintiff and the Class and California Subclass their reasonable attorneys' fees and expenses and costs of suit.

Very truly yours,

/s/ / Brent Jex

Brent Jex
**KEEGAN & BAKER, LLP**

**SENDER: COMPLETE THIS SECTION**

- ☒ Complete items 1, 2, 3. Also complete item 4 if Restricted Delivery is desired.
- ☒ Print your name and address on the reverse so that we can return the card to you.
- ☒ Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Citibank, N.A.
ATTN: Legal Dept.
399 Park Avenue
New York, NY 10022

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X *L. Johnson*
☐ Agent
☐ Addressee

B. Received by ( Printed Name)
*L. Johnson*

C. Date of Delivery
3-6-12

D. Is delivery address different from item 1? ☐ Yes
If YES, enter delivery address below: ☐ No

3. Service Type
☒ Certified Mail  ☐ Express Mail
☐ Registered  ☒ Return Receipt for Merchandise
☐ Insured Mail  ☐ C.O.D.

4. Restricted Delivery? (Extra Fee) ☐ Yes

2. Article Number
(Transfer from service label)   7010 0290 0001 6829 4102

PS Form 3811, February 2004       Domestic Return Receipt       102595-02-M-1540

---

**SENDER: COMPLETE THIS SECTION**

- ☒ Complete items 1, 2, 3. Also complete item 4 if Restricted Delivery is desired.
- ☒ Print your name and address on the reverse so that we can return the card to you.
- ☒ Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Citibank, N.A.
ATTN: Legal Dept.
17085 Monterey Rd
Morgan Hill, CA 95037

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X
☒ Agent
☐ Addressee

B. Received by ( Printed Name)

C. Date of Delivery

D. Is delivery address different from item 1? ☐ Yes
If YES, enter delivery address below: ☐ No

3. Service Type
☒ Certified Mail  ☐ Express Mail
☐ Registered  ☒ Return Receipt for Merchandise
☐ Insured Mail  ☐ C.O.D.

4. Restricted Delivery? (Extra Fee) ☐ Yes

2. Article Number
(Transfer from service label)   7010 0290 0001 6829 4096

PS Form 3811, February 2004       Domestic Return Receipt       102595-02-M-1540

EXHIBIT C

©COPY

1   STROOCK & STROOCK & LAVAN LLP
    JULIA B. STRICKLAND (State Bar No. 083013)
2   SHANNON E. PONEK (State Bar No. 261135)
    2029 Century Park East, Suite 1600
3   Los Angeles, CA 90067-3086
    Telephone: 310-556-5800
4   Facsimile: 310-556-5959
    Email: lacalendar@stroock.com
5
    Attorneys for Defendant
6      CITIBANK, N.A.
7
8                  UNITED STATES DISTRICT COURT
9                CENTRAL DISTRICT OF CALIFORNIA
10
11  ZAKMAR KATS,                      )  Case No.
                                      )
12           Plaintiff,               )  CV12-01607 MMM (JCx)
                                      )
13      vs.                           )  NOTICE OF REMOVAL OF DEFENDANT
                                      )  CITIBANK, N.A.
14  CITIBANK, N.A.,                   )
                                      )  [Pursuant to 28 U.S.C. §§ 1331, 1441(b),
15           Defendant.               )  1446 – Federal Question]
                                      )
16                                    )

LA 51516448

1    **TO THE UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT**

2    **OF CALIFORNIA:**

3        **PLEASE TAKE NOTICE THAT**, pursuant to 28 U.S.C. Sections 1331, 1441(b), and

4    1446, defendant Citibank, N.A. ("Citibank") hereby removes the action entitled <u>Zakmar Kats v.</u>

5    <u>Citibank</u>, Superior Court of California, County of Los Angeles, Case No. SM 12A00215 (the

6    "Action"), to the United States District Court for the Central District of California on the following

7    grounds:

8        1.   <u>Removal Is Timely.</u>  Citibank received Plaintiff's Claim and Order to Go to Small

9    Claims Court ("Plaintiff's Claim") in the Action from plaintiff Zakmar Kats ("Plaintiff") on

10   January 26, 2012.  A true and correct copy of Plaintiff's Claim received by Citibank in the Action

11   is attached hereto as Exhibit A.  Citibank has timely filed this Notice of Removal pursuant to 28

12   U.S.C. § 1446(b) because it has filed it within 30 days of service of Plaintiff's Claim, and within

13   one year after "commencement of the action" in state court.

14       2.   <u>This Court Has Removal Jurisdiction Over This Action.</u>  The Action is a civil action

15   of which this Court has original jurisdiction under 28 U.S.C. § 1331 and is one which Citibank may

16   remove to this Court pursuant to the provisions of 28 U.S.C. § 1441(b) in that Plaintiffs' claims

17   against Citibank arise under the laws of the United States.  Pursuant to 28 U.S.C. § 1331, original

18   jurisdiction of the district courts includes jurisdiction over "all civil actions arising under the

19   Constitution, laws, or treaties of the United States."  "An action may 'arise under' a law of the

20   United States if the plaintiff's right to relief necessarily turns on construction of federal law."

21   <u>Bright v. Bechtel Petroleum, Inc.</u>, 780 F.2d 766, 769 (1986) (citing <u>Franchise Tax Bd. of Cal. v.</u>

22   <u>Constr. Laborer's Vacation Trust</u>, 463 U.S. 1, 9 (1983)).  Put differently, claims "arise under"

23   federal law when a "well-pleaded complaint establishes . . . that the plaintiff's right to relief

24   necessarily depends on resolution of a substantial question of federal law, in that federal law is a

25   necessary element of one of the well-pleaded . . .claims."  <u>Christianson v. Colt Indus. Operating</u>

26   <u>Corp.</u>, 486 U.S. 800, 808 (1988) (quoting <u>Franchise Tax Bd.</u>, 463 U.S. at 13, 27-28) (internal

27   quotation marks and citations omitted).

28

LA 51516448

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East
Los Angeles, California 90067-3086

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East
Los Angeles, California 90067-3086

3.    Here, Plaintiff's right to relief on its claim against Citibank necessarily depends <u>only</u> on the resolution of a substantial question of federal law – i.e., whether Citibank wrongfully issued Plaintiff an IRS 1099 form.  <u>See, e.g.</u>, <u>Grable & Sons Metal Products, Inc. v. Darue Engineering & Mfg.</u>, 545 U.S. 308 (2005) (holding that a quiet title action in state court alleging the Internal Revenue Service had given the plaintiff inadequate notice under a federal tax provision was "an important issue of federal law that sensibly belongs in a federal court"); <u>Bright v. Bechtel Petroleum, Inc.</u>, 780 F.2d 766 (9th Cir. 1986) (holding that federal question jurisdiction existed in action for breach of an employment contract deriving from employer's withholding of federal income tax from a paycheck because "despite 'artfully pleading' his action as a breach of contract, [plaintiff's action] in fact is challenging federal income tax withholding laws and regulation"); <u>Johnson v. LPL Fin. Servs.</u>, 517 F. Supp. 2d 1231, 1232 (S.D. Cal. 2007) ("An IRS form 1099 is an informational statement businesses are required to provide to the recipient of a payment in order to report certain transactions to the IRS.  The requirement to issue a form 1099 is mandated by the Internal Revenue Code (hereinafter "I.R.C.") and associated Treasury Regulations (hereinafter "Treas. Regs.").  Failure to issue a form 1099 may result in penalties under I.R.C. § 6721.").

4.    In Plaintiff's Claim, Plaintiff's only allegation states:  "Citibank sent [Plaintiff a] 1099 form for $1,000.  [Plaintiff] did not receive any money from them. . . [Plaintiff] want[s] to collect the amount of $1,000 in order to pay 1099."  Plaintiff's Claim, at 2.  As pled in Plaintiff's Claim, the only legal or factual issue contested in the case is an issue of federal tax law.  Accordingly, the resolution of Plaintiff's Claim necessarily depends on the resolution of a substantial question of federal law.

5.    <u>Supplemental Jurisdiction</u>.  To the extent any other claims in the Action arise under state law, supplemental jurisdiction over such claims would exist pursuant to 28 U.S.C. §§ 1367 and 1441(c).

6.    <u>Pending Class Action</u>.  A class action against Citibank is pending in another federal court that involves all or a material part of the subject matter of this action:  <u>Bertram Hirsch and Igor Romanov v. Citibank, N.A</u>, United States District Court for the Southern District of New York, Case No. 12CIV1124, filed on February 14, 2012 ("<u>Romanov Class Action</u>").  The instant

- 2 -

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East
Los Angeles, California 90067-3086

1  action involves all or a material part of the subject matter of the <u>Romanov Class Action</u> because

2  they both involve claims based on the same alleged conduct in connection with Citibank issuing

3  I.R.S. 1099 forms to customers relating to American Airline miles promotions.  A copy of the Class

4  Action Complaint in the <u>Romanov Class Action</u> is attached hereto as Exhibit B.

5      7.     <u>Copies Of All Documents Served On Citibank</u>.  Pursuant to 28 U.S.C. § 1446(a),

6  true and correct copies of all pleadings, process and orders served on Citibank in the Action are

7  attached as Exhibit A.

8      8.     <u>This Is The Proper District Court</u>.  This Court is the proper district court for removal

9  because the Superior Court of the State of California for the County of Los Angeles is located

10  within the United States District Court for the Central District of California.

11     9.     <u>Notice Has Been Effected</u>.  Citibank concurrently is filing a copy of this Notice of

12  Removal of Action with the Superior Court of the State of California for the County of Los

13  Angeles.  Citibank will concurrently serve Plaintiff with copies of this Notice of Removal and the

14  Notice filed in the Action.

15  Dated:  February 24, 2012

16                                              STROOCK & STROOCK & LAVAN LLP
                                                JULIA B. STRICKLAND
17                                              SHANNON E. PONEK

18                                              By: _____
                                                              Shannon E. Ponek
19
                                                Attorneys for Defendant
20                                              CITIBANK, N.A.

21

22

23

24

25

26

27

28

- 3 -

LA 51516448

Case 1:12-cv-01124-CDAB-JLC Document 15-3 Filed 04/17/12 Page 6 of 8

# EXHIBIT A

## SC-100

### Plaintiff's Claim and ORDER to Go to Small Claims Court

Clerk stamps date here when form is filed.

CONFORMED COPY
OF ORIGINAL FILED
Los Angeles Superior Court

JAN 23 2012

John A. Clarke, Executive Officer/Clerk

By F. Sahara, Deputy

**Notice to the person being sued:**

. You are the Defendant if your name is listed in (2) on page 2 of this form. The person suing you is the Plaintiff, listed in (1) on page 2.

. You and the Plaintiff must go to court on the trial date listed below. If you do not go to court, you may lose the case.

. If you lose, the court can order that your wages, money, or property be taken to pay this claim.

. Bring witnesses, receipts, and any evidence you need to prove your case.

. Read this form and all pages attached to understand the claim against you and to protect your rights.

**Aviso al Demandado:**

. Usted es el Demandado si su nombre figura en (2) de la pagina 2 de este formulario. La persona que lo demanda es el Demandante, la que figura en (1) de la pagina 2.

. Usted y el Demandante tienen que presentarse en la corte en la fecha del juicio indicada a continuacion. Si no se presenta, puede perder el caso.

. Si pierde el caso la corte podria ordenar que le quiten de su sueldo, dinero u otros bienes para pagar este reclamo.

. Lleve testigos, recibos y cualquier otra prueba que necesite para probar su caso.

. Lea este formulario y todas las paginas adjuntas para entender la demanda en su contra y para proteger sus derechos.

*Fill in court name and street address:*

Superior Court of California, County of
Los Angeles: WEST DISTRICT (19484  )
SANTA MONICA COURTHOUSE
1725 MAIN STREET
SANTA MONICA, CA. 90401
(310) 260-1887

*Clerk fills in case number and case name:*

Case Number:
SM 12A00215
Case Name:
KATS, ZAKMAR  VS CITIBANK

### Order to Go to Court

**The people in (1) and (2) must go to court:** *(Clerk fills out section below.)*

| | TRIAL DATE | DATE 03/23/2012 | TIME 01:30 PM | DEPARTMENT WEG | LOCATION RM. 117 |
|---|---|---|---|---|---|

Date: 01/23/2012

JOHN A. CLARKE, Executive Officer/Clerk
By CYNTHIA PADILLA                    , Deputy

**Instructions for the person suing:**

. You are the Plaintiff. The person you are suing is the Defendant.

. *Before* you fill out this form, read Form SC-100-INFO, *Information for the Plaintiff* to know your rights. Get SC-100-INFO at any courthouse or county law library, or go to: *www.courts.ca.gov/smallclaims/forms*

. Fill out pages 2 and 3 of this form. Then make copies of **all** pages of this form. (Make 1 copy for each party named in this case and an extra copy for yourself.) Take or mail the original and these copies to the court clerk's office and pay the filing fee. The clerk will write the date of your trial in the box above.

. You must have someone at least 18--not you or anyone else listed in this case--give each Defendant a court-stamped copy of all 5 pages of this form and any pages this form tells you to attach. There are special rules for "serving," or delivering, this form to public entities, associations, and some businesses. See Forms SC-104, SC-104B, and SC-104C.

. **Go to court on your trial date listed above.** Bring witnesses, receipts, and any evidence you need to prove your case.

Judicial Council of California,  *www.courts.ca.gov*
Revised January 1, 2012, Mandatory Form
Code of Civil Procedure, 116.110 et seq.,
116.220(a), 116.340(g)

**Plaintiff's Claim and ORDER to Go to Small Claims Court**
**(Small Claims)**

SC-100, Page 1 of 5
-->

Ex. A, p. 4

| | Case Number: |
| --- | --- |
| | SM 12A00215 |

Plaintiff (list names): KATS, ZAKMAR

--------------------------------------------------------------------

## (1) The Plaintiff (the person, business, or public entity that is suing) is:

Name: KATS, ZAKMAR

Phone: (310) 827-1699

| Street address: 13243 FIJI WAY #B | MARINA DEL REY | CA | 90292 |
| *Street* | *City* | *State* | *Zip* |

| Mailing address *(if different):* | | | |
| *Street* | *City* | *State* | *Zip* |

### If more than one Plaintiff, list next Plaintiff here:

Name:

Phone:

| Street address: | | | |
| *Street* | *City* | *State* | *Zip* |

| Mailing address *(if different):* | | | |
| *Street* | *City* | *State* | *Zip* |

[ ] *Check here if more than 2 Plaintiffs and attach Form SC-100A.*
[ ] *Check here if either Plaintiff listed above is doing business under a fictitious name. If so, attach Form SC-103.*

## (2) The Defendant (the person, business, or public entity being sued) is:

Name: CITIBANK

Phone: (310) 754-3966

| Street address: 4375 GLENCOE AVE. | MARINA DEL REY | CA | 90292 |
| *Street* | *City* | *State* | *Zip* |

| Mailing address *(if different):* | | | |
| *Street* | *City* | *State* | *Zip* |

### If more than one Defendant, list next Defendant here:

Name:

Phone:

| Street address: | | | |
| *Street* | *City* | *State* | *Zip* |

| Mailing address *(if different):* | | | |
| *Street* | *City* | *State* | *Zip* |

[ ] *Check here if more than 2 Defendants and attach Form SC-100A.*
[ ] *Check here if any Defendant is on active military duty, and write his or her name here:*

## (3) The Plaintiff claims the Defendant owes $ 1000.00. *(Explain below):*

a. Why does the Defendant owe the Plaintiff money?
CITIBANK SENT ME 1099 FORM FOR $1,000.00. I DID NOT RECEIVE ANY
MONEY FROM THEM.

b. When did this happen? *(Date):*
If no specific date, give the time period: *Date Started:* 01 / 01 / 2012 *Through:* 01 / 23 / 2012

C. How did you calculate the money owed to you? (Do not include court costs or fees for service.)
I WANT TO COLLECT THE AMOUNT OF $1,000 IN ORDER TO PAY 1099.

[ ] *Check here if you need more space. Attach one sheet of paper or Form MC-031 and write* "SC-100, Item 3" *at the top.*

--------------------------------------------------------------------

Revised January 1, 2012     **Plaintiff's Claim and ORDER to GO to Small Claims Court** (Small Claims)     SC-100, Page 2 of 5 --&gt;

Ex. A, p. 5

# EXHIBIT D

Case 1:21-cv-01124-DAB-HJC Document 115-4 Filed 04/17/23 Page 180 of 271

JAMS, THE RESOLUTION EXPERTS

# CONSUMER ARBITRATION POLICY: MINIMUM STANDARDS OF PROCEDURAL FAIRNESS

*EFFECTIVE*
*JULY 15, 2009*

# JAMS Policy on Consumer Arbitrations Pursuant to Pre-Dispute Clauses Minimum Standards of Procedural Fairness

JAMS will administer arbitrations pursuant to mandatory pre-dispute arbitration clauses between companies and consumers[1] only if the contract arbitration clause and specified applicable rules comply with the following minimum standards of fairness.

**These minimum standards for arbitration procedures are:**

1. The arbitration agreement must be reciprocally binding on all parties such that: A) if a consumer is required to arbitrate his or her claims or all claims of a certain type, the company is so bound; and, B) no party shall be precluded from seeking remedies in small claims court for disputes or claims within the scope of its jurisdiction.

2. The consumer must be given notice of the arbitration clause. Its existence, terms, conditions and implications must be clear.

3. Remedies that would otherwise be available to the consumer under applicable federal, state or local laws must remain available under the arbitration clause, unless the consumer retains the right to pursue the unavailable remedies in court.

4. The arbitrator(s) must be neutral and the consumer must have a reasonable opportunity to participate in the process of choosing the arbitrator(s).

5. The consumer must have a right to an in-person hearing in his or her hometown area.

6. The clause or procedures must not discourage the use of counsel.

**7.** With respect to the cost of the arbitration, when a consumer initiates arbitration against the company, the only fee required to be paid by the consumer is $250, which is approximately equivalent to current Court filing fees. All other costs must be borne by the company including any remaining JAMS Case Management Fee and all professional fees for the arbitrator's services. When the company is the claiming party initiating an arbitration against the consumer, the company will be required to pay all costs associated with the arbitration.

**8.** In California, the arbitration provision may not require the consumer to pay the fees and costs incurred by the opposing party if the consumer does not prevail.

**9.** The arbitration provision must allow for the discovery or exchange of non-privileged information relevant to the dispute.

**10.** An Arbitrator's Award will consist of a written statement stating the disposition of each claim. The award will also provide a concise written statement of the essential findings and conclusions on which the award is based.

[1] *These standards are applicable where a company systematically places an arbitration clause in its agreements with individual consumers and there is minimal, if any, negotiation between the parties as to the procedures or other terms of the arbitration clause. A consumer is defined as an individual who seeks or acquires any goods or services primarily for personal family or household purposes, including the credit transactions associated with such purchases, or personal banking transactions. These standards do not apply to the use of arbitration in resolving disputes arising from commercial transactions between a lender and commercial borrowers, or a company and commercial customers,other financial services such as investment transactions, real estate transactions, or to matters involving underinsured motorists. Nor do they apply if the agreement to arbitrate was negotiated by the individual consumer and the company.*

**JAMS CONSUMER ARBITRATION POLICY: MINIMUM STANDARDS OF PROCEDURAL FAIRNESS**



THE RESOLUTION EXPERTS®

**1.800.352.JAMS • www.jamsadr.com**

*© Copyright 2009 JAMS. All rights reserved.*

# EXHIBIT E

American Arbitration Association
*Dispute Resolution Services Worldwide*

AAA *Online* LIBRARY

**AAA Review of Consumer Clauses**

The American Arbitration Association applies the Supplementary Procedures for Consumer-Related Disputes to arbitration clauses in agreements between individual consumers and businesses where the business has a standardized, systematic application of arbitration clauses with customers and where the terms and conditions of the purchase of standardized, consumable goods or services are non-negotiable or primarily non-negotiable in most or all of its terms, conditions, features, or choices. The product or service must be for personal or household use. The AAA will have the discretion to apply or not to apply the Supplementary Procedures and the parties will be able to bring any disputes concerning the application or non-application to the attention of the arbitrator. Consumers are not prohibited from seeking relief in a small claims court for disputes or claims within the scope of its jurisdiction, even in consumer arbitration cases filed by the business.

**IMPORTANT!**

**TO CONSUMERS**

If you have a dispute with a business, your agreement may have an arbitration clause naming the American Arbitration Association (AAA) to provide arbitration services. The AAA will only administer your dispute if the arbitration clause meets certain fairness standards that are contained in the AAA's Consumer Due Process Protocol.

If your claim is for $75,000 or less in actual damages and the arbitration clause in your contract does not substantially comply with the standards contained in the Protocol, we will give the company an opportunity to comply and meet those standards at the time you file your claim. In order to determine if the arbitration agreement substantially and materially complies with the due process standards of the Consumer Due Process Protocol, **the AAA reviews the parties' arbitration clause only**, and not the entire contract. The AAA's review of the arbitration clause is only an administrative review to determine whether the clause complies with the AAA's minimum due process standards in consumer arbitrations. However, the AAA's review is not an opinion on whether the arbitration agreement, the contract, or any part of the contract is legally enforceable. If a party wishes to raise issues concerning the legal enforceability of the arbitration agreement, the contract or any portion of the contract, those issues may be presented to the arbitrator for a determination.

If the AAA has determined that the arbitration clause does not comply with the standards contained in the Protocol, and **the business does not comply, the AAA will not handle your claim. However, you may pursue whatever other remedies you choose in another forum,** and you will not be charged any AAA fees or expenses. If your claim is under $75,000 and does go to arbitration, your costs will be capped at either $125 or $375, depending on the amount of your actual damages claimed. In addition, under the AAA's procedures, you may claim any amount of special damages such as attorney's fees or punitive damages, without an increase in fees.

***Small Claims Court Option***: Instead of going to arbitration, you may pursue your claim in your local small claims court, if it meets that court's jurisdictional limits. If you wish to have a small claims court hear your claim, you should contact them directly.

**TO BUSINESSES**

In order for you to name the AAA as the dispute resolution provider in your agreements with consumers, your arbitration clause must substantially comply with the Principles of the Consumer Due Process

**JA 182**



Protocol of fairness and due process in predispute arbitration. If you have an agreement with an arbitration clause that names the AAA, please contact us through the AAA office nearest you. The staff in our offices can also give you information about the AAA consumer ADR processes.

If a case is filed against your business and your arbitration clause contains provisions that are not acceptable under the Consumer Due Process Protocol, you will be given an opportunity to comply within a specific period of time. **If you do not revise your arbitration agreement to comply with the Consumer Due Process Protocol, we will return the filing information to the consumer with instructions to pursue other remedies and we will refuse to administer any other cases until your arbitration agreement is in compliance.** Please see the *Notice to Consumers and Businesses*.

In order to determine if the arbitration agreement substantially and materially complies with the due process standards of the Consumer Due Process Protocol, **the AAA reviews the parties' arbitration clause only**, and not the entire contract. The AAA's review of the arbitration clause is only an administrative review to determine whether the clause complies with the AAA's minimum due process standards in consumer arbitrations. However, the AAA's review is not an opinion on whether the arbitration agreement, the contract, or any part of the contract is legally enforceable. If a party wishes to raise issues concerning the legal enforceability of the arbitration agreement, the contract or any portion of the contract, those issues may be presented to the arbitrator for a determination.

For all consumer cases with claims under $75,000, the business is responsible for all AAA fees and Arbitrator compensation in excess of the consumer capped fee amounts.

# EXHIBIT F


**American Arbitration Association**
*Dispute Resolution Services Worldwide*

## *Consumer Due Process* PROTOCOL

Statement of Principles of the National Consumer Disputes Advisory Committee

Statement of Principles
Introduction: Genesis of the Advisory Committee
Scope of the Consumer Due Process
Glossary of Terms
Major Standards and Sources
Principle 1. Fundamentally-Fair Process
Principle 2. Access to Information Regarding ADR Program
Principle 3. Independent and Impartial Neutral; Independent Administration
Principle 4. Quality and Competence of Neutrals
Principle 5. Small Claims
Principle 6. Reasonable Cost
Principle 7. Reasonably Convenient Location
Principle 8. Reasonable Time Limits
Principle 9. Right to Representation
Principle 10. Mediation
Principle 11. Agreements to Arbitrate
Principle 12. Arbitration Hearings
Principle 13. Access to Information
Principle 14. Arbitral Remedies
Principle 15. Arbitration Awards
LIST OF SIGNATORIES

## STATEMENT OF PRINCIPLES

## PRINCIPLE 1. FUNDAMENTALLY-FAIR PROCESS

*All parties are entitled to a fundamentally-fair ADR process. As embodiments of fundamental fairness, these Principles should be observed in structuring ADR Programs.*

## PRINCIPLE 2. ACCESS TO INFORMATION REGARDING ADR PROGRAM

*Providers of goods or services should undertake reasonable measures to provide Consumers with full and accurate information regarding Consumer ADR Programs. At the time the Consumer contracts for goods or services, such measures should include (1) clear and adequate notice regarding the ADR provisions, including a statement indicating whether participation in the ADR Program is mandatory or optional, and (2) reasonable means by which Consumers may obtain additional information regarding the ADR Program. After a dispute arises, Consumers should have access to all information necessary for effective participation in ADR.*

## PRINCIPLE 3. INDEPENDENT AND IMPARTIAL NEUTRAL; INDEPENDENT ADMINISTRATION

1. *Independent and Impartial Neutral. All parties are entitled to a Neutral who is independent and impartial.*

2. *Independent Administration. If participation in mediation or arbitration is mandatory, the procedure should be administered by an Independent ADR Institution. Administrative services should include the maintenance of a panel of prospective Neutrals, facilitation of Neutral selection, collection and distribution of Neutral's fees and expenses, oversight and implementation of ADR rules and procedures, and monitoring of Neutral qualifications, performance, and adherence to pertinent rules, procedures and ethical standards.*

3. *Standards for Neutrals. The Independent ADR Institution should make reasonable efforts to ensure that Neutrals understand and conform to pertinent ADR rules, procedures and ethical standards.*

4. *Selection of Neutrals. The Consumer and Provider should have an equal voice in the selection of Neutrals in connection with a specific dispute.*

5. *Disclosure and Disqualification. Beginning at the time of appointment, Neutrals should be required to disclose to the Independent ADR Institution any circumstance likely to affect impartiality, including any bias or financial or personal interest which might affect the result of the ADR proceeding, or any past or present relationship or experience with the parties or their representatives, including past ADR experiences. The Independent ADR Institution should communicate any such information to the parties and other Neutrals, if any. Upon objection of a party to continued service of the Neutral, the Independent ADR Institution should determine whether the Neutral should be disqualified and should inform the parties of its decision. The disclosure obligation of the Neutral and procedure for disqualification should continue throughout the period of appointment.*

## PRINCIPLE 4. QUALITY AND COMPETENCE OF NEUTRALS

*All parties are entitled to competent, qualified Neutrals. Independent ADR Institutions are responsible for establishing and maintaining standards for Neutrals in ADR Programs they administer.*

## PRINCIPLE 5. SMALL CLAIMS

*Consumer ADR Agreements should make it clear that all parties retain the right to seek relief in a small claims court for disputes or claims within the scope of its jurisdiction.*

## PRINCIPLE 6. REASONABLE COST

1. *Reasonable Cost. Providers of goods and services should develop ADR programs which entail reasonable cost to Consumers based on the circumstances of the dispute, including, among other things, the size and nature of the claim, the nature of goods or services provided, and the ability of the Consumer to pay. In some cases, this may require the Provider to subsidize the process.*

2. *Handling of Payment. In the interest of ensuring fair and independent Neutrals, the making of fee arrangements and the payment of fees should be administered on a rational, equitable and consistent basis by the Independent ADR Institution.*

## PRINCIPLE 7. REASONABLY CONVENIENT LOCATION

*In the case of face-to-face proceedings, the proceedings should be conducted at a location which is reasonably convenient to both parties with due consideration of their ability to travel and other pertinent circumstances. If the parties are unable to agree on a location, the determination should be made by the Independent ADR Institution or by the Neutral.*

## PRINCIPLE 8. REASONABLE TIME LIMITS

*ADR proceedings should occur within a reasonable time, without undue delay. The rules governing ADR should establish specific reasonable time periods for each step in the ADR process and, where necessary, set forth default procedures in the event a party fails to participate in the process after reasonable notice.*

## PRINCIPLE 9. RIGHT TO REPRESENTATION

*All parties participating in processes in ADR Programs have the right, at their own expense, to be represented by a spokesperson of their own choosing. The ADR rules and procedures should so specify.*

## PRINCIPLE 10. MEDIATION

*The use of mediation is strongly encouraged as an informal means of assisting parties in resolving their own disputes.*

## PRINCIPLE 11. AGREEMENTS TO ARBITRATE

*Consumers should be given:*

    a. *clear and adequate notice of the arbitration provision and its consequences, including a statement of its mandatory or optional character;*
    b. *reasonable access to information regarding the arbitration process, including basic distinctions between arbitration and court proceedings, related costs, and advice as to where they may obtain more complete information regarding arbitration procedures and arbitrator rosters;*
    c. *notice of the option to make use of applicable small claims court procedures as an alternative to binding arbitration in appropriate cases; and,*
    d. *a clear statement of the means by which the Consumer may exercise the option (if any) to submit disputes to arbitration or to court process.*

## PRINCIPLE 12. ARBITRATION HEARINGS

1. *Fundamentally-Fair Hearing. All parties are entitled to a fundamentally-fair arbitration hearing. This requires adequate notice of hearings and an opportunity to be heard and to present relevant evidence to impartial decision-makers. In some cases, such as some small claims, the requirement of fundamental fairness may be met by hearings conducted by electronic or telephonic means or by a submission of documents. However, the Neutral should have discretionary authority to require a face-to-face hearing upon the request of a party.*

2. *Confidentiality in Arbitration. Consistent with general expectations of privacy in arbitration hearings, the arbitrator should make reasonable efforts to maintain the privacy of the hearing to the extent permitted by applicable law. The arbitrator should also carefully consider claims of privilege and confidentiality when addressing evidentiary issues.*

## PRINCIPLE 13. ACCESS TO INFORMATION

*No party should ever be denied the right to a fundamentally-fair process due to an inability to obtain information material to a dispute. Consumer ADR agreements which provide for binding arbitration should establish procedures for arbitrator-supervised exchange of information prior to arbitration, bearing in mind the expedited nature of arbitration.*

## PRINCIPLE 14. ARBITRAL REMEDIES

*The arbitrator should be empowered to grant whatever relief would be available in court under law or in equity.*

## PRINCIPLE 15. ARBITRATION AWARDS

1. *Final and Binding Award; Limited Scope of Review. If provided in the agreement to arbitrate, the arbitrator's award should be final and binding, but subject to review in accordance with applicable statutes governing arbitration awards.*

2. *Standards to Guide Arbitrator Decision-Making. In making the award, the arbitrator should apply any identified, pertinent contract terms, statutes and legal precedents.*

3. *Explanation of Award. At the timely request of either party, the arbitrator should provide a brief written explanation of the basis for the award. To facilitate such requests, the arbitrator should discuss the matter with the parties prior to the arbitration hearing.*

## INTRODUCTION: GENESIS OF THE ADVISORY COMMITTEE

Recent years have seen a pronounced trend toward incorporation of out-of-court conflict resolution processes in standardized agreements presented to consumers of goods and services. Some of these processes (such as mediation and non-binding evaluation) involve third party intervention in settlement negotiations; others involve adjudication (binding arbitration). Such processes have the potential to be of significant value in making dispute resolution quicker, less costly, and more satisfying. [1]

Yet because consumer contracts often do not involve arm's length negotiation of terms, and frequently consist of boilerplate language presented on a take-it-or-leave it basis by suppliers of goods or services, there are legitimate concerns regarding the fairness of consumer conflict resolution mechanisms required by suppliers. This is particularly true in the realm of binding arbitration, where the courts are displaced by private adjudication systems. In such cases, consumers are often unaware of their procedural rights and obligations until the realities of out-of-court arbitration are revealed to them after disputes have arisen. [2] While the results may be entirely satisfactory, they may also fall short of consumers' reasonable expectations of fairness [3] and have a significant impact on consumers' substantive rights and remedies. [4]

The use of mediation and other forms of alternative dispute resolution (ADR) by various state and federal courts has also raised concerns regarding quality, effectiveness and fairness. The response has been a number of national, state and local initiatives to establish standards for the guidance and information of courts. Until now, however, there has been no comparable national effort in the private consumer sphere.

In the spring of 1997, the American Arbitration Association (AAA) announced the establishment of a National Consumer Disputes Advisory Committee. The stated mission of the Advisory Committee is:

> *To bring together a broad, diverse, representative national advisory committee to advise the American Arbitration Association in the development of standards and procedures for the equitable resolution of consumer disputes.*

In light of its stated mission, the Advisory Committee's recommendations are likely to have a direct impact on the development of rules, procedures and policies for the resolution of consumer disputes under the auspices of the AAA.

The Advisory Committee's recommendations may also have a significant impact in the broader realm of consumer ADR. A Statement of Principles which is perceived as a broadly-based consensus regarding minimum requirements for mediation and arbitration programs for consumers of goods and services may influence the evolution of consumer rules generally and the development of state and federal laws governing consumer arbitration agreements. The standards may affect the drafting of statutes and influence judicial opinions addressing the enforceability of arbitration agreements pursuant to existing state or federal law. [5]

_____

1. See, *e.g.*, CPR Institute for Dispute Resolution, *ADR Cost Savings & Benefit Studies* (Catherine Cronin-Harris, ed. 1994) (summarizing some of the research findings on the relative advantages ADR may offer). See also, *e.g.*, *Madden v. Kaiser Foundation Hosp.*, 17 Cal. 3d 699, 711, 552 P.2d 1178, 1186 (1976) ("The speed and economy of arbitration, in contrast to the expense and delay of a jury trial, could prove helpful to all parties....")

2. The arbitration agreement may be included in the "fine print" in a brochure of terms and conditions inside a box of goods. See, *e.g.* , *Hill v. Gateway 2000, Inc.* , 105 F.3d 1147 (7th Cir. 1997) (Customers agreed to computer company's contract terms, including arbitration agreement, by failing to return merchandise within 30 days). See *Age of Compelled Arbitration*, 1997, Wis. L. Rev33, 40-53 (Offering a "cautionary tale" regarding employment arbitration agreement.)

3. See Mark E. Budnitz, *Arbitration of Disputes Between Consumers and Financial Institutions: A Serious Threat to Consumer Protection*, 10 Ohio St. J. On Disp. Res. 267 (1995) (discussing procedural limitations of arbitration in treating consumer disputes with banks and lenders); Schwartz, *supra* note 2 (discussing issues relating to adhesion contracts involving employees and consumers); Jean R. Sternlight, *Rethinking the Constitutionality of the Supreme Court's Preference for Binding Arbitration: A Fresh Assessment of Jury Trial, Separation of Powers, and Due Process Concerns* , 72 Tulane L. Rev. 1 (1997) (discussing due process concerns with binding arbitration under employment and consumer contracts). See, e.g., *Engalla V. Permanente Med. Grp.* , 938 P.2d 903 (Cal. 1997) (medical group may not compel arbitration where it administers own arbitration program, fraudulently misrepresents speed of arbitrator selection process, and the forces delays); *Broemmer V. Abortion Serv. of Phoenix* , 840 P.2d 1013 (Az. 1992) (refusing to enforce agreement in "adhesion contract" where drafter inserted potentially self-serving term requiring sole arbitrator of medical malpractice claims to be licensed medical doctor).

4. See Schwartz, *supra* note 2, at 60-61 (discussing perceptions regarding relative damages awards in court and in arbitration), 64-66 (summarizing some statistics on arbitration awards). See also William W. Park, *When and Why Arbitration Matters*, in The Commercial Way to Justice 73, 75 (G.M. Beresfort Hartwell ed., 1997) (" *Who* interprets an...agreement will frequently be more significant than *what* the applicable law says about the agreement....").

5. See, e.g., *Cole v. Burns International Security Services*, 105 F.3d 1465 (D.C.Cir. 1997) (Citing Due Process Protocol for Employment Disputes). The consensus-based approach of the broadly constituted group reflects the "public interest" model espoused by Professor Speidel. See Richard E. Speidel, *Contract Theory and Securities Arbitration: Whither Consent?* , 62 Brook. L. Rev. 1335 (1996).

**SCOPE OF THE CONSUMER DUE PROCESS PROTOCOL**

The Consumer Due Process Protocol (Protocol) was developed to address the wide range of consumer transactions those involving the purchase or lease of goods or services for personal, family or household use. These include, among other things, transactions involving: banking, credit cards, home loans and other financial services; health care services; brokerage services; home construction and improvements; insurance; communications; and the purchase and lease of motor vehicles and other personal property.

Across this broad spectrum of consumer transactions, the Protocol applies to all possible conflicts from small claims to complex disputes. In light of these realities, the Advisory Committee sought to develop principles which would establish clear benchmarks for conflict resolution processes involving consumers, while recognizing that a process appropriate in one context may be inappropriate in another. Therefore, the Protocol embodies flexible standards which permit consideration of specific circumstances.

In some cases, the AAA is developing or has developed special dispute resolution policies and procedures governing particular transactional systems. A recent example is its current initiative with respect to ADR in contracts for health care services. Where the general principles set forth in this Protocol conflict with more specific standards developed under the auspices of the AAA or some other independent organization with relatively broad participation by affected parties, the latter should govern.

There are other transactions that share many of the features of consumer transactions, such as those involving small businesses and individual employment contracts. While the Protocol was not developed for specific application to such other transactions, there may be circumstances in which the Protocol might be applied by analogy to ADR in those venues. The Principles articulated here are likely to have an impact on minimum standards of due process for other ADR systems involving persons of disparate bargaining power.

Each section of this document is devoted to treatment of a discrete topic concerning consumer ADR. It begins with a basic Principle that embodies the fundamental reasonable expectation of consumers as defined by the Advisory Committee. Each Principle is accompanied by Reporter's Comments that explain the rationale of the Advisory Committee in the context of other emerging standards. In addition, some Principles are supplemented by Practical Suggestions for putting the Principles into practice.

The specific mention of mediation and binding arbitration reflects the current emphasis on these processes in consumer conflict resolution. The Advisory Committee recognizes that a number of

other approaches are being employed to resolve commercial and consumer disputes, and encourages their use in accordance with the spirit of the Protocol.

The signatories to this Protocol were designated by their respective organizations, but the Protocol reflects their personal views and should not be construed as representing the policy of the designating organizations. Although the following Principles reflect a remarkable degree of consensus, achieved during the course of several meetings of the entire Advisory Committee, subcommittee deliberations, exchanges of numerous memoranda and of five drafts of the Protocol, Advisory Committee members at times accepted compromise in the interest of arriving at a common ground. As was the case with the task force which developed the *Employment Due Process Protocol*, opinions regarding the appropriateness of binding pre-dispute arbitration agreements in consumer contracts were never fully reconciled. Like that group, however, the Advisory Committee was able to address standards for ADR processes within the given context.

## GLOSSARY OF TERMS

Consumer
Consumer refers to an individual who purchases or leases goods or services, or contracts to purchase or lease goods or services, intended primarily for personal, family or household use.

Provider
Provider refers to a seller or lessor of goods or services to Consumers for personal, family or household use.

ADR Process
An ADR (Alternative Dispute Resolution) Process is a method for out-of-court resolution of conflict through the intervention of third parties. Mediation and arbitration are two widely used ADR processes.

Mediation
Mediation refers to a range of processes in which an impartial person helps parties to a dispute to communicate and to make voluntary, informed choices in an effort to resolve their dispute. A mediator, unlike an arbitrator, does not issue a decision regarding the merits of the dispute, but instead facilitates a dialogue between the parties with the view of helping them arrive at a mutually agreeable settlement.

Arbitration
Arbitration is a process in which parties submit disputes to a neutral third person or persons for a decision on the merits. Each party has an opportunity to present evidence to the arbitrator(s) in writing or through witnesses. Arbitration proceedings tend to be more informal than court proceedings and adherence to judicial rules of evidence is not usually required. Arbitrators decide cases by issuing written decisions or "awards." An award may or may not be binding on the parties, depending on the agreement to arbitrate. A "binding" arbitration award may be enforced as a court judgment under the terms of federal or state statutes, but judicial review of arbitration awards is limited.

Neutral

A Neutral is a mediator, arbitrator, or other independent, impartial third party selected to intervene in a Consumer-Provider dispute.

ADR Agreement

An ADR Agreement is an agreement between a Provider and a Consumer to submit disputes to mediation, arbitration, or other ADR Processes. As used in this Statement, the term includes provisions (sometimes incorporated by reference) in standard contracts furnished by Providers which signify the assent of the Consumer and Provider to such processes (although the assent may only be the "generalized assent" typically given by Consumers to standard terms).

ADR Program

An ADR Program is any program or service established by or utilized by a Provider of goods and services for out-of-court resolution of Consumer disputes. The term includes ADR rules and procedures and implementation of administrative structures.

Independent ADR Institution

An Independent ADR Institution is an organization that provides independent and impartial administration of ADR Programs for Consumers and Providers, including, but not limited to, development and administration of ADR policies and procedures and the training and appointment of Neutrals.

**MAJOR STANDARDS AND SOURCES**

The Reporter's Comments accompanying these Principles cite a number of existing standards and sources relied upon by the Advisory Committee. The more frequently cited standards and sources are set forth below by their full title as well as the abbreviated title that appears in the Comments.

American Arbitration Association, *Commercial Arbitration Rules*, July 1, 1996 (AAA Commercial Rules)

American Arbitration Association, *Construction Industry Dispute Resolution Procedures*, Oct. 15, 1997 (AAA Construction Procedures)

American Arbitration Association, *Wireless Industry Arbitration Rules*, July 15, 1997 (AAA Wireless Rules)

American Arbitration Association & American Bar Association, *Code of Ethics for Arbitrators in Commercial Disputes* (1977) (Code of Ethics for Arbitrators)

Center for Dispute Settlement, Institute of Judicial Admin., *Standards for Court-Connected Mediation Programs* (Standards for Court-Connected Programs)

Council of Better Business Bureaus, Inc., *Arbitration (Binding)* (BBB Arbitration Rules)

CPR-Georgetown Commission on Ethics and Standards in ADR Working Group on Provider Organizations, *Principles for ADR Provider Organizations* (Draft of April 4, 1998) (Principles for ADR Provider Organizations)

*Federal Arbitration Act*, 9 U.S.C. " 1-16 (as amended and in effect July 1, 1992) (Federal Arbitration Act)

Blue-Ribbon Advisory Panel on Kaiser Permanente Arbitration, *The Kaiser Permanente Arbitration System: A Review and Recommendations for Improvement* 1 (1998) (Kaiser Permanente Review and Recommendations)

Joint Committee (American Arbitration Association, American Bar Association and Society of Professionals in Dispute Resolution) on Standards of Conduct, *Standards of Conduct for Mediators* (1994) (Joint Standards for Mediators)

Society of Professionals in Dispute Resolution (SPIDR) Commission on Qualifications, *Ensuring Competence and Quality in Dispute Resolution Practice* (Draft Report 1994)(SPIDR Report on Qualifications)

Society of Professionals in Dispute Resolution (SPIDR) Law and Public Policy Committee, *Mandated Participation and Settlement Coercion: Dispute Resolution as It Relates to the Courts* (1991) (SPIDR Report on Court-Mandated ADR)

Society of Professionals in Dispute Resolution (SPIDR) Commission on Qualifications, *Principles Concerning Qualifications* (1989) (SPIDR Principles)

Task Force on Alternative Dispute Resolution in Employment, *A Due Process Protocol for Mediation and Arbitration of Statutory Disputes Arising Out of the Employment Relationship* (1995) (Employment Due Process Protocol)

*Uniform Arbitration Act* , 7 U.A.A. 1 (1997) (Uniform Arbitration Act)

## PRINCIPLE 1. FUNDAMENTALLY-FAIR PROCESS

*All parties are entitled to a fundamentally-fair ADR process. As embodiments of fundamental fairness, these Principles should be observed in structuring ADR Programs.*

Reporter's Comments

Users of ADR are entitled to a process that is fundamentally fair. Emerging standards governing consensual and court-connected ADR programs reflect pervasive concerns with fair process. *See, e.g.,* III Ian R. Macneil, Richard E. Speidel, & Thomas J. Stipanowich, *Federal Arbitration Law: Agreements, Awards & Remedies Under the Federal Arbitration Act* '32.2.1 (1994) [hereinafter *Federal Arbitration Law* ] (noting "universal agreement" that arbitrators must provide parties with fundamentally-fair hearing). *See also Kaiser Permanente Review and Recommendations 1*

("As the sponsor of a mandatory system of arbitration, Kaiser Permanente must assure a fair system to their members, physicians and staff.")

Where conflict resolution processes are defined by a written contract, that writing is often viewed by courts as the primary indicator of the "procedural fairness" for which the parties bargained. As the Advisory Committee recognized, however, ADR agreements in most Consumer contracts are "take-it-or-leave-it" contracts which are not products of negotiation by Consumers. *See* David S. Schwartz, *Enforcing Small Print to Protect Big Business: Employee and Consumer Rights Claims in an Age of Compelled Arbitration* , 1997 Wis. L. Rev. 33, 55-60 (discussing adhesion dimension of pre-dispute arbitration agreements in standardized contracts); *Kaiser Permanente Review and Recommendations 28 (noting that many members of a major HMO have no realistic alternative for medical care).* It is possible, therefore, that contracts to which they have generally assented contain ADR Agreements which fall so far short of Consumers' reasonable expectations that they would not have entered into the agreement had they been aware of the provisions. Thus, although these Principles attempt to enhance the likelihood that Consumers will have specific knowledge of ADR provisions at the time of contracting, the Advisory Committee also believed it necessary to describe a baseline of reasonable expectations for ADR in Consumer transactions. These Principles identify specific minimum due process standards which embody the concept of fundamental fairness, including: informed consent; impartial and unbiased Neutrals; independent administration of ADR; qualified Neutrals; access to small claims court; reasonable costs (including, where appropriate, subsidized Provider-mandated procedures); convenient hearing locations; reasonable time limits; adequate representation; fair hearing procedures; access to sufficient information; confidentiality; availability of court remedies; application of legal principle and precedent by arbitrators; and the option to receive a statement of reasons for arbitration awards.

Where provisions in a standardized pre-dispute arbitration agreement fail to meet Consumers' reasonable expectations, there is authority for the principle that courts may properly refuse to enforce the arbitration agreement in whole or in part. *See Restatement (Second) of Contracts* ' 211 (1981); *Broemmer v. Abortion Services of Phoenix, Ltd* ., 173 Ariz. 148, 840 P.2d 1013 (1992)(standardized arbitration agreement was unenforceable where its terms fell beyond patient's reasonable expectations); *Graham v. Scissor-Tail, Inc.,* 623 P.2d 165 (Cal. 1981)(arbitration clauses in adhesion contracts are unenforceable if they are contrary to the reasonable expectations of parties or unconscionable). *Cf. Cole v. Burns International Security Services* , 105 F.3d 1465 (D.C. Cir. 1997)(setting forth minimum due process standards for judicial enforcement of arbitration agreement in the context of a statutory employment discrimination claim where the employee was required to enter into the agreement as a condition of employment). Procedural fairness in Consumer arbitration agreements may also be policed under other principles. *See, e.g., Stirlen v. Supercuts* , 51 Cal. App. 4th Supp. 1519, 60 Cal. Rptr.2d 138 (1997)(finding remedial limits in "adhesive" employment agreement unconscionable); *Engalla v. Permanente Med. Grp.,* 938 P.2d 903 (Cal. 1997)(arbitration agreement was unenforceable if there was substantial delay in arbitrator selection contrary to consumer's reasonable, fraudulently induced, contractual expectations).

Because the Principles in this Protocol represent a fundamental standard of fairness, waiver of any of these Principles in a pre-dispute agreement will naturally be subject to scrutiny as to

conformity with the reasonable expectations of the parties and other judicial standards governing the enforceability of such contracts. Assuming they have sufficient specific knowledge and understanding of the rights they are waiving, however, Consumers may waive compliance with these Principles after a dispute has arisen.

## PRINCIPLE 2. ACCESS TO INFORMATION REGARDING ADR PROGRAM

*Providers of goods or services should undertake reasonable measures to provide Consumers with full and accurate information regarding Consumer ADR Programs. At the time the Consumer contracts for goods or services, such measures should include (1) clear and adequate notice regarding the ADR provisions, including a statement indicating whether participation in the ADR Program is mandatory or optional, and (2) reasonable means by which Consumers may obtain additional information regarding the ADR Program. After a dispute arises, Consumers should have access to all information necessary for effective participation in ADR.*

Reporter's Comments

*See SPIDR Report on Qualifications* at 9 ("Consumers are entitled to know what tasks the neutral...may perform and what tasks they are expected to perform in the course of a particular dispute resolution service.") *Cf. SPIDR Principles* at 6-7 ("It is the responsibility of...private programs offering dispute resolution services to define clearly the services they provide...[and provide information about the program and Neutrals to the parties.]"); *Kaiser Permanente Review and Recommendations 28* (provider of medical services has duty to provide users with "enough information and facts to allow them to understand the actual operation of the arbitration system"); *Principles for ADR Provider Organizations 2* . At a minimum, Consumers should be provided with (or have prompt access to) written information to explain the process. This should include general information describing each ADR process used and its distinctive features, including:

   *the nature and purpose of the process, including the scope of ADR provisions;

   *an indication of whether or not the Consumer has a choice regarding use of the process;

   *the role of parties and attorneys, if any;

   *procedures for selection of Neutrals;

   *rules of conduct for Neutrals, and complaint procedures;

   *fees and expenses;

   *information regarding ADR Program operation, including locations, times of operation, and case processing procedures;

*the availability of special services for non-English speakers, and persons with disabilities; and,

*the availability of alternatives to ADR, including small claims court.

*See, e.g., BBB Arbitration Rules* (defining arbitration and the roles of various participants; providing "checklist" for Consumers preparing for arbitration; setting forth procedural rules). *Cf . Standards for Court-Connected Programs* ' 3.2.b. (listing information which courts sponsoring mediation should provide to program users). *See also SPIDR Principles* at 6-7 (listing information which private programs should offer to parties regarding the program and participating Neutrals). Consumers should also be able to obtain a copy of pertinent rules and procedures. In the case of binding arbitration provisions, there should also be a straightforward explanation of the differences between arbitration and court process. See Principle 11 "Agreements to Arbitrate." Although the Provider of goods or services is charged with the responsibility for making certain that Consumers have access to appropriate information regarding ADR, the Independent ADR Institution has an important role in this area. The Independent ADR Institution must be prepared to communicate to the parties all information necessary for effective use of the ADR process(es), particularly after a dispute arises.

All materials should be prepared in plain straightforward language. As a rule, such information should be in the same language as the principal contract for goods or services. *See, e.g., N.Y. Pers. Prop. Law* ' 427 (McKinney 1997). *See also Standards for Court-Connected Programs* ' 3.2.b., Commentary, at 3-4 (If a significant percentage of the population served is monolingual in a particular language, the material should be available in that language.)

<u>Practical Suggestions</u>

An example of a creative approach to providing information about Consumer ADR is provided by a major university medical center's Health Care Dispute Resolution Program. The medical center provides prospective patients with a written explanation of mediation and arbitration procedures for resolution of health care-related disputes one month before they visit the center to complete the remaining paperwork. As the written materials explain, the program is voluntary; patients are not required to opt for the procedures as a condition to receiving treatment. Patients may contact the center for additional information regarding the processes.

For purposes of allowing Consumers access to information about dispute resolution programs, the AAA makes available an 800 customer service telephone number. In addition, the AAA, like some other Independent ADR Institutions, also has a World Wide Web site; it posts its rules and an explanation of its mediation and arbitration procedures on the Web site.

A panel proposing reforms to a major HMO-sponsored arbitration system recommended the creation of an "ombudsperson program to assist members in navigating the system of dispute resolution." *Kaiser Permanente Review and Recommendations 2.43.*

**PRINCIPLE 3. INDEPENDENT AND IMPARTIAL NEUTRAL; INDEPENDENT ADMINISTRATION**

*1. Independent and Impartial Neutral. All parties are entitled to a Neutral who is independent and impartial.*

*2. Independent Administration. If participation in mediation or arbitration is mandatory, the procedure should be administered by an Independent ADR Institution. Administrative services should include the maintenance of a panel of prospective Neutrals, facilitation of Neutral selection, collection and distribution of Neutral's fees and expenses, oversight and implementation of ADR rules and procedures, and monitoring of Neutral qualifications, performance, and adherence to pertinent rules, procedures and ethical standards.*

*3. Standards for Neutrals. The Independent ADR Institution should make reasonable efforts to ensure that Neutrals understand and conform to pertinent ADR rules, procedures and ethical standards.*

*4. Selection of Neutrals. The Consumer and Provider should have an equal voice in the selection of Neutrals in connection with a specific dispute.*

*5. Disclosure and Disqualification. Beginning at the time of appointment, Neutrals should be required to disclose to the Independent ADR Institution any circumstance likely to affect impartiality, including any bias or financial or personal interest which might affect the result of the ADR proceeding, or any past or present relationship or experience with the parties or their representatives, including past ADR experiences. The Independent ADR Institution should communicate any such information to the parties and other Neutrals, if any. Upon objection of a party to continued service of the Neutral, the Independent ADR Institution should determine whether the Neutral should be disqualified and should inform the parties of its decision. The disclosure obligation of the Neutral and procedure for disqualification should continue throughout the period of appointment.*

<u>Reporter's Comments</u>

The concept of a fair, independent and impartial Neutral (or Neutral Panel) is enshrined in leading standards governing arbitration and mediation. *See Federal Arbitration Act* ' 10(a)(2); *Uniform Arbitration Act* ' 12(a)(2); *AAA Commercial Rules* 12, 13, 14, 19; *BBB Arbitration Rules* 6, 8. *The Joint Standards for Mediators* describe mediator impartiality as "central" to the mediation process and require mediators to conduct mediation in an impartial manner. *Joint Standards for Mediators*, Art. II; *Standards for Court-Connected Programs* ' 8.1.a. Similar policies animate standards requiring mediators to disclose conflicts of interest and to conduct the mediation in a fair manner. *Joint Standards for Mediators*, Arts. III, VI; *SPIDR Principles*, Principles 4.b., c., f.; 6.d., e., i.; *Standards for Court-Connected Programs* ' 8.1.b.

When Neutrals are appointed by a court or other organization, the appointing entity has an important obligation to ensure their impartiality. This obligation entails a reasonable level of oversight of Neutral performance. Comments to the *Joint Standards for Mediators* indicate that "[w]hen mediators are appointed by a court or institution, the appointing agency shall make reasonable efforts to ensure that mediators serve impartially." *Joint Standards for Mediators*, Art. II. The *Standards for Court-Connected Programs* therefore require courts to "adopt a code

of ethical standards for mediators [covering, among other things, impartiality and conflict of interest], together with procedures to handle violations of the code." *Standards for Court-Connected Programs* ' 8.1. For these and other reasons, the integrity and impartiality of the administrative organization is also important; the growing use of arbitration and mediation in the Consumer context has also raised issues regarding the administration of such processes. *See, e.g., Engalla v. Permanente Med. Grp.,* 928 P.2d 903 (Cal. 1997). *See generally* Edward Dauer, *Engalla's Legacy to Arbitration* , ADR Currents, Summer 1997, at 1; *Principles for ADR Provider Organizations* (setting forth general principles of responsible practice for ADR Provider Organizations, "entities which hold themselves out as offering, brokering or administering dispute resolution services").

In addition to appointing Neutrals, administering institutions often perform many functions which have a direct impact on the conduct of the dispute resolution process, including functions sometimes performed by Neutrals. The consensus of the Advisory Committee was that the reality and perception of impartiality and fairness was as essential in the case of Independent ADR Institutions as it was in the case of individual Neutrals. Thus, the Advisory Committee concluded that when an ADR Agreement mandates that parties resort to mediation or arbitration, the administering Independent ADR Institution should be independent of either party and impartial . *See, e.g., Kaiser Permanente Review and Recommendations 31* (recommending, first and foremost, the "creation of an independent, accountable administrator" for the Kaiser Permanente arbitration system to counter "perception of bias" raised by "self-administration"). *See also Principles for ADR Provider Organizations* (draft standards for organizations providing ADR services). For this and other reasons, this Principle may be the single most significant contribution of the Protocol. In the long term, moreover, the independence of administering institutions may be the greatest challenge of Consumer ADR.

Broad disclosure of actual or potential conflicts of interest on the part of prospective Neutrals is critical to the real and perceived fairness of ADR. Although consenting parties have considerable freedom to choose Neutrals, including those with experience in a particular industry or profession, the key to informed consent is broad disclosure by prospective Neutrals. Therefore, a long line of authority under federal and state arbitration statutes establishes the principle that an arbitrator's failure to disclose certain relationships or other facts which raise issues of partiality may result in reversal of an arbitration award. *See generally* III *Federal Arbitration Law* Ch. 28 (discussing legal and ethical rules governing arbitrator impartiality). The principle of disclosure is embodied in leading arbitration rules and ethical standards. *See AAA Commercial Rule* 19, *NASD Code* ' 10312; *BBB Arbitration Rules* 6, 8.

The *Joint Standards for Mediators* mandate disclosure of "all actual and potential conflicts of interest reasonably known to the mediator" including any "dealing or relationship that might create an impression of possible bias." *Joint Standards for Mediators*, Art. III. Thereafter, the mediator must await the parties' agreement to proceed with mediation. The same concerns require mediators to identify and avoid conflicts during (and even after) mediation. *Id. Cf. Employment Due Process Protocol* ' C.4. (mediators and arbitrators have a duty to disclose any relationship which might reasonably constitute or be perceived as a conflict of interest); *SPIDR Principles* , Principles 4.b., c., f.; 6.d.,e., i.; *Standards for Court-Connected Programs* ' 8.1.b.

Although they did not establish it as a requirement under these Principles, most members of the Advisory Committee endorsed the concept of a "list selection" process similar to that employed by the AAA. *See AAA Commercial Rule* 14. Under this process, the Independent ADR Institution provides each of the parties with lists of prospective Neutrals and invites the parties to identify and rank acceptable individuals. Mutually acceptable Neutrals are thereby identified. The AAA approach served as the model for other ADR standards. *See, e.g., Employment Due Process Protocol* ' C.3.; Securities Industry Conference on Arbitration, *List Selection Rule* (Final Draft, Sept. 18, 1997)(proposed by SICA as modification to Section 8 of the *Uniform Code of Arbitration* ); Proposed Rule Change by National Association of Securities Dealers, File No. SR-NASD097 (proposed by NASD as modification to Rules 10310 and 10311 of the NASD Code of Arbitration Procedure). The concern was expressed that the list selection approach may create a financial tie between Neutrals in the pool and Providers, who will be "repeat players" in the ADR Program. Such considerations may mandate, among other things, a larger panel of Neutrals, rotating assignments, or disclosure of past awards rendered by arbitrators.

In the interest of informed selection, the Advisory Committee recommends that parties be provided with or have access to some information regarding recent ADR proceedings conducted by prospective Neutrals. *Cf. Employment Due Process Protocol* ' B.3 (recommending that parties be provided with names, addresses, and phone numbers of party representatives in a prospective arbitrator's six most recent cases to aid in selection).

The dictates of fairness also extend to the conduct of ADR sessions. Thus, for example, arbitrators generally are forbidden from communicating with parties outside of hearings. *See* III *Federal Arbitration Law* ' 32.4. Similarly, standards for mediator conduct demand impartiality. *See, e.g., Standards for Court-Connected Programs* ' 8.1.

Although the rules and procedures of an ADR Program and oversight by the Independent ADR Institution are important in assuring the impartiality of Neutrals, it is also essential that Neutrals be bound to perform in accordance with recognized ethical standards. In the case of arbitrators, the leading ethical standard is the *Code of Ethics for Arbitrators in Commercial Disputes* (current version). Similarly, ethical standards governing mediator eligibility also require impartiality. *See, e.g., Standards for Court-Connected Programs* ' 8.1. It is the responsibility of the Independent ADR Institution to develop or adopt ethical standards for Neutrals and to ensure that Neutrals understand and conform to applicable standards.

Some arbitration procedures provide for a "tripartite" panel in which each party appoints its own "party-arbitrator," and the two party-arbitrators select a third arbitrator to complete the panel. *See generally* III *Federal Arbitration Law* ' 28.4; *see also* Alan Scott Rau, *Integrity in Private Judging*, 38 S. Tex. L. Rev. 485, 505-08 (1997)(noting problems with party-arbitrator concept). For a number of reasons, the Advisory Committee believed such practices should be avoided in the Consumer sphere, and that all arbitrators should be neutral. *Cf. Kaiser Permanente Review and Recommendations* 42 (expressing serious concerns regarding tripartite panel approach).

<u>Practical Suggestions</u>

Independent ADR Institutions should develop procedures which are appropriate to each of the ADR Programs they administer. A helpful model for program administrators is the User Advisory Committee now being utilized by the AAA to establish procedures and policies for ADR in the areas of employment, construction, health care, and other transactional settings. *Cf. Kaiser Permanente Review and Recommendations* 32 (recommending "on-going, volunteer Advisory Committee" comprised of representatives of various interest groups, including "an appropriate consumer advocacy organization" to consult in development of arbitration program). Such entities should provide a forum in which representatives of Consumers and Providers cooperate in the development and implementation of policies and procedures governing an ADR program, including selection of Neutrals.

For selection of Neutrals, the Independent ADR Institution might utilize a list procedure similar to that used by the AAA. The list of prospective Neutrals should include pertinent biographical information, including the names of parties and representatives involved in recent arbitration proceedings handled by the prospective Neutral. *Cf. Employment Due Process Protocol* ' B.3 (recommending that parties be provided with names, addresses, and phone numbers of party representatives in a prospective arbitrator's six most recent cases to aid in selection). Each party should be afforded discretion to reject any candidate with or without cause. Failing agreement on a Neutral or panel of Neutrals in this fashion, the Neutral should be appointed by the Independent ADR Institution, subject to objection for good cause.

## PRINCIPLE 4. QUALITY AND COMPETENCE OF NEUTRALS

*All parties are entitled to competent, qualified Neutrals. Independent ADR Institutions are responsible for establishing and maintaining standards for Neutrals in ADR Programs they administer.*

Reporter's Comments

Organizations providing ADR services for Consumer transactions should have a continuing obligation to monitor the quality of the services they provide. This obligation requires that they establish and maintain standards for Neutrals within the program which is appropriate to the issues or disputes being addressed. The SPIDR Commission on Qualifications calls upon private as well as public programs offering ADR services to set and monitor program performance. *See SPIDR Principles*, Principle 6, at 3-4. Likewise, the *Standards for Court-Connected Programs* call upon courts to "ensure that the mediation programs to which they refer cases are monitored adequately...and evaluated [periodically]." *Standards for Court-Connected Programs* ' 6.0.

The most critical element in ADR quality control is the establishment and maintenance of standards of competence for Neutrals within the program. "Competence" refers to "the acquisition of skills, knowledge and...other attributes" deemed necessary to assist others in resolving disputes in a particular setting. *See SPIDR Report on Qualifications* at 6. In 1989, the SPIDR Commission on Qualifications published a list of general skills and areas of knowledge that should be considered by groups establishing competency standards. *See SPIDR Principles*, Principle 11, at 4-7.

While ensuring the competence of Neutrals is always important, it is particularly "critical in contexts where party choice over the process, program or neutral is limited" a reality of many Consumer ADR programs. *See SPIDR Report on Qualifications* at 5; *SPIDR Principles*, Principle 3 at 2 (extent to which Neutral qualifications are mandated should vary by degree of choice parties have over dispute resolution process, ADR Program, and Neutral). The SPIDR Commission on Qualifications requires private programs to, among other things, establish clear criteria for the selection and evaluation of Neutrals and conduct periodic performance evaluations. *SPIDR Principles* at 3. *See also SPIDR Report on Qualifications* at 6 (Neutrals, professional associations, programs and Consumers should all have responsibility for addressing and assessing Neutral performance); American Bar Ass'n Young Lawyers Div. & Special Comm. On Alternative Means of Dispute Resolution, *Resolving Disputes: An Alternative Approach, A Handbook for Establishment of Dispute Settlement Centers* 32 (1983) (noting importance of post-mediation evaluation by administering agency).

The Advisory Committee concluded that it would be inappropriate (and, probably, impossible) to set forth a set of universally applicable qualifications for Neutrals in Consumer disputes. The Advisory Committee's conclusions parallel those of other groups establishing broad standards for the conduct of ADR. *See, e.g.*, *SPIDR Report on Qualifications; SPIDR Principles* at 1, 2. As the SPIDR Commission on Qualifications determined, Neutral qualifications are best established by joint efforts of concerned "stakeholders" in specific contexts. *See, e.g., Kaiser Permanente Review and Recommendations* 35-36 (recommending involvement of advisory committee in development of arbitrator qualifications).

It is important for Consumers to have a voice in establishing and maintaining standards of competence and quality in ADR programs. The SPIDR Commission on Qualifications recently observed that "consumers...share a responsibility with programs, [Neutrals]...and associations to join in evaluating and reporting on the performance of [Neutrals]...and programs and contributing to the development of policies and standards on qualifications." *SPIDR Report on Qualifications*, ' G.2. at 9. *See also SPIDR Principles*, Principle 2 at 2 (private entities making judgments about neutral qualifications should be guided by groups that include representatives of consumers of services). Although Neutral expertise is traditionally a hallmark of arbitration, technical or professional experience often carries with it the perception if not the reality of bias. From the Consumer's perspective, therefore, an arbitrator who shares the professional or commercial background of a Provider may not be the ideal judge. *See, e.g. , Broemmer v. Abortion Serv. of Phoenix* , 840 P.2d 1013 (Ariz. 1992)(adhesion arbitration agreement provided by abortion clinic which, among other things, required arbitrator to be a licensed obstetrician/gynecologist, was unenforceable as beyond reasonable expectations of patient).

An Independent ADR Institution's responsibility for the qualifications of Neutrals in a particular Consumer ADR program dictates the development of an appropriate training program. Ideally, the training should include a mentoring program with experienced Neutrals as well as coverage of applicable principles of Consumer law. *See* Mark E. Budnitz, *Arbitration of Disputes Between Consumers and Financial Institutions: A Serious Threat to Consumer Protection* , 10 Ohio St. J. on Disp. Res. 267, 315 (arbitrators need special legal expertise to address statutory issues respecting consumer claims against financial institutions). Successful completion of such

training should be reflected in the information on prospective Neutrals furnished to the parties prior to selection. *Cf. Employment Due Process Protocol* ' C.2.

The Advisory Committee generally supports the concept of broad choice in selection of Neutrals, and recognizes the right of Consumers and Providers to jointly select any Neutral in whom the parties have requisite trust, even one who does not possess all of the qualifications recommended by an ADR Program. *Cf. Employment Due Process Protocol* ' C.1.; *Standards for Court-Connected Programs* ' 13.4 ("Parties should have the widest possible latitude in selecting mediators, consistent with public policy."). This assumes, of course, that both parties have a true choice in the matter, that they are duly informed about the background and qualifications of the Neutrals proposed, and that all such Neutrals have made full disclosure of possible conflicts of interest in accordance with Principle 3.

<u>Practical Suggestions</u>

Elements of effective quality control include the establishment of standards for Neutrals, the development of a training program, and a program of ongoing performance evaluation and feedback. Because the requirements of parties will vary with the circumstances, it will be necessary to establish standards for Neutrals in an ADR Program with due regard for the specific needs of users of the program. As noted in connection with Principle 3, a helpful model for program administrators is the User Advisory Committee now being utilized by the AAA to establish procedures and policies for ADR in the areas of employment, construction, health care, and other transactional settings. Such entities could bring Consumer and Provider representatives together to assist in the development and implementation of programs to train, qualify and monitor the performance of Neutrals.

## PRINCIPLE 5. SMALL CLAIMS

*Consumer ADR Agreements should make it clear that all parties retain the right to seek relief in a small claims court for disputes or claims within the scope of its jurisdiction.*

<u>Reporter's Comments</u>

Disputes arising out of Consumer transactions often involve relatively small amounts of money. Such disputes may be well-suited to resolution by informal ADR processes and judicial small claims procedures.

Within the judicial system, the least expensive and most efficient alternative for resolution of claims for minor amounts of money often lies in small claims courts. These courts typically provide a convenient, less formal and relatively expeditious judicial forum for handling such disputes, and afford the benefit, where necessary, of the coercive powers of the judicial system. The Advisory Committee concluded that access to small claims tribunals is an important right of Consumers which should not be waived by a pre-dispute ADR Agreement.

Practical Suggestions

Because, for cases involving small amounts of money, parties retain the option of an oral hearing in small claims court, it may be reasonable for the ADR Agreement to provide for arbitration of small claims without a face-to-face hearing. Such alternatives may include "desk arbitration," which involves the making of an arbitration award based on written submissions; proceedings conducted by telephone or electronic data transmission; and other options. *See* Principle 12.

Mediation conducted by telephone conference call has also proven effective in resolving Consumer disputes. At least one major auto manufacturer has successfully used this technique to resolve warranty claims.

## PRINCIPLE 6. REASONABLE COST

*1. Reasonable Cost. Providers of goods and services should develop ADR programs which entail reasonable cost to Consumers based on the circumstances of the dispute, including, among other things, the size and nature of the claim, the nature of goods or services provided, and the ability of the Consumer to pay. In some cases, this may require the Provider to subsidize the process.*

*2. Handling of Payment. In the interest of ensuring fair and independent Neutrals, the making of fee arrangements and the payment of fees should be administered on a rational, equitable and consistent basis by the Independent ADR Institution.*

Reporter's Comments

A fundamental principle of our civil justice system is that a person should never be denied access to a court due to an inability to pay court costs. The reality is that the public justice system is heavily subsidized, and that users pay only a small fraction of the actual cost of trial and related procedures. Moreover, indigent litigants may be afforded relief from even these small fees. This principle has been extended in many cases to court-connected ADR programs, in which courts defray all or part of the expenses of mediation or court-connected arbitration. *See Standards for Court-Connected Programs*, " 5.1.a, 13.0 ("[c]ourts should impose mandatory attendance only when the cost of mediation is publicly funded"; "[c]ourts should make mediation available to parties regardless of the parties' ability to pay"). According to data from the National Center for State Courts' ADR database, approximately 60% of programs did not depend upon the parties to pay mediator fees for contract and tort cases; no programs charged user fees for mediation of small claims. *See Standards for Court-Connected Programs* ' 13.2., Commentary, at 13-4.

Similar policies have prompted various private ADR tribunals to institute mechanisms for waiving filing fees and other administrative expenses in appropriate cases. *See, e.g., NASD Code* ' 10332 (permitting Director of Arbitration to waive fees or deposits for parties in securities arbitration); *Nazon v. Shearson Lehman Bros., Inc.,* 832 F. Supp. 1540, 1543 (S.D. Fla. 1993)(employee, although required to bear expenses of pursuing civil rights claim in arbitration, might seek waiver of fees under NASD rules). One federal court of appeals recently concluded that to be enforceable with respect to actions under statutes governing employment discrimination, an arbitration agreement must not "require employees to pay either unreasonable

costs or any arbitrators' fees or expenses as a condition of access to the arbitration forum." *Cole v. Burns Int'l Security Serv.*, 105 F.3d 1465, 1482-84 (D.C. Cir. 1997).

Due to the wide range of transactions and the equally broad spectrum of conflict in the Consumer arena, it is inappropriate to mandate bright-line rules regarding ADR costs. In determining what is reasonable, consideration should be given to the nature of the conflict (including the size of monetary claims, if any), and the nature of goods or services provided. In some cases, it may be possible to fulfill the principle of reasonable cost by the use of the Internet, the telephone, other electronic media, or through written submissions. *See, e.g.,* Michael F. Altschul & Elizabeth S. Stong, *AAA Develops New Arbitration Rules to Resolve Wireless Disputes* , ADR Currents, Fall 1997, at 6. Abbreviated procedures may be particularly appropriate in the context of small monetary claims, where there is always the alternative of a face-to-face hearing in small claims court. *See* Principle 5.

In some cases, the need to ensure reasonable costs for the Consumer will require the Provider of goods or services to subsidize the costs of ADR which is mandated by the agreement. Indeed, many companies today deem it appropriate to pay most or all of the costs of ADR procedures for claims and disputes involving individual employees. *See* Mei L. Bickner, et al, *Developments in Employment Arbitration*, 52 Disp. Res. J. 8 (1997). The consensus of the Committee was that if participation in mediation is mandated by the ADR agreement, the Provider should pay the costs of the procedure, including mediator's fees and expenses. The Committee considered, and ultimately rejected, the alternative of establishing specific requirements for Provider subsidization of the cost of arbitration procedures, other than to conclude that the Provider of goods and services should ensure the consumer a basic minimum arbitration procedure appropriate to the circumstances.

In some cases, an arbitrator may find it appropriate to defray the cost of Consumer participation in arbitration by an award of costs. Some lemon laws provide for such relief. *See, e.g., Chrysler Corp. v. Maiocco* , 209 Conn. 579, 552 A.2d 1207 (1989)(applying Connecticut Lemon Law); *Walker v. General Motors Corp* ., 160 Misc.2d 903, 611 N.Y.S.2d 741 (1994)(applying provision of New York Lemon Law permitting "prevailing consumer" to receive award of attorney's fees); *General Motors Corp. v. Fischer* , 140 Misc.2d 243, 530 N.Y.S.2d 484 (1988)(same). In some cases, it may be appropriate for an arbitrator in a Consumer case to render an award of attorney's fees pursuant to statute or in other cases where a court might do so. Without such an award, however, the Committee does not support the proposition that Providers are required to subsidize Consumers' attorney's fees for ADR.

At the same time, there are legitimate concerns that having the Provider pay all or a substantial portion of neutral's fees and expenses may undermine the latter's impartiality. For this reason, as observed in the *Employment Due Process Protocol*, "[i]mpartiality is best assured by the parties sharing the fees and expenses of the mediator and arbitrator." *Employment Due Process Protocol* ' 6. *See also* Stephen J. Ware, *Arbitration and Unconscionability After* Doctor's Associates, Inc. v. Casarotto, 31 Wake Forest L. Rev. 1001, 1023 (1996). *But see* Alan Scott Rau, *Integrity in Private Judging*, 38 S. Tex. L. Rev. 485, 528 (1997). Therefore, the Advisory Committee concludes that Consumers should have the option to share up to half of the Neutral's fees and expenses. In addition, unless the parties agree otherwise after a dispute arises, the handling of fee

arrangements and the payment of fees should be conducted by the Independent ADR Institution. The latter, "by negotiating the parties' share of costs and collecting such fees, might be able to reduce the bias potential of disparate contributions by forwarding payment to the mediator and/or arbitrator without disclosing the parties' share therein ." *Employment Due Process Protocol* ' 6.

Some ADR Programs serving Consumers are staffed wholly or partly by unpaid volunteers. *See, e.g.*, *BBB Arbitration Rules* at 2. The use of such programs, including community dispute resolution centers, may be a satisfactory means of addressing cost concerns associated with Consumer ADR, particularly in cases involving low stakes. However, concerns have been expressed by some authorities regarding overdependence on volunteer Neutrals. *See Standards for Court-Connected Programs* ' 13.1, Commentary, at 13-2 (warning of dangers of exclusive reliance on volunteers in ADR programs). Care must be taken by those responsible for overseeing such programs to make certain that lower cost does not come at the expense of adequately qualified Neutrals.

Practical Suggestions

In the event that an ADR procedure is mandated by the Provider of goods and services and the Consumer demonstrates an inability to pay all or part of the costs of the procedure, the Provider should front such costs subject to allocation in the arbitration award or mediation settlement.

In some cases, it may be possible to fulfill the principle of reasonable cost by the use of the Internet, the telephone, other electronic media, or through written submissions. See, e.g., Michael F. Altschul & Elizabeth S. Stong, *AAA Develops New Arbitration Rules to Resolve Wireless Disputes* , ADR Currents, Fall 1997, at 6.

## PRINCIPLE 7. REASONABLY CONVENIENT LOCATION

*In the case of face-to-face proceedings, the proceedings should be conducted at a location which is reasonably convenient to both parties with due consideration of their ability to travel and other pertinent circumstances. If the parties are unable to agree on a location, the determination should be made by the Independent ADR Institution or by the Neutral.*

Reporter's Comments

The Advisory Committee concludes that ADR proceedings should take place at a location that is reasonably convenient to all parties.

Flexibility in choosing a hearing location is a theoretical advantage of consensual conflict resolution, permitting minimal cost and inconvenience to all parties. On the other hand, location terms may put one party at a great disadvantage, significantly increasing the cost and logistical complexity of dispute resolution. This is particularly true with regard to binding arbitration, which may involve the participation of multiple witnesses as well as the parties and their representatives. *See* III *Federal Arbitration Law* ' 32.8.3.

Typically, contractual agreements which provide that arbitration hearings will be conducted in a particular place are honored by the courts. *See, e.g., Management Recruiters Int'l, Inc. v. Bloor* , 129 F.3d 851 (6 th Cir. 1997)(under *Federal Arbitration Act* , forum expectations of parties in arbitration agreement are enforceable, and may not be upset by state law); *Bear Stearns & Co. v. Bennett* , 938 F.2d 31, 32 (2 nd Cir. 1991)(noting "prima facie validity" of forum-selection clauses, including those in arbitration agreements); *Snyder v. Smith* , 736 F.2d 409, 419 (7th Cir.), cert. denied, 469 U.S. 1037, 105 S. Ct. 513, 83 L. Ed.2d 403 (1984)(courts must give effect to freely-negotiated arbitration clause in commercial agreement). *See* II *Federal Arbitration Law* ' 24.2.3.4 (discussing *Federal Arbitration Act* ). *Cf. Carnival Cruise Lines, Inc. v. Shute* , 449 U.S.585,111 S.Ct. 1522, 113 L. Ed. 2d 622 (1991)(judicial forum selection clause in terms on cruise ship passenger ticket enforceable); *M/S Bremen v. Zapata Off-Shore Co.* , 407 U.S. 1, 92 S. Ct. 1907. 32 L.Ed.2d (1972)(judicial forum selection clause is prima facie valid and should be enforced unless enforcement is shown by the resisting party to be unreasonable under the circumstances).

The same is true of cases where the parties agree to a process for selecting location, such as that provided by the *AAA Rules. See, e.g., AAA Commercial Rule* 11. There is authority for pre-award challenges to location selection mechanisms. *Aerojet-General Corp. v. AAA* , 478 F.2d 248 (9th Cir. 1973)(pre-award judicial review appropriate where choice of arbitration locale not made in good faith and one or more parties are faced with severe irreparable injury). Again, however, such action is likely to be deemed appropriate only in extreme cases. *See Seguro de Servicio de Salud v. McAuto Systems* , 878 F.2d 5, 9 n.6 (1st Cir. 1989); *S.J. Groves & Sons Co. v. AAA* , 452 F. Supp. 121, 124 (D. Minn. 1978).

Some courts, however, have identified limits on locational designations in judicial forum selection provisions. *See* Mark E. Budnitz, *Arbitration of Disputes Between Consumers and Financial Institutions: A Serious Threat to Consumer Protection* , 10 Ohio St. J. on Disp. Res. 267, 292; David S. Schwartz, *Enforcing Small Print to Protect Big Business: Employee and Consumer Rights Claims in an Age of Compelled Arbitration* , 1997 Wis. L. Rev. 36, 121 n.366. Forum selection clauses may be overcome if it can be demonstrated that their incorporation in the contract was the result of fraud, undue influence, or an extreme disparity in bargaining power, or if the selected forum is so inconvenient that it would effectively deprive a party of a day in court. *See, e.g., Kubis & Persyk Assoc., Inc. v. Sun Microsystems, Inc* ., 146 N.J. 176, 188-97, 680 A.2d 618, 624-29 (1996)(reviewing cases and recognizing limits on enforceability of forum selection clauses); *Moses v. Business Card Expr., Inc* ., 929 F.2d 1131, 1136-39 (6 th Cir.), cert. denied, 502 U.S. 821, 112 S. Ct. 81, 116 L.Ed.2d 54 (1991)(in considering change of venue motion, forum selection clause must be considered along with convenience of parties and witnesses and overall fairness); *Hoffman v. Minuteman Press Int'l, Inc.,* 747 F. Supp. 552 (W.D. Mo. 1990)(denying venue change in accordance with forum selection agreement on basis of extreme hardship and alleged fraud in the inducement); *Cutter v. Scott & Fetzer Co* ., 510 F. Supp. 905, 908 (E.D. Wis. 1981)(refusing to enforce forum selection clause on basis of state Fair Dealership Law, and observing that clause was not the subject of negotiation). *See also Restatement (Second) of Conflict of Laws* ' 80 (1969)(agreement regarding place of action will be given effect unless it is unfair or unreasonable); Benjamin Levin & Richard Morrison, Kubis *and the Changing Landscape of Forum Selection Clauses,* 16 Franchise. L.J. 97 (1997)(discussing trend to limit enforceability of forum selection clauses in franchise agreements by statute and

case law); Donald B. Brenner, *There is a Developing Trend Among Courts of Making Choice of Forum Clauses in Franchise Agreements Presumptively Invalid* , 102 Com. L.J. 94 (1997)(same).

In the course of finding a judicial forum selection provision in a form franchise agreement presumptively invalid, the New Jersey Supreme Court recognized that the following factors may be relevant to enforceability: (1) whether the provision is the product of arm's length negotiations or is effectively imposed by a party with disproportionate bargaining power; and (2) whether the provision provides an "indirect benefit to...[the stronger party by making] litigation more costly and cumbersome for economically weaker...[parties] that often lack the sophistication and resources to litigate effectively a long distance from home." *Kubis* , 146 N.J. at 193-94, 680 A.2d at 626-27. *See also Model Choice of Forum Act* ' 3(4) Comment (1968)("A significant factor to be considered in determining whether there was an abuse of economic power or other unconscionable means' [sufficient to deny enforcement to a forum selection clause] is whether the choice of forum agreement was contained in an adhesion, or take-it-or-leave-it' contract.").

Such considerations may also affect the enforceability of an agreement to arbitrate. *See Patterson v. ITT Consumer Financial Corp.,* 14 Cal. App. 4 [th] , 1659, 18 Cal. Rptr.2d 563 (1993)(arbitration provisions in loan agreements requiring California consumers to arbitrate in Minnesota were unconscionable).

Similar concerns have led some states to enact laws placing geographical limitations on the situs of arbitration. *See, e.g.* , *Hambell v. Alphagraphics Franchising Inc.,* 779 F. Supp. 910 (E.D. Mich. 1991)(provision in franchise agreement for arbitration to take place outside state is void and unenforceable under Mich. Stat. Ann. ' 19.854(27)(f)(1984)); *Donmoor, Inc. v. Sturtevant* , 449 So.2d 869 (Fla. Ct. App. 1984)(clause in contract providing for arbitration in another state is unenforceable). Of course, such laws may be preempted by federal substantive law within the scope of the *Federal Arbitration Act* . *See* Levin & Morrison, *supra* , at 115-16.

In light of concerns such as the foregoing which are also relevant in the consumer arena, the Advisory Committee concluded that contractual ADR provisions should include a commitment to conduct ADR at a "reasonably convenient location." Some members of the Advisory Committee favored setting an arbitrary mileage limit (i.e. "no more than 50 miles from the place where the transaction occurred") while others advocated the nearest large city. Others pointed out that parties sometimes relocate. There was general agreement, however, that an agreed-upon process for independent determination of the locale if the parties fail to agree would be fair and equitable to both parties. *See, e.g., AAA Rule* 11; *Uniform Code of Arbitration* ' 9; *NASD Code of Arbitration Procedure* ' 10315. A similar function may be performed by the arbitrator or other duly appointed Neutral. (The *AAA Rules* already accord arbitrators the authority to set specific sites for arbitration hearings. *See AAA Rule* 21.)

In many cases, it may be possible to minimize the need for long distance travel and attendant expenses through the use of telephonic communications and submission of documents. An example of the application of such devices is the Expedited Procedures of the *AAA Rules* , which are generally applied to claims of $50,000 or less. *See AAA Rules* 9, 53-57. *See also Uniform Code of Arbitration* ' 2. Telephonic mediation has long been a feature of some lemon law

programs, and is currently being used in Consumer ADR by the National Futures Association (NFA). The National Association of Securities Dealers (NASD) is currently conducting a pilot program utilizing telephonic mediation.

Recent projects sponsored by the Better Business Bureau, the American Arbitration Association, and other organizations suggest the possibilities of online conflict resolution for online transactions as well as other kinds of disputes. *See generally* George H. Friedman, *Alternative Dispute Resolution and Emerging Online Technologies: Challenges and Opportunities*, 19 Hastings Comm. & Ent. L.J. 695 (1997).

If, as proposed, Consumers have the alternative of pursuing relief in a small claims court of competent jurisdiction, many concerns associated with long distance travel will be obviated with regard to small claims.

Practical Suggestions

Unless a convenient location can be specifically identified in the ADR agreement, the location should be left to the agreement of the parties after a dispute has arisen. The rules governing ADR under the agreement should establish a process for determination of the location by an independent party (such as a Neutral or the Independent ADR Institution) if the parties cannot agree on a location.

In some cases, it may be reasonable to conduct proceedings by telephone or electronic data transmission, with or without submission of documents. *See, e.g.,* Principle 12. Such options may be particularly desirable in the case of arbitration of small claims, since the parties have the choice of going to small claims court. *See* Principle 5.

**PRINCIPLE 8. REASONABLE TIME LIMITS**

*ADR proceedings should occur within a reasonable time, without undue delay. The rules governing ADR should establish specific reasonable time periods for each step in the ADR process and, where necessary, set forth default procedures in the event a party fails to participate in the process after reasonable notice.*

Reporter's Comments

A primary impetus for conflict resolution outside the court system is the potential for relatively speedy and efficient resolution of disputes. From the Consumer's perspective, moreover, the expectation of a reasonably prompt conclusion is likely to be, along with cost savings, the leading perceived advantage of consensual mediation or arbitration. *See Madden v. Kaiser Foundation Hospitals*, 17 Cal.3d 699, 711, 131 Cal. Rptr. 882, 552 P.2d 1178 (1976)(speed and economy of arbitration, in contrast to the expense and delay of jury trial, could prove helpful to all parties).

The principle of relatively prompt, efficient conflict resolution underlies standards governing the conduct of Neutrals. Mediators are admonished that "[a] quality process requires a commitment

by the mediator to diligence...." *Joint Standards for Mediators*, Art. VI. The *Joint Standards for Mediators* also comment that "[m]ediators should only accept cases when they can satisfy the reasonable expectations of the parties concerning the timing of the process." *Id.*

A basic requirement is that the rules governing ADR establish and further the basic principle of conflict resolution within a reasonable time. This means not only that the rules should set forth specific time periods for various steps in the ADR process, but that default rules come into play if a party fails to participate in the manner required by the rules after due notice. This principle is embodied in leading ADR standards, including the *AAA Commercial Rules. See, e.g.,* Rules 6, 8, 11, 13, 14, 15, 21, 35, 36, 41. *See also BBB Arbitration Rule* 27 ("BBB shall make every effort to obtain a final resolution of your complaint within 60 days, unless state or federal law provides otherwise. This time period may be extended at the request of the customer.").

Of course, it is not enough that the agreement places strict time limitations on procedural steps if these limitations are not effectively enforced a likely occurrence when an ADR Program is not independent of the Provider. Extreme disparity between stipulated time limits and actual practice under arbitration rules may render an arbitration agreement unenforceable, as discussed at length in a recent California Supreme Court decision. *See generally Engalla v. Permanente Med. Grp., Inc.,* 938 P.2d 903 (Cal. 1997). The court pointedly observed,

[M]any large institutional users of arbitration, including most health maintenance organizations (HMO's), avoid the potential problems of delay in the selection of arbitrators by contracting with neutral third party organizations, such as the American Arbitration Association (AAA). These organizations will then assume responsibility for administering the claim from the time the arbitration demand is filed, and will ensure the arbitrator or arbitrators are chosen in a timely manner.

*Id.* at 975-76. In response to this decision, Kaiser appointed an advisory panel to propose reforms to its arbitration program. *See Kaiser Permanente Review and Recommendations 33-34* (recommending establishment of and adherence to stated arbitration process deadlines).

Similarly, courts interpreting state lemon laws have acknowledged the right of Consumers to forgo arbitration and sue in court when the statutory period for the lemon law remedy elapsed without a remedy through no fault of their own. *See, e.g., Harrison v. Nissan Motor Corp.,* 111 F.3d 343 (3 [rd] Cir. 1997)(court suit permissible where BBB failed to conduct arbitration within stipulated period); *Ford Motor Co. v. Ward* , 577 So.2d 641 (1991)(Consumer not required to exhaust arbitration procedures before bringing suit where dealer made it impossible for Consumer to arbitrate).

Practical Suggestions

When a Consumer dispute involves a small amount of money and relatively straightforward issues, it is reasonable to assume that an out-of-court resolution of such issues should be relatively quick. In such cases, it may be appropriate to develop expedited procedures and to set outside time limits on ADR Processes. Thus, for example, "Fast Track" arbitration procedures for construction disputes provide that "[t]he arbitration shall be completed by settlement or

award within sixty (60) days of confirmation of the arbitrator's appointment, unless all parties agree otherwise or the arbitrator extends this time in extraordinary cases . . . ." *AAA Construction Procedures,* ' F-12. The rules also require the award to be rendered within seven days from the closing of the hearing. *See id.,* ' F-11.

Similarly, the *AAA Wireless Rules* set forth Fast Track procedures for matters involving less than $2,000 in claims or counterclaims. The Fast Track contemplates a "desk" arbitration procedure involving a hearing on documents; a limit of one seven-day extension on the time to respond to a claim or counterclaim; notice by telephone, electronic mail and other forms of electronic communication and by overnight mail, shortened time limits to select an arbitrator; no discovery except in extraordinary cases; a shortened time limit for rendition of award; and a time standard which sets a goal of 45 days from appointment of the arbitrator to award.

## PRINCIPLE 9. RIGHT TO REPRESENTATION

*All parties participating in processes in ADR Programs have the right, at their own expense, to be represented by a spokesperson of their own choosing. The ADR rules and procedures should so specify.*

Reporter's Comments

The right to be counseled by an attorney or other representative is an important one that is frequently reflected in standard rules governing ADR proceedings. *See, e.g.* , *AAA Commercial Rule* 22; *NASD Code* ' 10316; *BBB Arbitration Rule* 9.

The Advisory Committee adapted pertinent provisions of the *Employment Due Process Protocol* . *See Employment Due Process Protocol* ' B.1.

In the interest of full disclosure of potential conflicts of interest on the part of Neutrals, the Advisory Committee recommends that the names and affiliations of lawyers and other representatives of each party be communicated to prospective Neutrals and to all parties prior to selection of Neutrals.

As previously noted, the Advisory Committee recognizes that the cost of legal services should be borne by the parties who are receiving the services, and Providers should not be expected to subsidize the cost of legal representation for Consumers. There may, however, be situations where an arbitrator awards attorney's fees in circumstances where they would be available in court. *See* Commentary to Principle 6.

The Advisory Committee recognizes that the involvement of non-attorney representatives in some forms of binding arbitration has raised issues respecting the unauthorized practice of law. The Committee takes no position regarding these issues.

Practical Suggestions

Although the cost of legal services should be borne by the parties who are receiving the services, Independent ADR Institutions should provide Consumers with information regarding referral services and other institutions which might offer assistance in locating and securing competent spokespersons, such as bar associations, legal service associations, and Consumer organizations.

## PRINCIPLE 10. MEDIATION

*The use of mediation is strongly encouraged as an informal means of assisting parties in resolving their own disputes.*

Reporter's Comments

The increasing popularity of mediation has been a primary impetus for the revolution in conflict resolution approaches. Mediation describes a range of processes in which an impartial person helps disputing parties to communicate and to make voluntary, informed choices in an effort to resolve their dispute. The rapid growth of mediation may be attributed to its informality, flexibility, and emphasis on the particular needs of disputing parties. For this reason, mediation is uniquely adaptable to a wide spectrum of controversies.

The widespread use of mediation in court-connected programs inspired the development of a set of national standards for such endeavors. *See generally Standards for Court-Connected Programs.*

Parallel developments are occurring in the private sphere. Recently, the leading standard construction industry contract was modified to require mediation as an element in project conflict resolution, necessitating modification of related AAA rules. *See AAA Construction Procedures.*

Advisory Committee members agreed that mediation should be encouraged as a valuable intervention strategy, but differed as to the propriety and reasonableness of Provider-drafted ADR Agreements in Consumer contracts which require Consumers to participate in mediation. Those unopposed to such provisions, a majority of Advisory Committee members, noted that mediation offers significant potential advantages and relatively few risks to participants. Particularly where the Provider subsidizes mediation, they reasoned, the prospective benefits to Consumers far outweigh the costs. Those expressing concerns regarding "mandatory" mediation adhere to the view that the choice to participate in settlement discussions should be made voluntarily, and only after conflict arises. Other concerns relate to the cost of mediation, the quality of mediators, the likelihood that not all disputes will be appropriate for mediation, and the lack of understanding of mediation processes (including an understanding of the role of the neutral intervener) on the part of many Consumers. *Cf. Standards for Court-Connected Programs* ' 5.0 (courts should impose mandatory attendance in court-connected mediation only when the cost of mediation is publicly funded, the mediation program is of high quality, and other requirements are met); *SPIDR Report on Court-Mandated ADR* at 2-3.

Encouragement of the use of mediation involves, among other things, educating Consumers and their attorneys about the process. *See* Principle 2 "Access to Information Regarding ADR

Program." *See also SPIDR Principles* at 6 ("It is the responsibility of...private programs offering dispute resolution services to define clearly the services they provide...[and provide information about the program and neutrals to the parties.]"). At a minimum, Consumers should be provided with (or have immediate access to) written information to explain mediation. As a rule, such information should be in the same language as the principal contract for goods or services. *Cf. Standards for Court-Connected Programs* ' 3.2.b., Commentary, at 3-4 (If a significant percentage of the population served is non-English-speaking, the material should be available in other languages as well.) *See* Principle 2.

Education of users should also include some treatment of the distinctive styles and strategies employed by mediators. Today, mediators handling commercial disputes sometimes employ a facilitative, non-directive approach to problem-solving; in other situations, a more directive approach may be employed. *See generally* Leonard L. Riskin, *Understanding Mediators' Orientations, Strategies, and Techniques: A Grid for the Perplexed*, 1 Harv. Negotiation L. Rev. 7 (1996)(providing a graphic tool for analyzing mediator approaches). Participants need to decide in advance of selection the approach they want a mediator to adopt. The Independent ADR Institution should advise the parties regarding the possibility of interviewing prospective mediators regarding qualifications and style, and help to arrange such interviews.

Practical Suggestions

As referenced in Principle 5, mediation conducted by telephone conference call has proven to be an effective, economical method of resolving Consumer disputes where in-person mediation may not be feasible.

**SPECIAL PROVISIONS RELATING TO BINDING ARBITRATION**

**PRINCIPLE 11. AGREEMENTS TO ARBITRATE**

*Consumers should be given:*

    a.  *clear and adequate notice of the arbitration provision and its consequences, including a statement of its mandatory or optional character;*

    b.  *reasonable access to information regarding the arbitration process, including basic distinctions between arbitration and court proceedings, related costs, and advice as to where they may obtain more complete information regarding arbitration procedures and arbitrator rosters;*

    c.  *notice of the option to make use of applicable small claims court procedures as an alternative to binding arbitration in appropriate cases; and,*

    d.  *a clear statement of the means by which the Consumer may exercise the option (if any) to submit disputes to arbitration or to court process.*

Reporter's Comments

In convening the Advisory Committee which developed this Protocol, the AAA requested that the Committee focus its attention upon due process standards for the conduct of Consumer ADR processes and not directly address the process of forming an agreement to mediate or to arbitrate. Committee deliberations revealed a range of opinions regarding the use of pre-dispute binding arbitration agreements in Consumer contracts. Without taking a position on the appropriateness of such agreements, the Committee developed Principle 11 with the intended purpose of

providing guidance to the AAA and similar Independent ADR Institutions in the development of specific arbitration programs within the context of existing law enforcing pre-dispute arbitration agreements. Within this context, Principle 11 emphasizes the importance of knowing, informed assent to arbitration agreements.

<u>Practical Suggestions</u>

Consumers should have clear and adequate notice of the arbitration provision and basic information regarding the process at the time of assent. The appropriate method of giving notice and providing essential information will vary with the circumstances. For example, electronic transactions involving software licensure agreements require different notice procedures than face-to-face negotiations or paper transactions. In all cases, however, there should be some form of conspicuous notice of the agreement to arbitrate and its basic consequences (including comparison to court process, cost information, etc.). In addition, the Consumer should be given the opportunity to acquire additional information regarding the arbitration process. The latter might be obtainable through a mail or Web site address, an 800 number or other means for Consumers to obtain additional information regarding arbitration rules and procedures (such as a brochure available on request).

The following is an example of a possible notice. Ideally, the "notice box" would be sufficiently prominent in the contract document or electronic record so that a Consumer would readily notice it.

| **NOTICE OF ARBITRATION AGREEMENT:** |
|---|
| This agreement provides that all disputes between you and [PROVIDER] will be resolved by <u>BINDING ARBITRATION</u> .<br><br>You thus GIVE UP YOUR RIGHT TO GO TO COURT to assert or defend your rights under this contract (EXCEPT for matters that may be taken to SMALL CLAIMS COURT).<br><br>*Your rights will be determined by a NEUTRAL ARBITRATOR and NOT a judge or jury.<br><br>* You are entitled to a <u>FAIR HEARING</u> , BUT the arbitration procedures are <u>SIMPLER AND MORE LIMITED</u> THAN RULES APPLICABLE IN COURT.<br><br>*Arbitrator decisions are as enforceable as any court order and are subject to <u>VERY LIMITED REVIEW</u> BY A COURT.<br><br><u>FOR MORE DETAILS</u> ,<br><br>*Review Section 6.2 above, OR<br><br>* Check our Arbitration Web Site @ ACMEADR.COM, OR<br><br>* Call 1-800-000-0000 |

Among other things, Consumers should have access to information regarding the initiation of the arbitration process. This may be accomplished, for example, by providing customers with a brochure outlining relevant arbitration procedures. If the Consumer has the option of choosing between arbitration or court process, either at the time of contracting or after disputes have arisen, the timing and means of electing the option should also be clearly stated in the notice.

## PRINCIPLE 12. ARBITRATION HEARINGS

*1. Fundamentally-Fair Hearing. All parties are entitled to a fundamentally-fair arbitration hearing. This requires adequate notice of hearings and an opportunity to be heard and to present relevant evidence to impartial decision- makers. In some cases, such as some small claims, the requirement of fundamental fairness may be met by hearings conducted by electronic or telephonic means or by a submission of documents. However, the Neutral should have discretionary authority to require a face-to-face hearing upon the request of a party.*

*2. Confidentiality in Arbitration. Consistent with general expectations of privacy in arbitration hearings, the arbitrator should make reasonable efforts to maintain the privacy of the hearing to the extent permitted by applicable law. The arbitrator should also carefully consider claims of privilege and confidentiality when addressing evidentiary issues.*

Reporter's Comments

There is universal agreement that parties to arbitration are entitled to a "fundamentally-fair hearing." *See* III *Federal Arbitration Law* ' 32.3.1.1. The language of subsection 1 closely follows the definition of a "fundamentally-fair hearing" set forth in *Bowles Financial Grp., Inc. v. Stifel, Nicolaus & Co* ., 22 F.3d 1010, 1013 (10 [th] Cir. 1994)(applying the *Federal Arbitration Act* ). Beyond these basic requirements, of course, "[a]rbitration need not follow all the niceties of...courts." *Grovner v. Georgia-Pacific Corp*., 625 F.2d 1289, 1290 (5 [th] Cir. 1980). Moreover, the arbitrators have great leeway in conducting hearings, within the bounds of the parties' agreement. *See Federal Arbitration Law, supra*, " 32.1., 32.3.1.1.

Although authority is split on whether or not parties are guaranteed a face-to-face hearing before the arbitrators, *see id.* , the Advisory Committee concluded that while in some circumstances fundamental fairness may require a face-to-face hearing, in other cases the requirement may be satisfied by telephonic or electronic communications or submissions of documents. *See, e.g.* , *Construction Arbitration Procedures* ' F-9. *See, e.g.,* Michael F. Altschul & Elizabeth S. Stong, *AAA Develops New Arbitration Rules to Resolve Wireless Disputes* , ADR Currents, Fall 1997, at 6. In small claims cases, the requirement of these Principles that parties retain the option of going to small claims court may make it reasonable for the ADR agreement to provide alternatives to a face-to-face hearing.

Although confidentiality of hearings may be considered an advantage of arbitration, there is no absolute guarantee of confidentiality. *See id.* , ' 32.6.1. Unlike court proceedings, however, the general public has no right to attend arbitration proceedings; if the parties agree, moreover, attendance at hearings may be severely restricted. *See, e.g.*, *AAA Commercial Rule* 25 (directing arbitrators to "maintain the privacy of the hearings unless the law provides to the contrary").

Likewise, arbitrators should be mindful of evidentiary privileges and confidentiality rights available to its parties under applicable law and have discretion to issue protective orders respecting such rights.

The Advisory Committee recognized the dilemma posed by the tension between the desire for confidentiality in arbitration and the need to provide Consumers access to information regarding arbitrators and sponsoring Independent ADR Institutions, including case statistics, data on recent arbitrations and other pertinent information. *See, e.g.,* Alan Scott Rau, *Integrity in Private Judging* , 38 S. Tex. L. Rev. 485, 524-26 (1997)(discussing concerns with "asymmetry of information" regarding arbitrators when one party is an institutional "repeat player," and suggesting need for increased disclosure of information regarding past decisions by an arbitrator); Mark E. Budnitz, *Arbitration of Disputes Between Consumers and Financial Institutions: A Serious Threat to Consumer Protection* , 10 Ohio St. J. on Disp. Res. 267, 293 (discussing disparity between "repeat players" and consumers with regard to knowledge of prospective arbitrators). Although the Advisory Committee did not address this issue, it recommends that the matter be the focus of serious study by the Committee or a similar advisory group, supported by appropriate independent research efforts.

Practical Suggestions

Because these Principles provide that parties should retain the option of an oral hearing in small claims court (Principle 5), it may be reasonable for the ADR agreement to provide other means for small claims arbitration. Such alternatives may include a "desk arbitration" involving a decision on written submissions, participation in proceedings by telephone or electronic data transmission, and other options.

As is generally the case in commercial arbitration, arbitrators may undertake reasonable means to protect the privacy of the hearing.

## PRINCIPLE 13. ACCESS TO INFORMATION

*No party should ever be denied the right to a fundamentally-fair process due to an inability to obtain information material to a dispute. Consumer ADR agreements which provide for binding arbitration should establish procedures for arbitrator-supervised exchange of information prior to arbitration, bearing in mind the expedited nature of arbitration.*

Reporter's Comments

It is understood that ADR sometimes represents a tradeoff between the concept of full discovery associated with court procedures and the efficiencies associated with minimal pretrial process. A hallmark of binding arbitration is the avoidance of the cost and delay associated with extensive pre-hearing discovery. *See* III *Federal Arbitration Law* ' 34.1. In recent years, however, the notion that arbitration means little or no discovery has moderated due to the widening range of cases submitted to arbitration and the increasing recognition that at least some pre-hearing exchange of information may be necessary and appropriate to meet the due process rights of participants and may in some cases reduce the overall length of the process. *See id.* , Ch. 34. *See*

*also* Mark E. Budnitz, *Arbitration of Disputes Between Consumers and Financial Institutions: A Serious Threat to Consumer Protection,* 10 Ohio St. J. on Disp. Res. 267, 283-84, 311, 314 (arguing that limits on discovery in arbitration hamper consumer claimants).

Addressing statutory disputes arising out of employment relationships, the *Employment Due Process Protocol* states that "[a]dequate but limited pre-trial discovery is to be encouraged and employees [and their representatives] should have access to all information reasonably relevant to mediation and/or arbitration of their claims." *Employment Due Process Protocol* ' B.3. The Committee supports the concept of limiting the exchange of information as much as possible while ensuring that Consumers and Providers each have access to information that is legally obtainable and relevant to their case. In most cases, this means that pre-hearing information exchange will consist of an exchange of documents as directed by the arbitrator, identification of witnesses and a summary of their expected testimony. Arbitrators should have the authority to require additional discovery when necessary, such as requiring the deposition of witnesses unable to appear at the hearing in order to preserve their testimony.

Although information exchange issues which cannot be handled by the agreement of the parties should generally be left to the discretion of the arbitrator, it may be appropriate for advisory groups (including adequate consumer representation) to develop guidelines for information exchange in specific kinds of cases. *See, e.g.,* National Association of Securities Dealers, National Arbitration and Mediation Committee, *Report of the Drafting Subcommittee on The Discovery Guide* , Dec. 3, 1997 Draft.

Some Advisory Committee members also expressed concern about the forced production of privileged documents, and argued that arbitrators should be required to observe established privileges such as the attorney-client privilege and work-product privilege. *See* James H. Carter, *The Attorney-Client Privilege and Arbitration,* ADR Currents, Winter 1996-97, 1. As stated in Principle 12, arbitrators should "carefully consider claims of privilege and confidentiality when addressing evidentiary issues." Such protections may be addressed in the arbitration agreement (including incorporated arbitration procedures), and should be thoroughly treated, along with information exchange issues, in arbitrator training programs.

Practical Suggestions

In many cases, issues relating to information exchange may be addressed by the arbitrator(s) at a preliminary conference. *See, e.g., AAA Wireless Rules* " R-9, R-10. Some rules require that all exhibits be exchanged a certain number of days prior to hearings. *See id.,* R-10.

## PRINCIPLE 14. ARBITRAL REMEDIES

*The arbitrator should be empowered to grant whatever relief would be available in court under law or in equity.*

Reporter's Comments

As a general rule, arbitrators have broad authority to fashion relief appropriate to the circumstances. *See* III *Federal Arbitration Law* ' 36.1.1. Their discretion is limited only by the agreement of the parties and the scope of the submission to arbitration. *See id.,* ' 36.1.2.

There are, however, a number of issues respecting the ability of arbitrators to award certain remedies which would be available in court. For example, although the trend under federal and state law is to acknowledge the authority of arbitrators to award punitive damages, a few state courts still take the opposing view. *See generally Federal Arbitration Law* , *supra* , ' 36.3; Thomas J. Stipanowich, *Punitive Damages and the Consumerization of Arbitration,* 92 Nw. U. L. Rev. 1 (1998). And although courts may award attorney's fees where permitted by statute or by agreement of the parties, or where a party acts vexatiously or in bad faith, there is conflicting authority regarding the ability of arbitrators to take similar action. *See generally Federal Arbitration Law* , *supra* , ' 36.8.

This provision incorporates language similar to that contained in the *Employment Due Process Protocol*, ' C.5. The intent is to make clear that arbitrators deriving their authority from Consumer contracts should enjoy the same authority courts have to fashion relief, including awarding attorney's fees and punitive damages in appropriate cases.

Contractual limitations of damages may limit the authority of arbitrators in the same fashion that they limit judicial remedies. It is possible that an award of damages in excess of a contractual limit would be vacated under pertinent statutory standards or common law principles. *See, e.g., FAA* ' 10(a)(4). *But see* Stipanowich, *Punitive Damages, supra,* at 33-36 (discussing public policy limitations on pre-dispute caps on punitive damages).

## PRINCIPLE 15. ARBITRATION AWARDS

1. *Final and Binding Award; Limited Scope of Review. If provided in the agreement to arbitrate, the arbitrator's award should be final and binding, but subject to review in accordance with applicable statutes governing arbitration awards.*
2. *Standards to Guide Arbitrator Decision-Making. In making the award, the arbitrator should apply any identified, pertinent contract terms, statutes and legal precedents.*
3. *Explanation of Award. At the timely request of either party, the arbitrator should provide a brief written explanation of the basis for the award. To facilitate such requests, the arbitrator should discuss the matter with the parties prior to the arbitration hearing.*

Reporter's Comments

Review of arbitration awards is very limited under modern arbitration statutes. Courts are very reluctant to vacate awards, or to second-guess the decisions of arbitrators on matters of procedure or substance. *See generally* IV *Federal Arbitration Law*, ch. 40. "Arbitrators can misconstrue contracts, make erroneous decisions of fact, and misapply law, all without having their awards vacated." *See id.*, ' 40.6.1. While some members of the Advisory Committee expressed concerns regarding the current state of the law, it was generally agreed that finality was a primary objective of arbitration and that it would be inappropriate to recommend more rigorous judicial review for Consumer arbitration awards than for other arbitration awards. At the same time, however, the Advisory Committee concluded that the rules should specifically direct arbitrators to follow pertinent contract terms and legal principles. This requirement may have implications for qualifications and training of Neutrals pursuant to Principle 4.

Leading modern arbitration statutes do not require arbitrators to provide a written explanation or give reasons for their awards. *See generally* III *Federal Arbitration Law* ' 37.4.1. Similarly, some leading commercial arbitration rules do not require findings of fact or conclusions of law. *See, e.g., AAA Commercial Rules*. Those supporting "bare" awards argue that a written rationale will make it more likely that courts will inquire into the merits of the award, contrary to policies of finality underlying modern statutes. They also observe that not being required to write an opinion simplifies the arbitral task and permits multi-member arbitration panels, like juries, to agree on a decision without concurring on a rationale. *See id.*

On the other hand, some other commercial arbitration rules call for a statement of the underlying rationale. *See, e.g., CPR Rules for Non-administered Arbitration of Business Disputes*, Rule 13.2. Those supporting awards with written rationales argue that a written rationale encourages more disciplined decision-making and enhances party satisfaction with the result. *See* Alan Scott Rau, *Integrity in Private Judging*, 38 S. Tex. L. Rev. 485, 529-39 (1997)(offering arguments in favor of "reasoned" awards). After considering the pros and cons of "reasoned " awards, the Advisory Committee concluded that arbitrators of Consumer disputes should provide at least a brief written explanation if requested to do so by any party.

As noted in the Comments accompanying Principle 12, the Advisory Committee recognized the dilemma posed by the tension between the desire for confidentiality in arbitration (including information regarding arbitration awards) and the need to provide Consumers access to information regarding arbitrators and sponsoring Independent ADR Institutions, including case statistics, data on recent arbitrations and other pertinent information. Although the Advisory Committee did not address this issue, it recommends that the matter be the focus of serious study by the Advisory Committee or a similar advisory group, supported by appropriate independent research efforts.

Practical Suggestions

To facilitate requests for reasoned awards, the arbitrator should raise the issue with the parties prior to the arbitration hearing. The matter should be addressed at the preliminary conference if one is conducted.

A DUE PROCESS PROTOCOL FOR MEDIATION AND ARBITRATION OF CONSUMER DISPUTES

Dated: April 17, 1998

Some of the signatories to this Protocol were designated by their respective organizations, but the Protocol reflects their personal views and should not be construed as representing the policy of the designating organizations.

The Honorable Winslow Christian          Ken McEldowney
*Co-chair*                               Executive Director
Justice (Retired)                        Consumer Action
California Court of Appeal

William N. Miller
*Co-chair*
Director of the ADR Unit
Office of Consumer Affairs
Virginia Division of Consumer Protection
Designated by National Association of
Consumer Agency Administrators

David B. Adcock
Office of the University Counsel
Duke University

Steven G. Gallagher
Senior Vice President
American Arbitration Association

Michael F. Hoellering
General Counsel
American Arbitration Association

J. Clark Kelso
Director
Institute for Legislative Practice
University of the Pacific
McGeorge School of Law

Elaine Kolish
Associate Director
Division of Enforcement
Bureau of Consumer Protection
Federal Trade Commission

Robert Marotta
Wolcott, Rivers, Wheary, Basnight & Kelly,
P.C.
Formerly Office of the General Counsel
General Motors Corporation

Robert E. Meade
Senior Vice President
American Arbitration Association

Michelle Meier
Former Counsel for Government Affairs
Consumers Union

Anita B. Metzen
Executive Director
American Council on Consumer Interests

James A. Newell
Associate General Counsel
Freddie Mac

Shirley F. Sarna
Assistant Attorney General-In-Charge
Consumer Frauds and Protection Bureau
Office of the Attorney General
State of New York
Designated by National Association
of Attorneys General

Daniel C. Smith
Vice President and Deputy General Counsel
Fannie Mae

Terry L. Trantina
Member
Ravin, Sarasohn, Cook, Baumgarten, Fisch &
Rosen, P.C.
Formerly General Attorney
AT&T Corp.

Deborah M. Zuckerman
Staff Attorney
Litigation Unit
American Association of Retired Persons

Thomas Stipanowich
*Academic Reporter*
W.L. Matthews Professor of Law
University of Kentucky College of Law

JA 219

- [AAA MISSION & PRINCIPLES](#)
- [PRIVACY POLICY](#)
- [TERMS OF USE](#)
- [TECHNICAL RECOMMENDATIONS](#)
- ©2007 AMERICAN ARBITRATION ASSOCIATION. ALL RIGHTS RESERVED

# EXHIBIT G

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| **BETRAM HIRSCH and IGOR** | § | |
| **ROMANOV, individually and on behalf** | § | |
| **Of all Others Similarly Situated** | § | |
| | § | **Case No. 12 Civ. 1124 (DAB)** |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **ECF Case** |
| | § | |
| **CITIBANK, N.A.,** | § | |
| | § | |
| **Defendant** | § | |

## AFFIDAVIT OF JOSEPH E. MATRANGA IN SUPPORT OF

## PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO

## COMPEL ARBITRATION AND STAY THE ACTION

I, JOSEPH E. MATRANGA, declare and state under penalty of perjury as follows:

1.      I am a legally competent adult and have personal knowledge of the following facts and if called upon I could and would competently testify to the matters stated herein.  As to those matters stated on information and belief, I believe them to be true.

2.      I have been continuously licensed as a certified public accountant in the State of California and in good standing since 1985.  I am also a principal of Matranga & Company, a certified public accounting firm located in San Diego, California. Our firm has a broad business and personal tax practice, which includes tax planning, tax return preparation and representation of taxpayers in IRS audit proceedings (as a non-lawyer). Our firm also has a significant audit practice for non-public companies.

1

3.    I serve on the Board of Directors for a community bank located in San Diego, California.  As such, I am familiar with the tax rules and regulations particular to banking institutions such as Citibank.

4.    I have been asked by the Plaintiffs in this case to serve as a consultant and potentially as an expert with respect to the accounting and tax issues facing the parties as result of Citibank's mileage award program. My rate to do so is $300.00 per hour with an initial retainer of $3,000.00.

5.    To determine whether the amount stated in each 1099 was proper (if even proper at all), I would have to evaluate Citibank's methodology for determining market value of the mileage award through discovery and deposition review, review their publicly filed financial statements, compare it with the auditor's work papers and perhaps conduct research.  I would also need to prepare an analysis on the value of mileage awards through other accepted methodologies. The bulk of the work would involve an analysis of Citibank's methodology.

6.    The total cost to do this could range from $10,000 - $15,000, perhaps more depending on the volume of discovery produced in the case.

7.    Because the bulk of the work would involve an analysis of Citibank's methodology, it is certainly the type of work that could benefit more than one dissatisfied consumer.  It also seems impractical, if not cost prohibitive, for one consumer to incur the costs of the required analysis needed to challenge Citibank's valuation methodology.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed this 16th day of April, 2012 in San Diego, California.

Dated: ___4/16/12___

_____
JOSEPH E. MATRANGA, CPA

dckghirc

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x
 3   BELTRAM HIRSCH, et al.,
 4                  Plaintiffs,
 5          v.                              12 CV 1124(DAB)(JLC)
 6   CITIBANK, N.A.,
 7                  Defendant.
 8   ------------------------------x
                                           New York, N.Y.
 9                                         December 20, 2013
                                           9:30 a.m.
10
     Before:
11
                         HON. JAMES L. COTT,
12
                                           Magistrate Judge
13
                             APPEARANCES
14
     SCHOENGOLD & SPORN, P.C.
15        Attorney for Plaintiffs
     SAMUEL SPORN
16          -and-
     THE LAW OFFICES OF JAMES C. KELLY
17        Attorney for Plaintiffs Beltram Hirsch and Igor Romanov
18   STROOCK STROOCK & LAVAN, LLP
          Attorney for Defendant Citibank, N.A.
19   JOSEPH STRAUSS
20
21
22
23
24
25
```

```
 1              (Case called)

 2              THE COURT:  My time is somewhat limited this morning

 3    because I'm on criminal duty, to let you know.  We'll need to

 4    conclude these proceedings by 10:00.  You have about 25 minutes

 5    and I hope that's sufficient.  Maybe we won't even need all of

 6    that time.

 7              I'm hopeful that you've worked out a lot of the issues

 8    that were identified.  Tell me what I can do to help.

 9              MR. SPORN:  We actually had a deposition yesterday.

10    We had a meet-and-confer, so we narrowed issues.  I know you

11    had a lot of paperwork.

12              THE COURT:  I read it all, but can you tell me today

13    what's still open and then we'll figure out how to resolve it.

14              MR. SPORN:  We have fixed certain dates with different

15    people, and we are together on one witness, a Ms. Jacqueline

16    Sarah.  I offered an hour because she's a working lady.  I hope

17    that's okay with Mr. Strauss if we'll do an hour.

18              MR. STRAUSS:  I suggested it be telephonic.

19              MR. SPORN:  We need to see her.  I'll do an hour, if

20    that's good, we'll do it.

21              THE COURT:  It sounds like the meet-and-confer is

22    continuing.

23              MR. SPORN:  I have another idea.  We're going out

24    January 6 to do Mr. Ashley; he is no longer with the company.

25    He was a customer financial analyst who is a critical person.
```

```
 1              THE COURT:  Is he the one who is in California now?

 2              MR. SPORN:  No.

 3              THE COURT:  He's here.

 4              MR. STRAUSS:  He's in Great, Neck New York.

 5              MR. SPORN:  He's in Great Neck.  Mr. Strauss said the

 6    witness will be available in Great Neck, and we will go to

 7    Great Neck and to do his deposition. so, on January 6, maybe

 8    we'll take Ms. Sarah's deposition for an hour.

 9              MR. STRAUSS:  I have to check on her availability.

10              MR. SPORN:  Okay.

11              MR. STRAUSS:  Plus, at this point, I'm not going to

12    agree to produce her because I still don't think you have

13    adequately supported it.

14              THE COURT:  Why do you think she's a relevant witness,

15    so I can understand that.  Your clients say they had an

16    interaction with her?

17              MR. SPORN:  Exactly.

18              THE COURT:  You said if it was necessary, you'd

19    produce an affidavit, but the time it would take to produce an

20    affidavit would probably be as long as making her available for

21    an hour.

22              MR. STRAUSS:  I guess, but the real issue is she

23    doesn't have any recollection of ever dealing with plaintiff.

24              THE COURT:  It will be a waste of an hour, but it's

25    only an hour.
```

[Transcript 4]    JA 226

```
1              MR. STRAUSS:  I know.  According to them, the
2    plaintiff first spoke to her about the issuance of 1099 forms,
3    and it's our position that that's irrelevant.
4              If she had spoken to him regarding the opening of his
5    account, that might be another story, but she has no
6    recollection of ever dealing with the plaintiff.  Even if she
7    did, any discussion about the 1099 forms would be completely
8    irrelevant.  Even as to that hour, it's still a waste of time
9    in our opinion.
10             MR. SPORN:  It's very essential.  Your Honor got
11   background from this case.  You know this is a promotional deal
12   by Citibank.  You come in, you put $25,000 down, and they give
13   you 20,000 mileage.
14             Key to this whole situation is unknown to the clients,
15   they got a 1099.  Nowhere in the literature anywhere was there
16   a 1099.  So, that's what actually sparked the case of
17   Mr. Hirsch and Romanov.
18             Mr. Hirsch actually went and spoke to yesterday's
19   client, Ms. Vivian Safa, and she was also at the same branch.
20   It's very important what the discussion was about their
21   so-called 1099 obligation.  It's very critical in the case.
22             THE COURT:  What does the 1099 obligation have to do
23   with what notice, if any, your clients had with respect to
24   arbitration, because that's the threshold issue, at least as I
25   read the Second Circuit decision and what I understand Judge
```

```
 1      Batts is going to have a hearing about is that there's a

 2      threshold issue about whether you should be in this court or

 3      whether you should be arbitrating, right?

 4              MR. SPORN:  Exactly.

 5              THE COURT:  The discovery you're involved in now

 6      really focused on that, right?

 7              MR. SPORN:  Yes.

 8              THE COURT:  Tell me what the 1099 has to do with that.

 9              MR. SPORN:  The 1099 is part of the deal, the

10      arrangement that a customer goes in, makes a relation.

11              We all know that the bank has an obligation to its

12      customer and vice versa.  They have rights and obligations.

13      So, it's the usual opening up of an account.

14              One of the documents which is key in this case is what

15      they call a client manual.  It is not an agreement.  It is a

16      client manual and it's 45 pages.

17              The defense says under standard operating procedure,

18      that is one of the documents we give to the customer.  That's

19      strongly denied by both of the plaintiffs.  They deny ever

20      getting this document.

21              On pages 44 and 45, there's a clause that says you are

22      waiving either party can decide to waive a right to trial by

23      jury, they waive their right to participate in a class action,

24      and they will go to small claims court.  Nowhere was that

25      discussed.  Yesterday, Ms. Safa, who is a customer
```

1    representative at this point, she didn't even know what the

2    word "arbitration" meant.  The point is, it's all relevant.

3           One more thing, your Honor.  In the last page of the

4    summary of the mandamus from the Court, it's in there that they

5    raise as a defense certain benefits that they gave to the

6    client.  And they use a, quote, "estoppel argument."  On page

7    four of the mandamus, it's in there that that's an issue that

8    is to be tried.

9           THE COURT:  Right.  The way I read that, though,

10   that's a merits issue to be tried, as opposed to the

11   should-the-matter-be-arbitrated-or-not issue, and that's a

12   separate issue.  In other words, I read the Second Circuit's

13   decision in the section you're talking about where it summarize

14   it's summarizing the estoppel argument, among other things, on

15   page four into five and creating another issue of fact –- let

16   me just finish –- that strikes me as not a subject that Judge

17   Batts is going to be opining on at her hearing.

18          MR. SPORN:  No, I don't agree with you, your Honor.

19   You see, it's part of one transaction.  A customer goes in and

20   there are certain material nondisclosures that's in the opinion

21   itself.  And on page four, the Court says that's one of the

22   issues, not the issue, to be tried, the issues to be tried

23   citing the *Bensadoun* case, and that's an issue that needs to be

24   discussed.

25          There is one other thing I should add.

1           THE COURT:  Can I interrupt because, again, as I say,

2     my time is limited.  I don't think we should spend so much time

3     about whether this should be a one-hour deposition.  The worst

4     case scenario is it's irrelevant to the ultimate cause, so take

5     one hour of this person's deposition and no more.

6           MR. SPORN:  That's fine.  One other thing, if I may.

7           THE COURT:  Hold on a second.

8           MR. STRAUSS:  I have to get a word in some time.

9           THE COURT:  Hold on a second.  The issue before the

10    Court is should you get an hour of this person.  My ruling is

11    yes, you get an hour; no more than that.

12          What's the next issue for the Court to decide today?

13          MR. SPORN:  The next issue is where we diverge.

14          We have gotten certain documents just last week.  We,

15    pursuant to Rule 26, have sent to the defendants in the middle

16    of October our Rule 26.  Defendants have not responded to that

17    at all.  They have just neglected to do it.

18          I have gone through this mandamus order.  There is

19    nothing in there about merits.  There is no word in that whole

20    document as to merit, nor did Judge Batts say anything about

21    merits.

22          THE COURT:  You think everything is fair game and

23    discovery should proceed as usual?

24          MR. SPORN:  No, not at all.

25          MR. STRAUSS:  Your Honor, that's exactly what he's

dckghirc

1    arguing.

2         MR. SPORN:  I'm not.  What's very critical here is the

3    triggering point of this case where the 1099 came to the

4    client, the client goes back to Citibank, to Great Neck, and

5    speaks to the people that we just talked about, the one-hour

6    deal.  The other person has, just this morning, been told to us

7    that he's available on January 6 to be deposed, so we're good

8    on that.  We're very clear.  That is a key person to be

9    deposed.

10        It's very critical as to what documents, if any, this

11   witness, Mr. Ashley, gave to the plaintiff.  There's a dispute

12   as to what document he got, whether that constitutes an

13   agreement or not, and whether there was any discussion of,

14   quote, "arbitration."

15        THE COURT:  What hasn't been produced pursuant to your

16   request that you believe you need for the Ashley deposition?

17        MR. SPORN:  Here it is, for Ashley:  The customer goes

18   into the bank, makes the complaint about the 1099.  We have

19   just gotten two days ago a letter from Citibank saying they

20   have looked into it, and there's a Nancy Chan who has

21   represented as disclosed the promotional offer was reviewed

22   with our legal and corporate tax documents.

23        THE COURT:  Hold on a second.

24        The issue Judge Batts has to decide at her hearing is

25   whether this case should be arbitrated or not, correct?

1              MR. SPORN:  Correct.

2              THE COURT:  So, what benefits or not your clients got

3    has nothing to do with that discrete threshold almost

4    jurisdictional-like question, correct?

5              MR. SPORN:  Partially.

6              THE COURT:  What's incorrect about that?  Be very

7    precise.

8              MR. SPORN:  Yes.  What's incorrect is that, quote, the

9    client manual which is 45 pages is a threshold between an

10   arbitration by defendants and this issue before the Court.  It

11   is a question whether that document constitutes part of the

12   agreement.  We say no; they say yes.

13             THE COURT:  What does that have to do with what hasn't

14   yet been produced to you?  I'm in the business of making

15   decisions about specific disputes.

16             You started off this session about the fact that you

17   have made certain document requests to which you have not

18   gotten responses.

19             My question to you, to which I have not yet gotten an

20   answer, is what documents has Citibank not yet produced to you

21   that you believe you need for the hearing in January before

22   Judge Batts?  That's my question.  Then you started making a

23   speech about something.

24             Tell me what documents in your request – identify

25   them – they haven't responded to.

1          MR. SPORN:  We have asked for a bunch of documents.

2     They have refused to give us any documents relating to the 1099

3     tax forms.

4          THE COURT:  What does that have to do with the

5     question of arbitrability?

6          MR. SPORN:  Here it is:  When the customer is before

7     the account representative, they have a duty to disclose in

8     making a deal if there's an arrangement between the parties.

9     It's a material nondisclosure.  And the question is where is an

10    agreement to arbitrate?  They claim it's in a client manual,

11    which is buried somewhere.

12         THE COURT:  What haven't they produced that you want?

13         MR. SPORN:  There is, right in this paper.

14         THE COURT:  Tell me what is the number of the document

15    request and what it asks for.

16         MR. SPORN:  Here it is:  It's 140 and 141 where they

17    say we have checked with our legal and corporate, and they say

18    we have to give you a 1099.

19         MR. STRAUSS:  That document only involves the issuance

20    of the 1099 tax forms.  That is completely irrelevant.  That

21    goes to the merits of their substantive claims.  This is a

22    motion to compel arbitration.  The issues as to the merits are

23    not discoverable.

24         THE COURT:  They're not yet discoverable to be

25    precise.

[Transcript 11]   JA 233

1          MR. STRAUSS:  Yes, they're not discoverable until we

2    go to arbitration.  We're dealing with limited discovery here.

3          THE COURT:  Hold on a second.  You might not go to

4    arbitration.

5          MR. STRAUSS:  Then we proceed to discovery.

6          THE COURT:  That's what I'm saying; they're not yet

7    discoverable.

8          MR. STRAUSS:  As of right now, the Second Circuit

9    reversed Judge Batts' decision denying the motion to compel

10   arbitration, remanded the case to Judge Batts, and now we're

11   engaging in limited discovery.

12         They're using the limited discovery ordered by

13   Judge Batts as a guise to get full-blown discovery as to the

14   merits of the case.  Every time you ask him about that

15   document, he tries to tie it back to the client manual.  It has

16   nothing to do with the client manual.

17         The issue before Judge Batts is whether the client

18   manual was provided to the plaintiffs where the plaintiffs

19   were -- on inquiring notice regarding the client manual.  Those

20   are the limited issues for discovery.

21         Most of the discovery requests, we haven't objected to

22   all of them.  Some of them are okay because they deal with

23   those limited issues, but others go to the misrepresentations

24   as to the taxability of airline miles, the issuance of the 1099

25   forms, the valuation of the airline miles; those are their

1    claims in this case.  The merits of this case are not subject

2    to discovery.  At this juncture, we are dealing with a limited

3    issue.

4           It's hard for me to believe that Judge Batts ordered

5    full-blown discovery as to the merits on November 25 to be

6    completed by January 10.  She didn't do it; she didn't say

7    that.

8           In this circuit, there's only limited discovery as to

9    arbitrability on a motion to compel arbitration.  You don't get

10   full-blown discovery as to the merits.

11          THE COURT:  Mr. Sporn, third and last time:  What

12   specific documents, identify them, do you believe have not been

13   produced that you believe are needed for your presentation to

14   Judge Batts at the hearing in January?

15          MR. SPORN:  Yesterday at the deposition of Ms. Safa --

16          THE COURT:  Hold on.  You are already starting by not

17   being responsive.

18          The responsive answer is, Judge, on page whatever of

19   our document request, number such and such, this is what we're

20   asking for and they haven't produced it.

21          MR. KELLY:  I have it.

22          THE COURT:  I don't want to hear about yesterday's

23   deposition, and we have ten minutes to go.

24          MR. KELLY:  The request for production number one, all

25   documents related to American Airlines miles between Citibank

1   Hirsch and Romanov as described in the complaint, including any

2   correspondence between Citibank, Hirsch and Romanov.

3            THE COURT:  You're reading very fast for me, and I'm

4   sure very fast for the court reporter.

5            MR. SPORN:  I think what this goes to is the estoppel

6   argument.

7            They're arguing they are estopped from claiming the

8   arbitration agreement because they received benefits.  They

9   produced interest that they received.  We're saying they didn't

10  get benefits.  They moved all of this money, they took this

11  time to open this account with the expectation they were

12  receiving these airline miles.

13           THE COURT:  The issue is, what notice, if any, your

14  clients had at the time they opened this account, that if there

15  were disputes, whether they would be arbitrated or not.  That's

16  the issue, correct?  It has nothing to do with what the

17  benefits they got by opening the account are.

18           How does the benefits have anything to do with it?

19           MR. SPORN:  That's in the mandate.  That's one of the

20  issues, an estoppel argument.

21           THE COURT:  I don't read the Second Circuit summary

22  order the way you are reading it.  The way I read it is as

23  follows:

24           On page two, it says, "The defendant appeals from the

25  district court's decision denying its motion to compel

1   arbitration after concluding that the agreement to arbitrate

2   was not binding on the parties as the signature cards signed by

3   appellees upon opening Citibank deposit accounts fail

4   sufficiently to reference the document containing the

5   arbitration provision."

6           Then the next paragraph says, "Citibank contends that

7   the district court erred," and it says why.

8           Then you go to the next page, page three, and the

9   holding of this order is, "We hold the district court erred in

10  concluding that the signature cards did not sufficiently

11  incorporate by reference the client manual without deciding

12  whether Citibank provided Hirsch and Romanov with the client

13  manuals when they opened their accounts."

14          Thus, what follows from that statement is that your

15  hearing before Judge Batts is going to address the question of

16  whether Citibank provided Hirsch and Romanov with the client

17  manuals when they opened their accounts, and discovery related

18  to that subject is entirely fair game.

19          Going forward in that same paragraph, it says, "On

20  remand, the Court should decide whether Citibank provided

21  appellants -- " but it should say appellees " -- with the

22  client manuals."  That's the issue that they are defining for

23  Judge Batts to have the hearing she has said she's going to

24  have.

25          "In deciding this factual issue, the Court should

1    consider whether Citibank fulfilled its burden of proof in

2    demonstrating a corporate policy requiring a provision of the

3    client manual," hence your right desire to have a 30(b)(6)

4    witness who will address the question of whether there was and

5    what was, if any, the corporate policy requiring the provision

6    of the client manual, all entirely fair game and within the

7    context of what the Second Circuit has said; then it says "and

8    whether appellants -- " they mean appellees, " -- actually

9    received a copy of the client manual," that's all fair game.

10   That, to my way of thinking, ends what the purpose of the

11   hearing is.

12          Now, you're saying but, Judge, we have dicta, because

13   it's clearly dicta, which says we note these certain things,

14   and then it talks about alternatively Citibank's contention

15   about equitable estoppel, and they say that's an issue of fact,

16   as well.  And you're saying, Judge, that's totally fair game

17   for the hearing, too.  I respectfully disagree.

18          I don't think that's what they intend by this.  I

19   think they're just saying there are a lot of issues here.

20   That's how I read it.  I don't read it that this equitable

21   estoppel argument is one that's going to be coming before Judge

22   Batts.

23          Are you pressing your equitable estoppel argument at

24   the hearing in January?  If you are, then maybe that changes

25   things.

dckghirc

1          MR. STRAUSS:  Probably not, but the point on the

2     equitable estoppel is, by entering into the agreement governing

3     their accounts, plaintiffs received benefits, interest in the

4     administration of the service of their accounts.

5          We don't argue that one of the benefits is these

6     airline miles.  They're the ones trying to use this estoppel

7     argument to try to tie in the airline's promotional offer and

8     whatever benefits they received as a result of receiving the

9     airline miles.  They're the ones trying to do that.  It's a

10    very crafty, creative argument to try to get full-blown merits

11    discovery through this estoppel argument.

12          Even if it is considered by Judge Batts, it's just

13    limited to the fact that they received interest and the

14    servicing in the administration of their accounts.

15          THE COURT:  What are you willing to stipulate to for

16    purposes of a hearing about this which might create more

17    boundaries around what proper discovery is, if anything?

18          MR. STRAUSS:  If we're willing, we'll stipulate to the

19    fact that they received interest and their accounts were

20    administered and serviced by Citibank.  As far as I'm

21    concerned, that's it.  That's the estoppel argument.

22          The estoppel argument is a very minor argument.  It's

23    not even really on the table.  The main point of this is what

24    your Honor has said.

25          THE COURT:  Right.  Well, how about making it even

1    easier for Judge Batts, which is saying for purposes of the

2    hearing, the estoppel issue is not something that's going to be

3    presented?

4            MR. STRAUSS:  That's fine, your Honor.

5            THE COURT:  No estoppel, no discovery related to

6    estoppel.

7            MR. STRAUSS:  It seems like that's muddying the

8    waters.

9            THE COURT:  I think so, too.  I don't think, with

10   respect, that the Second Circuit anticipates Judge Batts having

11   a hearing in which estoppel is going to be front and center,

12   even secondary.  I don't think that's what it's about.  I think

13   she has to expand what she looked at beyond what she looked at

14   initially and then decide whether your clients had notice or

15   not.

16           If she thinks they did not, then you're going to be

17   back in this court litigating full-blown merits discovery.  If

18   she finds that, not just on the incorporation theory but on

19   something else, they had sufficient notice, then you're going

20   to be in arbitration.  And you'll still get merits discovery,

21   albeit in the context of arbitration.

22           You're not going to be shut down, but the question is,

23   what's the right, narrow path to walk on; that's what I'm

24   trying to define with you all.  But now you have on the record

25   a representation from counsel that estoppel is going to be out

1    of your hearing, so I think that simplifies things.

2            What else is left to resolve today?

3            MR. SPORN:  The other thing is we indicated that we

4    want Nancy Chan, the woman who was involved in this whole

5    discussion as to whether our client received the so-called

6    client manual.

7            MR. STRAUSS:  Nancy Chan --

8            MR. SPORN:  Hear me out.

9            THE COURT:  Sit down, Mr. Strauss, for a second.

10           MR. SPORN:  I just want to say it came out.  She

11   responds to our client, and she is now explaining why there's a

12   connection between this document, which is the crux.

13           THE COURT:  This document being what?

14           MR. SPORN:  This is the client manual.  It is not an

15   agreement.  It says "client manual," it's 45 pages and it's

16   folded like this.

17           The issue that Judge Batts had is saying you cannot

18   take this 45-page document and at 44 say, yes, you have agreed

19   to waive all of your Constitutional rights, federal and state.

20   Now, that was the issue before Judge Batts.

21           We believe that the discovery should proceed to show

22   that this is not a document that could be binding on this

23   plaintiff; therefore, when this woman answers our client and

24   then says --

25           THE COURT:  Mr. Sporn, I'm going to cut you off

1   because we're running out of time.

2           You want Ms. Chan's deposition?

3           MR. SPORN:  Yes.

4           THE COURT:  Yes or no?

5           MR. STRAUSS:  No.  That letter has absolutely nothing

6   to do with the client manual.  That letter is in response to

7   his disagreement with the issuance of the 1099 form.

8           THE COURT:  Can I see it, please.

9           MR. SPORN:  Yes.

10          MR. STRAUSS:  He is contesting the 1099 form; that

11  goes to the merits.

12          Ms. Chan had absolutely nothing to do with opening the

13  accounts, providing the client manual to the plaintiffs.  She

14  had absolutely nothing to do with the client manual, the

15  opening of the accounts.  She had nothing to do with Plaintiff

16  Hirsch.  She had nothing to do with Plaintiff Romanov.

17          That letter is in response to his complaint about the

18  issuance of the 1099 forms.  Guess what?  That's what they

19  allege in their complaint.  They're complaining about the

20  issuance of the 1099 forms.  That is exactly the type of

21  full-blown discovery that is impermissible.

22          THE COURT:  Give me a moment to look at this.

23          MR. STRAUSS:  You'll notice there is absolutely no

24  mention of the client manual in that letter.  I don't

25  understand how he's trying to make that connection.

dckghirc

1             THE COURT:  Mr. Sporn, how would this document be

2    marked into evidence at the hearing before Judge Batts with

3    respect to the question of arbitrability?

4             MR. SPORN:  Because it bears on the issue of what the

5    customer financial person gave to the client at the opening of

6    the account, and the document was received, and how there was

7    alleged notice of a so-called agreement to arbitrate, and that

8    becomes part of the whole issue where I believe the Second

9    Circuit was very clear.  They wanted more; not less.  They

10   wanted us to give further evidence.

11            I don't see how this is prejudicial to defendant.

12            THE COURT:  There is nothing in this letter whatsoever

13   about the client manual.  It's not mentioned.  There's nothing

14   whatsoever in this letter about the interaction Mr. Hirsch had

15   with whoever at the bank assisted with his opening this

16   account.  I don't see how this particular piece of

17   correspondence would be admissible at the hearing that Judge

18   Batts is contemplating having.

19            MR. SPORN:  Here it is, your Honor:  The document

20   becomes germane to the question of what notice, if any, our

21   client had.  It becomes germane.

22            He's complaining that he's getting a 1099 from left

23   field.  He has no idea of it.  He makes the complaint.  The

24   client says they have an internal procedure where they have a

25   checklist and they're supposed to check off what they gave to

 1  the client.  Our client says no; they say yes.

 2          In your first page, your Honor, that you read from the

 3  Second Circuit, they have the SOP, standard operating

 4  procedure, and that was the other person we required, Joan

 5  Haslam, who gave her testimony before the Second Circuit.  We

 6  need to depose her.  She has made representations.

 7          THE COURT:  You're getting a 30(b)(6) witness.  You're

 8  getting the two people at the Great Neck branch.  It sounds to

 9  me like you're getting everything you need.  It sounds like

10  this is going to be cumulative, repetitive, and duplicative.

11          MR. SPORN:  No.

12          THE COURT:  By the way, we're out of time because,

13  with respect, Mr. Sporn, you're rather long-winded and you

14  never really respond to questions when they're asked.

15          MR. SPORN:  Okay.

16          THE COURT:  Now we're off on another tangent, which is

17  you've just identified another person.

18          MR. SPORN:  That's our last item.  Very simple.  She

19  was the --

20          THE COURT:  Who is "she."

21          MR. SPORN:  Joan Haslam put the document before the

22  Second Circuit.  That was their SOP person.  And that was an

23  issue in the Second Circuit's opinion.

24          THE COURT:  Hold on a minute.  You're getting a

25  30(b)(6) witness, correct?

**[Transcript 22]   JA 244**

1        MR. SPORN:  Yes, but it's not Joan Haslam.

2        THE COURT:  What difference does it make who it is?

3    They have to decide who they think has knowledge.  That's not

4    for you to decide.  You don't get to tell them who their

5    30(b)(6) witness is.

6        MR. SPORN:  She comes from nowhere.

7        THE COURT:  "She" who?

8        MR. SPORN:  Joan Haslam participate in this before.

9        THE COURT:  I don't even know who she is.

10        MR. SPORN:  She's an "A" in the appendix.

11        MR. STRAUSS:  She's not a fact witness.  She did not

12    participate.

13        THE COURT:  Why don't you both talk together; that's

14    really helpful for the court reporter.

15        MR. STRAUSS:  I'm sorry about that.

16        MR. SPORN:  She's an essential part of the record

17    before the Second Circuit, and we need her.

18        THE COURT:  Have you asked Mr. Strauss for her?

19        MR. SPORN:  I did.  He denied it.  He said you can't

20    have her.

21        THE COURT:  Who is she?

22        MR. STRAUSS:  She's a vice-president at Citibank.  She

23    is not a fact witness.  Her testimony is about Citibank's

24    policies and procedures regarding the provisions of the client

25    manual to customers at the time they open their accounts.

1    She's not a fact witness.  She had nothing to do with

2    this.  She did not participate in this at all.  That testimony

3    is going to be exactly the same as the 30(b)(6) witness that we

4    have agreed to produce.

5    THE COURT:  And who is that?

6    MR. STRAUSS:  Nancy Lewis, the vice-president at

7    Citibank.

8    THE COURT:  I don't understand what Ms. Haslam has to

9    offer that Ms. Lewis won't have to offer.

10    MR. SPORN:  She made representations in the appendix,

11    which I have right here.  I can show it to you.  She made

12    certain misrepresentations to the Second Circuit, and we have

13    to challenge her on what the SOP is.

14    THE COURT:  Hold on a second.  You have someone who

15    submitted some declaration in the circuit that wasn't in the

16    district court?

17    MR. STRAUSS:  No.

18    THE COURT:  Ms. Haslam had some submission before

19    Judge Batts as part of your motion to compel?

20    MR. STRAUSS:  We submitted a declaration of Joan

21    Haslam to Judge Batts.  In that declaration, she attached the

22    business records of Citibank.  She attached the client manual.

23    She attached the marketplace addendum.  She set forth the

24    facts.

25    THE COURT:  And everything that she submitted to the

1    Court is going to be fair game for plaintiff's counsel to ask

2    Ms. Lewis about in the 30(b)(6) deposition.

3              MR. STRAUSS:  Exactly.

4              MR. SPORN:  Here it is.

5              THE COURT:  I don't think it matters that it was her.

6    Citibank is Citibank, especially when it's a 30(b)(6)

7    deposition.

8              Whoever is identified is going to bind Citibank, okay?

9    Whatever testimony they give, it is binding to Citibank.  So,

10   any and all questions that you want to ask Ms. Lewis about

11   Ms. Haslam's submission before Judge Batts is entirely fair

12   game, and you should do that.

13             MR. SPORN:  I have no problem.

14             THE COURT:  I don't see why you get Ms. Haslam instead

15   of Ms. Lewis.  You don't get them both.

16             MR. SPORN:  Because she was the person they used for

17   their evidence before the Second Circuit.  It's right here on

18   the appendix.

19             THE COURT:  I'm unmoved.  Overruled.

20             Is there anything else?

21             MR. SPORN:  That's all.

22             THE COURT:  All right.

23             MR. STRAUSS:  I assume before we segue to Haslam's

24   letter, the Ms. Chan letter --

25             THE COURT:  Right.  I'm not directing Ms. Chan be

**[Transcript 25]  JA 247**

 1   produced either for purposes of a hearing.  I don't see

 2   anything in that letter, which is what plaintiff's counsel

 3   handed up, as a basis for her deposition.

 4         The correspondence here doesn't have anything to do

 5   with the limited discovery that I think is appropriate based on

 6   my understanding of the hearing Judge Batts is holding.

 7         MR. SPORN:  We sent out a notice for Ms. Haslam.  He

 8   rejected it.  It may be when we do Ms. Lewis deposition, she

 9   has no knowledge, but then we'd want to come back to you and

10   ask about that because she is the person before the Second

11   Circuit.  She made certain things about the notice, the

12   so-called manual.

13         THE COURT:  You should ask every single question that

14   you have characterized as a misrepresentation of Ms. Lewis at

15   the 30(b)(6) deposition.  And if you find that she is

16   unqualified for some reason to have served as a 30(b)(6)

17   witness and you can't work it out with Mr. Strauss, then you

18   can renew your application.

19         MR. SPORN:  Thank you, your Honor.  That will satisfy

20   us.

21         THE COURT:  Is there anything else today?

22         MR. SPORN:  That's enough.  Thank you for your

23   patience.

24         THE COURT:  Mr. Strauss, anything else?

25         MR. STRAUSS:  No, your Honor.

dckghirc

1          THE COURT:  Have a good holiday.

2          (Adjourned)

**JA 249**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------- X
                                                 ::

BERTRAM HIRSCH and IGOR ROMANOV, on     :
behalf of themselves and all others similarly situated, :
                                                 :

                       Plaintiffs,         :       Case No. 12 Civ. 1124 (DAB)
                                                 :
        vs.                              :

CITIBANK, N.A.,                           :
                                                   :
                       Defendant.         :
------------------------------------------------------------- X

## RESPONSES AND OBJECTIONS OF DEFENDANT
## CITIBANK, N.A. TO PLAINTIFFS' FIRST SET OF INTERROGATORIES

    Defendant Citibank, N.A. ("Citibank"), by its attorneys Stroock & Stroock & Lavan LLP,

hereby responds and objects (the "Responses"), pursuant to Rule 33 of the Federal Rules of Civil

Procedure, to Plaintiffs' First Set of Interrogatories (the "Interrogatories") as follows:

## PRELIMINARY STATEMENT

    Citibank responds to the Interrogatories based upon the investigation conducted in the

time available since service of the Interrogatories. The Responses are based on information now

known to Citibank and that Citibank believes to be relevant to the subject matter covered by the

Interrogatories. In the future, Citibank may acquire additional information, or discover

information currently in its possession, bearing on the Interrogatories and Citibank's Responses

thereto. Citibank reserves the right: (1) to make subsequent revisions, supplements or

amendments to these Responses based on any information, evidence, documents and/or facts and

things which may be subsequently discovered, or the relevance of which may be subsequently

discovered; and (2) to produce, introduce or rely on additional or subsequently acquired or

discovered information, documents or evidence at trial or in any pretrial proceedings in this

action. Citibank incorporates this Preliminary Statement into each Response as if fully set forth therein.

## GENERAL OBJECTIONS

1.     The following General Objections form a part of, and are hereby incorporated in, the Specific Responses to the Interrogatories set forth below. Nothing in these Responses should be construed as a waiver of any of these General Objections.

2.     Citibank objects to the Interrogatories to the extent they seek information or documents that exceed the scope of permissible discovery authorized by the Court's Order dated November 25, 2013 (the "Order"), and as authorized by the rulings made by Magistrate Judge Cott at the December 20, 2013 hearing ("December 20, 2013 hearing").

3.     Citibank objects to the Interrogatories to the extent they seek information or documents that are neither relevant nor reasonably calculated to lead to the discovery of admissible evidence in this action.

4.     Citibank objects to the Interrogatories to the extent they seek identification and/or production of information or documents that are not within Citibank's possession, custody or control.

5.     Citibank objects to the Interrogatories to the extent they impose on Citibank obligations inconsistent with or greater than those set forth in the Federal Rules of Civil Procedure and/or the Local Rules of the Court.

6.     Citibank objects to the Interrogatories to the extent they seek confidential and proprietary business information and/or documents that belong to Citibank. Citibank will not produce any such information and/or documents without the execution by the parties, and entry by the Court, of an appropriation Stipulation Regarding Confidentiality and Protective Order.

7.      Citibank objects to the Interrogatories to the extent they call for documents in which parties and/or non-parties have a legitimate expectation or right of privacy pursuant to constitutional, statutory or case law.

8.      Citibank objects to the Interrogatories to the extent they are vague, ambiguous, overbroad, unduly burdensome, or in any way seek information beyond the scope of discovery permitted by the Federal Rules of Civil Procedure or Local Rules of the Court.

9.      Citibank objects to the Interrogatories to the extent they call for the production of information or documents that are subject to the attorney-client privilege, constitute trial preparation or work product material, or are otherwise privileged or protected from discovery. Inadvertent identification or production of such information or documents shall not constitute a waiver of any privilege with respect to the subject matter thereof, and shall not waive the right of Citibank to object to the use of any such information or documents contained therein during any subsequent proceeding.

10.     Citibank objects to the Interrogatories to the extent they call for the production of information or documents equally available to Plaintiffs or presently in the possession of Plaintiffs.

11.     Citibank objects to the Interrogatories to the extent they are not limited to a time period relevant to the events at issue in this action.

12.     Citibank objects to the definition of "Citibank" and the "Company." Citibank responds to the Interrogatories only for itself.

13.     Citibank objects to the definition of "Client Manual" to the extent it implies that the Client Manual provided to Plaintiffs is not a valid, binding and enforceable agreement governing Plaintiffs' accounts with Citibank that are the subject of this action.

14. Citibank objects to the definition of "American Airline Miles Offers" on the grounds that it is vague and ambiguous.

## SPECIFIC RESPONSES AND OBJECTIONS

<u>Interrogatory No. 1</u>

State the name of the managers of the Citibank branches at the time that Plaintiffs opened up the Citibank accounts that are described in the Complaint, and state the names of the representatives that met with Plaintiffs to open up their accounts, and specifically state whether said Citibank personnel know and/or recall that Clients' Manuals were physically delivered and accepted by the Plaintiffs in this action at the time of opening said accounts.

<u>Response No. 1</u>

In addition to the General Objections, Citibank objects to this Interrogatory on the grounds, among others, that: (i) it is vague and ambiguous, including as to the term "accepted"; (ii) it is compound and/or has subparts; (iii) it is overbroad and unduly burdensome; (iv) it seeks information that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence in this action; and (v) it seeks a legal conclusion.

Subject to, and without waiving the foregoing objections, Citibank responds to this Interrogatory as follows:

Plaintiff Hirsch's account was opened on October 25, 2010 at Citibank's branch in Great Neck, New York by Michael Ashley. The Manager of the Great Neck branch at the time Plaintiff Hirsch's account was opened was George Lotto.

Plaintiff Romanov's account was opened on October 25, 2010 at Citibank's branch in Marina Del Rey, California by Fazri Zubair. The Manager of the Marina Del Rey branch at the time Plaintiff Romanov's account was opened was Fabiola Diaz.

-4-

<u>Interrogatory No. 2</u>

State whether there is a document showing receipt by Plaintiffs of Citibank's Client Manual. If the answer to the above is in the affirmative, annex a copy or copies of said document(s) together with the response.

<u>Response No. 2</u>

In addition to the General Objections, Citibank objects to this Interrogatory on the grounds, among others, that: (i) it is vague and ambiguous, including as to the term "showing receipt"; and (ii) it seeks information that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence in this action. Citibank further objects to this Interrogatory on the grounds that discovery is ongoing.

Subject to, and without waiving the foregoing objections, Citibank responds to this Interrogatory as follows: At the time Plaintiffs opened their accounts and received the Client Manual, they each executed a signature card acknowledging that they would "be bound by any agreement governing any account opened in the title indicated on this card." <u>See</u> CITI-0000078 and CITI-0000080.

<u>Interrogatory No. 3</u>

State the name of each state in which Citibank has provided customers with airline miles in connection with an American Airline Miles Offers and issued a Form 1099 for the receipt of said airline miles, and state the number of consumers in each state that received said airline miles.

Response No. 3

      In addition to the General Objections, Citibank objects to this Interrogatory on the grounds that it exceeds the scope of permissible discovery. Citibank further objects to this Interrogatory on the grounds, among others, that: (i) it is overbroad, unduly burdensome and harassing; (ii) it is vague and ambiguous; (iii) it is compound and/or has subparts; and (iv) it seeks information that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence in this action.

Interrogatory No. 4

      State whether Citibank received advice from an attorney, CPA, accountant, or any other advisor, that airline miles issues in connection with any American Airline Miles Offers should or must be reported to the IRS as income received by the recipient of said airline miles. If the answer to the above is in the affirmative in whole or in part, set forth a copy or copies of any and all documents to the effect that issues miles constitute income as defined in the IRS rules and regulations.

Response No. 4

      In addition to the General Objections, Citibank objects to this Interrogatory on the grounds that it exceeds the scope of permissible discovery. Citibank further objects to this Interrogatory on the grounds, among others, that: (i) it is vague and ambiguous; (ii) it is compound and/or has subparts; (iii) it seeks information that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence in this action; and (iv) it seeks information protected from disclosure by the attorney-client privilege and/or work product doctrines.

Interrogatory No. 5

State the value, methodology, and determination that Citibank uses to pay American Airlines for airline miles to be distributed to customers in connection with an American Airline Miles Offer.

Response No. 5

In addition to the General Objections, Citibank objects to this Interrogatory on the grounds that it exceeds the scope of permissible discovery. Citibank further objects to this Interrogatory on the grounds, among others, that: (i) it is overbroad and unduly burdensome; (ii) it is vague and ambiguous; (iii) it seeks information that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence in this action; and (iv) it seeks confidential and proprietary business information belonging to Citibank.

Interrogatory No. 6

State whether the IRS issued any ruling prior to or during the relevant class period to the effect that issued miles constitute income under Federal Law. If the answer is in the affirmative, set forth a copy or copies of said alleged ruling together with the response.

Response No. 6

In addition to the General Objections, Citibank objects to this Interrogatory on the grounds that it exceeds the scope of permissible discovery. Citibank further objects to this Interrogatory on the grounds, among others, that: (i) it is vague and ambiguous; and (ii) it seeks information that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence in this action.

Interrogatory No. 7

State how Citibank determined that the value of American Airline miles issued to Plaintiffs were 2.5 cents per mile, setting forth any and all methodology and determination of said value, and all documents in support of said determination.

Response No. 7

In addition to the General Objections, Citibank objects to this Interrogatory on the grounds that it exceeds the scope of permissible discovery. Citibank further objects to this Interrogatory on the grounds, among others, that: (i) it is overbroad, unduly burdensome and harassing; (ii) it is vague and ambiguous; (iii) it is compound and/or has subparts; (iv) it seeks information that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence in this action; and (v) it seeks confidential and proprietary business information belonging to Citibank.

Interrogatory No. 8

State the names, addresses and job titles of alleged Citibank personnel (or third persons or parties) who or which composed or crafted and Client Manuals allegedly utilized in the Citibank offer as stated in the Complaint, identifying when said Client Manuals were composed, crafted, printed and allegedly distributed to Plaintiffs and putative class members.

Response No. 8

Citibank objects to this Interrogatory on the grounds, among others, that: (i) it is overbroad, unduly burdensome and harassing; (ii) it is vague, ambiguous and unintelligible, including as to the terms "composed," "crafted" and "Citibank offer"; (iii) it is compound and/or has subparts; (iv) it seeks information that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence in this action.

Subject to, and without waiving the foregoing objections, Citibank responds to this Interrogatory as follows:   The version of the Client Manual governing Plaintiffs' accounts with Citibank was:  (i) created June 2010; (ii) effective July 1, 2010; and (iii) was provided to Plaintiffs at the time they opened their accounts in October 2010 pursuant to Citibank's regular practices and procedures in place at that time.  The Declaration of Joan Haslam, dated March 14, 2012, submitted in support of Citibank's Motion to Compel Arbitration, inadvertently referenced an earlier version of the Client Manual effective January 1, 2010.  The "Resolution of Disputes by Arbitration" sections in both versions of the Client Manual are identical.  The Client Manual effective July 1, 2010 is attached to these Responses as Exhibit A.

Interrogatory No. 9

State the number of Client Manuals composed and crafted, and/or printed and allegedly distributed during the relevant time period (or prior thereto) to Plaintiffs.  If the answer is in the affirmative, state what record or proof exists that Citibank maintains of said composition, crafting, printing and/or distribution to Plaintiffs and the acknowledgement of receipt of Client Manuals by said Plaintiffs.

Response No. 9

In addition to the General Objections, Citibank objects to this Interrogatory on the grounds, among others, that: (i)  it is overbroad, unduly burdensome and harassing; (ii) it is vague, ambiguous and unintelligible, including as to the terms "composed" and "crafted"; (iii) it is compound and/or has subparts; (iv) it seeks information that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence in this action.

Subject to, and without waiving the foregoing objections, Citibank responds to this Interrogatory as follows:  Plaintiffs received a Client Manual and Marketplace Addendum at the

-9-

time they opened their accounts in October 2010 pursuant to Citibank's regular practices and procedures in place at that time. When Plaintiffs received the Client Manual and Marketplace Addendum, they each executed a signature card acknowledging that they would "be bound by any agreement governing any account opened in the title indicated on this card." A copy of the Marketplace Addendum provided to Plaintiff Hirsch when he opened his account is attached to these Responses as Exhibit B. A copy of the Marketplace Addendum provided to Plaintiff Romanov when he opened his account is attached to these Responses as Exhibit C.

<u>Interrogatory No. 10</u>

State whether Citibank had any written sales manual, policy or procedure guide or any other literature provided to Citibank personnel for use and utilization for the promotional offer(s) described in the Complaint herein which contained a requirement that a new customer pursuant to the promotional offer(s) must receive and acknowledge receipt of the alleged Client Manual. If the answer is in the affirmative, set forth a copy or copies thereof together with the response herein.

<u>Response No. 10</u>

In addition to the General Objections, Citibank objects to this Interrogatory on the grounds, among others, that: (i) it is overbroad, unduly burdensome and harassing; (ii) it is vague, ambiguous and unintelligible, including as to the term "use and utilization for the promotional offer(s)"; (iii) it is compound and/or has subparts; (iv) it seeks information that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence in this action.

Subject to, and without waiving the foregoing objections, Citibank responds to this Interrogatory as follows: Pursuant to Citibank's regular practices and procedures, all customers

-10-

opening a new deposit account at a Citibank branch, regardless of whether the account was or is opened pursuant to a "promotional offer," are provided with a copy of the Client Manual and Marketplace Addendum at the time the account is opened.  <u>See also</u> CITI-0000119 and CITI-0000133.

<u>Interrogatory No. 11</u>

State who was the principal Citibank person and/or Administrator of the promotional offer(s) described in the Complaint herein, identifying his/her address, job title and job description.

<u>Response No. 11</u>

In addition to the General Objections, Citibank objects to this Interrogatory on the grounds that it exceeds the scope of permissible discovery.  Citibank further objects to this Interrogatory on the grounds, among others, that:  (i)  it is overbroad, unduly burdensome and harassing; (ii) it is vague and ambiguous; and (iii) it seeks information that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence in this action; and (v) it seeks confidential and proprietary business information belonging to Citibank.

Dated:  New York, New York
        December 23, 2013

STROOCK & STROOCK & LAVAN LLP

By: _____
    Joseph E. Strauss
180 Maiden Lane
New York, New York 10038-4982
212-806-5400
jstrauss@stroock.com

Julia B. Strickland, Esq.
Stroock & Stroock & Lavan LLP
2029 Century Park East
Los Angeles, CA 90067-3086
310-556-5800
lacalendar@stroock.com

*Attorneys for Defendant Citibank, N.A.*

-12-

**JA 261**

## VERIFICATION

I, Nancy Lewis, state under penalty of perjury that: I am presently a Senior Vice President in Operations for Citibank, N.A. ("Citibank"). I am authorized to sign these responses on behalf of Citibank. The foregoing responses to interrogatories were propounded with the assistance and advice of counsel and employees of Citibank; the responses have been made upon information from records of Citibank that are believed to be accurate; Citibank reserves the right to make any changes in the responses if it appears at any time that omissions or errors have been made therein and more accurate information is available; and that, subject to the limitations set forth herein, these responses are true to the best of my knowledge, information and belief.

Signed under the penalty of perjury this _23_ day of December, 2013.


_____
Nancy Lewis

Exhibit A


**Exhibit A -- Client Manual – Consumer Accounts (effective July 1, 2010)**
**[See pp. JA 412 - JA 440 ]**

Exhibit B

**Exhibit B -- Marketplace Addendum – New York (effective July 2010)**
**[See pp. JA 441 - JA 466 ]**

Exhibit C

**Exhibit C -- Marketplace Addendum – California and Nevada**
**(effective July 2010)**
**[See pp. JA 467 - JA 491 ]**